RON BENDER (SBN 143364)
TODD M. ARNOLD (SBN 221868)
JOHN-PATRICK M. FRITZ (SBN 245240)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbrb.com, tma@lnbrb.com, jpf@lnbrb.com

Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### (SANTA ANA DIVISION)

| | |
|---|---|
| In re:<br><br>LIFEMASTERS SUPPORTED SELFCARE, INC., a California corporation,<br><br>        Debtor. | ) Case No. 8:09-bk-19722-ES<br>)<br>) Chapter 11<br>)<br>)<br>) **APPLICATION OF DEBTOR AND**<br>) **DEBTOR IN POSSESSION TO EMPLOY**<br>) **ALVAREZ & MARSAL HEALTHCARE**<br>) **INDUSTRY GROUP, LLC AS CRISIS**<br>) **MANAGERS PURSUANT TO 11 U.S.C.**<br>) **§ 328; DECLARATION OF GEORGE D.**<br>) **PILLARI IN SUPPORT THEREOF**<br>)<br>) [No Hearing Required – Local<br>) Bankruptcy Rule 2014-1(b)]<br>)<br>)<br>) |

1   LifeMasters Supported SelfCare, Inc., the Chapter 11 debtor
2   and debtor in possession herein (the "Debtor"), hereby submits
3   this application (the "Application") for Court approval of its
4   employment of Alvarez & Marsal Healthcare Industry Group, LLC
5   ("A&M") as crisis managers pursuant to 11 U.S.C. § 328 and upon
6   the terms and conditions described below.  In support of this
7   Application, the Debtor respectfully represents as follows:

A.   Case Background

1.   The Debtor commenced its bankruptcy case by filing a
voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq.
(the "Bankruptcy Code") on September 14, 2009 (the "Petition
Date").   The Debtor continues to operate its business, manage
its financial affairs and operate its bankruptcy estate as a
debtor in possession pursuant to Sections 1107 and 1108 of the
Bankruptcy Code.

2.   The Debtor is a privately held company which was
founded in 1994.  The Debtor is headquartered in Irvine,
California, and also has offices located in Cupertino,
California, South San Francisco, California, Rancho Cordova,
California, Albuquerque, New Mexico, Indianapolis, Indiana, and
San Antonio, Texas.

3.   The Debtor had total revenue in 2008 of approximately
$80 million.  With the exception of certain equipment lessors
and sellers, the Debtor does not have any known secured
creditors.  The Debtor is not aware of any entity that asserts a

1 lien against the Debtor's cash collateral. The Debtor currently
2 has approximately 250 employees. Additional information about
3 the Debtor can be obtained at the Debtor's website -
4 www.lifemasters.com.

5 4. The Debtor is a national disease management company
6 whose mission is to help its many thousands of participants
7 achieve and maintain optimal health by closing the gaps in
8 medical care and encourage the adoption of healthy lifestyles.
9 With more than a decade of experience, the Debtor is an expert
10 at delivering disease management services to individuals with
11 chronic diseases such as diabetes, cardiovascular disease,
12 respiratory disease, musculoskeletal conditions and their co-
13 morbidities.
14

15 5. The Debtor's health professionals coach and educate
16 participants over the phone, teach them how to monitor their
17 vital signs and symptoms, and ultimately take more
18 responsibility for their health. The Debtor involves the
19 participant's physicians by providing them with relevant medical
20 information between office visits to prevent unnecessary
21 complications. This often results in participants establishing
22 a better relationship with their physicians and can help them
23 avoid unnecessary hospitalizations and emergency room visits,
24 reducing total costs to payors.
25

26 6. The Debtor has worked with, and continues to work
27 with, some of the nation's leading health plans, employers,

28
3

retirement systems and governmental organizations, which purchase the Debtor's services in an effort to reduce costs and enhance care. Historically, approximately 30% of the Debtor's gross revenue has been derived from its contracts with the Center for Medicare and Medicaid Services ("CMS"), which administers a number of Medicare and Medicaid programs. In or about October, 2006, the Debtor requested early termination of one of its contracts with CMS due to a range of significant program problems and irregularities, rendering it impossible for the Debtor to satisfy the financial risk terms of the cooperative agreements. In or about June, 2009, CMS cancelled a different contract with the Debtor for a demonstration program involving participants located in Florida. In conjunction with canceling the foregoing contracts, CMS has asserted claims to recover all amounts previously paid to the Debtor, which amounts to an aggregate of approximately $106 million.

7. As a result of the forgoing loss of revenue from CMS and claim by CMS resulting from the termination of the CMS contracts, coupled with various other financial issues facing the Debtor, the Debtor elected to commence a Chapter 11 bankruptcy case in an effort to reorganize.

B. The Debtor's Pre-Petition Engagement of A&M

8. Beginning on June 10, 2009 and continuing through the Petition Date, A&M served as the restructuring advisors to the Debtor. During this period, several professionals of A&M,

4

including George Pillari and Brian Buchanan, devoted substantial amounts of time and effort working with the Debtor's senior management to, among other things, assist in the development of projections, assist in cash management activities, assist in the preparation of a liquidation analysis, assist in the development and implementation of a business plan, and assist in the scale down of the Debtor's business operations and labor force given the termination of the CMS contracts. In addition to the foregoing, A&M advised the Debtor's Board of Directors and coordinated the Debtor's efforts to prepare for a chapter 11 bankruptcy filing.

C.    The Debtor's Post-Petition Engagement of A&M

9.    On the Petition Date, the Debtor entered into a new engagement agreement with A&M to provide for the Debtor's post-petition retention of A&M (the "Engagement Agreement"). A copy of the Engagement Agreement is attached as Exhibit "A" to the annexed Declaration of George D. Pillari (the "Pillari Declaration").

10.    Pursuant to the Engagement Agreement, A&M will make available to the Debtor George Pillari to serve as the Debtor's President and Brian Buchanan to serve as the Debtor's Chief Financial Officer. In addition, upon the mutual agreement of A&M and the Debtor, A&M shall make available to the Debtor such additional personnel as are necessary to assist A&M in the

performance of its duties. (See paragraph 1 of the Engagement Agreement).

11. Mr. Pillari and Mr. Buchanan, together with any additional personnel provided by A&M, shall, among other things,

i. perform a financial review of the Debtor's business, including, but not limited to, a review and assessment of financial information that has been, and that will be, provided by the Debtor to its creditors, including short-term and long-term cash flow projections;

ii. assist in the identification of cost reductions and operations improvement opportunities;

iii. develop for the review by the Debtor's Board of Directors possible restructuring plans or strategic alternatives for maximizing the enterprise value of the Debtor's various business lines;

iv. serve as the principal contact with the Debtor's creditors with respect to the Debtor's financial and operational matters;

v. work with members of the Debtor's senior management to assist the Debtor in effectuating a smooth transition into Chapter 11, including assisting the Debtor and its counsel to prepare motions, schedules, statements of financial affairs and monthly operating reports and facilitating the delivery of financial information to a Creditors' Committee and other parties in interest;

6

vi. assist the Debtor to analyze its business and exit strategies, prepare cash flow projections and other necessary financial and pro forma data, and formulate and prepare a reorganization plan; and

vii. perform such other services as are reasonably requested or directed by the Debtor's Board of Directors and agreed to by A&M.

12. Mr. Pillari, Mr. Buchanan and other A&M personnel utilized by the Debtor shall continue to be employed by A&M and while rendering services to the Debtor will continue to work with other personnel at A&M in connection with other unrelated matters, which will not unduly interfere with their services provided pursuant to the Engagement Agreement. With respect to the Debtor, Mr. Pillari, Mr. Buchanan and other A&M personnel utilized by the Debtor shall operate under the direction of the Debtor's Board of Directors.

