RON BENDER (SBN 143364)
TODD M. ARNOLD (SBN 221868)
JOHN-PATRICK M. FRITZ (SBN 245240)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  rb@lnbrb.com, tma@lnbrb.com, jpf@lnbrb.com

Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:09-bk-19722-ES |
| LIFEMASTERS SUPPORTED SELFCARE, INC., a California corporation, | Chapter 11 |
| Debtor. | **DECLARATION OF NON-OPPOSITION RE: DEBTOR'S MOTION TO: (1) APPROVE COMPROMISE WITH LANDLORD PURSUANT TO FED.R.BANKR.P. 9019; AND (2) APPROVE EMPLOYMENT AND PAYMENT OF CB RICHARD ELLIS, INC. PURSUANT TO 11 U.S.C. § 328** |
| | [No Hearing Required Pursuant to Local Bankruptcy Rules 2014-1(b) & 9013-1(o)] |

## DECLARATION OF TODD M. ARNOLD

I, TODD M. ARNOLD, declare as follows:

1.     I am over 18 years of age.  I have personal knowledge of the facts set forth below, and, if called to testify, could and would competently testify thereto.

2. I am an attorney licensed to practice law in the State of California, and before, among other courts, the United States District Court and the Bankruptcy Court for the Central District of California.

3. I am an attorney with the law firm of Levene, Neale, Bender, Rankin & Brill L.L.P., proposed general bankruptcy counsel to LifeMasters Supported SelfCare, Inc., the debtor and debtor in possession herein (the "Debtor").

4. On October 6, 2009, the Debtor filed and served its Notice of Motion and Motion to: (1) Approve Compromise with Landlord Pursuant to Fed.R.Bankr.P. 9019(a), and (2) Approve Employment and Payment of CB Richard Ellis, Inc. Pursuant to 11 U.S.C. § 328 (the "Motion"). A true and correct copy of the Motion, together with proof of service thereof, is attached hereto as Exhibit "1."

5. Also on October 6, 2009, the Debtor filed and served its Memorandum of Points and Authorities in Support of Debtor's Motion to: (1) Approve Compromise with Landlord Pursuant to Fed.R.Bankr.P. 9019(a), and (2) Approve Employment and Payment of CB Richard Ellis, Inc. Pursuant to 11 U.S.C. § 328 (the "Memorandum"). A true and correct copy of the Memorandum, together with proof of service thereof, is attached hereto as Exhibit "2."

-2-

6.    More than fifteen (15) days have passed since the Motion and Memorandum were filed and served, and this office has received neither an opposition to the Motion nor a request for a hearing on the Motion.

7.    Based on the foregoing, it is respectfully requested that the Court enter the concurrently filed order granting the Motion.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of October 2009, at Los Angeles, California.

/s/ Todd M. Arnold
TODD M. ARNOLD

1  RON BENDER (SBN 143364)
   TODD M. ARNOLD (SBN 221868)
2  JOHN-PATRICK M. FRITZ (SBN 245240)
   LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
4  Los Angeles, California 90067
   Telephone:  (310) 229-1234
5  Facsimile:  (310) 229-1244
   Email:  rb@lnbrb.com, tma@lnbrb.com, jpf@lnbrb.com
6
7  Proposed Counsel for Debtor and Debtor in Possession

8                    UNITED STATES BANKRUPTCY COURT
9                    CENTRAL DISTRICT OF CALIFORNIA
10                       (SANTA ANA DIVISION)
11

12  In re                           )  Case No. 8:09-bk-19722-ES
                                    )
13  LIFEMASTERS SUPPORTED           )  Chapter 11
14  SELFCARE, INC., a California    )
    corporation,                    )
                                    )
15                                  )  DEBTOR'S NOTICE OF MOTION AND
                    Debtor.         )  MOTION TO:
16                                  )  (1) APPROVE COMPROMISE WITH
                                    )  LANDLORD PURSUANT TO
17                                  )  FED.R.BANKR.P. 9019; AND
18                                  )  (2) APPROVE EMPLOYMENT AND
                                    )  PAYMENT OF CB RICHARD ELLIS,
19                                  )  INC. PURSUANT TO 11 U.S.C. §
                                    )  328
20                                  )
21                                  )  [No Hearing Required Pursuant
                                    )  to Local Bankruptcy Rules
22                                  )  2014-1(b) & 9013-1(o)]
                                    )
23                                  )
                                    )
24  _____)
25
26
27
28                              EXHIBIT __1__

                                   1

1   **PLEASE TAKE NOTICE** that Lifemasters Supported Selfcare,
2   Inc., a California corporation, the Chapter 11 debtor and debtor
3   in possession herein (the "Debtor"), hereby moves, by way of this
4   notice of motion (the "Notice") and motion (the "Motion"), for
5   the entry of an order (1) approving a compromise with First Park
6   Ten Cotenancy, as successor in interest to CP-Park Ten, Ltd, the
7   landlord (the "Landlord") of the premises of approximately 47,770
8   square feet (the "Premises") located in the building (the
9   "Building") at 6660 First Park Ten Boulevard, San Antonio, Texas
10  leased by the Debtor under that certain Lease Agreement (and the
11  first, second, and third amendments thereto) (collectively, the
12  "Lease") pursuant to Fed.R.Bankr.P. 9019(a), and (2) approving
13  the employment and payment of CB Richard Ellis, Inc. ("CBRE") as
14  the broker for the re-leasing of the Building pursuant to 11
15  U.S.C. § 328.

16   **PLEASE TAKE FURTHER NOTICE** that the Debtor and the Landlord
17  are parties to the Lease, which expires in September 2012.
18  Monthly base rent under the Lease is $49,760.42 and will increase
19  to $51,750.83 in October 2010.  Pursuant to the Lease, the Debtor
20  provided the Landlord with a deposit in the current amount of
21  $275,000 (the "Deposit").

22   In late 2008, the Debtor determined that it would be in its
23  best interest to terminate the Lease and vacate the Premises, as
24  the Debtor no longer needed the Premises to operate its business.
25  However, the Debtor did not want to incur a large liability to
26  the Landlord for terminating the Lease and vacating the Premises.
27  Accordingly, the Debtor entered into an Exclusive Sublease
28  Listing Agreement with CBRE (the "Listing Agreement") in the

2

1 | hopes that CBRE could find a replacement tenant for the Premises
2 | and reduce or eliminate any damages claim of the Landlord arising
3 | from the Debtor's termination of the Lease.

4 | The Debtor chose CBRE as its broker because of CBRE's
5 | expertise and familiarity with the Building, as CBRE acted as the
6 | broker for the Landlord in obtaining the Debtor as a tenant.
7 | CBRE ultimately located NuComm International, Inc. (or its
8 | affiliate)("NuComm") as a potential new tenant for the Building.
9 | CBRE is entitled to a commission of $92,852.09 (the "Commission")
10 | under the Listing Agreement. This is the total amount that will
11 | be paid to CBRE under the Listing Agreement. It is the parties'
12 | contemplation that CBRE's employment shall be pursuant to 11
13 | U.S.C. § 328(a). As such, CBRE will not be required to file an
14 | application for the payment of its fees and costs, and will be
15 | entitled to payment directly from the Debtor upon entry of an
16 | order approving the Motion and all conditions precedent in the
17 | Listing Agreement, including NuComm's execution of a new lease of
18 | the Building. The Debtor believes that good cause exists to
19 | approve the employment and payment of CBRE as requested herein,
20 | as the re-leasing of the Building to NuComm is part and parcel
21 | with the compromise described below.

22 | The Debtor currently has personal property (the "Personal
23 | Property") with an estimated fair market value of approximately
24 | $132,396 located in the Premises.

25 | In order to resolve all claims between the Debtor and the
26 | Landlord regarding early termination of the Lease, the Debtor and
27 | the Landlord entered into a Third Amendment to Lease Agreement
28 | (the "Third Amendment) and a Lease Surrender and Termination

1 | Agreement (the "Termination Agreement"). The terms of the
2 | compromise set forth in the Third Amendment and the Termination
3 | Agreement, can be summarized as follows:[1]

4 |        a.    The Premises leased by the Debtor will be reduced
5 |    from approximately 47,770 square feet to approximately 7,000
6 |    square feet;

7 |        b.    Base monthly rent will be reduced to $7,291.66;

8 |        c.    The lease term will end on November 13, 2009 (the
9 |    "Termination Date"), instead of in September 2012;

10 |        d.    On the Termination Date,

11 |             i.    The Lease will be deemed to be terminated;

12 |             ii.   The Debtor will vacate the Premises;

13 |             iii.  The Landlord will enter into a lease with
14 |        NuComm for the entire Building, including the Premises;

15 |             iv.   The Debtor will be deemed to have abandoned
16 |        the Personal Property located at the Premises to the
17 |        Landlord;

18 |             v.    The Debtor will pay the Landlord $16,810.00
19 |        in consideration for the termination of the Lease under
20 |        the Termination Agreement (the "Termination Fee");

21 |             vi.   With certain limited exceptions, the Debtor
22 |        and the Landlord will release each other from all
23 |        claims, arising from, or in connection with, the Lease;

24 |             vii.  The Landlord will be deemed to have waived
25 |        its right to recover any amounts from the Debtor's

26 |

27 | [1] This summary is for informational purposes only.  To the extent there is any
   | disagreement between this summary and the actual terms of the Third Amendment and
28 | the Termination Agreement, the terms of the foregoing documents shall control.

1    bankruptcy estate, including recovery on any alleged

2    secured, administrative, priority, and unsecured

3    claims; and

4    viii.   The Landlord will be deemed to have waived

5    any right to assert any interest in, or recover any

6    amounts from, the Deposit.

7    Under the proposed compromise, the Debtor will part with

8    total consideration in the amount of $242,058.09 ($132,396 (value

9    of Personal Property being abandoned to the Landlord), plus

10   $16,810 Termination Fee payment to the Landlord, plus $92,852.09

11   Commission payment to CBRE). In exchange for the foregoing, the

12   Debtor will recover its $275,000 Deposit. On this basis alone,

13   the proposed compromise will clearly benefit the Debtor, as the

14   amount recovered exceeds the consideration paid by $32,952.

15   In addition to the foregoing, the proposed compromise will

16   also benefit the Debtor by (1) almost immediately terminating the

17   Debtor's responsibility for costs associated with maintaining and

18   operating the Premises, (2) reducing the general unsecured claim

19   pool by $334,067.50, and (3) assuring a result regarding claims

20   between the Debtor and the Landlord.

21   For all of the foregoing reasons, and others set forth in

22   the Memorandum of Points and Authorities (the "Memorandum") in

23   support of the Motion, the Debtor submits that the proposed

24   compromise under the Third Amendment and the Lease Termination

25   Agreement is fair, reasonable, and in the best interests of the

26   Debtor and its creditors and, therefore should be approved by the

27   Court.

28

1     **PLEASE TAKE FURTHER NOTICE** that a copy of the Memorandum may
2  be obtained by written request to Levene, Neale, Bender, Rankin &
3  Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles,
4  California 90067, Attention: Todd M. Arnold, Fax: (310) 229-1244,
5  Email: tma@lnbrb.com.

6     **PLEASE   TAKE   FURTHER   NOTICE** that, pursuant to Local
7  Bankruptcy Rule 2014-1(b)(3)(E), any response and request for a
8  hearing, in the form required by Local Bankruptcy Rule 9013-
9  1(f)(1), must be filed and served on the Debtor, LNBRB and the
10  Office of the United States Trustee no later than 15 days
11  following the date of service of this Notice.

12     **PLEASE TAKE FURTHER NOTICE** that Local Bankruptcy Rules 2014-
13  1(b)(3)(E) and 9013-1(o)(1) requires that any response and
14  request for hearing on this Motion must (1) be in the form
15  required by Local Bankruptcy Rule 9013-1(f)(1), and (2) be filed
16  with the Court and served on (i) the Office of the United States
17  Trustee, (ii) the Debtor's counsel, whose name and address is set
18  forth in the upper, left-hand corner of this Notice, and (iii) CB
19  Richard Ellis, Inc., 100 Congress Ave., Suite 500, Austin, Texas
20  78701, Attention: Scott Senese, within 15 days after the service
21  of this Notice.  The failure to timely respond to this Motion may
22  be deemed to be consent to the relief requested in this Motion.

23     **WHEREFORE**, the Debtor respectfully requests that the Court
24  enter an order:

25        (1)  affirming the adequacy of notice given;

26        (2)  granting the Motion in its entirety;

27        (3)  approving the compromise set forth in the Third
28             Amendment and the Termination Agreement;

1      (4)   approving the Debtor's employment and payment of CBRE

2           under the terms of the Listing Agreement pursuant to 11

3           U.S.C. § 328;

4      (5)   authorizing the Debtor, the Landlord, and CBRE to take

5           all actions necessary to effectuate the terms of the

6           Third Amendment, the Termination Agreement, and the

7           Listing Agreement;

8      (6)   affording such further and other relief as is

9           appropriate under the circumstances.

10  Dated: October 6, 2009       LIFEMASTERS SUPPORTED SELFCARE,
11                         INC.

12                         */s/ Todd M. Arnold*
                          RON BENDER
13                         TODD M. ARNOLD
                          JOHN-PATRICK M. FRITZ
14                         LEVENE, NEALE, BENDER, RANKIN
15                            & BRILL L.L.P.
                          Proposed Attorneys for Chapter 11
16                         Debtor and Debtor in Possession

17

18

19

20

21

22

23

24

25

26

27

28

| In re:                                  | CHAPTER 11 |
|-----------------------------------------|------------|
| LIFEMASTERS SUPPORTED SELFCARE, INC.    |            |
|                            Debtor(s).   | CASE NUMBER 8:09-bk-19722-ES |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067.