13. The Debtor selected A&M (and in particular Mr. Pillari and Mr. Buchanan) to serve as crisis managers because of A&M's extensive experience providing financial advisory, crisis management and restructuring services in Chapter 11 reorganization proceedings and its excellent reputation for the services it has rendered in numerous Chapter 11 bankruptcy cases on behalf of debtors and creditors throughout the United States. Moreover, the Debtor selected A&M (and in particular Mr. Pillari and Mr. Buchanan) to serve as crisis managers because of the in-

depth knowledge and familiarity that A&M had garnered regarding the Debtor and its business operations during the period leading up to the Petition Date, and the belief that by continuing the existing relationship with A&M, rather than retaining a new crisis manager, the Debtor could minimize any disruption to its restructuring efforts.

D.    The Debtor's Immediate Need to Employ A&M

14.    The Debtor has an immediate need to employ A&M for a number of reasons, including (i) that two of A&M's employees (Mr. Pillari and Mr. Buchanan) will be serving as the Debtor's President and Chief Financial Officer from the outset of this bankruptcy case, and (ii) the fact that the Debtor expects this case to evolve rapidly and, therefore, the continuing services of A&M are critical to avoid delay in the administration of this case and to enable the Debtor to meet the demands of this case from the outset.

15.    Given that A&M worked closely with the Debtor's senior management and Board of Directors prior to the Petition Date to understand the Debtor's business model, to assist the Debtor in the preparation of updated cash flow projections, and to address other financial and operational issues facing the Debtor, A&M became thoroughly familiar with the Debtor's operations and is well positioned to support the Debtor's crisis manager needs in a timely and efficient manner.

8

E.   The Qualifications of A&M

16.   A&M is part of a turnaround management consulting firm which was founded in 1983 to provide specialized debtor management and advisory services to troubled companies.  The firm has since grown to become a global provider of management and advisory services to companies in crisis or those in need of performance improvement in specific financial and operational areas.   A&M's core services include Turnaround Management Consulting, Interim and Crisis Management, Creditor Advisory, and Performance Improvement in the healthcare industry.  A&M has provided interim management services in a number of large and mid-size bankruptcy restructurings throughout the United States.

17.   Mr. Pillari is a Managing Director of A&M.   Mr. Pillari has extensive experience in serving as a turnaround consultant and financial advisor, with a particular expertise in the health care area.  Mr. Pillari has substantial knowledge and experience serving in senior management positions and as a restructuring advisor.   In these capacities, Mr. Pillari has assisted troubled companies with stabilizing their financial condition, analyzing their operations and developing an appropriate business plan to accomplish the necessary restructuring of their operations and finances.  A copy of Mr. Pillari's curriculum vitae is attached as Exhibit "B" to his annexed Declaration.

F.   The Terms of the Debtor's Employment of A&M

18.   Pursuant to the terms of the Engagement Agreement (see paragraph 2), for the services of providing the Debtor with Mr. Pillari as President, Mr. Buchanan as Chief Financial Officer and such other personnel as A&M provides, A&M will be paid by the Debtor at the flat rate of $120,000 per month.   Such rates shall be subject to adjustment annually at such time as A&M adjusts its rates generally.

19.   In addition, the Debtor will reimburse A&M for its reasonable out-of-pocket expenses incurred in connection with this assignment, such as travel, lodging, duplicating, computer research, messenger and telephone charges.   In addition, the Debtor will reimburse A&M for the reasonable fees and expenses of its counsel incurred in connection with the preparation, negotiation, enforcement and approval of the Engagement Agreement.   All fees and expenses due to A&M will be billed on a semi-monthly basis or, at A&M's discretion, more frequently.

20.   The Debtor previously remitted to A&M a pre-petition retainer in the amount of $187,500, which A&M shall credit against any amounts due at the termination of the Engagement Agreement and return to the Debtor upon the satisfaction of all obligations under the Engagement Agreement.

21.   A&M was paid the total sum of $333,391.44 by the Debtor prior to the Petition Date for pre-petition services rendered by A&M to the Debtor (which was exclusive of the

10

$187,500 retainer described above). The Debtor advised A&M that the source of these payments was the Debtor's funds.

22. The Engagement Agreement may be terminated by either the Debtor or A&M without cause by giving 30 days' written notice to the other party.

23. Because A&M is being employed under Section 328 of the Bankruptcy Code on a flat fee basis, A&M will not be maintaining time sheets, and A&M will not be filing quarterly fee applications.

24. A&M and the Debtor believe that the terms of the Engagement Agreement are reasonable and appropriate for a case of this size and complexity, taking into account A&M's substantial experience, skill level and expertise.

25. Pursuant to paragraph 9 of the Engagement Agreement and the Indemnification Agreement which is made a part thereof and which is attached hereto (the "Indemnification Agreement"), the Debtor has agreed to indemnify (a) Mr. Pillari, Mr. Buchanan and other A&M personnel working for the Debtor on the most favorable terms provided to the Debtor's other officers and directors, and (b) A&M and certain related parties pursuant to the terms of the Indemnification Agreement. The Debtor has agreed further that the Mr. Pillari and Mr. Buchanan will be covered as officers under the Debtor's existing director and officer liability insurance policies.

26. The Debtor and A&M reserve the right to seek, pursuant to Court order, to alter the financial terms of the Debtor's employment of A&M in the future (pursuant to the mutual consent of the Debtor and A&M) in the event that A&M's role in this case changes or expands, including in regards to any plan of reorganization, funding or financing, or sale of the company.

G. Disinterestedness.

27. Even though A&M is not being retained as a professional under section 327(a) of the Bankruptcy Code, A&M performed a conflicts check in connection with its initial engagement with the Debtor. That conflicts check revealed that except as set forth in the Pillari Declaration, A&M (a) has no connection with the Debtor, its creditors or other parties in interest in the Debtor's Chapter 11 Case, (b) does not hold any interest adverse to the Debtor's estate and (c) believes that at the time of the Debtor's Chapter 11 filing, it was "disinterested" as defined by section 101(14) of the Bankruptcy Code.

28. If any new material facts or relationships are discovered or arise, A&M will provide the Court with a supplemental declaration. A&M has agreed not to share with any person or firm the compensation to be paid for professional services rendered in connection with this Chapter 11 Case.

H. Miscellaneous Matters

29. A&M has not received any lien or other interest in

12

1 property of the Debtor or of a third party to secure payment of
2 A&M's fees or expenses.

3    30.  A&M has not shared or agreed to share its compensation
4 for representing the Debtor with any other person or entity,
5 except among its members.

6    31.  A&M understands the provisions of 11 U.S.C. Sections
7 328, 330 and 331 which require, among other things, Court
8 approval of the Debtor's employment of A&M and of all fees and
9 reimbursement of expenses that A&M will receive from the Debtor
10
11 and the Debtor's estate.

12    32.  At the time of the Debtor's Chapter 11 filing, A&M was
13 not a creditor, an equity security holder or an insider of the
14 Debtor.

15    33.  A&M does not have any previous connection with any
16 insider of the Debtor or any insider of an insider of the
17 Debtor.

18    34.  A&M is not and was not an investment banker for any
19 outstanding security of the Debtor.  A&M has not been within
20 three years before the Petition Date an investment banker for a
21 security of the Debtor, or an attorney for such an investment
22
23 banker in connection with the offer, sale or issuance of any
24 security of the Debtor.

25    35.  Neither A&M nor any member of A&M is, nor was, either
26 at the time of the Debtor's Chapter 11 filing or within two
27 years before the Petition Date, a director, officer or employee

28
                              13

1  of the Debtor or of any investment banker for any security of
2  the Debtor.