A true and correct copy of the foregoing document described as **DEBTOR'S NOTICE OF MOTION AND MOTION TO: (1) APPROVE COMPROMISE WITH LANDLORD PURSUANT TO FED.R.BANKR.P. 9019; AND (2) APPROVE EMPLOYMENT AND PAYMENT OF CB RICHARD ELLIS, INC. PURSUANT TO 11 U.S.C. § 328** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On October 6, 2009, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Todd M Arnold    tma@lnbrb.com
- Catherine E Bauer    Catherine.Bauer@usdoj.gov
- Ron Bender    rb@lnbrb.com
- Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On October 6, 2009, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

The Hon. Erithe A. Smith Via Overnight Mail
United States Bankruptcy Court
411 West Fourth Street
Santa Ana, CA 92701

**ALL THE ATTACHED SERVICE LISTS WERE SERVED BY U.S. MAIL**

☒ Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2009 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| October 6, 2009 | Lourdes Cruz | /s/ Lourdes Cruz |
|-----------------|--------------|------------------|
| *Date*          | *Type Name*  | *Signature*      |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1**

LifeMasters Supported SelfCare, Inc.
RSN
File No. 4427

LifeMasters Supported SelfCare, Inc.
15635 Alton Parkway, Suite 400
Irvine, CA 92618

Catherine E. Bauer
Nancy S Goldenberg
U.S. Trustee - Santa Ana
411 West Fourth Street, Suite 9041
Santa Ana, CA 92701-8000

Counsel for 11 Fortune Park, L.P.
Christine D. Lynch
Goulston & Storrs, P.C.
400 Atlantic Avenue
Boston, MA 02110

LifeMasters Supported SelfCare, Inc.
Professionals
File No. 4427

LifeMasters Supported SelfCare, Inc.
15635 Alton Parkway, Suite 400
Irvine, CA 92618

U.S. Trustee - Santa Ana
411 West Fourth Street
Suite 9041
Santa Ana, CA 92701-8000

George D. Pillari/Brian Buchanan
Alvarez & Marsal Healthcare
Industry Group, LLC *Service by E-Mail Only
San Francisco|Los Angeles
gpillari@alvarezandmarsal.com
bbuchanan@alvarezandmarsal.com

Tatum, LLC
2040 Main Street, Suite 720
Irvine, CA 92614

General Counsel
Lucy W. Reckseit
3944 O'Neill Drive
San Mateo, California 94403

Special Healthcare Counsel
Laurence Freedman
Karen Smith Thiel
Patton Boggs LLP
2550 M Street, N.W.
Washington, D.C. 20037

Scott Senese, Managing Director
CB Richard Ellis
Austin and San Antonio Offices
100 Congress Avenue, Suite 500
Austin, TX 78701

LifeMasters
Utilities
File No. 4427

At&T
Bankruptcy Department (All Regions)
P.O. Box 769
Arlington, TX 76004

Verizon Wireless
Mary Taylor
Financial Services (Southern CA Region)
15505 Sand Canyon Avenue
Irvine, CA 92618

Masergy Communications, Inc.
2740 Dallas Parkway
Plano, TX 75093

Qwest Communications Corp.
Attention: Bankruptcy Dept.
P.O. Box 5508
Bismarck, ND 58506

CPS Energy
Bankruptcy Section
145 Navarro, Mail Drop 101013
San Antonio, TX 78205

Counsel for CPS Energy
Elizabeth G. Smith
Law Offices of Elizabeth G. Smith
6655 First Park Ten, Suite 250
San Antonio, TX 78213

AT&T
Payment Center
Sacramento, CA 95887-0001

AT&T - UNIVERSAL BILLER
PO BOX 78045
PHOENIX, AZ 85062-8045

AT&T
P O Box 78522
Phoenix, AZ 85062-8522

AT&T
PO Box 8100
Aurora IL, 60507-8100

AT&T 0695
P.O. Box 5001
Carol Stream, IL 60197-5001

AT&T
P.O. Box 105262
Atlanta, GA 30348-5262

AT&T 2449
PO BOX 630047
DALLAS, TX 75263-0047

Masergy
P.O. Box 671454
Dallas, TX 75267-1454

Qwest
P.O Box 856137
LOUISVILLE, KY 40285-6137

VERIZON WIRELESS
P.O. BOX 9622
MISSION HILLS, CA 91346-9622

CPS Energy - City Public Service
P.O. Box 2678
San Antonio, TX 78289-0001

Qwest
P.O Box 856169
LOUISVILLE, KY 40285-6169

LifeMasters Supported SelfCare, Inc.
Wells Fargo – Cash Mgmt Motion
File No. 4427

Nathan C. Smith
Relationship Manager
Wells Fargo Bank, N.A.
Commercial Banking Office
2030 Main Street, Suite 900
Irvine, CA 92614

LifeMasters Supported SelfCare, Inc.
MML
File No.: 4427

ABL ORGANIZATION
930 W. Town and Country Road
Orange, CA 92868-4714

Aetna Health Management, LLC
980 Jolly Road, Mailstop U2IL
Blue Bell, PA 19422

AHS New Mexico Holdings, Inc.
7850 Jefferson NE, Suite 200
Attn: Ron Stern
Albuquerque, NM 87109

American Diagnostic Corp.   ADC
55 Commerce Drive
Hauppauge, NY 11788

AmeriChoice Health Services
333 N. Alabama St, Suite 350
Indianapolis, IN 46204

Ashcraft Real Estate & Development Corp.
8200 Mountain Rd. NE suite 102
Albuquerque, NM 87110-7835

AT&T - Bankr. Dept. All Regions
P.O. Box 769
Arlington, TX 76004

Callahan-Pentz Properties
5674 Stoneridge Dr. Suite 212
Pleasanton, CA 94588

Canon Financial Services, Inc
14904 Collections Center Dr
Chicago, IL 60693

CDW Government Inc.
75 Remittance Dr.
Chicago, IL 60675-1515

Centers for Medicare & Medicaid  CMS
7500 Security Boulevard
Baltimore, MD 21244-1850

Cenveo San Francisco
P.O. Box 31001-1187
Pasadena, CA 91110-1187

CHANNING L. BETE CO., INC.
PO BOX 84-5897
BOSTON, MA 02284-5897

Chinese Community Health Plan
445 Grant Ave, Suite 700
San Francisco, CA 94108

Cisco Systems Capital Corporation
1111 Old Eagle School Road
Wayne, PA 19087

Cisco Systems Capital CRO
PO BOX 41601
Philadelphia, PA 19101

CIT Communications Finance Corporation
1 CIT Drive
Livingston, NJ 07039

CIT Technology Financial Services, Inc.
PO BOX 550599
Jacksonville, FL 32255

CIT Technology Financing Services I LLC
10201 Centurion Parkway North
Jacksonville, FL 32256

CIT Technology Financing Services, Inc.
23896 Network Place
Chicago, IL 60673-1238

Citicorp Vendor Finance, Inc.
1255 Wrights Lane
West Chester, PA 19380

Consona Corporation
Attn: Kathy Kinder
450 E. 9th Street, Suite 300
Indianapolis, IN 46240

CP-Park Ten, Ltd.
c/o Champion Partners, S. Modory
15601 Dallas Parkway, Suite100
Addison, TX 75001

CPRE-1 LLC
c/o Jones Lang LaSalle
201 Mission Street, Suite 1300
San Francisco, CA 94105

CPRE-1 LLC c/o Jones Lang LaSalle
201 Mission Street, Suite 1300
San Francisco, CA 94105

CPS Energy - Bankruptcy Section
145 Navarro, Mail Drop 101013
San Antonio, TX 78205

De Lage Landen Financial Services, Inc.
1111 Old Eagle School Road
Wayne, PA 19087

DeLage Landen
1055 Westlakes Dr.
Berwyn, PA 13212

Dell Financial Services, L.P.
12234 N. IH-35, Bldg. B
Austin, TX 78753

Deloitte Tax LLP
PO Box 2079
Carol Stream, IL 60132-2079

DOME Printing
340 Commerce Circle
Sacramento, CA 95815

Duquesne Litho Inc.
350 Presto-Sygan Road
Bridgeville, PA 15017

Eleven Fortune Park Limited Partnership
P.O. Box 60430
Charlotte, NC 28260-0430

Eleven Fortune Park Limited Prtnshp
c/o IBUS Management & Development
1899 Pennsylvania Ave, NW, Ste 530
Washington, DC 20006

Expanets of North America LLC
9780 Mt. Pyramid Ct., Suite 400
Englewood, CO 80112

Faria Printing & Graphics
1812 Tribute Road
Sacramento, CA 95815

First Choice Services   Santa Clara
3130 Alfred St
Santa Clara, CA 95054

Fuller Engineering Co., LLC
4135 West 99th Street
Carmel, IN 46032

H2 Communications
1817 East Carson Street
Pittsburgh, PA 15203

Heeter Direct
441 Technology Drive
Canonsburg, PA 15317

IBM
PO BOX 676673
Dallas, TX 72567

IBM Credit LLC
1 North Castle Drive
Armonk, NY 10504

Indiana Economic Development Corporation
One North Capital Ave, Suite 700
Indianapolis, IN 46204

INGENIX
P O Box 271256
Salt Lake City, UT 84127-1256

IRON MOUNTAIN  IRV  Acct #CF514
PO Box 601002
Los Angeles, CA 90060-1002

Kieckhafer,Schiffer & Company LLP
6201 Oak Canyon Drive
Irvine, CA 92618

Knova/Consona CRM Inc.
Dept. CH 10863
Palatine, IL 60055-0863

Masergy
2740 Dallas Parkway
Plano, TX 75093

MERCER HUMAN RESOURCE
CONSULTING
P.O. BOX 730212
DALLAS, TX 75373

Neopost Leasing
PO BOX 45822
San Francisco, CA 94145-0822

New Mexico Taxation & Revenue Dept
P O Box 25127
Santa Fe, NM 87504-5127

Nice Systems, Inc
PO Box 9421
Uniondale, NY 11555-9421

OnTrac
Dept. 1664
Los Angeles, CA 90084-1664

Pitney Bowes Credit Corp
1313 N. Atlantic Street, FL3
Spokane, WA 99201

Pitney Bowes Financial Services
5101 Interchange Way
LOUISVILLE, KY 40229

Qwest  Bankr. Dept.
P.O. Box 5508
Bismarck, ND 58506

R Systems
5000 Windplay Drive, Suite 5
El Dorado Hills, CA 95762

SPARKLETTS DRINKING WATER
PO BOX 660579
DALLAS, TX 75266-0579

State Teachers Retirement System of Ohio
275 E. Broad Street
Columbus, OH 43215

Telapprise
6920 Santa Teresa Blvd
San Jose, CA 95119

The Irvine Company
8001 Irvine Center Drive, Suite 840
Irvine, CA 92618

THE NETWORK GUYS
39355 California St.
FREEMONT, CA 94538

The Wackenhut Corporation
4200 Wackenhut Drive, Suite 100
Palm Beach Gardens, FL 33410

VERIZON WIRELESS  Financial Services
15505 Sand Canyon Avenue
Irvine, CA 92618

Wimer Designs
93 Martin Drive
Novato, CA 94949

# File a Motion:

8:09-bk-19722-ES LifeMasters Supported SelfCare, Inc.

| | | |
|---|---|---|
| Type: bk | Chapter: 11 v | Office: 8 (Santa Ana) |
| Assets: y | Judge: ES | Case Flag: PlnDue, DsclsDue, Incomplete |

### U.S. Bankruptcy Court

### Central District Of California

Notice of Electronic Filing

The following transaction was received from Todd M Arnold entered on 10/6/2009 at 4:18 PM PDT and filed on 10/6/2009

**Case Name:**      LifeMasters Supported SelfCare, Inc.
**Case Number:**    8:09-bk-19722-ES
**Document Number:** 31

### Docket Text:
Motion to Approve Compromise Under Rule 9019 *with Landlord*, in addition to Application to Employ CB Richard Ellis, Inc. as Broker *Pursuant to 11 U.S.C. Section 328 with Notice of Motion and Proof of Service* Filed by Debtor LifeMasters Supported SelfCare, Inc. (Arnold, Todd)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**9019 Motion and Motion to Employ CBRE.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1106918562 [Date=10/6/2009] [FileNumber=28772131-0] [1dfb8d41d3d2b73a4722888628d360a2aa77a498487d21430f404a73eebf15ba79 3f20d644c13bcb72b1d5581fc75b1d987269a63e28c0418f6f862621842d4c]]

### 8:09-bk-19722-ES Notice will be electronically mailed to:

Todd M Arnold on behalf of Debtor LifeMasters Supported SelfCare, Inc.
tma@lnbrb.com

Catherine E Bauer on behalf of Interested Party Courtesy NEF
Catherine.Bauer@usdoj.gov

Ron Bender on behalf of Debtor LifeMasters Supported SelfCare, Inc.
rb@lnbrb.com

Nancy S Goldenberg on behalf of U.S. Trustee United States Trustee (SA)
nancy.goldenberg@usdoj.gov

United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov

**8:09-bk-19722-ES Notice will not be electronically mailed to:**

1  RON BENDER (SBN 143364)
   TODD M. ARNOLD (SBN 221868)
2  JOHN-PATRICK M. FRITZ (SBN 245240)
   LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone:  (310) 229-1234
   Facsimile:  (310) 229-1244
5  Email:  rb@lnbrb.com, tma@lnbrb.com, jpf@lnbrb.com
6
   Proposed Counsel for Debtor and Debtor in Possession
7