3   36.  As set forth in the annexed Pillari Declaration, to
4  the best of A&M's knowledge, A&M does not hold or represent any
5  interest materially adverse to the interest of the estate or of
6  any class of creditors or equity security holders, by reason of
7  any direct or indirect relationship to, connection with, or
8  interest in, the Debtor or an investment banker for any security
9  of the Debtor, or for any other reason.
10

11   37.  As set forth in the annexed Pillari Declaration, to
12  the best of A&M's knowledge, A&M does not hold or represent any
13  interest materially adverse to the Debtor or the Debtor's
14  estate, and at the time of the Debtor's Chapter 11 filing, A&M
15  was a "disinterested person" as that term is defined in Section
16  101(14) of the Bankruptcy Code.  Also, to the best of A&M's
17  knowledge, except as set forth in the Pillari Declaration, A&M
18  has no prior connection with the Debtor, any significant
19  creditors of the Debtor or its estate, or any other party in
20  interest in this case made known to A&M by the Debtor, or such
21  party's respective attorneys or accountants, the United States
22  Trustee or any person employed by the United States Trustee.  If
23  any new material facts or relationships arise or are discovered
24  by A&M, A&M will file a supplemental declaration with the Court
25  disclosing such facts or relationships.
26

27

28
                                14

1    38.  The Debtor believes that its employment of A&M upon

2  the terms and conditions set forth above is in the best interest

3  of the Debtor's estate.

4      **WHEREFORE**, the Debtor respectfully requests that the Court

5  approve the Debtor's employment of A&M as its crisis managers

6  upon the terms and conditions set forth above.

7  Dated: September 14, 2009      LIFEMASTERS   SUPPORTED   SELFCARE,
8                                 INC.,

9
                                    See Attached
10                                  _____
                                    Arthur H. Spiegel, III
11                                  Chairman of the Board

12  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.

13

14

15  By: _____
       RON BENDER
16     TODD M. ARNOLD
       JOHN-PATRICK M. FRITZ
17     LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
       Proposed Attorneys for Chapter 11
18     Debtor and Debtor in Possession

19

20

21

22

23

24

25

26

27

28
                                    15

38. The Debtor believes that its employment of A&M upon the terms and conditions set forth above is in the best interest of the Debtor's estate.

**WHEREFORE**, the Debtor respectfully requests that the Court approve the Debtor's employment of A&M as its crisis managers upon the terms and conditions set forth above.

Dated: September 14, 2009    LIFEMASTERS SUPPORTED SELFCARE, INC.,

Arthur H. Spiegel, III
Chairman of the Board

LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.

By:_____
RON BENDER
TODD M. ARNOLD
JOHN-PATRICK M. FRITZ
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
Proposed Attorneys for Chapter 11
Debtor and Debtor in Possession

## DECLARATION OF GEORGE D. PILLARI

I, GEORGE D. PILLARI, HEREBY DECLARE AS FOLLOWS:

1.    Either I have personal knowledge of the facts set forth below or a different professional at A&M has personal knowledge of such facts and has provided that information to me. If called to testify, I would and could competently testify thereto.

2.    I am a Managing Director of Alvarez & Marsal Healthcare Industry Group, LLC ("A&M").

3.    LifeMasters Supported SelfCare, Inc., Chapter 11 debtor and debtor in possession herein (the "Debtor"), commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code on September 14, 2009 (the "Petition Date").    The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession.

4.    The Debtor has requested A&M to serve as crisis managers for the Debtor.

5.    Beginning on June 10, 2009 and continuing through the Petition Date, A&M served as the restructuring advisers to the Debtor.    During this period, several professionals of A&M, including Brian Buchanan and me, devoted substantial amounts of time and effort working with the Debtor's senior management to, among other things, assist in the development of projections, assist in cash management activities, assist in the preparation

of a liquidation analysis, assist in the development and implementation of a business plan, and assist in the scale down of the Debtor's business operations and labor force given the termination of the CMS contracts. In addition to the foregoing, A&M advised the Debtor's Board of Directors and coordinated the Debtor's efforts to prepare for a chapter 11 bankruptcy filing.

6. On the Petition Date, the Debtor entered into a new engagement agreement with A&M to provide for the Debtor's post-petition retention of A&M (the "Engagement Agreement"). A copy of the Engagement Agreement is attached hereto as Exhibit "A".

7. Pursuant to the Engagement Agreement, A&M will make me available to the Debtor to serve as the Debtor's President and Brian Buchanan to serve as the Debtor's Chief Financial Officer. In addition, upon the mutual agreement of A&M and the Debtor, A&M shall make available to the Debtor such additional personnel as are necessary to assist A&M in the performance of its duties. (See paragraph 1 of the Engagement Agreement).

8. Mr. Buchanan and I, together with any additional personnel provided by A&M, shall, among other things,

i. perform a financial review of the Debtor's business, including, but not limited to, a review and assessment of financial information that has been, and that will be, provided by the Debtor to its creditors, including short-term and long-term cash flow projections;

17

1  ii. assist in the identification of cost reductions and
2  operations improvement opportunities;

3  iii. develop for the review by the Debtor's Board of
4  Directors possible restructuring plans or strategic alternatives
5  for maximizing the enterprise value of the Debtor's various
6  business lines;

7  iv. serve as the principal contact with the Debtor's
8  creditors with respect to the Debtor's financial and operational
9  matters;
10

11  v. work with members of the Debtor's senior management to
12  assist the Debtor in effectuating a smooth transition into
13  Chapter 11, including assisting the Debtor and its counsel to
14  prepare motions, schedules, statements of financial affairs and
15  monthly operating reports and facilitating the delivery of
16  financial information to a Creditors' Committee and other
17  parties in interest;

18  vi. assist the Debtor to analyze its business and exit
19  strategies, prepare cash flow projections and other necessary
20  financial and pro forma data, and formulate and prepare a
21  reorganization plan; and

22  vii. perform such other services as are reasonably
23  requested or directed by the Debtor's Board of Directors and
24  agreed to by A&M.
25

26  9.    Mr. Buchanan and I, along with the other A&M personnel
27  utilized by the Debtor, shall continue to be employed by A&M and

28

1 while rendering services to the Debtor will continue to work
2 with other personnel at A&M in connection with other unrelated
3 matters, which will not unduly interfere with their services
4 provided pursuant to the Engagement Agreement. With respect to
5 the Debtor, we will operate under the direction of the Debtor's
6 Board of Directors.

7 10. Given that A&M worked closely with the Debtor's senior
8 management and Board of Directors prior to the Petition Date to
9 understand the Debtor's business model, to assist the Debtor in
10 the preparation of updated cash flow projections, and to address
11 other financial and operational issues facing the Debtor, A&M
12 became thoroughly familiar with the Debtor's operations and is
13 well positioned to support the Debtor's crisis manager needs in
14 a timely and efficient manner.

16 11. A&M is part of a turnaround management consulting firm
17 which was founded in 1983 to provide specialized debtor
18 management and advisory services to troubled companies. The
19 firm has since grown to become a global provider of management
20 and advisory services to companies in crisis or those in need of
21 performance improvement in specific financial and operational
22 areas. A&M's core services include Turnaround Management
23 Consulting, Interim and Crisis Management, Creditor Advisory,
24 and Performance Improvement in the healthcare industry. A&M has
25 provided interim management services in a number of large and
27 mid-size bankruptcy restructurings through the United States.

19

12. I have extensive experience in serving as a turnaround consultant and financial advisor, with a particular expertise in the health care area. I have substantial knowledge and experience serving in senior management positions and as a restructuring advisor. In these capacities, I have assisted troubled companies with stabilizing their financial condition, analyzing their operations and developing appropriate business plans to accomplish the necessary restructuring of their operations and finances. A copy of my curriculum vitae is attached hereto as Exhibit "B".

13. Pursuant to the terms of the Engagement Agreement (see paragraph 2), for the services of providing the Debtor with me as President, Mr. Buchanan as Chief Financial Officer and such other personnel as A&M provides, A&M will be paid by the Debtor at the flat rate of $120,000 per month. Such rates shall be subject to adjustment annually at such time as A&M adjusts its rates generally.

14. In addition, the Debtor will reimburse A&M for its reasonable out-of-pocket expenses incurred in connection with this assignment, such as travel, lodging, duplicating, computer research, messenger and telephone charges. In addition, the Debtor will reimburse A&M for the reasonable fees and expenses of its counsel incurred in connection with the preparation, negotiation, enforcement and approval of the Engagement

1  Agreement. All fees and expenses due to A&M will be billed on a
2  semi-monthly basis or, at A&M's discretion, more frequently.