8                  UNITED STATES BANKRUPTCY COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10                      (SANTA ANA DIVISION)

11

12  In re                          ) Case No. 8:09-bk-19722-ES
                                    )
13  LIFEMASTERS SUPPORTED          ) Chapter 11
    SELFCARE, INC., a California    )
14  corporation,                    )
                                    )
15                                  ) **MEMORANDUM OF POINTS AND**
                                    ) **AUTHORITIES IN SUPPORT OF**
16              Debtor.             ) **DEBTOR'S MOTION TO:**
                                    ) **(1) APPROVE COMPROMISE WITH**
17                                  ) **LANDLORD PURSUANT TO**
                                    ) **FED.R.BANKR.P. 9019; AND**
18                                  ) **(2) APPROVE EMPLOYMENT AND**
                                    ) **PAYMENT OF CB RICHARD ELLIS,**
19                                  ) **INC. PURSUANT TO 11 U.S.C. §**
                                    ) **328; DECLARATIONS OF BRIAN**
20                                  ) **BUCHANAN AND SCOTT SENESE IN**
                                    ) **SUPPORT THEREOF**
21                                  )
                                    )
22                                  ) [No Hearing Required Pursuant
                                    ) to Local Bankruptcy Rules
23                                  ) 2014-1(b) & 9013-1(o)]
                                    )
24                                  )
                                    )
25                                  )
                                    )
26                                  )
                                    )
27  _____

28
                                              EXHIBIT 2

                            1

1

TABLE OF CONTENTS

2

3    I.    STATEMENT OF FACTS ........................................2

4        A. BACKGROUND............................................2

5
        B. THE LEASE.............................................5
6

7        C. THE PROPOSED COMPROMISE...............................6

8        D. EMPLOYMENT AND PAYMENT OF CBRE........................8

9    II.   DISCUSSION .............................................10

10        A. THE COURT SHOULD APPROVE THE COMPROMISE BETWEEN
            THE DEBTOR AND THE LANDLORD ..........................10
11

12            1. STANDARD ........................................10

13            2. DISCUSSION ......................................12

14            a. The Probability of Success in the Litigation.....12

15            b. The Difficulties, if any, to be Encountered
                in the Matter of Collection.....................13
16

17            c. The Complexity of the Litigation Involved, and
                the Expense, Inconvenience, and Delay
18                Necessarily Attending it........................13

19            d. The Paramount Interest of the Creditors and a
                Proper Deference to Their reasonable Views.......13
20

21        B. THE COURT SHOULD APPROVE THE EMPLOYMENT AND PAYMENT
            OF CBRE AS THE BROKER FOR THE RE-LEASING OF THE
22            PREMISES PURSUANT TO 11 U.S.C. § 328.................14

23            1. STANDARD ........................................14

24            2. DISCUSSION ......................................15

25    III.   CONCLUSION ............................................16

26
    DECLARATION OF BRIAN BUCHANAN ...............................18
27
    DECLARATION OF SCOTT SENESE .................................28
28

1

# TABLE OF AUTHORITIES

2

Page(s)

**FEDERAL CASES**

3

4    Anaconda-Ericsson Inc. v. Hessen (In re Teltronics Services, Inc.)

5       762 F.2d 185 (2d Cir. 1985) .................................12

6    Cosoff v. Rodman (In re W.T. Grant Co.)
        699 F.2d 599 (2d Cir. 1983), cert. denied 464 U.S. 822

7       (1983) ......................................................12

8    In re AB Liquidating Corp.

9       416 F.3d 961 (9th Cir. 2005)................................13

10   In re Lee Way Holding Co.
        120 B.R. 881 (Bankr. S.D. Ohio 1990) .......................12

11
     In re Mayan Networks Corp.

12      306 B.R. 295 (9th Cir. BAP 2004) ...........................13

13   In re Onecast Media, Inc.
        439 F.3d 558 (9th Cir. 2006)................................13

14

15   Martin v. Kane (In re A & C Properties)
        784 F.2d 1377 (9th Cir. 1986), cert. denied 479 U.S. 854

16      (1986) ...................................................11, 12

17   Newman v. Stein
        464 F.2d 689 (2d Cir. 1972), cert. denied sub nom. Benson

18      v. Newman, 409 U.S. 1039 (1972) ............................12

19   United States v. Alaska National Bank (In re Walsh Constr., Inc.)

20      669 F.2d 1325 (9th Cir. 1982) ..............................11

21   Woodson v. Fireman's Fund Ins. Co. (In re Woodson)

22      839 F.2d 610 (9th Cir. 1988) ...............................11

23   **FEDERAL STATUTES**

24   11 U.S.C. § 101 ...........................................2, 5

25   11 U.S.C. § 101(14) .........................................10

26   11 U.S.C. §502(b)(6) ........................................12

27   11 U.S.C. § 327 ..............................................9

28

11 U.S.C. § 328 .................................2, 9, 10, 14, 16

11 U.S.C. § 328(a) ....................................9, 14, 15

11 U.S.C. § 330 ...............................................9

11 U.S.C. § 331 ...............................................9

11 U.S.C. § 365(a) ..........................................12

11 U.S.C. § 1107 .............................................3

11 U.S.C. § 1108 .............................................3

**OTHER AUTHORITIES**

Fed.R.Bankr.P. 9019(a), and (2) ...............................2

Fed.R.Bankr.P. 9019(a) ......................................10

Lifemasters Supported Selfcare, Inc., a California corporation, the Chapter 11 debtor and debtor in possession herein (the "Debtor"), hereby files its memorandum of points and authorities (the Memorandum") in support of the Debtor's motion (the "Motion") to (1) approve a compromise with First Park Ten Cotenancy, as successor in interest to CP-Park Ten, Ltd, the landlord (the "Landlord") of the premises of approximately 47,770 square feet (the "Premises") located in the building (the "Building") at 6660 First Park Ten Boulevard, San Antonio, Texas leased by the Debtor under that certain Lease Agreement (and the first, second, and third amendments thereto) (collectively, the "Lease") pursuant to Fed.R.Bankr.P. 9019(a), and (2) approve the employment and payment of CB Richard Ellis, Inc. ("CBRE") as the broker for the re-leasing of the Building pursuant to 11 U.S.C. § 328.

## I.

## STATEMENT OF FACTS

### A.   BACKGROUND.

1.    The Debtor commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on September 14, 2009 (the "Petition Date").   The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor

in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2. The Debtor is a privately held company which was founded in 1994. The Debtor is headquartered in Irvine, California, and also has offices located in Cupertino, California, South San Francisco, California, Rancho Cordova, California, Albuquerque, New Mexico, Indianapolis, Indiana, and San Antonio, Texas.

3. The Debtor had total revenue in 2008 of approximately $80 million. With the exception of certain equipment lessors and sellers, the Debtor does not have any known secured creditors. The Debtor is not aware of any entity that asserts a lien against the Debtor's cash collateral. The Debtor currently has approximately 250 employees. Additional information about the Debtor can be obtained at the Debtor's website - www.lifemasters.com.

4. The Debtor is a national disease management company whose mission is to help its many thousands of participants achieve and maintain optimal health by closing the gaps in medical care and encourage the adoption of healthy lifestyles. With more than a decade of experience, the Debtor is an expert at delivering disease management services to individuals with chronic diseases such as diabetes, cardiovascular disease,

3

respiratory disease, musculoskeletal conditions and their co-morbidities.

5.    The Debtor's health professionals coach and educate participants over the phone, teach them how to monitor their vital signs and symptoms, and ultimately take more responsibility for their health.    The Debtor involves the participant's physicians by providing them with relevant medical information between office visits to prevent unnecessary complications.    This often results in participants establishing a better relationship with their physicians and can help them avoid unnecessary hospitalizations and emergency room visits, reducing total costs to payors.

6.    The Debtor has worked with, and continues to work with, some of the nation's leading health plans, employers, retirement systems and governmental organizations, which purchase the Debtor's services in an effort to reduce costs and enhance care.    Historically, approximately 30% of the Debtor's gross revenue has been derived from its contracts with the Center for Medicare and Medicaid Services ("CMS"), which administers a number of Medicare and Medicaid programs.    In or about October, 2006, the Debtor requested early termination of one of its contracts with CMS due to a range of significant program problems and irregularities, rendering it impossible for the Debtor to satisfy the financial risk terms of the cooperative agreements.

4

In or about June, 2009, CMS cancelled a different contract with the Debtor for a demonstration program involving participants located in Florida. In conjunction with canceling the foregoing contracts, CMS has asserted claims to recover all amounts previously paid to the Debtor, which amounts to an aggregate of approximately $106 million.

7. As a result of the forgoing loss of revenue from CMS and claim by CMS resulting from the termination of the CMS contracts, coupled with various other financial issues facing the Debtor, the Debtor elected to commence a Chapter 11 bankruptcy case in an effort to reorganize.

**B.  THE LEASE.**

8. In January 2005, the Debtor entered into the Lease with the Landlord. A true and correct copy of the Lease (including the three amendments thereto) is attached hereto as Exhibit "1." The Lease term ends in September 2012.

9. Monthly base rent under the Lease is $49,760.42 and will increase to $51,750.83 in October 2010. In addition to base rent, the Debtor is required to pay its share of basic operating costs (e.g., common area maintenance costs) for the Building in which the Premises was located.

10. Pursuant to the Lease, the Debtor provided the Landlord with a deposit (the "Deposit") in the form of a letter of credit (the "L/C") backed by a certificate of deposit (the "CD"). The

5

original amount of the Deposit was \$575,000. Over time, the Deposit has been reduced and is currently in the amount of approximately \$275,000.

11. The Debtor currently has personal property (the "Personal Property") with an estimated fair market value of approximately \$132,396 located in the Premises. A listing of the Personal Property is attached hereto as Exhibit "2."

12. The Debtor is current on its obligations under the Lease.

## C. THE PROPOSED COMPROMISE.

13. In order to resolve all claims between the Debtor and the Landlord regarding early termination of the Lease, the Debtor and the Landlord entered into a Third Amendment to Lease Agreement (the "Third Amendment) and a Lease Surrender and Termination Agreement (the "Termination Agreement"), both of which are subject to Court approval. A true and correct copy of the Third Amendment is included with Exhibit "1." A true and correct copy of the Termination Agreement is attached hereto as Exhibit "3."

14. The terms of the compromise set forth in the Third Amendment and the Termination Agreement, can be summarized as follows:[1]

---

[1] This summary is for informational purposes only. To the extent there is any disagreement between this summary and the actual terms of the Third Amendment and the Termination Agreement, the terms of the foregoing documents shall control.

1    a.   The Premises leased by the Debtor will be reduced
2   from approximately 47,770 square feet to approximately 7,000
3   square feet;
4        b.   Base monthly rent will be reduced to \$7,291.66;
5        c.   The lease term will end on November 13, 2009 (the
6   "Termination Date"), instead of in September 2012;
7
8        d.   On the Termination Date,
9             i.   The Lease will be deemed to be terminated;
10            ii.  The Debtor will vacate the Premises;
11            iii. The Landlord will enter into a lease with
12   NuComm International, Inc. (or its affiliate)("NuComm")
13   for the entire Building, including the Premises;
14
15            iv.  The Debtor will be deemed to have abandoned
16   the Personal Property located at the Premises to the
17   Landlord;
18            v.   The Debtor will pay the Landlord \$16,810.00
19   in consideration for the termination of the Lease under
20   the Termination Agreement (the "Termination Fee");
21
22            vi.  With certain limited exceptions, the Debtor
23   and the Landlord will release each other from all
24   claims, arising from, or in connection with, the Lease;
25            vii. The Landlord will be deemed to have waived
26   its right to recover any amounts from the Debtor's
27   bankruptcy estate, including recovery on any alleged
28

7

1

secured,   administrative,   priority,   and   unsecured
claims; and

2

3

viii.   The Landlord will be deemed to have waived
any right to assert any interest in, or recover any
amounts from, the Deposit under the L/C and shall
cooperate with the Debtor, as needed, to enable the
Debtor to terminate the L/C and recover the Certificate
of Deposit securing the L/C.

4

5

6

7

8

9

10

15.   Under the terms of the Termination Agreement, the

11

Debtor is required to seek Bankruptcy Court approval of the Third

12

Amendment and the Termination Agreement on an expedited basis.

13

**D.   EMPLOYMENT AND PAYMENT OF CBRE.**

14

15

16.   In late 2008, the Debtor determined that it would be in

16

its best interest to terminate the Lease and vacate the Premises,

17

as the Debtor no longer needed the Premises to operate its

18

business.   However, the Debtor did not want to incur a large

19

liability to the Landlord for terminating the Lease and vacating

20

the Premises.   Accordingly, the Debtor entered into an Exclusive

21

Sublease Listing Agreement with CBRE (the "Listing Agreement") in

22

23

the hopes that CBRE could find a replacement tenant for the

24

Premises and reduce or eliminate any damages claim of the

25

Landlord arising from the Debtor's termination of the Lease.   A

26

true and correct copy of the Listing Agreement is attached hereto

27

as Exhibit "4."

28

8

17. The Debtor chose CBRE as its broker because of CBRE's expertise and familiarity with the Building, as CBRE acted as the broker for the Landlord in obtaining the Debtor as a tenant.

18. CBRE ultimately located NuComm as a potential new tenant for the Building. As discussed, on the Termination Date, NuComm will enter into a new lease for the Building, including the Premises.

19. As set forth in the attachment to the Listing Agreement, CBRE is entitled to a commission of $92,852.09 (the "Commission"). This is the total amount that will be paid to CBRE under the Listing Agreement.