3  15. The Debtor previously remitted to A&M a pre-petition
4  retainer in the amount of $187,500, which A&M shall credit
5  against any amounts due at the termination of the Engagement
6  Agreement and return to the Debtor upon the satisfaction of all
7  obligations under the Engagement Agreement.
8
9  16. A&M was paid the total sum of $333,391.44 by the
10 Debtor prior to the Petition Date for pre-petition services
11 rendered by A&M to the Debtor (which was exclusive of the
12 $187,500 retainer described above). The Debtor advised A&M that
13 the source of these payments was the Debtor's funds.

14 17. The Engagement Agreement may be terminated by either
15 the Debtor or A&M without cause by giving 30 days' written
16 notice to the other party.

17 18. Because A&M is being employed under Section 328 of the
18 Bankruptcy Code on a flat fee basis, A&M will not be maintaining
19 time sheets, and A&M will not be filing quarterly fee
20 applications.

21 19. A&M believes that the terms of the Engagement
22 Agreement are reasonable and appropriate for a case of this size
23 and complexity, taking into account A&M's substantial
24 experience, skill level and expertise.
25
26 20. Pursuant to paragraph 9 of the Engagement Agreement
27 and the Indemnification Agreement which is made a part thereof

28
                                21

and which is attached hereto, the Debtor has agreed to indemnify (a) me, Mr. Buchanan and other A&M personnel working for the Debtor on the most favorable terms provided to the Debtor's other officers and directors, and (b) A&M and certain related parties pursuant to the terms of the Indemnification Agreement. The Debtor has agreed further that Mr. Buchanan and I will be covered as officers under the Debtor's existing director and officer liability insurance policies.

21. A&M reserves the right to seek, pursuant to Court order, to alter the financial terms of the Debtor's employment of A&M in the future (pursuant to the mutual consent of the Debtor and A&M) in the event that A&M's role in this case changes or expands, including in regards to any plan of reorganization, funding or financing, or sale of the company.

22. Even though A&M is not being retained as a professional under section 327(a) of the Bankruptcy Code, A&M performed a conflicts check in connection with the preparation of this Declaration. Such analysis consisted of a review of its and its affiliates (the "Firm"), contacts with the Debtor and certain entities holding large claims against or interests in the Debtor that were made reasonably known to A&M by the Debtor. A listing of the parties reviewed is reflected in Exhibit "C" to this Declaration. A&M's review included providing a list of such parties to all A&M employees worldwide and conducting a query of such parties in a database containing names of

individuals and entities that are represented by A&M. A summary of such relationships that A&M identified during this process is also set forth in Exhibit "C" to this Declaration. Based on the conflict check described above, except as otherwise provided herein, to the best of my knowledge, the Firm (a) has no connection with the Debtor, its creditors or other parties in interest in the Debtor's Chapter 11 Case, (b) does not hold any interest adverse to the Debtor's estate, and (c) believes that at the time of the Debtor's Chapter 11 filing, it was "disinterested" as defined by section 101(14) of the Bankruptcy Code.

23. Based on the results of its review, to the best of my knowledge, the Firm does not have a relationship with any of the parties listed in Exhibit "C" in matters related to these proceedings. The Firm has provided and could reasonably be expected to continue to provide services unrelated to the Debtor's case for the various entities shown on Exhibit "C". The Firm's assistance to these parties has been related to providing various financial restructuring, litigation support, business consulting and/or tax services. To the best of my knowledge, the Firm's involvement in the Debtor's Chapter 11 case does not compromise its ability to continue such consulting services.

24. Further, as part of its diverse practice, the Firm appears in numerous cases and proceedings, and participates in

transactions that involve many different professionals, including attorneys, accountants, and financial consultants, who represent claimants and parties-in-interest in the Debtor's Chapter 11 Case.

25. If any new material facts or relationships are discovered or arise, A&M will provide the Court with a supplemental declaration. A&M has agreed not to share with any person (other than its members) or other firm the compensation to be paid for professional services rendered in connection with the Debtor's Chapter 11 Case.

26. A&M has not received any lien or other interest in property of the Debtor or of a third party to secure payment of A&M's fees or expenses.

27. A&M understands the provisions of 11 U.S.C. Sections 328, 330 and 331 which require, among other things, Court approval of the Debtor's employment of A&M and of all fees and reimbursement of expenses that A&M will receive from the Debtor and the Debtor's estate.

28. At the time of the Debtor's Chapter 11 filing, A&M was not a creditor, an equity security holder or an insider of the Debtor.

29. A&M does not have any previous connection with any insider of the Debtor or any insider of an insider of the Debtor.

30.  A&M is not and was not an investment banker for any outstanding security of the Debtor.  A&M has not been within three years before the Petition Date an investment banker for a security of the Debtor, or an attorney for such an investment banker in connection with the offer, sale or issuance of any security of the Debtor.

31.  Neither A&M nor any member of A&M is, nor was, either at the time of the Debtor's Chapter 11 filing or within two years before the Petition Date, a director, officer or employee of the Debtor or of any investment banker for any security of the Debtor.

32.  To the best of my knowledge, A&M does not hold or represent any interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor or an investment banker for any security of the Debtor, or for any other reason.

33.  To the best of my knowledge, A&M does not hold or represent any interest materially adverse to the Debtor or the Debtor's estate, and, at the time of the Debtor's Chapter 11 filing, A&M was a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code.  Also, to the best of my knowledge, except as set forth herein, A&M has no prior connection with the Debtor, any significant creditors of the Debtor or its estate, or any other party in interest in this

case made known to A&M by the Debtor, or such party's respective attorneys or accountants, the United States Trustee or any person employed by the United States Trustee. If any new material facts or relationships arise or are discovered by A&M, A&M will file a supplemental declaration with the Court disclosing such facts or relationships.

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 14th day of September, 2009, at South San Francisco, California.

GEORGE D. PILLARI, Declarant

26

EXHIBIT "A"



ALVAREZ & MARSAL

September 14, 2009

Mr. Arthur Spiegel
Chairman of the Board
LifeMasters Supported SelfCare, Inc.
15635 Alton Parkway, Suite 400
Irvine, CA 92618

Dear Art:

This letter confirms and sets forth the terms and conditions of the engagement between Alvarez & Marsal Healthcare Industry Group, LLC ("A&M") and LifeMasters Supported SelfCare, Inc. (the "Company"), including the scope of the services to be performed and the basis of compensation for those services. Upon execution of this letter by each of the parties below and receipt of the retainer described below, this letter will constitute an agreement between the Company and A&M.

1.    Description of Services

    a.    Officers. In connection with this engagement, A&M shall make available to the Company:

        (i)    George Pillari to serve as the President and Brian Buchanan to serve as the Chief Financial Officer ("CFO"); and

        (ii)    Upon the mutual agreement of A&M and the Board of Directors of the Company (the "Board"), such additional personnel as are necessary to assist in the performance of the duties set forth in clause 1.b below (the "Additional Personnel"). Such Additional Personnel shall be designated by the Company as executive officers.

    b.    Duties.