20. CBRE understands the provisions of 11 U.S.C. Sections 327, 328, 330 and 331 which require, among other things, Court approval of the Debtor's employment of CBRE as the Debtor's broker and of all fees and expenses that CBRE will receive from the Debtor's estate. It is the parties' contemplation that CBRE's employment shall be pursuant to 11 U.S.C. § 328(a). As such, CBRE will not be required to file an application for the payment of its fees and costs, and will be entitled to payment directly from the Debtor upon entry of an order approving the Motion and all conditions precedent in the Listing Agreement, including NuComm's execution of a new lease of the Building.

21. As set forth in the annexed Declaration of Scott Senese, other than as stated herein, to the best of CBRE's

9

knowledge, CBRE does not hold or represent any interest adverse to the Debtor, the Debtor's creditors or the bankruptcy estate, and, though not required for employment under Section 328, CBRE is a "disinterested person" as that term is defined in Section 101(14).  In addition, except as set forth above, CBRE has no prior connection with the Debtor, the bankruptcy estate, any insiders of the Debtor, any entities related to the Debtor, any creditors of the Debtor (other than to the extent that CBRE may have acted as a broker for such creditors), or any other party in interest in this case, or their respective attorneys or accountants, the United States Trustee or any person employed by the United States Trustee, or the Bankruptcy Judge assigned to the Debtor's bankruptcy case.

## II.

## DISCUSSION

**A.   THE COURT SHOULD APPROVE THE COMPROMISE BETWEEN THE DEBTOR AND THE LANDLORD.**

**1.   STANDARD.**

Bankruptcy Rule 9019(a) provides that:

> On motion by the [debtor in possession] and after notice and hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, the debtor and indenture trustees as provided in [Bankruptcy Rule] 2002 and to any other entity as the court may direct.

Fed.R.Bankr.P. 9019(a).

The Court of Appeals for the Ninth Circuit has long recognized that "[t]he bankruptcy court has great latitude in approving compromise agreements." Woodson v. Fireman's Fund Ins. Co. (In re Woodson), 839 F.2d 610, 620 (9th Cir. 1988). "The purpose of a compromise agreement is to allow the [debtor in possession] and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." Martin v. Kane (In re A & C Properties), 784 F.2d 1377, 1380-81 (9th Cir. 1986), cert. denied 479 U.S. 854 (1986). Accordingly, in approving a compromise, the Court need not conduct an exhaustive investigation of the claims sought to be compromised. See United States v. Alaska National Bank (In re Walsh Constr., Inc.), 669 F.2d 1325, 1328 (9th Cir. 1982). Rather, it is sufficient that the Court find that the compromise was negotiated in good faith and is reasonable, fair, and equitable. See In re A & C Properties, supra, 784 F.2d at 1381.

The Court of Appeals for the Ninth Circuit has identified the following factors for consideration in determining whether a proposed compromise agreement is reasonable, fair, and equitable:

> (a) the probability of success in the litigation;
>
> (b) the difficulties, if any, to be encountered in the matter of collection;
>
> (c) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and

11

1

> (d) the paramount interest of the creditors
> and a proper deference to their
> reasonable views in the premises.

2

3  In re A & C Properties, supra, 784 F.2d at 1381 (the "A & C

4  Factors").

5

6  Consideration of these factors does not require the Court to

7  determine whether a compromise presented is the best one that

8  could possibly have been achieved. Rather, the Court need only

9  canvass the issues to determine whether the compromise falls

10  "below the lowest point in the zone of reasonableness." Newman

11  v. Stein, 464 F.2d 689, 698 (2d Cir. 1972) (emphasis added),

12  cert. denied sub nom. Benson v. Newman, 409 U.S. 1039 (1972); see

13  also Anaconda-Ericsson Inc. v. Hessen (In re Teltronics Services,

14  Inc.), 762 F.2d 185, 189 (2d Cir. 1985); Cosoff v. Rodman (In re

15  W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983), cert. denied

16  464 U.S. 822 (1983). Finally, although the Court should give

17  deference to the reasonable views of creditors, "objections do

18  not rule. It is well established that compromises are favored in

19  bankruptcy." In re Lee Way Holding Co., 120 B.R. 881, 891

20  (Bankr. S.D. Ohio 1990).

21

22  **2. DISCUSSION.**

23  a. The Probability of Success in the Litigation.

24

25  If the Debtor rejected the Lease under Section 365(a), the

26  Landlord would be entitled to a claim in the amount of at least

27  $609,067.50 (i.e., one year of rent) under Section 502(b)(6) (the

28  "Lease Rejection Claim"). The Debtor is unaware of any defenses

12

1  or claims of offset against such Lease Rejection Claim.

2       b.    The Difficulties, if any, to be Encountered in the

3             Matter of Collection.

4       Under the independence principle, the Landlord would be

5  entitled to recover $275,000 of its allowed Lease Rejection Claim

6  from the L/C.  See, e.g., In re Onecast Media, Inc., 439 F.3d

7

8  558, 564 (9th Cir. 2006); In re AB Liquidating Corp., 416 F.3d

9  961, 964 (9th Cir. 2005); In re Mayan Networks Corp., 306 B.R.

10  295, 299 (9th Cir. BAP 2004).

11      c.    The Complexity of the Litigation Involved, and the

12            Expense, Inconvenience, and Delay Necessarily

13            Attending it.

14

15      The litigation would not be overly complex.  It appears

16  quite certain that the outcome outlined above would result if the

17  proposed compromise is not approved by the Court.  That is, the

18  Debtor would reject the Lease; the Landlord would assert a Lease

19  Rejection Claim in the amount of $609,067.50; the landlord would

20  draw $275,000 the L/C and thereby reduce the Lease Rejection

21  Claim to $334,067.50.

22

23      d.    The Paramount Interest of the Creditors and a

24            Proper Deference to Their reasonable Views.

25      Under the proposed compromise, the Debtor will part with

26  total consideration in the amount of $242,058.09 ($132,396 (value

27  of Personal Property being abandoned to the Landlord), plus

28

13

$16,810 Termination Fee payment to the Landlord, plus $92,852.09 Commission payment to CBRE). In exchange for the foregoing, the Debtor will recover its $275,000 Certificate of Deposit securing the L/C. On this basis alone, the proposed compromise will clearly benefit the Debtor, as the amount recovered exceeds the consideration paid by $32,952.

In addition to the foregoing, the proposed compromise will also benefit the Debtor by (1) almost immediately terminating the Debtor's responsibility for costs associated with maintaining and operating the Premises, (2) reducing the general unsecured claim pool by $334,067.50, and (3) assuring a result regarding claims between the Debtor and the Landlord.

For all of the foregoing reasons, the Debtor submits that the proposed compromise under the Third Amendment and the Lease Termination Agreement is fair, reasonable, and in the best interests of the Debtor and its creditors and, therefore should be approved by the Court.

**B. THE COURT SHOULD APPROVE THE EMPLOYMENT AND PAYMENT OF CBRE AS THE BROKER FOR THE RE-LEASING OF THE PREMISES PURSUANT TO 11 U.S.C. § 328.**

**1. STANDARD.**

Section 328 authorizes the employment of a professional person on a percentage and/or contingent fee basis. 11 U.S.C. § 328(a). Notwithstanding the terms if underlying employment

14

1  agreement, the Court may allow compensation different from the

2  compensation provided for in the employment agreement after the

3  conclusion of employment if the terms and conditions prove to

4  have been improvident in light of developments not capable of

5
   being anticipated at the time of the fixing of such terms and
6
7  conditions.  11 U.S.C. § 328(a).

8      **2.   DISCUSSION.**

9       The employment and payment of CBRE under the terms of the

10  Listing  Agreement  is  part  and  parcel  with  the  proposed

11  compromise.   The Termination Agreement underlying the proposed

12  compromise is conditioned upon the Landlord entering into a new

13
   lease for the Building with NuComm.  The Debtor does not believe
14
15  that NuComm or the Landlord would attempt to do an end-around to

16  prevent CBRE from receiving benefits under the Listing Agreement,

17  as this could subject the Landlord and/or NuComm, not to mention

18  the Debtor, to claims by CBRE.  If NuComm does not enter into a

19  new lease with the Landlord for the Building, then the Debtor

20  will  not  obtain  the  benefits  resulting  from  the  proposed

21  compromise and may end up worse off.  That is, the Debtor (1)

22
   would almost assuredly lose its entire Deposit, (2) would have to
23
24  continue paying rent going forward from the Petition Date or be

25  subject to an administrative claim until the Lease is rejected

26  and the Premises is vacated, and (3) would have to conduct a sale

27  of the Personal Property, which would likely result in a recovery

28

15

of less than the $132,396 estimated fair market value of the Personal Property after deducting costs of sale and fees and costs associated with obtaining Court approval of such sale.

In consideration of the foregoing, and the benefit being conferred upon the Debtor under the Listing Agreement, the Debtor submits that good cause exists to authorize the Debtor to employ CBRE and pay CBRE the $92,852.09 Commission pursuant to the terms of Listing Agreement and 11 U.S.C. § 328.

## III.

### CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

(1) affirming the adequacy of notice given;

(2) granting the Motion in its entirety;

(3) approving the compromise set forth in the Third Amendment and the Termination Agreement;

(4) approving the Debtor's employment and payment of CBRE under the terms of the Listing Agreement pursuant to 11 U.S.C. § 328;

(5) authorizing the Debtor, the Landlord, and CBRE to take all actions necessary to effectuate the terms of the Third Amendment, the Termination Agreement, and the Listing Agreement;

///

///

16

1    (6)   affording   such   further   and   other   relief   as   is

2         appropriate under the circumstances.

3    Dated: October 6, 2009         LIFEMASTERS SUPPORTED SELFCARE,
                                     INC.
4

5
                                     /s/ Todd M. Arnold
6                                    RON BENDER
                                     TODD M. ARNOLD
7                                    JOHN-PATRICK M. FRITZ
                                     LEVENE, NEALE, BENDER, RANKIN
8                                        & BRILL L.L.P.
                                     Proposed Attorneys for Chapter 11
9                                    Debtor and Debtor in Possession

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

## DECLARATION OF BRIAN BUCHANAN

I, Brian Buchanan, hereby declare as follows:

1.   I am over 18 years of age.   Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.   I am the Chief Financial Officer of LifeMasters Supported SelfCare, Inc., a California corporation, the Chapter 11 debtor and debtor in possession herein (the "Debtor").   I make this declaration in support of the Memorandum to which this declaration is attached.   Unless otherwise stated, all capitalized terms herein have the same meanings as in the Memorandum.

3.   The Debtor commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on September 14, 2009 (the "Petition Date").   The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.   The Debtor is a privately held company which was founded in 1994.   The Debtor is headquartered in Irvine, California, and also has offices located in Cupertino, California, South San Francisco, California, Rancho Cordova,

18

California, Albuquerque, New Mexico, Indianapolis, Indiana, and San Antonio, Texas.

5. The Debtor had total revenue in 2008 of approximately $80 million. With the exception of certain equipment lessors and sellers, the Debtor does not have any known secured creditors. The Debtor is not aware of any entity that asserts a lien against the Debtor's cash collateral. The Debtor currently has approximately 250 employees. Additional information about the Debtor can be obtained at the Debtor's website - www.lifemasters.com.

6. The Debtor is a national disease management company whose mission is to help its many thousands of participants achieve and maintain optimal health by closing the gaps in medical care and encourage the adoption of healthy lifestyles. With more than a decade of experience, the Debtor is an expert at delivering disease management services to individuals with chronic diseases such as diabetes, cardiovascular disease, respiratory disease, musculoskeletal conditions and their co-morbidities.

7. The Debtor's health professionals coach and educate participants over the phone, teach them how to monitor their vital signs and symptoms, and ultimately take more responsibility for their health. The Debtor involves the participant's physicians by providing them with relevant medical information

between office visits to prevent unnecessary complications. This often results in participants establishing a better relationship with their physicians and can help them avoid unnecessary hospitalizations and emergency room visits, reducing total costs to payors.

8. The Debtor has worked with, and continues to work with, some of the nation's leading health plans, employers, retirement systems and governmental organizations, which purchase the Debtor's services in an effort to reduce costs and enhance care. Historically, approximately 30% of the Debtor's gross revenue has been derived from its contracts with the Center for Medicare and Medicaid Services ("CMS"), which administers a number of Medicare and Medicaid programs. In or about October, 2006, the Debtor requested early termination of one of its contracts with CMS due to a range of significant program problems and irregularities, rendering it impossible for the Debtor to satisfy the financial risk terms of the cooperative agreements. In or about June, 2009, CMS cancelled a different contract with the Debtor for a demonstration program involving participants located in Florida. In conjunction with canceling the foregoing contracts, CMS has asserted claims to recover all amounts previously paid to the Debtor, which amounts to an aggregate of approximately $106 million.

9. As a result of the forgoing loss of revenue from CMS and claim by CMS resulting from the termination of the CMS contracts, coupled with various other financial issues facing the Debtor, the Debtor elected to commence a Chapter 11 bankruptcy case in an effort to reorganize.

10. In January 2005, the Debtor entered into the Lease with the Landlord. A true and correct copy of the Lease (including the three amendments thereto) is attached hereto as Exhibit "1." The Lease term ends in September 2012.

11. Monthly base rent under the Lease is $49,760.42 and will increase to $51,750.83 in October 2010. In addition to base rent, the Debtor is required to pay its share of basic operating costs (e.g., common area maintenance costs) for the Building in which the Premises was located.

12. Pursuant to the Lease, the Debtor provided the Landlord with a deposit (the "Deposit") in the form of a letter of credit (the "L/C") backed by a certificate of deposit (the "CD"). The original amount of the Deposit was $575,000. Over time, the Deposit has been reduced and is currently in the amount of approximately $275,000.