        (i)    The President and CFO, together with any Additional Personnel, shall perform a financial review of the Company, including but not limited to a review and assessment of financial information that has been, and that will be, provided by the Company to its



EXHIBIT A

Alvarez & Marsal
Healthcare Industry Group, LLC

creditors, including without limitation its short and long-term projected cash flows;

(ii) The President, CFO and any Additional Personnel shall assist in the identification of cost reduction and operations improvement opportunities;

(iii) The President, CFO, and any Additional Personnel shall develop for the Board's review possible restructuring plans or strategic alternatives for maximizing the enterprise value of the Company's various business lines;

(iv) The President and CFO shall serve as the principal contact with the Company's creditors with respect to the Company's financial and operational matters; and

(v) The President, CFO and any Additional Personnel shall perform such other services as requested or directed by the Board and agreed to by such officer.

c. Reporting. The President shall report to the Board.

d. Employment by A&M. The President, CFO and any Additional Personnel will continue to be employed by A&M and while rendering services to the Company will continue to work with other personnel at A&M in connection with other unrelated matters, which will not unduly interfere with services pursuant to this engagement. With respect to the Company, however, the President, CFO and any Additional Personnel shall operate under the direction of the Board and A&M shall have no liability to the Company for any acts or omissions of such officers.

e. Projections; Reliance; Limitation of Duties. You understand that the services to be rendered by the President, CFO and any Additional Personnel may include the preparation of projections and other forward-looking statements, and that numerous factors can affect the actual results of the Company's operations, which may materially and adversely differ from those projections and other forward-looking statements. In addition, the President, CFO, and any Additional Personnel will be relying on information provided by other members of the Company's management in the preparation of those projections and other forward-looking statements. Neither the President, CFO, any Additional Personnel nor A&M makes

any representation or guarantee that an appropriate restructuring proposal or strategic alternative can be formulated for the Company, that any restructuring proposal or strategic alternative presented to the Board will be more successful than all other possible restructuring proposals or strategic alternatives, that restructuring is the best course of action for the Company or, if formulated, that any proposed restructuring plan or strategic alternative will be accepted by any of the Company's creditors, shareholders and other constituents. Further, neither the President, CFO, any Additional Personnel nor A&M assumes responsibility for the selection of any restructuring proposal or strategic alternative that any such officer assists in formulating and presenting to the Board, and the President, CFO, and any Additional Personnel shall be responsible for implementation only of the proposal or alternative approved by the Board and only to the extent and in the manner authorized and directed by the Board.

f.   <u>Additional Responsibilities</u>.   Upon the mutual agreement of the Company and A&M, A&M may provide such additional personnel as the Company may request to assist in performing the services described above and such other services as may be agreed to, on such terms and conditions and for such compensation as the Company and A&M shall agree.

g.   In connection with the services to be provided hereunder, from time to time A&M may utilize the services of employees of its affiliates. Such affiliates are wholly owned by A&M's parent company and employees.

2.    <u>Compensation</u>

      a.    A&M will be paid by the Company for the services of the President, CFO, and any Additional Personnel at the flat rate of $120,000 per month. Such rates shall be subject to adjustment annually at such time as A&M adjusts its rates generally.

      b.    In addition, A&M will be reimbursed for its reasonable out-of-pocket expenses incurred in connection with this assignment, such as travel, lodging, duplicating, computer research, messenger and telephone charges. In addition, A&M shall be reimbursed by the Company for the reasonable fees and expenses of its counsel incurred in connection with preparation, negotiation, enforcement and approval of this Agreement. All fees and expenses due to A&M will be billed on a semi-monthly basis or, at A&M's discretion, more frequently.

      c.    The Company has previously remitted to A&M a retainer in the amount of $187,500, which shall be credited against any amounts due at the termination of this engagement and returned upon the satisfaction of all obligations hereunder.

3.    <u>Term</u>

The engagement will commence as of the date hereof and may be terminated by either party without cause by giving 30 days' written notice to the other party. A&M normally does not withdraw from an engagement unless the Company misrepresents or fails to disclose material facts, fails to pay fees or expenses, or makes it unethical or unreasonably difficult for A&M to continue to represent the Company, or unless other just cause exists. In the event of any such termination, any fees and expenses due to A&M shall be remitted promptly (including fees and expenses that accrued prior to but were invoiced subsequent to such termination). The Company may immediately terminate A&M's services hereunder at any time for Cause by giving written notice to A&M. Upon any such termination, the Company shall be relieved of all of its payment obligations under this Agreement, except for the payment of fees and expenses through the effective date of termination (including fees and expenses that accrued prior to but were invoiced subsequent to such termination) and its obligations under paragraphs 7 and 8. For purposes of this Agreement, "Cause" shall mean if (i) the President, CFO or any of the Additional Personnel is convicted of, admits guilt in a written document filed with a court of competent jurisdiction to, or enters a plea of nolo contendere

to, an allegation of fraud, embezzlement, misappropriation or any felony; (ii) the President, CFO or any of the Additional Personnel willfully disobeys a lawful direction of the Board; or (iii) a material breach of any of A&M's or the President, CFO or any of the Additional Personnel material obligations under this Agreement which is not cured within 30 days of the Company's written notice thereof to A&M describing in reasonable detail the nature of the alleged breach. For purposes of this Agreement, termination for "Good Reason" shall mean either its resignation caused by a breach by the Company of any of its material obligations under this Agreement that is not cured within 30 days of A&M having given written notice of such breach to the Company describing in reasonable detail the nature of the alleged breach or a filing of a petition under Chapter 11 of the United States Bankruptcy Code in respect of the Company unless within 45 days thereafter (or, if sooner, prior to the date on which a plan of reorganization is confirmed or the case is converted to one under Chapter 7), the Company has obtained judicial authorization to continue the engagement on the terms herein pursuant to an order which has become a final, nonappealable order.

4.   No Audit, Duty to Update.

It is understood that the President, CFO, any Additional Personnel and A&M are not being requested to perform an audit, review or compilation, or any other type of financial statement reporting engagement that is subject to the rules of the AICPA, SEC or other state or national professional or regulatory body. They are entitled to rely on the accuracy and validity of the data disclosed to them or supplied to them by employees and representatives of the Company. The President, CFO, any Additional Personnel, and A&M are under no obligation to update data submitted to them or review any other areas unless specifically requested by the Board to do so.

5.   No Third Party Beneficiary.

The Company acknowledges that all advice (written or oral) given by A&M to the Company in connection with this engagement is intended solely for the benefit and use of the Company (limited to its Board and management) in considering the matters to which this engagement relates. The Company agrees that no such advice shall be used for any other purpose or reproduced, disseminated, quoted or referred to at any time in any manner or for any purpose other than accomplishing the tasks referred to herein without A&M's prior approval (which shall not be unreasonably withheld), except as required by law.

6.    Conflicts.

A&M is not currently aware of any relationship that would create a conflict of interest with the Company or those parties-in-interest of which you have made us aware.  Because A&M is a consulting firm that serves clients on an international basis in numerous cases, both in and out of court, it is possible that A&M may have rendered or will render services to or have business associations with other entities or people which had or have or may have relationships with the Company, including creditors of the Company.  In the event you accept the terms of this engagement, A&M will not represent, and A&M has not represented, the interests of any such entities or people in connection with this matter.

7.    Confidentiality / Non-Solicitation.

The President, CFO, any Additional Personnel and A&M shall keep as confidential all non-public information received from the Company in conjunction with this engagement, except (i) as requested by the Company or its legal counsel; (ii) as required by legal proceedings or (iii) as reasonably required in the performance of this engagement.  All obligations as to non-disclosure shall cease as to any part of such information to the extent that such information is or becomes public other than as a result of a breach of this provision.  Except as specifically provided for in this letter, the Company on behalf of itself and its subsidiaries and affiliates and any person which may acquire all or substantially all of its assets agrees that, until two (2) years subsequent to the termination of this engagement, it will not solicit, recruit, hire or otherwise engage any employee of A&M who worked on this engagement while employed by A&M ("Solicited Person").  Should the Company or any of its subsidiaries or affiliates or any person who acquires all or substantially all of its assets extend an offer of employment to or otherwise engage any Solicited Person and should such offer be accepted, A&M shall be entitled to a fee from the party extending such offer equal to the Solicited Person's hourly client billing rate at the time of the offer multiplied by 4,000 hours for a Managing Director, 3,000 hours for a Senior Director and 2,000 hours for any other A&M employee.  The fee shall be payable at the time of the Solicited Person's acceptance of employment or engagement.