13. The Debtor currently has personal property (the "Personal Property") located in the Premises. A listing of the Personal Property is attached hereto as Exhibit "2." Based on depreciation and the age of the Personal Property, I estimate

21

that the Personal Property has a fair market value approximately $132,396.

14. The Debtor is current on its obligations under the Lease.

15. In order to resolve all claims between the Debtor and the Landlord regarding early termination of the Lease, the Debtor and the Landlord entered into a Third Amendment to Lease Agreement (the "Third Amendment) and a Lease Surrender and Termination Agreement (the "Termination Agreement"), both of which are subject to Court approval. A true and correct copy of the Third Amendment is included with Exhibit "1." A true and correct copy of the Termination Agreement is attached hereto as Exhibit "3."

16. The terms of the compromise set forth in the Third Amendment and the Termination Agreement, can be summarized as follows:[2]

　　　a. The Premises leased by the Debtor will be reduced from approximately 47,770 square feet to approximately 7,000 square feet;

　　　b. Base monthly rent will be reduced to $7,291.66;

　　　c. The lease term will end on November 13, 2009 (the "Termination Date"), instead of in September 2012;

---

[2] This summary is for informational purposes only. To the extent there is any disagreement between this summary and the actual terms of the Third Amendment and the Termination Agreement, the terms of the foregoing documents shall control.

d.   On the Termination Date,

i.   The Lease will be deemed to be terminated;

ii.   The Debtor will vacate the Premises;

iii.   The Landlord will enter into a lease with NuComm International, Inc. (or its affiliate)("NuComm") for the entire Building, including the Premises;

iv.   The Debtor will be deemed to have abandoned the Personal Property located at the Premises to the Landlord;

v.   The Debtor will pay the Landlord $16,810.00 in consideration for the termination of the Lease under the Termination Agreement (the "Termination Fee");

vi.   With certain limited exceptions, the Debtor and the Landlord will release each other from all claims, arising from, or in connection with, the Lease;

vii.   The Landlord will be deemed to have waived its right to recover any amounts from the Debtor's bankruptcy estate, including recovery on any alleged secured, administrative, priority, and unsecured claims; and

viii.   The Landlord will be deemed to have waived any right to assert any interest in, or recover any amounts from, the Deposit under the L/C and shall cooperate with the Debtor, as needed, to enable the

23

Debtor to terminate the L/C and recover the Certificate

of Deposit securing the L/C.

17.   Under the terms of the Termination Agreement, the Debtor is required to seek Bankruptcy Court approval of the Third Amendment and the Termination Agreement on an expedited basis.

18.   I am informed and believe that, in late 2008, the Debtor determined that it would be in its best interest to terminate the Lease and vacate the Premises, as the Debtor no longer needed the Premises to operate its business.   However, I am informed and believe that, the Debtor did not want to incur a large liability to the Landlord for terminating the Lease and vacating the Premises.   I am informed and believe that, based on the foregoing, the Debtor entered into an Exclusive Sublease Listing Agreement with CBRE (the "Listing Agreement") in the hopes that CBRE could find a replacement tenant for the Premises and reduce or eliminate any damages claim of the Landlord arising from the Debtor's termination of the Lease.   A true and correct copy of the Listing Agreement is attached hereto as Exhibit "4."

19.   I am informed and believe that, the Debtor chose CBRE as its broker because of CBRE's expertise and familiarity with the Building, as CBRE acted as the broker for the Landlord in obtaining the Debtor as a tenant.

20.   CBRE ultimately located NuComm as a potential new tenant for the Building.   As discussed, on the Termination Date,

24

NuComm will enter into a new lease for the Building, including the Premises.

21. As set forth in the attachment to the Listing Agreement, CBRE is entitled to a commission of $92,852.09 (the "Commission"). This is the total amount that will be paid to CBRE under the Listing Agreement.

22. I am informed and believe that, if the Debtor rejected the Lease under Section 365(a), the Landlord would be entitled to a claim in the amount of at least $609,067.50 (i.e., one year of rent) under Section 502(b)(6) (the "Lease Rejection Claim"). I am unaware of any defenses or claims of offset against such Lease Rejection Claim.

23. As discussed, under the proposed compromise, the Debtor will part with total consideration in the amount of $242,058.09 ($132,396 (value of Personal Property being abandoned to the Landlord), plus $16,810 Termination Fee payment to the Landlord, plus $92,852.09 Commission payment to CBRE). In exchange for the foregoing, the Debtor will recover its $275,000 Certificate of Deposit securing the L/C. On this basis alone, I believe that the proposed compromise will clearly benefit the Debtor, as the amount recovered exceeds the consideration paid by $32,952.

24. In addition to the foregoing, I believe that the proposed compromise will also benefit the Debtor by (1) almost immediately terminating the Debtor's responsibility for costs

associated with maintaining and operating the Premises, (2) reducing the general unsecured claim pool by $334,067.50, and (3) assuring a result regarding claims between the Debtor and the Landlord.

25. For all of the foregoing reasons, I believe that the proposed compromise under the Third Amendment and the Lease Termination Agreement is fair, reasonable, and in the best interests of the Debtor and its creditors and, therefore, should be approved by the Court.

26. The employment and payment of CBRE under the terms of the Listing Agreement is part and parcel with the proposed compromise. The Termination Agreement underlying the proposed compromise is conditioned upon the Landlord entering into a new lease for the Building with NuComm. I do not believe that NuComm or the Landlord would attempt to do an end-around to prevent CBRE from receiving benefits under the Listing Agreement, as this could subject the Landlord and/or NuComm, not to mention the Debtor, to claims by CBRE. If NuComm does not enter into a new lease with the Landlord for the Building, then the Debtor will not obtain the benefits resulting from the proposed compromise and may end up worse off. That is, the Debtor (1) would almost assuredly lose its entire Deposit, (2) would have to continue paying rent going forward from the Petition Date or be subject to an administrative claim until the Lease is rejected and the

26

1  Premises is vacated, and (3) would have to conduct a sale of the

2  Personal Property, which would likely result in a recovery of

3  less than the $132,396 estimated fair market value of   the

4  Personal Property after deducting costs of sale and fees and

5  costs associated with obtaining Court approval of such sale.

6

7      27.  In consideration of the foregoing, and the benefit

8  being conferred upon the Debtor under the Listing Agreement, the

9  I believe that good cause exists to authorize the Debtor to

10  employ CBRE and pay CBRE the $92,852.09 Commission pursuant to

11  the terms of Listing Agreement and 11 U.S.C. § 328.

12      I declare under penalty of perjury that the foregoing is

13  true and correct.

14

15      Executed this 6th day of October 2009, at South San

16  Francisco, California.

17

18                              _____

19                              BRIAN BUCHANAN

20

21

22

23

24

25

26

27

28

27

1

## DECLARATION OF SCOTT SENESE

2

I, Scott Senese, hereby declare as follows:

3

1.    I am over 18 years of age.    Except where otherwise

4

stated, I have personal knowledge of the facts set forth below

5

6

and, if called to testify, I would and could competently testify

7

thereto.

8

2.    I  am  a  licensed  real  estate  agent  and  a  Managing

9

Director  of  CB  Richard,  Ellis,  Inc.  ("CBRE").    I  make  this

10

declaration  in  support  of  the  Memorandum  to  which  this

11

declaration is attached insofar as it relates to the employment

12

and payment of CBRE.   Unless otherwise stated, all capitalized

13

terms herein have the same meanings as in the Memorandum.

14

3.    I  am  informed  and  believe  that,  in  late  2008,  the

15

16

Debtor  determined  that  it  would  be  in  its  best  interest  to

17

terminate the Lease and vacate the Premises, as the Debtor no

18

longer needed the Premises to operate its business.  I am further

19

informed and believe that, the Debtor did not want to incur a

20

large liability to the Landlord for terminating the Lease and

21

vacating the Premises.    In consideration of the foregoing, the

22

23

Debtor entered into an Exclusive Sublease Listing Agreement with

24

CBRE (the "Listing Agreement") in the hopes that CBRE could find

25

a replacement tenant for the Premises and reduce or eliminate any

26

damages  claim  of  the  Landlord  arising  from  the  Debtor's

27

28

28

termination of the Lease.  A true and correct copy of the Listing Agreement is attached hereto as Exhibit "4."

4.    I am informed and believe that, the Debtor chose CBRE as the Debtor's broker because of CBRE's expertise and familiarity with the Building, as CBRE acted as the broker for the Landlord in obtaining the Debtor as a tenant.

5.    CBRE ultimately located NuComm as a potential new tenant for the Building.

6.    As set forth in the attachment to the Listing Agreement, CBRE is entitled to a commission of $92,852.09 (the "Commission").  This is the total amount that will be paid to CBRE under the Listing Agreement.

7.    CBRE understands the provisions of 11 U.S.C. Sections 327, 328, 330 and 331 which require, among other things, Court approval of the Debtor's employment of CBRE as the Debtor's broker and of all fees and expenses that CBRE will receive from the Debtor's estate.  It is the parties' contemplation that CBRE's employment shall be pursuant to 11 U.S.C. § 328(a).  As such, CBRE will not be required to file an application for the payment of its fees and costs, and will be entitled to payment directly from the Debtor upon entry of an order approving the Motion and all conditions precedent in the Listing Agreement, including NuComm's execution of a new lease of the Building.

29

8. Other than as stated herein, to the best of my and CBRE's knowledge, CBRE does not hold or represent any interest adverse to the Debtor, the Debtor's creditors or the bankruptcy estate, and, though not required for employment under Section 328, CBRE is a "disinterested person" as that term is defined in Section 101(14). In addition, except as set forth above, CBRE has no prior connection with the Debtor, the bankruptcy estate, any insiders of the Debtor, any entities related to the Debtor, any creditors of the Debtor (other than to the extent that CBRE may have acted as a broker for such creditors), or any other party in interest in this case, or their respective attorneys or accountants, the United States Trustee or any person employed by the United States Trustee, or the Bankruptcy Judge assigned to the Debtor's bankruptcy case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of October 2009, at Austin, Texas.

_____
SCOTT SENESE

LEASE AGREEMENT

BETWEEN

**CP-PARK TEN, LTD.,**
AS LANDLORD

AND

**LIFEMASTERS SUPPORTED SELFCARE, INC.,**
AS TENANT

JANUARY 3, 2005

FIRST PARK TEN TECH CENTER
6660 FIRST PARK TEN BOULEVARD
SAN ANTONIO, TEXAS 78201

EXHIBIT 1

## TABLE OF CONTENTS

Page No.

SECTION 1 – DEFINITIONS ............................................................................................. 1
  1.1    Definitions............................................................................................................... 1
SECTION 2 – PREMISES................................................................................................... 4
  2.1    Lease Grant ............................................................................................................. 4
  2.2    Tenant Improvements ............................................................................................. 4
  2.3    WAIVER OF WARRANTIES; ACCEPTANCE OF CONDITION. ..................... 4
  2.4    Re-Measurement of Premises ................................................................................. 4
SECTION 3 – LEASE TERM ............................................................................................. 4
  3.1    Lease Term.............................................................................................................. 4
  3.2    Intentionally Deleted .............................................................................................. 5
  3.3    Termination Right ................................................................................................... 5
  3.4    Holding Over .......................................................................................................... 5
SECTION 4 – RENT ........................................................................................................... 5
  4.1    Payment of Rent...................................................................................................... 5
  4.2    Basic Operating Costs............................................................................................. 6
  4.3    Other Amounts Owing to Landlord ........................................................................ 8
  4.4    Late Payments; Dishonored Checks. ...................................................................... 9
  4.5    Net Lease ................................................................................................................ 9
  4.6    Free Rent Period ..................................................................................................... 9
  4.7    Property Tax Abatements......................................................................................... 9
SECTION 5 – CREDIT ENHANCEMENT ........................................................................ 9
  5.1    Intentionally Deleted .............................................................................................. 9
  5.2    Intentionally Deleted ............................................................................................ 10
  5.3    Financial Statements ............................................................................................ 10
  5.4    Letter of Credit..................................................................................................... 10
SECTION 6 – LEGAL AND CONTRACTUAL LIMITATIONS ON USE OF PREMISES ................. 11
  6.1    Use ....................................................................................................................... 11
  6.2    Compliance with Laws......................................................................................... 11
  6.3    Building Rules and Regulations; No Nuisance..................................................... 13
  6.4    Quiet Enjoyment .................................................................................................. 13
  6.5    Exclusivity ........................................................................................................... 13
SECTION 7 – OPERATIONAL MATTERS ..................................................................... 14
  7.1    Services to be Furnished by Landlord................................................................... 14
  7.2    Parking ................................................................................................................. 14
  7.3    Signage................................................................................................................. 15
  7.4    Repairs and Maintenance by Landlord ................................................................. 15
  7.5    Maintenance by Tenant......................................................................................... 15
  7.6    Repairs by Tenant ................................................................................................ 16
  7.7    Alterations, Tenant Improvements....................................................................... 16
  7.8    Telecommunications ............................................................................................ 17
  7.9    Change of Name or Common Areas ..................................................................... 17
  7.10  Entry by Landlord ................................................................................................ 17
SECTION 8 – TRANSFER OF LEASEHOLD RIGHTS ................................................... 17
  8.1    Transfers by Tenant ............................................................................................. 17
  8.2    Affiliate Transfers ............................................................................................... 18
  8.3    Transfer Requirements.......................................................................................... 19
  8.4    Transfers by Landlord........................................................................................... 19
SECTION 9 – INSURANCE; CASUALTY; ALLOCATION OF LIABILITY ................. 19
  9.1    Property Insurance ............................................................................................... 19