8.    Indemnification.

The Company shall indemnify the President, CFO, and all Additional Personnel to the same extent as the most favorable indemnification it extends to its officers or directors, whether under the Company's bylaws, its certificate of incorporation, by contract or otherwise, and no reduction or termination in any of the benefits provided under any such indemnities shall affect the benefits provided to the President, CFO, or Additional Personnel. The President, CFO, and each Additional Personnel shall be covered as an officer under the Company's existing director and officer liability insurance policy. As a condition of A&M accepting this engagement, a Certificate of Insurance evidencing such coverage shall be furnished to A&M prior to the effective date of this Agreement. The Company shall give thirty (30) days' prior written notice to A&M of cancellation, non-renewal, or material change in coverage, scope, or amount of such director and officer liability policy. The Company shall also maintain any such insurance coverage for the President, CFO, and each Additional Personnel for a period of not less than two years following the date of the termination of such officer's services hereunder. The provisions of this section 8 are in the nature of contractual obligations and no change in applicable law or the Company's charter, bylaws or other organizational documents or policies shall affect the President's, CFO's, or any Additional Personnel's rights hereunder. The attached indemnity provisions are incorporated herein and the termination of this agreement or the engagement shall not affect those provisions, which shall survive termination.

9.  Miscellaneous.

This Agreement shall (together with the attached indemnity provisions) be: (a) governed and construed in accordance with the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflict of laws thereof; (b) incorporates the entire understanding of the parties with respect to the subject matter thereof; and (c) may not be amended or modified except in writing executed by each of the signatories hereto. The Company and A&M agree to waive trial by jury in any action, proceeding or counterclaim brought by or on behalf of the parties hereto with respect to any matter relating to or arising out of the performance or non-performance of the Company or A&M hereunder. The Company and A&M agree that the Bankruptcy Court having jurisdiction over the Company's Chapter 11 case (or any case into which it may be converted) shall have exclusive jurisdiction over any and all matters arising under or in connection with their obligations hereunder. Notwithstanding anything herein to the contrary, A&M may reference or list the Company's name and/or a general description of the services in A&M's marketing materials, including, without limitation, on A&M's website.

If the foregoing is acceptable to you, kindly sign the enclosed copy to acknowledge your agreement with its terms.

Very truly yours,

Alvarez & Marsal Healthcare Industry Group, LLC

By: _____

George D. Pillari
Managing Director

Accepted and Agreed:

*LifeMasters Supported SelfCare, Inc.*

By: _____

Arthur Spiegel
Chairman of the Board

Attachment: Indemnity Agreement



If the foregoing is acceptable to you, kindly sign the enclosed copy to acknowledge your agreement with its terms.

Very truly yours,

Alvarez & Marsal Healthcare Industry Group, LLC

By: _____

George D. Pillari
Managing Director

Accepted and Agreed:

*LifeMasters Supported SelfCare, Inc.*

By: _____

Arthur Spiegel
Chairman of the Board

Attachment:  Indemnity Agreement

If the foregoing is acceptable to you, kindly sign the enclosed copy to acknowledge your agreement with its terms.

Very truly yours,

Alvarez & Marsal Healthcare Industry Group, LLC

By: _____

George D. Pillari
Managing Director

Accepted and Agreed:

*LifeMasters Supported SelfCare, Inc.*

By: _____

Arthur Spiegel
Chairman of the Board

Attachment: Indemnity Agreement

# INDEMNIFICATION AGREEMENT

This indemnity is made part of an agreement, dated September 14, 2009 (which together with any renewals, modifications or extensions thereof, is herein referred to as the "Agreement") by and between Alvarez & Marsal Healthcare Industry Group, LLC ("A&M") and LifeMasters Supported SelfCare, Inc. (the "Company"), for services to be rendered to the Company by A&M.

A.    The Company agrees to indemnify and hold harmless each of A&M, its affiliates and their respective shareholders, members, managers, employees, agents, representatives and subcontractors (each, an "Indemnified Party" and collectively, the "Indemnified Parties") against any and all losses, claims, damages, liabilities, penalties, obligations and expenses, including the costs for counsel or others (including employees of A&M, based on their then current hourly billing rates) in investigating, preparing or defending any action or claim, whether or not in connection with litigation in which any Indemnified Party is a party, or enforcing the Agreement (including these indemnity provisions), as and when incurred, caused by, relating to, based upon or arising out of (directly or indirectly) the Indemnified Parties' acceptance of or the performance or nonperformance of their obligations under the Agreement; provided, however, such indemnity shall not apply to any such loss, claim, damage, liability or expense to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from such Indemnified Party's gross negligence or willful misconduct.  The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with the engagement of A&M, except to the extent that any such liability for losses, claims, damages, liabilities or expenses are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from such Indemnified Party's gross negligence or willful misconduct.  The Company further agrees that it will not, without the prior consent of an Indemnified Party, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which such Indemnified Party seeks indemnification hereunder (whether or not such Indemnified Party is an actual party to such claim, action, suit or proceedings) unless such settlement, compromise or consent includes an unconditional release of such Indemnified Party from all liabilities arising out of such claim, action, suit or proceeding.

B.    These indemnification provisions shall be in addition to any liability which the Company may otherwise have to the Indemnified Parties. In the event that, at any time whether before or after termination of the engagement or the Agreement, as a result of or in connection with the Agreement or A&M's and its personnel's role under the Agreement, A&M or any Indemnified Party is required to produce any of its personnel (including former employees) for examination, deposition or other written, recorded or oral presentation, or A&M or any of its personnel (including former employees) or any other Indemnified Party is required to produce or otherwise review, compile, submit, duplicate, search for, organize or report on any material within such Indemnified Party's possession or control pursuant to a subpoena or other legal (including administrative) process, the Company will reimburse the Indemnified Party for its out of pocket expenses, including the reasonable fees and expenses of its counsel, and will compensate the

Indemnified Party for the time expended by its personnel based on such personnel's then current hourly rate.

C.      If any action, proceeding or investigation is commenced to which any Indemnified Party proposes to demand indemnification hereunder, such Indemnified Party will notify the Company with reasonable promptness; provided, however, that any failure by such Indemnified Party to notify the Company will not relieve the Company from its obligations hereunder, except to the extent that such failure shall have actually prejudiced the defense of such action.  The Company shall promptly pay expenses reasonably incurred by any Indemnified Party in defending, participating in, or settling any action, proceeding or investigation in which such Indemnified Party is a party or is threatened to be made a party or otherwise is participating in by reason of the engagement under the Agreement, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise.   Each Indemnified Party hereby undertakes, and the Company hereby accepts its undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified therefor.  If any such action, proceeding or investigation in which an Indemnified Party is a party is also against the Company, the Company may, in lieu of advancing the expenses of separate counsel for such Indemnified Party, provide such Indemnified Party with legal representation by the same counsel who represents the Company, provided such counsel is reasonably satisfactory to such Indemnified Party, at no cost to such Indemnified Party; provided, however, that if such counsel or counsel to the Indemnified Party shall determine that due to the existence of actual or potential conflicts of interest between such Indemnified Party and the Company such counsel is unable to represent both the Indemnified Party and the Company, then the Indemnified Party shall be entitled to use separate counsel of its own choice, and the Company shall promptly advance its reasonable expenses of such separate counsel upon submission of invoices therefor.  Nothing herein shall prevent an Indemnified Party from using separate counsel of its own choice at its own expense.  The Company will be liable for any settlement of any claim against an Indemnified Party made with the Company's written consent, which consent shall not be unreasonably withheld.

D.      In order to provide for just and equitable contribution if a claim for indemnification pursuant to these indemnification provisions is made but it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that such indemnification may not be enforced in such case, even though the express provisions hereof provide for indemnification, then the relative fault of the Company, on the one hand, and the Indemnified Parties, on the other hand, in connection with the statements, acts or omissions which resulted in the losses, claims, damages, liabilities and costs giving rise to the indemnification claim and other relevant equitable considerations shall be considered; and further provided that in no event will the Indemnified Parties' aggregate contribution for all losses, claims, damages, liabilities and expenses with respect to which contribution is available hereunder exceed the amount of fees actually received by the Indemnified Parties pursuant to the Agreement.  No person found liable for a fraudulent misrepresentation shall be entitled to contribution hereunder from any person who is not also found liable for such fraudulent misrepresentation.