- i -

| | | |
|---|---|---|
| 9.2 | Liability and Other Insurance | 20 |
| 9.3 | Casualty Damage | 21 |
| 9.4 | INDEMNITY BY TENANT | 22 |
| 9.5 | INDEMNITY BY LANDLORD | 22 |
| 9.6 | Waiver of Claims and Subrogation Rights | 22 |
| 9.7 | Damages from Certain Causes | 23 |
| SECTION 10 – CONDEMNATION | | 23 |
| 10.1 | Condemnation | 23 |
| 10.2 | Condemnation Award | 24 |
| SECTION 11 – TITLE ENCUMBRANCES | | 24 |
| 11.1 | Subordination to Mortgage; Lender Rights | 24 |
| 11.2 | Intentionally Deleted | 24 |
| 11.3 | Mechanic's Liens | 24 |
| 11.4 | Tenant's Financing | 25 |
| | 25 | |
| SECTION 12 – DEFAULT; DISPUTES; REMEDIES | | 25 |
| 12.1 | Default by Tenant | 25 |
| 12.2 | Landlord's Remedies | 25 |
| 12.3 | Default by Landlord | 27 |
| 12.4 | Limitation on Landlord's Liability | 27 |
| 12.5 | Attorney's Fees | 27 |
| SECTION 13 – MISCELLANEOUS | | 27 |
| 13.1 | Notices | 27 |
| 13.2 | Estoppel Agreements | 28 |
| 13.3 | No Implied Waiver | 28 |
| 13.4 | Independent Obligations | 28 |
| 13.5 | Severability | 28 |
| 13.6 | Recording | 28 |
| 13.7 | Governing Law | 28 |
| 13.8 | Force Majeure | 28 |
| 13.9 | Time of Performance | 28 |
| 13.10 | Commissions | 28 |
| 13.11 | Merger of Estates | 28 |
| 13.12 | Survival of Indemnities and Covenants | 29 |
| 13.13 | Headings | 29 |
| 13.14 | Entire Agreement | 29 |
| 13.15 | Amendment | 29 |
| 13.16 | Intentionally Deleted | 29 |
| 13.17 | Multiple Counterparts | 29 |
| 13.18 | Effect of Delivery of this Lease | 29 |
| 13.19 | OFAC Certification | 29 |
| 13.20 | Property Code | 29 |
| SECTION 14 – SPECIAL PROVISIONS | | 30 |
| 14.1 | Emergency Generator | 30 |
| 14.2 | Temporary Space | 31 |

- ii -

## LEASE AGREEMENT

THIS LEASE AGREEMENT ("Lease") is executed effective as of January 3, 2005 (the "Effective Date"), between CP-PARK TEN, LTD., a Texas limited partnership ("Landlord"), and LIFEMASTERS SUPPORTED SELFCARE, INC., a California corporation ("Tenant").

### SECTION 1 – DEFINITIONS

1.1    Definitions As used in this Lease, the following terms are defined below:

"Base Rent" means the following:

| Months | Base Rent per Square Foot of Floor Space (per year)* | Annual Base Rent* | Monthly Base Rent* |
|--------|------|------|------|
| 1-5 | $-0- | $-0- | $-0- |
| 6-65 | $12.50 | $575,000.00 | $47,916.67 |
| 66-89 | $13.00 | $598,000.00 | $49,833.33 |

*The foregoing Base Rent amounts are based on a premises area of 46,000 square feet of floor space. Upon approval of the Final Space Plan (as defined in the Construction Agreement), Landlord will re-measure the Premises to determine the floor area of the Premises and if such re-measurement yields a different floor area than 46,000 square feet, then the Base Rent shall be adjusted, upward or downward as the case may be, to reflect the annual rental rates set forth above and a corresponding adjustment shall be made to the Construction Allowance (as defined in Exhibit "D") and to the "Tenant's Share" definition Notwithstanding the foregoing, in no event will the Premises consist of a floor area which is less than 45,000 square feet or more than 55,000 square feet.

"Basic Operating Costs" has the meaning given to such term in Section 4.2.

"Broker" means CB Richard Ellis.

"Building" means the building located upon the Property. The address of the Building is 6660 First Park Ten Boulevard, San Antonio, Texas 78201. The Building contains 65,898 square feet of floor space.

"Building Standard" means the level of service or type of equipment standard in the Building or the type, brand or quality of materials Landlord designates from time to time to be the minimum or exclusive type, brand or quality to be used in the Building.

"Commencement Date" means the earlier of (i) the date Tenant commences business in the Premises (excluding the Temporary Space), or (ii) March 1, 2005.

"Common Areas" means all areas, spaces, facilities and equipment (whether or not located within the Building) made available by Landlord for the common and joint use of Landlord, Tenant and others designated by Landlord. "Common Areas" includes, without limitation, tunnels, loading docks, walkways, sidewalks and driveways necessary for access to the Building, Parking Areas, Building lobbies, atriums, landscaped areas, public corridors, public restrooms, Building stairs, elevators

LEASE AGREEMENT / LIFEMASTERS – Page 1

open to the public, service elevators (service elevators will be available only for tenants of the Building and others designated by Landlord), drinking fountains and any such other areas and facilities, if any, as are designated by Landlord from time to time as Common Areas. "Common Areas" also includes areas so designated by Landlord on a floor of the Building occupied by a single tenant.

"Complex" means the Property, as well as the Building and Common Areas.

"Construction Agreement" means the Construction Agreement attached to this Lease as Exhibit "D".

"Default Rate" means the lesser of (i) the rate of 18% per year, and (ii) the maximum rate of interest then permissible for a commercial loan to Tenant in the State.

"Landlord-Related Party" means any officer, director, owner, partner, employee, agent, contractor, property manager, or broker of Landlord.

"Lease Term" means the period that begins on the Commencement Date and ends on the last day of the eighty-ninth (89th) full calendar month after the Commencement Date. By way of example, if the Commencement Date is March 15, the Lease Term would expire on August 31 of the appropriate year.

"Lease Year" means a period of 12 consecutive calendar months. If the Commencement Date does not occur on the first day of a month, the first Lease Year will begin on the first day of the month following the Commencement Date.

"Market Area" means the San Antonio metropolitan area.

"Normal Business Hours" means Monday through Friday, 7:30 a.m. to 5:30 p.m.

"Notice Address" means:

| With respect to Landlord: | c/o Champion Partners, Ltd. |
| | 15601 Dallas Parkway, Suite 100 |
| | Addison, Texas  75001 |
| | Attn: Mr. Stephen M. Modory |
| | Tel.: 972.490.5600 |
| | Fax: 972.490.5599 |
| | |
| With a copy to: | T. Andrew Dow, Esq. |
| | Winstead Sechrest & Minick P.C. |
| | 5400 Renaissance Tower |
| | 1201 Elm Street |
| | Dallas, Texas 75270 |
| | Tel.: 214.745.5387 |
| | Fax: 214.745.5390 |
| | |
| With respect to Tenant: | LifeMasters Supported SelfCare, Inc. |
| | 280 Utah Avenue |
| | South San Francisco, California  94080 |
| | Attn: CEO |
| | Tel.: 650.873.6000 |

LEASE AGREEMENT / LIFEMASTERS – Page 2

Fax: 650.873.6065

"Parking Areas" means those areas located upon the Property designated by Landlord, from time to time, to be parking areas.

"Premises" means that portion of the Building outlined on the floor plan(s) attached to this Lease as Exhibit "B". The Premises consists of 46,000 square feet of floor space, which square footage is subject to adjustment as provided in Section 2.4.

"Property" means the land described in Exhibit "A" attached hereto.

"Punchlist Items" means touch-up, minor finish, mechanical adjustment, or decoration work to be performed as a part of completing the Tenant Improvements.

"Rent" means, collectively, the Base Rent, the Tenant's Share of Basic Operating Costs (as provided in Section 4), the amounts to be paid by Tenant pursuant to the Construction Agreement (if any), and all other sums of money becoming due and payable to Landlord under this Lease.

"Rules and Regulations" means the rules and regulations for the Complex set forth on Exhibit "C" attached hereto, and any other reasonable rules and regulations that may be adopted or altered by Landlord in accordance with this Lease.

"Service Areas" means those areas, spaces, facilities and equipment serving the Building (whether or not located within the Building), including, but not limited to, service elevators, mechanical, telephone, electrical, janitorial and similar rooms and air and water refrigeration equipment, but to which Tenant and other occupants of the Building will have limited or no access.

"State" means the State of Texas.

"Taxes" means all taxes, assessments and governmental charges, whether federal, state, county or municipal, and whether they be by taxing districts or authorities presently taxing the Complex or by others, subsequently created or otherwise and any other taxes, association dues and assessments attributable to the Complex or its operation. The term "Taxes" does not include federal and state income taxes, franchise taxes, inheritance, estate, gift, corporation, net profits or any similar tax for which Landlord becomes liable or which may be imposed upon or assessed against Landlord. If, at any time during the Lease Term, the present method of taxation is changed so that in lieu of the whole or any part of any taxes, assessments or governmental charges levied, assessed or imposed on the Complex, there is levied, assessed or imposed on Landlord a capital levy or other tax directly on the Rent, or a franchise tax, assessment, levy or charge measured by or based, in whole or in part, upon the Rent, then all such taxes, assessments, levies or charges, or the part thereof so measured or based, will be included within the term "Taxes".

"Tenant Improvements" means those improvements to the Premises that Tenant has agreed to construct pursuant to the Construction Agreement.

"Tenant-Related Party" means any officer, director, owner, partner, employee, agent, contractor, vendor or broker of Tenant.

"Tenant's Share" means 69.80%, the proportion that the floor space of the Premises bears to the entire floor space of the Building, which percentage is subject to change as provided in Section 2.4.

LEASE AGREEMENT / LIFEMASTERS – Page 3

## SECTION 2 – PREMISES

2.1   <u>Lease Grant</u>. Landlord leases to Tenant, and Tenant leases from Landlord, the Premises and the non-exclusive right to use the Common Areas and Parking Areas, subject to all of the terms and conditions of this Lease. Landlord retains the right to grant easements and similar rights over, upon, and through the Premises without the consent or joinder of Tenant, so long as Landlord's exercise of such right does not adversely affect Tenant's rights hereunder in any material respect.

2.2   <u>Tenant Improvements</u>. Tenant will construct the Tenant Improvements in accordance with the terms of the Construction Agreement. Tenant is taking the Premises "as is" and "with all faults".

2.3   <u>WAIVER OF WARRANTIES: ACCEPTANCE OF CONDITION</u>.

(a)   TENANT ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS LEASE (INCLUDING THE CONSTRUCTION AGREEMENT), NEITHER LANDLORD NOR ANY LANDLORD-RELATED PARTY HAS MADE ANY REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO THE HABITABILITY, MERCHANTABILITY, SUITABILITY, QUALITY, CONDITION OR FITNESS FOR ANY PARTICULAR PURPOSE (COLLECTIVELY, THE "<u>DISCLAIMED WARRANTIES</u>") WITH REGARD TO THE PREMISES OR THE COMPLEX. TENANT HEREBY WAIVES, TO THE EXTENT PERMITTED BY LAW, THE DISCLAIMED WARRANTIES WITH REGARD TO THE PREMISES AND THE COMPLEX.

(b)   As of the Effective Date (i) Tenant has inspected (or has caused to be inspected) the Premises and the Complex, (ii) Tenant accepts the Premises and the Complex as being in good and satisfactory condition and suitable for Tenant's purposes, and (iii) the Premises and the Complex fully comply with Landlord's covenants and obligations hereunder.

(c)   Notwithstanding the foregoing, Tenant does not waive the right to cause Landlord to correct any "latent defects" (i.e., defects not reasonably discoverable during a thorough investigation of the Premises) in or affecting the Premises. If Tenant does not give Landlord written notice within 6 months following the Commencement Date, regarding latent defects in or affecting the Premises, such failure will constitute a waiver of any further claims of Tenant regarding such defects. However, nothing contained in this <u>Section 2.3(c)</u> limits the right of Tenant to enforce the repair and maintenance obligations of Landlord under this Lease.

2.4   <u>Re-Measurement of Premises</u>. Upon approval of the Final Space Plan (as defined in the Construction Agreement), Landlord will re-measure the Premises to determine the floor area of the Premises and if such re-measurement yields a different floor area than 46,000 square feet, then the Base Rent shall be adjusted, upward or downward as the case may be, to reflect the annual rental rates set forth in <u>Section 1.1</u> of this Lease, and a corresponding adjustment shall be made to the Construction Allowance (as defined in <u>Exhibit "D"</u>) and the Tenant's Share definition. To the extent any such adjustment is made, the parties agree to promptly enter into an amendment to this Lease reflecting such adjustment. Notwithstanding the foregoing, in no event will the Premises consist of a floor area which is less than 45,000 square feet or more than 55,000 square feet.

## SECTION 3 – LEASE TERM

3.1   <u>Lease Term</u>. This Lease will continue in force during a period beginning on the Effective Date of this Lease and ending on the expiration of the Lease Term, unless this Lease is terminated early or

extended to a later date pursuant to the terms of this Lease. The Lease Term will commence and Rent will accrue beginning on the Commencement Date.

3.2     Intentionally Deleted.

3.3     Termination Right.

(a)     Tenant shall have the right to terminate (the "Termination Right") this Lease as to all, but not a portion of the Premises effective on the date which is the last day of the sixty-fifth (65th) month after the Commencement Date (the "Early Termination Date"), provided each of the following conditions has been satisfied: (i) Tenant has given Landlord written notice (the "Termination Notice") at least nine (9) months prior to the Early Termination Date; (ii) Tenant is not in default hereunder at the time Tenant gives the Termination Notice to Landlord or at any time thereafter prior to the Early Termination Date; and (iii) Tenant has paid to Landlord on or before 90 days after Tenant's delivery of the Termination Notice, a Termination Fee (herein so called) equal to the product obtained by multiplying the total number of square feet of floor area in the Premises by $10.18. By way of example, if the Premises contains 46,000 square feet of floor area, the Termination Fee would be $468,280.00.