E.     In the event the Company and A&M seek judicial approval for the assumption of the Agreement or authorization to enter into a new engagement agreement pursuant to either of which A&M would continue to be engaged by the Company, the Company shall promptly pay expenses reasonably incurred by the Indemnified Parties, including attorneys' fees and expenses, in connection with any motion, action or claim made either in support of or in opposition to any such retention or authorization, whether in advance of or following any judicial disposition of such motion, action or claim, promptly upon submission of invoices therefor and regardless of whether such retention or authorization is approved by any court.   The Company will also promptly pay the Indemnified Parties for any expenses reasonably incurred by them, including attorneys' fees and expenses, in seeking payment of all amounts owed it under the Agreement (or any new engagement agreement) whether through submission of a fee application or in any other manner, without offset, recoupment or counterclaim, whether as a secured claim, an administrative expense claim, an unsecured claim, a prepetition claim or a postpetition claim.


F.     Neither termination of the Agreement nor termination of A&M's engagement nor the filing of a petition under Chapter 7 or 11 of the United States Bankruptcy Code (nor the conversion of an existing case to one under a different chapter) shall affect these indemnification provisions, which shall hereafter remain operative and in full force and effect.


G.     The rights provided herein shall not be deemed exclusive of any other rights to which the Indemnified Parties may be entitled under the certificate of incorporation or bylaws of the Company, any other agreements, any vote of stockholders or disinterested directors of the Company, any applicable law or otherwise.


LIFEMASTERS SUPPORTED                    ALVAREZ & MARSAL HEALTHCARE
SELFCARE, INC.                           INDUSTRY GROUP, LLC



By: _____             By: _____

E.     In the event the Company and A&M seek judicial approval for the assumption of the Agreement or authorization to enter into a new engagement agreement pursuant to either of which A&M would continue to be engaged by the Company, the Company shall promptly pay expenses reasonably incurred by the Indemnified Parties, including attorneys' fees and expenses, in connection with any motion, action or claim made either in support of or in opposition to any such retention or authorization, whether in advance of or following any judicial disposition of such motion, action or claim, promptly upon submission of invoices therefor and regardless of whether such retention or authorization is approved by any court. The Company will also promptly pay the Indemnified Parties for any expenses reasonably incurred by them, including attorneys' fees and expenses, in seeking payment of all amounts owed it under the Agreement (or any new engagement agreement) whether through submission of a fee application or in any other manner, without offset, recoupment or counterclaim, whether as a secured claim, an administrative expense claim, an unsecured claim, a prepetition claim or a postpetition claim.

F.     Neither termination of the Agreement nor termination of A&M's engagement nor the filing of a petition under Chapter 7 or 11 of the United States Bankruptcy Code (nor the conversion of an existing case to one under a different chapter) shall affect these indemnification provisions, which shall hereafter remain operative and in full force and effect.

G.     The rights provided herein shall not be deemed exclusive of any other rights to which the Indemnified Parties may be entitled under the certificate of incorporation or bylaws of the Company, any other agreements, any vote of stockholders or disinterested directors of the Company, any applicable law or otherwise.

LIFEMASTERS SUPPORTED                       ALVAREZ & MARSAL HEALTHCARE
SELFCARE, INC.                              INDUSTRY GROUP, LLC


By: _Arthur Puplett_                        By: _____
    Chairman

-3-

# INDEMNIFICATION AGREEMENT

E.     In the event the Company and A&M seek judicial approval for the assumption of the Agreement or authorization to enter into a new engagement agreement pursuant to either of which A&M would continue to be engaged by the Company, the Company shall promptly pay expenses reasonably incurred by the Indemnified Parties, including attorneys' fees and expenses, in connection with any motion, action or claim made either in support of or in opposition to any such retention or authorization, whether in advance of or following any judicial disposition of such motion, action or claim, promptly upon submission of invoices therefor and regardless of whether such retention or authorization is approved by any court.  The Company will also promptly pay the Indemnified Parties for any expenses reasonably incurred by them, including attorneys' fees and expenses, in seeking payment of all amounts owed it under the Agreement (or any new engagement agreement) whether through submission of a fee application or in any other manner, without offset, recoupment or counterclaim, whether as a secured claim, an administrative expense claim, an unsecured claim, a prepetition claim or a postpetition claim.

F.     Neither termination of the Agreement nor termination of A&M's engagement nor the filing of a petition under Chapter 7 or 11 of the United States Bankruptcy Code (nor the conversion of an existing case to one under a different chapter) shall affect these indemnification provisions, which shall hereafter remain operative and in full force and effect.

G.     The rights provided herein shall not be deemed exclusive of any other rights to which the Indemnified Parties may be entitled under the certificate of incorporation or bylaws of the Company, any other agreements, any vote of stockholders or disinterested directors of the Company, any applicable law or otherwise.

LIFEMASTERS SUPPORTED
SELFCARE, INC.

ALVAREZ & MARSAL HEALTHCARE
INDUSTRY GROUP, LLC


By:  _____

By:   George D. Pillari

EXHIBIT "B"

# George Pillari



**George Pillari**

Managing Director

Healthcare Industry Group

Copyright 2007. Alvarez & Marsal. All Rights Reserved.

▸ George Pillari is a Managing Director with Alvarez & Marsal Healthcare Industry Group in San Francisco. Mr. Pillari brings broad experience working with investors and lenders across various industries, including hedge funds, financial guaranty insurers and money-center banks. His recent experience includes assignments in hospitals, healthcare outsourcing, medical devices, laboratories, assisted living, managed care and skilled nursing.

▸ Mr. Pillari's restructuring work includes acting as an adviser to debtors and creditors both in and out of court. His debtor advisory work has involved optimizing liquidity, restructuring operations, and recrafting business plans. As an adviser to creditors, Mr. Pillari has assisted in maximizing and expediting recoveries in several healthcare cases.

▸ Prior to joining A&M, Mr. Pillari was the CEO of CBCA Inc., a health benefits outsourcing company that processed more than $1 billion of medical claims annually on behalf of corporate customers. Prior to CBCA, Mr. Pillari was co-founder and CEO of Solucient, a leading provider of healthcare information, software and technologies. While at Solucient, he assisted hospitals, health plans, and pharmaceutical companies in using clinical and financial information metrics to improve performance and execute on mission statements. Mr. Pillari led Solucient from its start-up phase through to its Initial Public Offering (IPO), and managed it as a public company for four years before it was acquired by The Thomson Corporation.

▸ Mr. Pillari earned a bachelor's degree from The Johns Hopkins University, where he also worked at The Johns Hopkins Center for Healthcare Finance and Management. He has authored numerous articles and studies, and has served as a speaker and commenter across the healthcare industry. Mr. Pillari has been named an Ernst & Young Healthcare Entrepreneur of the Year.

EXHIBIT B



ALVAREZ & MARSAL

Copyright 2007. Alvarez & Marsal. All Rights Reserved.

For further information, please contact:

George D. Pillari

Managing Director

Healthcare Industry Group

(408) 656-7070

gpillari@alvarezandmarsal.com

# GEORGE D. PILLARI

## Summary of Qualifications

Experienced CEO has executed more than $500 million of equity and debt offerings and completed 30+ acquisitions and divestitures. Duties have included the management of boards of directors, public investors, lenders, auditors, investment bankers, media, and venture investors through all stages of a company's life cycle. Built two different healthcare companies from start-up through successful sales and has expertise across all major healthcare markets (pharmaceutical, payer, provider and consumer).

## Professional Experience

**Alvarez & Marsal**
2006 to present
*Managing Director, Healthcare*

A&M is a global professional services firm. Responsibilities include due diligence of acquisition targets, restructuring of distressed organizations and interim operational management of companies.

**Summerfield Associates, LLC**
2005 to 2006
*Founder, Chairman & CEO*

Summerfield provides advisory and consulting services to senior executives in the healthcare industry.