(b)     If Tenant exercises the Termination Right pursuant to this Section 3.3, Tenant must vacate the Premises no later than the Early Termination Date. Tenant must remove all of Tenant's personal property (including fixtures and equipment) and Tenant must, at its own cost and expense, repair any damage that Tenant may cause to the Premises in connection with such removal.

(c)     Landlord's and Tenant's obligations which have accrued under this Lease prior to the Early Termination Date will survive the termination of this Lease.

(d)     If Tenant fails to surrender possession of the Premises by the Early Termination Date, Tenant shall be subject to Section 3.4 below.

(e)     Upon Tenant's performance of each of the obligations contained in this Section 3.3, neither Landlord nor Tenant shall have any further obligations or liabilities under this Lease, except for those which by their express terms survive termination of the Lease.

3.4     Holding Over. If Tenant continues to occupy the Premises after the expiration of the Lease Term without the prior written consent of Landlord, such occupancy will be a tenancy at sufferance under all of the terms, covenants and conditions of this Lease, but the Base Rent will increase to a daily Base Rent equal to the number determined by multiplying the Base Rent for the final month of the Lease Term by 150%, and then dividing by 30. Tenant will also pay any and all costs, expenses or damages sustained by Landlord as a result of such holdover.

## SECTION 4 – RENT

4.1     Payment of Rent.

(a)     Except as otherwise expressly provided in this Lease, Tenant must pay Rent to Landlord in advance in monthly installments on the first day of each calendar month during the Lease Term, at Landlord's Notice Address or to such other person or at such other address as Landlord may from time to time designate in writing.

(b)     Rent must be paid without notice, demand, abatement, deduction or offset, except as otherwise expressly provided in this Lease.

LEASE AGREEMENT / LIFEMASTERS – Page 5

(c)    Together with its payment of Rent, Tenant also must pay to Landlord any applicable municipal, city, county, state, or federal excise, sales, use or transaction privilege taxes levied or imposed against or on account of the amounts payable by Tenant hereunder or the receipt thereof by Landlord (excluding state or federal income taxes imposed or levied against Landlord).

4.2    Basic Operating Costs.

(a)    Prior to the commencement of this Lease and prior to the commencement of each additional calendar year during the Lease Term, Landlord may, at its option, provide Tenant with a then-current estimate of Basic Operating Costs for the upcoming calendar year.  Thereafter, Tenant must pay, as additional rental, in monthly installments in accordance with Section 4.1, the estimated Tenant's Share of Basic Operating Costs for the calendar year in question.  The failure of Landlord to estimate Basic Operating Costs and bill Tenant on a monthly basis will not relieve Tenant of its obligation to pay Tenant's Share of Basic Operating Costs.

(b)    If the Building is not at least 95% occupied during any year of the Lease Term (including the calendar year in which the Lease Term commences), the Basic Operating Costs will be "grossed up" by increasing the variable components of Basic Operating Costs to the amount which Landlord projects would have been incurred had the Building been 95% occupied during such year, such amount to be annualized for any partial year.

(c)    By April 1 of each calendar year during Tenant's occupancy (including the calendar year following the year in which the Lease Term is terminated), or as soon thereafter as possible, Landlord will furnish to Tenant a statement of Tenant's Share of Basic Operating Costs (the "Statement").  Landlord and Tenant will determine whether there is any difference between the amount, if any, collected by Landlord from Tenant for the estimated Tenant's Share of Basic Operating Costs and the actual amount of Tenant's Share of Basic Operating Costs.  If there is an underpayment by Tenant, Tenant must pay the amount of such underpayment to Landlord within 30 days following delivery of the Statement.  If there has been an overpayment by Tenant, Landlord will credit such overpayment against Rent next coming due under the Lease.  At the end of the Lease Term, if no Event of Default exists, Landlord will refund any overpayment to Tenant in cash.  If the Lease Term commences or ends at any time other than the first day of a calendar year, Tenant's Share of Basic Operating Costs will be prorated for such calendar year according to the number of days of the Lease Term in such calendar year.

(d)    If there exists any dispute as to the calculation of Tenant's Share of Basic Operating Costs (a "Dispute"), the events, errors, acts or omissions giving rise to the Dispute will not constitute a breach or default by Landlord nor shall Landlord be liable to Tenant, except as specifically provided below.  If there is a Dispute, Tenant must notify Landlord in writing (specifying the items in dispute) within 90 days after receipt of the Statement.  Notwithstanding the existence of a Dispute, Tenant must timely pay the amount in dispute as and when required under this Lease, but payment will be without prejudice to Tenant's position.  Upon receipt of the payment, Landlord will give Tenant such supplementary information regarding the items in Dispute as may be reasonably requested by Tenant in an effort to resolve such Dispute.  If Landlord and Tenant are unable to resolve the Dispute, the Dispute will be referred to a mutually satisfactory third party certified public accountant for final resolution, although Tenant will retain the audit rights contained in Section 4.2(e).  The cost of the certified public accountant will be paid by the party found to be least accurate (in terms of dollars in dispute).  The decision of the certified public accountant will be final and binding.  Final settlement must be made within 30 days after receipt of such accountant's decision.  If Tenant does not dispute the calculation of Tenant's Share of Basic Operating Costs in accordance with the procedures and within the time periods specified in this Section 4.2(d), or if Tenant does not request an audit of the Basic Operating Costs in

accordance with the procedures and within the time periods specified in <u>Section 4.2(e)</u>, the Statement will be considered final and binding for the calendar year in question.

(e)    Tenant, at Tenant's expense, will have the right, no more frequently than once per calendar year, following 30 days' prior written notice (such written notice to be given within 30 days following Tenant's receipt of the Statement) to Landlord, to audit Landlord's books and records relating to Basic Operating Costs for the immediately preceding calendar year only.  Tenant's right to audit Landlord's books and records is subject to the following conditions:

(i)    Tenant must conduct the audit in a manner that will not unreasonably interfere with the conduct of Landlord's business.

(ii)    Tenant must conduct the audit during normal business hours and at the location where Landlord maintains its books and records.

(iii)    Tenant must deliver to Landlord a copy of the results of such audit within 5 business days after its receipt by Tenant.

(iv)    No audit will be permitted if an Event of Default by Tenant (including any failure by Tenant to pay an amount in Dispute) has occurred and is continuing.

(v)    Tenant must reimburse Landlord for the cost of all copies requested by Tenant or Tenant's auditor.

(vi)    The audit must be conducted by an independent, nationally-recognized accounting firm or a local accounting firm reasonably acceptable to Landlord that is not being compensated by Tenant on a contingency fee basis. The auditor and Tenant must agree with Landlord in writing to keep the results of the audit confidential by executing and delivering to Landlord a confidentiality agreement in a form acceptable to Landlord, in Landlord's reasonable discretion.

(vii)    No subtenant will have the right to audit Landlord.

(viii)    Tenant and its permitted assignees will be permitted only a total of 1 audit per calendar year.

(ix)    Tenant must conclude the audit within 60 days after Tenant's receipt of the Statement.

(x)    Any assignee's audit right will be limited to the period after the effective date of the assignment.

Unless Landlord in good faith disputes the results of the audit, an appropriate adjustment will be made between Landlord and Tenant to reflect any overpayment or underpayment of Tenant's Share of Basic Operating Cost Increases within 30 days after delivery of such audit to Landlord, in the manner described in <u>Section 4.2(c)</u>. If Landlord in good faith disputes the results of any such audit, the parties will in good faith attempt to resolve any disputed items. If Landlord and Tenant are able to resolve such dispute, final settlement will be made within 30 days after resolution of the dispute. If the parties are unable to resolve any such dispute, either Landlord or Tenant may trigger the Dispute mechanism described in <u>Section 4.2(d)</u>.

LEASE AGREEMENT / LIFEMASTERS – Page 7

(f)    "Basic Operating Costs" means all costs and expenses incurred by Landlord in each calendar year for operating, maintaining, repairing, managing and, except as otherwise specifically provided in Section 4.2(g) below, owning the Complex.  "Basic Operating Costs" includes, without limitation, utilities attributable to the Common Areas of the Building (if any), insurance, Taxes, general landscaping, mowing of grass, care of shrubs (including replacement of plants), operation and maintenance of lawn sprinkler system, operation and maintenance of exterior security lighting, water service and sewer charges, repainting of exterior surfaces of truck doors, handrails, down spouts and other parts of the Building that require periodic preventative maintenance, roof maintenance (to the extent not directly paid by Tenant), parking lot maintenance (including paving repairs and maintenance), common area maintenance, security service, pest control service for the Common Areas and Service Areas, property management fees, property owners' association dues and assessments, costs of insurance relating to the Complex, Permitted Legal Expenses (hereinafter defined), and any and all sales, use or other taxes with respect to the foregoing charged by 1 or more applicable authorities.  For purposes of the foregoing sentence, the term "Permitted Legal Expenses" means those legal expenses incurred with respect to the Complex which (i) relate directly to the use or operation of the Complex (as opposed to a particular tenant's space), (ii) benefit all of the tenants of the Complex generally, and (iii) are customarily the type of expense passed through to tenants in leases similar to this Lease.  Landlord may, at its option, amortize over a period of time reasonably determined by Landlord, and collect through Basic Operating Costs, the costs and expenses associated with the replacement of capital investment items if such costs and expenses are the type customarily passed through to tenants in leases similar to this Lease (such as, by way of example only, paving and painting of the Building), but expressly excluding the roof, foundation and other structural components of the Building.

(g)    "Basic Operating Costs" will not include any expenses or costs for the following items:

(i)    Except as provided in Section 4.2(f), costs that, under generally accepted accounting principles, are required to be classified as capital expenditures;

(ii)    Except as provided in Section 4.2(f), depreciation or amortization of the Building or its contents or components;

(iii)    Expenses for the preparation of space (including tenant finish out costs) or other similar type work that Landlord performs for any tenant or prospective tenant of the Building;

(iv)    Expenses incurred in leasing or obtaining new tenants or retaining existing tenants, such as marketing costs and leasing commissions;

(v)    Except as provided in Section 4.2(f), legal expenses;

(vi)    Interest, amortization or other costs associated with any mortgage, loan or refinancing of the Complex; or

(vii)    Any ground rent incurred for the Complex.

4.3    Other Amounts Owing to Landlord.  If Landlord incurs any expenses on behalf of Tenant or is otherwise due reimbursement from Tenant under this Lease, such amounts will be additional Rent. Tenant must pay the amounts owing within 15 days after its receipt of an invoice from Landlord.

LEASE AGREEMENT / LIFEMASTERS – Page 8

4.4   Late Payments; Dishonored Checks.

(a)   If Landlord does not receive any installment of Rent within 5 days after the date due, Tenant, to the extent permitted by law, must pay, in addition to the installment of Rent, a late payment charge equal to 5% of the installment of Rent due. The late payment charge will increase to 10% of the installment of Rent due if Tenant becomes responsible for a late payment charge more than twice during any consecutive 12-month period. The late payment charge will revert to 5% after Tenant has paid Rent for 12 consecutive months without incurring a late payment charge. Because the additional costs and expenses resulting to Landlord from late payments are difficult to ascertain precisely, this late payment charge constitutes a reasonable and good faith estimate by the parties of the extent of such additional costs and expenses.

(b)   In addition to the late payment charge contained in Section 4.4(a), all Rent, if not paid within 30 days after the date due, will, at the option of Landlord, and to the extent permitted by law, bear interest from the date due until paid at the Default Rate.

(c)   If any check is tendered by Tenant and not duly honored with good funds, the check will not constitute payment of Rent. Tenant will, in addition to any other remedies available to Landlord under this Lease (including late payment charges), pay Landlord a "NSF" fee of $25.00.

(d)   Acceptance of a late payment charge by Landlord does not constitute a waiver of Tenant's default with respect to the overdue amount, nor will it be construed as a waiver by Landlord of the requirement for timely payment nor create a course of dealing permitting such late payments. Any payment by Tenant or receipt by Landlord of a lesser amount than the monthly installment of Rent due under this Lease will be deemed to be on account of the earliest Rent due hereunder. No endorsement or statement on any check or any letter accompanying any check or payment as Rent will be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other remedy provided in this Lease.

4.5   Net Lease. This Lease is intended to be a fully net lease, so that this Lease will yield, net to Landlord, the Rent specified in this Lease. In that regard, all Basic Operating Costs (including, without limitation, all Taxes, insurance premiums, and utility charges), maintenance (except as otherwise provided in this Lease), repair and replacement expenses (except as otherwise provided in this Lease), expenses relating to compliance with all applicable laws and all other costs, fees, charges, expenses, reimbursements and obligations of every kind and nature whatsoever relating to the Premises which may arise or become due during the Lease Term must be paid and discharged by Tenant.

4.6   Free Rent Period. Landlord and Tenant acknowledge that Base Rent for the Premises is abated during the first five (5) months of the Lease Term (the "Free Rent Period"). Notwithstanding the foregoing, Tenant agrees that Tenant must pay Tenant's Share of Basic Operating Costs and all other charges due under this Lease during the Free Rent Period, it being agreed that only Base Rent is abated during such Free Rent Period.