**CBCA Inc.**
2000 to 2005
*Founder, Chairman & CEO*

CBCA is one of the largest, independent providers of health and pharmacy benefits administrative services to self-insured employers and health insurance companies. The Company utilizes onshore and offshore resources to offer healthplan administrative, disease management and PBM services to a national client base. CBCA processes $1.0+ bb of health claims annually.  Company was sold to Careguide (OTC: PATY), a publicly traded disease management company and to Benistar, a private benefits management company.

**HCIA Inc.**
1985 to 1999
*Founder, Chairman & CEO*

HCIA (nka Solucient) is a healthcare information content company that provides the hospital, insurance, and pharmaceutical industries with database, software, and analytical services that are used to benchmark clinical performance and outcomes, and to manage the cost and delivery of healthcare. HCIA has operations throughout the U.S. and parts of Europe. The company was listed on the NASDAQ National Market, had annual revenues of $65 million in 1999 when it was acquired by Veronis, Suhler & Stevenson, a private investment firm in conjunction with VNU, an international media and information company. Solucient is now owned by Thomson Corp.

**The Johns Hopkins Center for Healthcare Finance & Management**
1984 to 1985
*Research Analyst*

Performed economic and policy-related data analyses of the healthcare system. Gathered data, created databases and software systems, and presented findings to faculty members and corporate sponsors.

## Education/Personal

B.S., 1984. The Johns Hopkins University, Baltimore, MD.  Major in Mathematical Sciences.  Varsity Football and Baseball.

Born 1962, New York City. Married with five children, excellent health.

Ernst & Young Entrepreneur of the Year, 1996, Greater Washington, Maryland, and Virginia.

## Major Presentations & Appearances

| | |
|---|---|
| America's Health Network | Business Week |
| Cable News Network | New York Times |
| Turnaround Management Association | Washington Post |
| Wall Street Journal | California Health Lawyers Association |
| Daily Bankruptcy Review | |

## Publications

Maizel, S.R., Pillari, G.D., Passarelli, S., "The Financial Crisis Facing the California's Hospital Industry," *California Health Law News*, (Spring 2009).

Maizel, S.R., Pillari, G.D., Passarelli, S., "The Financial Crisis Facing the Hospital Industry in America," *Journal of the American Bankruptcy Institute*, (December 2008).

Pillari, G.D., Sansone, G.A. "Hospital Insolvency: The Looming Crisis." *Alvarez & Marsal Healthcare Industry Group, LLC* (March 2008).

Naidu, G.M., Kleimenhagen, A., and Pillari, G.D.  "Is Performance Related to Marketing Research in the Health Care Industry?", *Journal of Hospital Marketing, Volume 8(2),* (Spring 1994) pp 199-225.

Kleimenhagen, A., Naidu, G.M., and Pillari, G.D. "How Have Hospitals Faced the Pricing Issues of the 1990's?", *Journal of Hospital Marketing,* Volume 8(2), (Spring 1994) pp 177-198.

Pillari, G.D., Zeuschner, S. "All Signs Point to LTC Industry Growth," *McKnight's Long-Term Care News*, Vol. 15(1), (January 1994).

Naidu, G.M., Kleimenhagen, A., and Pillari, G.D. "Is Product-Line Management Appropriate for Your Health Care Facility?", *Journal of Health Care Marketing*, (Fall 1993).

Naidu, G.M., Kleimenhagen, A., and Pillari, G.D. "Organization of Marketing in U.S. Hospitals: An Empirical Study of Hospitals," *Health Care Management Review,* Volume 17(4), (Fall 1992), pp. 29-43.

Pillari, G.D. "Information to Solve Problems," *McKnight's Long Term Care News,* (January 1992)

Pillari, G.D. "Those Pliable Hospital Occupancy Rates,"  Commentary in *Modern Healthcare,* (May 20, 1991)

Naidu, G.M., Narayana, C.L., and Pillari, G.D. "Marketing Parallax in the Health Care Industry: An Empirical Investigation," *Journal of Hospital Marketing,* Vol. 6(1), (1991).

McCue, M. J., Renn, S. C., and Pillari, G.D. "Factors Affecting Credit Rating Downgrades of Hospital Revenue Bonds," *Inquiry*, Volume 27 (Fall 1990)

Pillari, G.D. "U.S. Hospital Trends in the 1990s," *HealthSpan,* (January 1990).

McCue, M.J., Renn, S.C., and Pillari, G.D. "Factors Affecting Credit Rating Downgrades of Hospital Revenue Bonds," *Inquiry,* (Fall 1986).

Schramm, C.J. and Pillari, G.D. "Investing in the Wrong Future for Hospitals," *Health Care Management Review,* (Fall 1986).

Watt, J.M., Derzon, R.A., Renn, S.C., Schramm, C.J., Hahn, J.S., and Pillari, G.D. "The Comparative Economic Performance of Investor-Owned Chain and Not-for-Profit Hospitals," *New England Journal of Medicine* 314, (January 9, 1986) pp. 89-96.

Anderson, G.F., Schramm, C.J., Rapoza, C.R., Renn, S.C., and Pillari, G.D. "Investor-Owned Chains and Teaching Hospitals: The Implications of Acquisition," *New England Journal of Medicine* 313, (July 18, 1985) pp. 201-204.

EXHIBIT "C"

# LifeMasters Supported SelfCare, Inc.

## Creditors [1]

AICCO
Avaya
Cisco
CIT
International Business Machines Corp
Qwest
Siemens Venture Capital Fund
Sprint
Verizon Wireless

## Clients of A&M and/or its Affiliates [2]

AICCO
AmeriChoice GA
AT&T
Avaya Inc.
CIT
Comcast Cable-PA
Dell Financial Services
Ford Motor Company
Ingenix
Intel Corporation
International Business Machines Corp
Pacific Venture Group
Qwest
Siemens Venture Capital Fund
The Irvine Company
United HealthCare Insurance Company
Verizon Wireless

## Significant Equity Holders [3]

Cisco
CIT
Intel Corporation
Siemens Venture Capital Fund

## Significant Joint Venture Partners [4]

International Business Machines Corp
Sprint
STRS

---

[1] A&M and/or an affiliate is currently advising or has previously advised these parties or their affiliates as creditors or various official creditors' committees in which these parties or their affiliates were members or which represented the interests of these parties or their affiliates.

[2] A & M and/ or an affiliate is currently providing or has previously provided certain consulting services to these parties or their affiliates in wholly unrelated matters.

[3] These parties or their affiliates are significant equity holders of other clients of A&M or its affiliates in wholly unrelated matters.

[4] These parties or their affiliates are significant joint venture partners of other clients of A&M or its affiliates in wholly unrelated matters.



EXHIBIT C

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067.

A true and correct copy of the foregoing document described as <u>APPLICATION OF DEBTOR AND DEBTOR IN POSSESSION TO EMPLOY ALVAREZ & MARSAL HEALTHCARE INDUSTRY GROUP, LLC AS CRISIS MANAGERS PURSUANT TO 11 U.S.C. § 328; DECLARATION OF GEORGE D. PILLARI IN SUPPORT THEREOF</u> will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On September 14, 2009, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Ron Bender    rb@lnbrb.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On <u>September 14, 2009,</u> I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.*

<u>Via Overnight Mail</u>
The Hon. Erithe A. Smith
United States Bankruptcy Court
411 West Fourth Street, Room 5041
Santa Ana, CA 92701

<u>Via U.S. Mail</u>
LifeMasters Supported SelfCare, Inc.
15635 Alton Parkway, Suite 400
Irvine, CA 92618

<u>Via U.S. Mail</u>
U.S. Trustee - Santa Ana
411 West Fourth Street
Suite 9041
Santa Ana, CA 92701-8000

☐ Service information continued on attached page

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9013-3.1**

| In re: | | CHAPTER 11 |
|---|---|---|
| LIFEMASTERS SUPPORTED SELFCARE, INC. | Debtor(s). | CASE NUMBER 8:09-bk-19722-ES |

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| September 14, 2009 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                                          **F 9013-3.1**