4.7   Property Tax Abatements. To the extent Tenant is able to procure from the City of San Antonio or any other taxing authority a property tax abatement for the Premises, the benefit of any such tax abatement will accrue to the benefit of Tenant.

### SECTION 5 – CREDIT ENHANCEMENT

5.1   Intentionally Deleted.

LEASE AGREEMENT / LIFEMASTERS – Page 9

5.2    Intentionally Deleted.

5.3    Financial Statements.  During the Lease Term, Tenant must provide to Landlord the following financial statements, all of which must be (i) certified to Landlord as being true and correct by either the chief financial officer of Tenant or an independent certified public accountant, as Tenant may elect, (ii) prepared in accordance with generally accepted accounting principles consistently applied, and (iii) otherwise in form and substance reasonably acceptable to Landlord:

(a)    year-to-date unaudited financial statements for Tenant within 30 days after a written request for same by Landlord, such request not to be made more often than 3 times per calendar year; and

(b)    annual audited financial statements for Tenant within 30 days after such audited financial statements are completed.

If any of the aforementioned financial statements are not furnished to Landlord within the applicable time periods, Tenant shall immediately pay to Landlord a late fee of $250.00, which fee is deemed to be Rent hereunder.

5.4    Letter of Credit.

(a)    Tenant must deliver to Landlord an irrevocable standby Letter of Credit in the initial amount of $575,000.00 (the "Letter of Credit") when Tenant delivers to Landlord a signed counterpart of this Lease.  Either the Letter of Credit must state on its face that it is "transferable to the successors and assigns of Owner at no charge to Owner" or Tenant will be responsible for the payment of any fee charged by the issuer of the Letter of Credit in connection with any transfer by Landlord. Landlord (or Landlord's lender) will hold the Letter of Credit as security for the performance by Tenant of Tenant's covenants and obligations under this Lease.  The Letter of Credit is not to be considered an advance payment of Rent or a measure for Tenant's liability for damages in case of a default by Tenant. Landlord may, from time to time, without prejudice to any other remedy, draw upon the Letter of Credit to the extent necessary to make good any arrearages of Rent or to satisfy any other covenant or obligation of Tenant hereunder.  The Letter of Credit must (i) be in a form reasonably acceptable to Landlord; (ii) be written by a bank or other financial institution reasonably acceptable to Landlord, and (iii) permit Landlord to unconditionally draw upon the Letter of Credit by presentation of the Letter of Credit accompanied only by 1 of the following written statements: (A) "We hereby draw under your Letter of Credit number _____ for USD _____ as _____ (the Tenant) is in default under the Lease Agreement dated _____, 200__, between _____' (the Landlord) and _____"; or (B) "We hereby draw under your Letter of Credit number _____ for USD _____ as this Letter of Credit is scheduled to expire within 30 days and _____ (the Landlord) has not received a renewal or replacement of this Letter of Credit."

(b)    The initial term of the Letter of Credit (the "Initial Term") must commence on the Effective Date of this Lease and expire at the end of the seventeenth (17th) month after the Commencement Date.  Not later than 30 days prior to the expiration of the Initial Term of the Letter of Credit and any renewal term thereafter (in each case, a "Renewal Deadline"), Tenant must renew the term of or replace the Letter of Credit to meet the requirements set forth herein.  All renewals or replacements of the Letter of Credit must be for one (1)-year terms and, provided no Event of Default has occurred and is continuing, the amount of the Letter of Credit will be reduced on an annual basis at each such renewal/replacement by an amount equal to $75,000.00 (with the result being that the first renewal/replacement Letter of Credit will be in an amount equal to $500,000.00, the second renewal/replacement Letter of Credit will be in an amount equal to $425,000.00, etc.).  Except as set forth in the immediately preceding sentence, all of the other terms and conditions of this Section 5.4 shall apply

LEASE AGREEMENT / LIFEMASTERS – Page 10

to the renewal or replacement Letters of Credit to the same extent as the original Letter of Credit. Failure to timely renew or replace the Letters of Credit and deliver the renewed Letters of Credit to Landlord prior to the applicable Renewal Deadline will enable Landlord to immediately draw upon the then existing Letter of Credit and hold the same as a cash security deposit until such time as the renewal or replacement Letter of Credit is delivered. If Landlord ever draws upon a Letter of Credit, and if this Lease has not terminated, Tenant must immediately deliver to Landlord either cash or an endorsement of the issuer of the Letter of Credit reinstating the credit for the portion thereof used by Landlord, or an additional Letter of Credit conforming to the requirements of this Section 5.4, in an amount equal to the reduced portion of the original Letter of Credit used by Landlord. Tenant must not encumber the Letter of Credit in any manner, and Landlord will not be bound by any purported encumbrance.

(c)    If Landlord transfers its interest in the Complex during the Lease Term, Landlord may transfer all or any portion of the Letter of Credit to the transferee (and Tenant and Landlord will take such actions as are necessary to cause the Letter of Credit to be issued in the name of such transferee). Upon such transfer Tenant must thereafter look only to the new landlord for the return of the Letter of Credit, and Landlord shall thereupon be released of all liability to Tenant for the return of or to account for such Letter of Credit and shall have no further rights under such Letter of Credit.

## SECTION 6 – LEGAL AND CONTRACTUAL LIMITATIONS ON USE OF PREMISES

6.1    Use. The Premises must be used solely for customer service/call center operations. The Premises may not be used for any other purpose. Tenant, at Tenant's sole cost and expense, must obtain any and all licenses necessary for its use of the Premises.

6.2    Compliance with Laws.

(a)    Generally. Tenant, at Tenant's sole cost and expense, must comply in all material respects with all current and future federal, state, municipal and other laws and ordinances and all covenants, conditions, restrictions and other matters of record applicable to the use of the Premises, the employees, agents, visitors and invitees of Tenant, and the business conducted in the Premises by Tenant.

(b)    Environmental Laws – Tenant. Without limiting the requirements in Section 6.2(a) and subject to Section 6.2(c), Tenant must, at Tenant's own expense, comply with all laws regulating the use, generation, storage, transportation, or disposal of Hazardous Substances ("Environmental Laws"). Landlord and Tenant agree upon the following additional terms with regard to Environmental Laws:

(i)    The term "Hazardous Substances", as used in this Lease, includes, without limitation, flammable, explosives, radioactive materials, asbestos, polychlorinated biphenyl (PCB's), chemicals known to cause cancer or reproductive toxicity, pollutants, contaminants, irritants, hazardous wastes, toxic substances or related materials, petroleum and petroleum products, and substances declared to be hazardous or toxic under any law or regulation now or hereafter enacted or promulgated by any applicable governmental authority, including under federal, state, and local laws, rules, regulations, and ordinances.

(ii)    Tenant must, at Tenant's own expense, make all submissions to, provide all information required by, and comply with all requirements of all governmental authorities (the "Authorities") under the Environmental Laws.

(iii)    If any Authority or any third party demands that a clean-up plan be prepared and that a clean-up be undertaken because of any deposit, spill, discharge, or other release of Hazardous Substances that occurs during the Lease Term or in connection with this

LEASE AGREEMENT / LIFEMASTERS – Page 11

Lease or Tenant's use of the Premises, whether during the Lease Term or not, at or from the Premises, or which arises at any time from Tenant's use or occupancy of the Premises, then Tenant must, at Tenant's own expense, prepare and submit the required plans and all related bonds and other financial assurances to the applicable Authorities. In such case Tenant must provide copies of all of such to Landlord at the same time provided to the Authorities. Tenant shall carry out all such clean-up plans.

(iv)    Tenant must promptly provide all information regarding the use, generation, storage, transportation, or disposal of Hazardous Substances that is requested by Landlord. If Tenant fails to fulfill any duty imposed under this Section 6.2(b) within a reasonable time, Landlord may do so. In such case, Tenant must reasonably cooperate with Landlord in order to prepare all documents Landlord deems reasonably necessary or appropriate to determine the applicability of the Environmental Laws to the Premises and Tenant's use thereof, and for compliance therewith, and Tenant must execute all documents promptly upon Landlord's request. No such action by Landlord and no attempt made by Landlord to mitigate damages under any Law will constitute a waiver of any of Tenant's obligations under this Section 6.2(b).

(v)    Notwithstanding anything contained in this Section 6.2(b) to the contrary, Tenant may not take any remedial action in or about the Premises, nor enter into any settlement agreement, consent decree or other compromise with respect to any claims relating to any Hazardous Substances in any way connected with the Premises without first notifying Landlord of Tenant's intention to do so and affording the Landlord the opportunity to appear, intervene or otherwise assert and protect Landlord's interest with respect thereto.

(vi)    Subject to Section 6.2(c), Tenant must indemnity, defend at its cost, and hold harmless Landlord and the Landlord-Related Parties from all fines, suits, procedures, claims and actions of every kind, and all costs associated therewith (including attorneys' and consultants' fees) arising out of or in any way connected with the following if caused by the acts or omissions of Tenant or a Tenant Related Party: (A) any deposit, spill, discharge or other release of Hazardous Substances that occurs during the Lease Term, at or from the Premises, or that arises at any time from Tenant's use or occupancy of the Premises (whether or not during the Lease Term), (B) Tenant's failure to provide all information, make all submissions, and take all steps required by all Authorities under the Environmental Laws and all other environmental laws, or (C) Tenant's failure to otherwise fulfill each and every obligation to be performed by it in this Section 6.2(b).

(vii)    Tenant must promptly notify Landlord and provide Landlord with copies of any notice or other correspondence given or received by Tenant regarding (A) Hazardous Substances affecting the Premises or the Complex, (B) Tenant's knowledge as to the violation of any law relating to Hazardous Substances on the Premises or in the Complex or (C) the breach by Tenant of any provisions of this Section 6.2(b).

(viii)    Tenant's obligations and liabilities under this Section 6.2(b) will survive the expiration or earlier termination of this Lease.

(c)    Environmental Laws – Landlord.  To Landlord's current, actual knowledge, Landlord represents to Tenant that no Hazardous Substances are currently present in the Building or on the Complex, nor, to Landlord's current actual knowledge, have any Hazardous Substances been concealed within, buried beneath, released on or from, or removed from the Building or the Complex. Landlord must indemnify, defend at its cost, and hold harmless Tenant from any and all fines, suits, proceedings, claims and actions of every kind, and all costs associated therewith (including attorneys' and

LEASE AGREEMENT / LIFEMASTERS – Page 12

consultants' fees) arising out of or in any way connected with the presence of, release of or threatened release of Hazardous Substances at or from the Property (excluding the Premises) which (i) occurred prior to the Effective Date of this Lease at or from the Premises, or (ii) were caused by the acts or omissions of Landlord or any Landlord Related Party.

(d)    Accessibility Laws.  Tenant, at its sole cost, is responsible for compliance with the Americans With Disabilities Act and comparable federal, state and local statutes or regulations relating to accessibility of facilities (the "Accessibility Laws") insofar as applicable within the Premises (including the Tenant Improvements and all Alterations made to the Premises or any other acts of Tenant after the Commencement Date) and all requirements of Accessibility Laws that relate to the employer-employee relationship or that are necessitated by the special needs of any employee, agent, visitor or invitee of Tenant, including, without limitation, requirements related to auxiliary aids and graphics.  Landlord, at its sole cost, is responsible for compliance with Accessibility Laws with respect to the Building Common Areas and the Service Areas, except for any improvements required to the Common Areas or Service Areas that are attributable to Tenant's specific use of the Premises.  Neither party will be in default under this Section 6.2(d) for its failure to comply with Accessibility Laws so long as the responsible party is either contesting in good faith, and by legal means, the enforcement of Accessibility Laws, or is undertaking diligent efforts to comply with Accessibility Laws.

6.3    Building Rules and Regulations; No Nuisance.

(a)    Landlord has the right to adopt and modify Rules and Regulations governing the use and occupancy of the Complex, including the Parking Areas.  Tenant must comply with the Rules and Regulations and must cause all of its Tenant-Related Parties, contractors, invitees and visitors to do so as well.  Landlord may change the Rules and Regulations from time to time, as Landlord deems necessary.  Any changes to the Rules and Regulations will be effective when sent by Landlord to Tenant in writing.  Landlord will have no liability to Tenant or any other person solely for its failure to enforce the Rules and Regulations, but Landlord agrees that it will enforce such Rules and Regulations in a non-discriminatory manner among all tenants.

(b)    Tenant may not commit any act which is a nuisance or annoyance to Landlord or to other tenants in the Building or Complex or which might, in the reasonable judgment of Landlord, appreciably damage Landlord's goodwill or reputation, or tend to injure or depreciate the value of the Building or Complex.

6.4    Quiet Enjoyment.  Tenant, on paying all sums required under this Lease and performing and observing all of its covenants and agreements, may peaceably and quietly occupy and use the Premises during the Lease Term.  Such occupancy and use is subject to the provisions of this Lease, all matters of record affecting the Complex and applicable governmental laws, rules, and regulations.  Landlord warrants and forever defends Tenant's right to such occupancy against the claims of any and all persons lawfully claiming the same or any part thereof by, through or under Landlord, subject only to the provisions of this Lease, all matters of record now or hereafter affecting the Complex and all applicable governmental laws, rules, and regulations.

6.5    Exclusivity.  So long as Tenant is using the Premises for customer service/call center operations and no Event of Default exists under this Lease, Landlord agrees that Landlord will not lease any additional space in the Building to another tenant for use as a customer service or call center operation that (i) has a similar primary focus in disease management or other similar medical related services, and/or (ii) has registered nurses as its primary source of call center labor.  Notwithstanding the foregoing, Landlord shall have the right at all times to lease additional space in the Building for any other use (including, without limitation, other call center operations).

LEASE AGREEMENT / LIFEMASTERS – Page 13