1  RON BENDER (SBN 143364)
   TODD M. ARNOLD (SBN 221868)
2  JOHN-PATRICK M. FRITZ (SBN 245240)
   LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone:  (310) 229-1234
   Facsimile:  (310) 229-1244
5  Email:  rb@lnbrb.com, tma@lnbrb.com, jpf@lnbrb.com

6  Attorneys for Chapter 11 Debtor
   and Debtor in Possession
7
                UNITED STATES BANKRUPTCY COURT
8                CENTRAL DISTRICT OF CALIFORNIA
                    (SANTA ANA DIVISION)
9

10

11  In re:                          ) Case No. 8:09-bk-19722-ES
                                    )
12  LIFEMASTERS        SUPPORTED    ) Chapter 11
    SELFCARE, INC., a California    )
13  corporation,                    )
                                    ) **DEBTOR'S MOTION FOR  AN ORDER:**
14                                  ) **(1)  APPROVING  AUCTION  SALE**
                 Debtor.            ) **FORMAT, BIDDING PROCEDURES AND**
15                                  ) **STALKING HORSE BID PROTECTIONS;**
                                    ) **(2) APPROVING FORM OF NOTICE TO**
16                                  ) **BE  PROVIDED  TO  INTERESTED**
                                    ) **PARTIES; (3) APPROVING FORM OF**
17                                  ) **ASSET  PURCHASE  AGREEMENT  FOR**
                                    ) **PROSPECTIVE OVERBIDDERS TO USE;**
18                                  ) **AND  (4)  SCHEDULING  A  COURT**
                                    ) **HEARING TO CONSIDER APPROVAL OF**
19                                  ) **THE SALE TO THE HIGHEST BIDDER;**
                                    ) **MEMORANDUM  OF  POINTS  AND**
20                                  ) **AUTHORITIES;  DECLARATION  OF**
                                    ) **GEORGE D.  PILLARI  IN  SUPPORT**
21                                  ) **THEREOF**
                                    )
22                                  )
                                    )
23                                  ) Court Scheduled Hearing:
                                    ) Date:  [To Be Scheduled]
24                                  ) Time:  [To Be Scheduled]
                                    ) Place: Courtroom "5A"
25                                  )        411 West Fourth Street
                                    )        Santa Ana, CA 92701-4593
26                                  )
                                    )
27                                  )

28  ─────────────────────────────

                        1

Pursuant to Sections 105(a), 363, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rule 6004-1(b)(1), LifeMasters Supported SelfCare, Inc., the Chapter 11 debtor and debtor in possession herein (the "Debtor"), hereby files this Motion ("Motion") for entry of an order (the "Bidding Procedures Order") as follows:

1. approving the auction sale format, bidding procedures and bid protections described below in the annexed Memorandum of Points and Authorities.

2. approving the Debtor's proposed form of notice to be provided to creditors, prospective overbidders and other parties in interest in the form attached as Exhibit "2" to the annexed Declaration of George D. Pillari.

3. approving the form of asset purchase agreement for prospective overbidders to use by requiring prospective overbidders either to use the same form of asset purchase agreement (the "APA") agreed to by the Debtor and Alere, LLC, (the "Purchaser"), or to submit a redlined version of a proposed asset purchase agreement which indicates the prospective overbidder's changes to the APA. A copy of the APA is attached as Exhibit "1" to the annexed Declaration of George D. Pillari.

4. scheduling a Court hearing to consider approval of the sale of the Acquired Assets (defined below) to Purchaser, or such other prevailing bidder, pursuant to the terms and

conditions of the APA. The Debtor requests the Court to schedule the actual sale hearing to be held on December 17, 2009 at 10:30 a.m., so that the Debtor can have an adequate period of time to market the sale of the Acquired Assets for overbid, obtain an entered order by the Court that week, and consummate the sale of its assets during the following week, and thereby comply with the timing requirements established in the APA.

    5.   Granting certain related relief.

As set forth more fully below, the Debtor has concluded that proceeding with an expedited sale of substantially all of its tangible and intangible assets designated for acquisition by Purchaser (excluding the Debtor's cash and outstanding accounts receivable), the Debtor's executory contracts and unexpired leases that Purchaser elects to acquire (the "Assumed Contracts"), and all of the Debtor's intellectual property (except for any intellectual property that Purchaser elects not to acquire) (collectively, the "Acquired Assets") for the highest price possible is in the best interests of this estate and is the optimal option available to the Debtor. The Debtor's business has been broadly and thoroughly marketed for sale by a highly skilled professional organization known as Alvarez & Marsal Healthcare Industry Group, LLC ("A&M"), which has broad experience managing a sale process. A&M has had extensive discussions and negotiations with a number of prospective

buyers, many of whom have already conducted and are continuing to conduct due diligence of the Debtor.

The APA was negotiated between the Debtor and Purchaser in good faith, arms-length negotiations, including exchanges of multiple drafts of asset purchase agreements between the Debtor and Purchaser (as well as concurrent exchanges of drafts of asset purchase agreements with another interested buyer). After numerous rounds of concurrent negotiations with both potential buyers (as well as oral conversations with numerous other prospective buyers), the Debtor has determined in the exercise of its sound business judgment that the $1.75 million cash proposal made by Purchaser in the APA is the best available offer for the Acquired Assets that the Debtor has received, and concluded that Purchaser's offer establishes a reasonable and viable floor for an auction sale of the Acquired Assets.

As more explained below, the Debtor does not have any secured debt, and, as of October 31, 2009, the Debtor has approximately $7,384,000 of cash and approximately $4,443,000 of outstanding accounts receivable. Accordingly, following the closing of the sale of the Acquired Assets, the Debtor will be in a position to propose a liquidating plan providing for the distribution of the proceeds from the sale of the Acquired Assets, coupled with the Debtor's cash and collections from outstanding accounts receivable, to the Debtor's administrative,

priority and general unsecured creditors in accordance with their respective priorities under the Bankruptcy Code.

In consultation with A&M, the Debtor has concluded that it is significantly better off having a binding agreement with a stalking horse bidder and then seeking overbids, if any, in an auction format, than it would be were it to proceed to an auction sale with no stalking horse bidder in place. Also in consultation with A&M, the Debtor has concluded that Purchaser is the ideal stalking horse bidder. The APA that Purchaser has executed is straight forward, and Purchaser has agreed to a break-up fee if it is not the winning bidder for the Debtor's assets at the auction sale of only $60,000 (without any additional expense reimbursement), which equates to approximately 3% of Purchaser's $1.75 million purchase price. The Debtor submits that this is an extremely reasonable break-up fee and a relatively small price for the Debtor to pay in exchange for having a guaranteed buyer at the auction sale. The Debtor also submits that a break-up fee of $60,000 will not dissuade other interested parties from bidding at the auction sale or otherwise serve to chill the bidding for the Acquired Assets in any way. In fact, as set forth in the APA, given that the initial overbid is required to be at least $100,000 higher than Purchaser's stalking horse bid and each subsequent bid thereafter is required to be at least $75,000 higher than the preceding bid, Purchaser will not have any bidding advantage at

the auction sale resulting from its break-up fee because each bid made at the auction sale will provide the Debtor's estate with a better net result than the previously submitted bid even after taking into account the payment of the $60,000 break-up fee to Purchaser if Purchaser is not the winning bidder at the auction sale.

Local Bankruptcy Rule 6004-1(b)(1) provides as follows:  "A hearing on a Motion to Establish Procedures for the Sale of the Estate's Assets ("Sale Procedures Motion") may be scheduled on not less than 5 days notice to applicable parties, unless an order shortening the time for a hearing is obtained under LBR 9075-1(b)."

While the APA requires the Debtor to obtain an entered order approving sale procedures within thirty days following the filing of this Motion (see Section 9.3 of the APA), the Debtor believes that there is no benefit to the Debtor's estate of delaying the consummation of a sale of the Acquired Assets. However, if the Debtor loses money between now and the consummation of the asset sale there would be a detriment to the Debtor's estate from delaying the consummation of the asset sale.  The Debtor cannot notify Purchaser and other interested parties of the date and time of the auction sale or the terms of the auction sale until the Court enters an order approving the sale procedures.  The Debtor would like to conduct the auction sale on December 14, 2009 and close the asset sale during the

week of December 21, so that the asset sale is consummated prior to the start of the holiday season. In order to comply with this time table and to provide other interested parties with reasonable notice of an opportunity to overbid, the Debtor requests the Court to schedule a hearing on this Motion on November 17, 2009 or the first possible available hearing date thereafter. A hearing on November 17, 2009 at 10:30 a.m. would be ideal because it would be within five days after the date of the filing of this Motion (thereby satisfying the five-day time period specified in Local Bankruptcy Rule 6004-1(b)(1)), and the Debtor's counsel and the principal representatives of A&M are scheduled to be in Court on that date and time on a different matter. Also, the Section 341(a) Meeting of Creditors is scheduled to take place in this case at 12:30 p.m. on November 17, 2009 so having this Motion approved before then on that same date will enable the Debtor to advise creditors who appear at the Section 341(a) Meeting of Creditors of the occurrence of these events. **If at all possible, the Debtor therefore requests the Court to schedule the hearing on this Motion on Tuesday, November 17, 2009 at 10:30 a.m.**

Concurrently with the filing of this Motion with the Court (on November 11, 2009), the Debtor served a copy of this Motion and all supportive papers upon the Office of the United States Trustee, the Debtor's twenty largest unsecured creditors, Purchaser and all parties who have requested special notice. As

soon as the Debtor obtains the date and time of the hearing on this Motion from the Court, the Debtor will provide expedited notice of such date and time upon the same people/entities who were served with this Motion.

The relief sought in this Motion is based upon this Motion, the Memorandum of Points and Authorities and Declaration of George D. Pillari annexed hereto, the statements, arguments and representations of counsel to be made at the hearing on this Motion, and any other evidence properly presented to the Court at or prior to the hearing on this Motion.

**WHEREFORE,** the Debtor respectfully requests that this Court:

1. schedule a hearing to consider approval of this Motion to be held on Tuesday, November 17, 2009 at 10:30 a.m. (or the first available date and time thereafter);

2. approve the auction sale format, bidding procedures and stalking horse bid protections described below in the annexed Memorandum of Points and Authorities;

3. approve the Debtor's proposed form of notice to be provided to creditors, prospective overbidders and other parties in interest in the form attached as Exhibit "2" to the annexed Declaration of George D. Pillari;

4. approve the form of asset purchase agreement for prospective overbidders to use by requiring prospective overbidders either to use the same form of APA agreed to by the

Debtor and Purchaser or to submit a redlined version of a proposed asset purchase agreement which indicates the changes to the APA requested by the prospective overbidder;

5.    schedule a Court hearing to consider approval of the sale of the Acquired Assets to Purchaser, or such other prevailing bidder.    The Debtor requests the Court to schedule the actual sale hearing to be held on December 17, 2009 at 10:30 a.m. so that the asset sale can be consummated during the week of December 21, 2009;

6.    enter the form of Bidding Procedures Order attached as Exhibit "3" to the annexed Declaration of George D. Pillari; and

7.    grant such other and further relief as the Court deems just and proper.

Dated: November 11, 2009          LIFEMASTERS SUPPORTED SELFCARE,
                                  INC.

                                  /s/ Ron Bender
                                  RON BENDER
                                  TODD M. ARNOLD
                                  JOHN-PATRICK M. FRITZ
                                  LEVENE, NEALE, BENDER, RANKIN
                                  & BRILL L.L.P.
                                  Attorneys for Chapter 11
                                  Debtor and Debtor in Possession

9

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES

I.   CASE BACKGROUND AND ASSET SALE PROCESS..................10

II.  THE ASSET PURCHASE AGREEMENT WITH PURCHASER.............21

III. DISCUSSION.........................................24

IV.  OTHER RELIEF REQUESTED BY THE DEBTOR....................30

V.   CONCLUSION .......................................31

DECLARATION OF GEORGE D. PILLARI...........................33

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

Cottle v. Storer Communication Inc.
    849 F.2d 570 (11th Cir. 1988) ...............................26

In re 995 Fifth Ave. Assoc., L.P.
    96 B.R. 24 (Bankr. S.D.N.Y. 1989) ..........................26

In re Atlanta Packaging Products, Inc.
    99 B.R. 124 (Bankr. N.D. Ga. 1988) .........................25

In re Financial News Network, Inc.
    126 B.R. 152 (Bankr. S.D.N.Y. 1991) ........................26

In re Integrated Resources, Inc.
    147 B.R. 650 (S.D.N.Y. 1992), *app. dismissed on*
    *jurisdictional grounds*, 3 F.3d 49 (2d Cir. 1993) ....26, 27, 28

In re S.N.A. Nut Co.
    186 B.R. 98 (Bankr. N.D. Ill. 1995) ....................26, 27

**FEDERAL STATUTES**

11 U.S.C. § 101 ......................................2, 9, 10, 14

11 U.S.C. § 105(a)........................................2, 23

11 U.S.C. § 363..........................................2, 24

11 U.S.C. § 363(b)(1)........................................24

11 U.S.C. § 503..........................................2, 20

11 U.S.C. § 507..........................................2, 20

11 U.S.C. § 1107...........................................10

11 U.S.C. § 1108...........................................10

**OTHER AUTHORITIES**

Fed.R.Bankr.P. 2002.......................................2, 24

Fed.R.Bankr.P. 6004..................................2, 24, 25

ii

Fed.R.Bankr.P. 6004-1(b)(1) ...............................2, 6, 7

Fed.R.Bankr.P. 6004(f) ........................................25

Fed.R.Bankr.P. 9014 ............................................2

MEMORANDUM OF POINTS AND AUTHORITIES

I.

CASE BACKGROUND AND ASSET SALE PROCESS

The Debtor commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on September 14, 2009 (the "Petition Date"). The Debtor continues to operate its business, manage its financial affairs, and operate its bankruptcy estate as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is a privately held company which was founded in 1994. The Debtor is headquartered in Irvine, California, and also has offices located in Cupertino, California, South San Francisco, California, Rancho Cordova, California, Albuquerque, New Mexico, Indianapolis, Indiana, and San Antonio, Texas.

The Debtor had total revenue in 2008 of approximately $80 million. With the exception of certain equipment lessors and sellers, the Debtor does not have any known secured creditors. The Debtor is not aware of any entity that asserts a lien against the Debtor's cash collateral. The Debtor currently has approximately 200 employees. Additional information about the Debtor can be obtained at the Debtor's website - www.lifemasters.com.

The Debtor is a national disease management company whose mission is to help its many thousands of participants achieve

10

and maintain optimal health by closing the gaps in medical care and encourage the adoption of healthy lifestyles. With more than a decade of experience, the Debtor is an expert at delivering disease management services to individuals with chronic diseases such as diabetes, cardiovascular disease, respiratory disease, musculoskeletal conditions and their co-morbidities.

The Debtor's health professionals coach and educate participants over the phone, teach them how to monitor their vital signs and symptoms, and ultimately take more responsibility for their health. The Debtor involves the participant's physicians by providing them with relevant medical information between office visits to prevent unnecessary complications. This often results in participants establishing a better relationship with their physicians and can help them avoid unnecessary hospitalizations and emergency room visits, reducing total costs to payors.

The Debtor has worked with, and continues to work with, some of the nation's leading health plans, employers, retirement systems and governmental organizations, which purchase the Debtor's services in an effort to reduce costs and enhance care. Historically, approximately 30% of the Debtor's gross revenue has been derived from its contracts with the Center for Medicare and Medicaid Services ("CMS"), which administers a number of Medicare and Medicaid programs. In or about October, 2006, the

11

1  Debtor requested early termination of one of its contracts with

2  CMS due to a range of significant program problems and

3  irregularities, rendering it impossible for the Debtor to

4  satisfy the financial risk terms of the cooperative agreements.

5  In or about June, 2009, CMS cancelled a different contract

6  with the Debtor for a demonstration program involving

7  participants located in Florida. In conjunction with canceling

8  the foregoing contracts, CMS has asserted claims to recover all

9  amounts previously paid to the Debtor, which amounts to an

10  aggregate of approximately $106 million.

11  The cancellation of contracts by CMS coupled with the

12  cancellation of contracts by other customers caused a

13  precipitous decrease of the Debtor's annual revenue by over 50%.

14  The combination of this loss of revenue coupled with the claim

15  asserted by CMS against the Debtor made it clear to the Debtor's

16  Board of Directors that an expeditious financial restructuring

17  was going to be necessary.

18  The Debtor's Board of Directors is comprised of five highly

19  sophisticated and experienced people, four of whom have never

20  been involved in the day-to-day operations of the Debtor's

21  business. Even though it has been clear from the time of the

22  CMS contract cancellation and assertion of the approximately

23  $106 million claim against the Debtor that the Debtor's assets

24  are worth substantially less than the Debtor's debt, and that

25  there would likely be no recovery for the Debtor's equity

26

27

28                                    12

holders, the members of the Debtor's Board of Directors take their fiduciary duty to maximize the recovery to creditors extremely seriously. Both prior and subsequent to the Petition Date, the Board has engaged in detailed and extensive meetings on an average of once per week in an effort to maximize the recovery for the Debtor's creditors.

Given the complexity of the Debtor's business and the dire circumstances facing the Debtor, the Board quickly concluded that the Debtor was in serious and immediate need of a highly skilled financial advisor to advise the Debtor. The Board interviewed a number of candidates and concluded that A&M was the optimal choice.

Beginning on June 10, 2009 and continuing through the Petition Date, A&M served as the restructuring advisors to the Debtor. During this period, several professionals of A&M, including George Pillari, Brian Buchanan and Steven Kraus, devoted substantial amounts of time and effort working with the Board and the Debtor's senior management to, among other things, assist in the development of projections, assist in cash management activities, assist in the preparation of a liquidation analysis, assist in the development and implementation of a business plan, and assist in the dramatic scale down of the Debtor's business operations and labor force, which was critically necessary to preserve the Debtor's cash reserves given the termination of the CMS contracts and others.

13

After consummating a substantial scale down of the Debtor's business operations and labor force, the Board concluded that the Debtor needed a chapter 11 bankruptcy filing as the vehicle by which the Debtor's business could either be sold or restructured through a confirmed plan of reorganization. The Debtor therefore filed a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date of September 14, 2009.

The Board determined that the Debtor's pre-petition management team was not qualified to take the Debtor through a chapter 11 bankruptcy process. None of them had experience in managing a financially distressed company (in or out of bankruptcy) and none of them had any experience or qualifications to manage an asset sale process or to formulate a chapter 11 plan of reorganization.

The Board therefore requested A&M, which is one of the nation's leading crisis management companies (as well as financial advisors), to agree to manage the Debtor through the entire bankruptcy process. Specifically, the Board requested George Pillari, a managing director of A&M, to serve as the Debtor's President and for Brian Buchanan, a director of A&M, to serve as the Debtor's Chief Financial Officer. The Board also requested A&M to provide such additional personnel as A&M determined were necessary to enable the Debtor to pursue the path that would maximize the recovery for the Debtor's creditors, whether that path consisted of a going concern asset

14

1 sale, a restructuring under a confirmed plan of reorganization,
2 or a liquidation of the Debtor's business.

3       Since the Petition Date, Mr. Pillari, Mr. Buchanan and
4 Steven Kraus of A&M who is serving as the Debtor's controller
5 have effectively served as the entire senior management team of
6 the Debtor and have worked essentially full time for the Debtor.
7 During their tenure as senior management of the Debtor, A&M has
8 provided, among others, the following critically important
9 benefits to the Debtor:

10      i.   A&M initiated and managed the Debtor's data center
11 migration plan, which is a core component of the Debtor's
12 business as a disease management company.   The data center
13 migration, coordinated and implemented by A&M, resulted in
14 substantial monetary savings and economic efficiencies for the
15
16 Debtor.   Moreover, with the Debtor's disparate technologies
17 consolidated into co-location facilities, the Debtor can relieve
18 itself of more than $3.0 million of annual rent expense for
19 office space that previously housed the equipment.

20      ii.  A&M    further    economized    the    Debtor's    business
21 operations by restructuring its work force from more than 400
22 employees to an expected number of 100 employees in the first
23 quarter of 2010, making the Debtor a more efficient and
24 competitive entity in the healthcare management industry.

25      iii. A&M analyzed all of the Debtor's executory contracts
26 and  unexpired  leases,  determined  which  ones  needed  to  be
27
28                              15

rejected at this early stage of the case, and coordinated the rejection of certain executory contracts and unexpired leases and negotiated settlements of their respective rejection damage claims.

iv.   A&M successfully persuaded the Debtor's key employees to remain with the Debtor which was a difficult task given the uncertainty created by the Debtor's bankruptcy filing. Retaining those employees helped to preserve the Debtor's going-concern value and enabled the Debtor to avoid the expense, inefficiency, knowledge loss and business disruption of having to hire and train new personnel.

v.    A&M interfaced with the Board and the Debtor's bankruptcy counsel and served as the point for receiving and disseminating all important information to the Board, the Debtor's counsel and prospective buyers and equity sponsors of a plan of reorganization.

vi.   Mr. Pillari and Mr. Buchanan (who have served as the Debtor's full time President and Chief Financial Officer since the inception of the Debtor's bankruptcy case) have been instrumental in the daily operations of the Debtor's business and restructuring, at all times seeking to implement a business plan to maintain the Debtor's cash balances and facilitate a prompt sale of the Debtor's business or the confirmation of a plan of reorganization.  In their capacities as the Debtor's two senior officers, Mr. Pillari and Mr. Buchanan have made crucial

16

business decisions for the Debtor regarding human resources, real estate leases, executory contracts, cash flow preservation, and dealing with vendors and creditors.

vii. Throughout this case, A&M has prepared detailed and continuous cash flow projections, liquidation analyses, asset sale analysis and going concern/plan restructuring analyses, to enable the Board to determine the optimal exit strategy for this case to maximize the recovery for the Debtor's creditors.

At the direction of the Board, A&M developed an asset sale and business reorganization strategy for the Debtor. Ultimately, the Board on A&M's advice concluded that pursuing a going concern asset sale strategy was the best way to maximize the recovery for the Debtor's creditors.

Rather than have the Debtor's estate incur the cost of employing an investment banker, A&M agreed to handle this role for the Debtor at no additional charge. A&M facilitated the entire asset sale process. During this process, A&M met with and facilitated the due diligence efforts of a number of prospective buyers. This included meetings or telephone conferences with more than 30 prospective buyers, educating them on the Debtor's business, facilitating extensive due diligence by numerous prospective buyers, negotiating asset sale terms, assisting in the documentation of asset sale agreements, and working with buyers in the preparation of the numerous and detailed exhibits to the asset sale agreements.

17

Less than two months after the Petition Date, A&M successfully navigated the Debtor's going concern sale process to the point of where the Debtor had fully negotiated and written asset purchase agreements with two different buyers. The best offer the Debtor received was from a buyer named Alere, LLC ("Purchaser"), which is a company already engaged in the same business as the Debtor.   Purchaser offered to purchase substantially all of the Debtor's tangible and intangible assets designated for acquisition by Purchaser (excluding the Debtor's cash and outstanding accounts receivable), the Debtor's executory contracts and unexpired leases that Purchaser elects to acquire (the "Assumed Contracts"), and all of the Debtor's intellectual property (except for any intellectual property that Purchaser elects not to acquire) (collectively, the "Acquired Assets") for a cash purchase price of $1.75 million.

The Board authorized Mr. Pillari to execute an Asset Purchase Agreement with Purchaser ("APA"), which occurred on November 2, 2009.  A copy of the APA is attached as Exhibit "1" to the annexed Declaration of George D. Pillari.   The APA was negotiated between the Debtor and Purchaser in good faith, arms-length negotiations, including exchanges of multiple drafts of asset purchase agreements between the Debtor and Purchaser (as well as concurrent exchanges of drafts of asset purchase agreements with another very interested buyer).   After numerous rounds of concurrent negotiations with both potential buyers (as

1  well as oral conversations with numerous other prospective
2  buyers), the Debtor determined in the exercise of its sound
3  business judgment that the $1.75 million cash proposal made by
4  Purchaser in the APA is the best available offer for the
5  Acquired Assets that the Debtor has received, and concluded that
6  Purchaser's offer establishes a reasonable and viable floor for
7  an auction sale of the Acquired Assets.

8       The Debtor does not have any secured debt, and, as of
9  October 31, 2009, the Debtor has approximately $7,384,000 of
10 cash and approximately $4,443,000 of outstanding accounts
11 receivable.  The sale is expected to net (after taking into
12 account the fact that the Debtor is retaining all of its cash
13 and accounts receivable) between $8-$10 million for the Debtor's
14 estate.  Following the closing of the sale, the Debtor will be
15 in a position to propose a liquidating plan providing for the
16 distribution of the proceeds from the sale of the Acquired
17 Assets, coupled with the Debtor's cash and collections from
18 outstanding accounts receivable, to the Debtor's administrative,
19 priority and general unsecured creditors in accordance with
20 their respective priorities under the Bankruptcy Code.
21

22      In consultation with A&M, the Debtor has concluded that it
23 is significantly better off having a binding agreement with a
24 stalking horse bidder and then seeking overbids, if any, in an
25 auction format, than it would be were it to proceed to an
26 auction sale with no stalking horse bidder in place.  Also in
27

28                              19

1  consultation with A&M, the Debtor has concluded that Purchaser
2  is the ideal stalking horse bidder.  The APA that Purchaser has
3  executed is straight forward, and Purchaser has agreed to a
4  break-up fee if it is not the winning bidder for the Debtor's
5  assets at the auction of only $60,000 (without any additional
6  expense reimbursement), which equates to approximately 3% of
7  Purchaser's $1.75 million purchase price.  The Debtor submits
8  that this is an extremely reasonable break-up fee and a
9  relatively small price for the Debtor to pay in exchange for
10 having a guaranteed buyer at the auction sale.  The Debtor also
11 submits that a break-up fee of $60,000 will not dissuade other
12 interested parties from bidding at the auction sale or otherwise
13 serve to chill the bidding for the Acquired Assets in any way.
14 In fact, as set forth in the APA, given that the initial overbid
15 is required to be at least $100,000 higher than Purchaser's
16 stalking horse bid and each subsequent bid thereafter is
17 required to be at least $75,000 higher than the preceding bid,
18 Purchaser will not have any bidding advantage at the auction
19 sale resulting from its break-up fee because each bid made at
20 the auction sale will provide the Debtor's estate with a better
21 net result than the previously submitted bid even after taking
22 into account the payment of the break-up fee to Purchaser if
23 Purchaser is not the winning bidder at the auction sale.  The
24 break-up fee will constitute an allowed administrative claim
25 against the Debtor's estate pursuant to Sections 503 and 507 of

20

1  the Bankruptcy Code until paid, and shall have a first pricrity

2  in and be paid out of the proceeds from the sale of the Acquired

3  Assets to a different buyer who is deemed to be the winning

4  bidder at the auction sale described below.

5  II.

6  THE ASSET PURCHASE AGREEMENT WITH PURCHASER

7  A copy of the APA entered into between the Debtor and

8  Purchaser is attached as Exhibit "1" to the annexed Declaration

9  of George D. Pillari.

10  A description of the assets to be purchased by Purchaser

11  free and clear of all liens, claims and interests (defined as

12  the "Acquired Assets") is set forth in full in Section 1.1 of

13  the APA.  As set forth therein, the Acquired Assets consist of

14  the Debtor's executory contracts and unexpired leases that

15  Purchaser elects to acquire (the "Assumed Contracts"); all of

16  the Debtor's application systems and software necessary to

17  support the Assumed Contracts; all of the Debtor's intellectual

18  support the Assumed Contracts; all of the Debtor's intellectual

19  property (except for any intellectual property that Purchaser

20  elects not to take); the Debtor's customer lists, sales pipeline

21  lists and supplier lists and all of the Debtor's records (except

22  for records which Purchaser determines are not necessary for

23  Purchaser to operate the business).

24  As set forth in Section 3.1 of the APA, the purchase price

25  will consist of $1.75 million cash.  Purchaser has already

26  delivered the $100,000 deposit to the Debtor's counsel as

27

28  21

1 required by Section 3.3 of the APA. As set forth in Section 2.2
2 of the APA, the Debtor will pay all cure costs associated with
3 executory contracts and unexpired leases which are assumed by
4 the Debtor and assigned to Purchaser, except for any cure costs
5 associated with unexpired leases of non-residential real
6 property which will be the responsibility of Purchaser.

7 Section 7.4 of the APA sets forth the agreement of the
8 Debtor and Purchaser relating to the bankruptcy aspects of the
9 sale, including the overbid procedures. The Debtor and
10 Purchaser have agreed that any initial overbid to Purchaser's
11 bid must: (i) be in all cash; (ii) be no less than $1,850,000
12 (the "Minimum Overbid"); (iii) be irrevocable until the closing
13 of the sale; (iv) be accompanied by a deposit equal to $100,000;
14
15 (v) demonstrate to the Debtor's reasonable satisfaction that the
16 bidder is financially able to consummate the transaction
17 contemplated by such bid; and (vi) contain terms and conditions
18 that, in the aggregate, are not materially more burdensome to
19 the Debtor than the terms and conditions contained herein.

20 Additionally, in order to be eligible to participate in and
21 to bid at the auction sale for the Acquired Assets, by 5:00 p.m.
22 PST on Thursday, December 10, 2009, prospective overbidders
23 must: (A) deliver to George D. Pillari of A&M and to Ron Bender,
24 Esq. of Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB")
25 the following: (i) a redlined version of the APA indicating any
26 changes the prospective overbidder wishes to make to the APA;
27

28 22

(ii) a schedule of all of the Debtor's executory contracts and unexpired leases that the prospective overbidder wants to have assigned to it and evidence of the prospective overbidder's financial ability to satisfy the "adequate assurance of future performance" requirements of 11 U.S.C. § 365(b)(1)(C) with respect to all such executory contracts and unexpired leases; and (iii) evidence of the prospective overbidder's financial ability to pay the Minimum Overbid; and (B) deliver the sum of $100,000 in immediately available funds to LNBRB to serve as a deposit.

If the Debtor does not receive a qualified overbid that is in compliance with the foregoing, the Debtor will proceed immediately with seeking Court approval of its sale of the Acquired Assets to Purchaser in accordance with the APA. If the Debtor does receive at least one qualified overbid, then all parties who submitted qualified overbids and Purchaser shall be entitled to participate in an auction sale for the Acquired Assets, with minimum subsequent bid increments of $75,000. If the Court fails to approve the Debtor's sale of the Acquired Assets to Purchaser and instead approves a sale of all or a significant portion of the Acquired Assets to a person or entity other than Purchaser, the Debtor has agreed that it will be required to pay to Purchaser (without any further order of the Court) a break-up fee of $60,000, which break-up fee shall have a first priority in and be paid out of the proceeds paid by the

winning bidder, and the Debtor will return the $100,000 deposit to Purchaser, immediately upon consummation of a transaction with such winning bidder.

No insider of the Debtor has any interest in or connection with Purchaser, and no insider of the Debtor will be receiving any special benefit as a result of the Debtor's sale of the Acquired Assets to Purchaser. The Debtor has entered into the APA with Purchaser and is filing this Motion with the Court solely because the Board, after consultation with A&M, has concluded that doing so is in the best interest of the Debtor's creditors.

## III.

## DISCUSSION

Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…." 11 U.S.C. § 363 (b)(1). Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he Court may issue any order, process or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Bankruptcy Rules 2002 and 6004 govern the scope of the notice to be provided in the event a debtor elects to sell property of the estate under Section 363; however, with respect to the procedures to be adopted in conducting a sale outside the ordinary course of a debtor's business, Bankruptcy

1 Rule 6004 provides only that such sale may be by private sale or
2 public auction, and requires only that the debtor provide an
3 itemized list of the property sold together with the prices
4 received upon consummation of the sale. Bankr. R. 6004(f).

5 Neither the Bankruptcy Code nor the Bankruptcy Rules
6 contain specific provisions with respect to the procedures to be
7 employed by a debtor in conducting a public or private sale.
8 Nonetheless, as one Court has stated, "It is a well-established
9 principle of bankruptcy law that the objective of bankruptcy
10 rules and the [Debtors'] duty with respect to such sales is to
11 obtain the highest price or greatest overall benefit possible
12 for the estate." In re Atlanta Packaging Products, Inc., 99
13 B.R. 124, 131 (Bankr. N.D. Ga. 1988). Additionally, courts have
14 long recognized the need for competitive bidding at hearings on
15 private sales; "[c]ompetitive bidding yields higher offers and
16 thus benefits the estate. Therefore, the objective is 'to
17 maximize bidding, not restrict it.'" Id.
18

19 The Debtor, consistent with the advice and recommendations
20 of A&M, has concluded that the auction and bidding procedures
21 outlined above (and in more detail in the APA) are designed to
22 enable this estate to obtain the highest price possible for the
23 Acquired Assets and provide the greatest possible recovery for
24 the Debtor's creditors.

25 Courts considering the procedures adopted by debtors with
26 respect to sales of assets outside the ordinary course of
27

28                                     25

business have noted concern with the inclusion of provisions
imposing so-called "break-up" fees on a debtor in the event a
contemplated sale does not occur or if a higher and better offer
is received. In general, "[a] 'break-up fee' is an incentive
payment to an unsuccessful bidder who placed the estate property
in a sales configuration mode ... to attract other bidders to
the auction." In re Financial News Network, Inc., 126 B.R. 152,
154 n. 5 (Bankr. S.D.N.Y. 1991); see also In re Integrated
Resources, Inc., 147 B.R. 650, 653 (S.D.N.Y. 1992), app.
dismissed on jurisdictional grounds, 3 F.3d 49 (2d Cir. 1993)
["[a] break-up fee, or more appropriately, a termination fee, is
an incentive payment to a prospective purchaser with which a
company fails to consummate a transaction"]. Agreements to
provide break-up fees are designed to compensate the potential
acquirer who serves as a catalyst or "stalking horse" which
attracts more favorable offers. In re S.N.A. Nut Co., 186 B.R.
98, 101 (Bankr. N.D. Ill. 1995); In re 995 Fifth Ave. Assoc.,
L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

Outside of bankruptcy, a break-up fee is generally allowed
as long as it "enhances" the bidding. In re S.N.A. Nut Co., 186
B.R. at 102. In the bankruptcy context, a break-up fee is
generally permissible "if reasonably related to the bidder's
efforts and the transaction's magnitude." Cottle v. Storer
Communication Inc., 849 F.2d 570, 578 (11th Cir. 1988); In re
995 Fifth Ave., 96 B.R. at 28. Generally speaking, whether the

26

payment of a break-up fee is appropriate is evaluated under the "business judgment rule." In re S.N.A. Nut Co., supra, 186 B.R. at 102. Under this rule, there is a presumption that, in making a business decision, the principals of the debtor acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company. Therefore, procedures utilized by a corporate debtor with respect to a proposed sale should be approved when the Court determines that such procedures are fair and do not violate any of the Debtor's fiduciary duties. Id.

In evaluating the appropriateness of a break-up fee, the appropriate question for the Court to consider is "whether the break-up fee served any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." In re Integrated Resources, Inc., 147 B.R. at 662.

The Debtor strongly believes that proceeding with an auction sale of the Acquired Assets with a locked-in buyer (as compared with proceeding with a blind auction with no actual sale agreement in hand) is in the overwhelming best interests of this estate and will result in the highest price possible being obtained for the Acquired Assets. All of the prospective bidders the Debtor was in discussions with, including Purchaser, were understandably only willing to serve as the stalking horse

27

1 | bidder if they received various forms of benefits for doing so,
2 | including a break-up fee. Without giving such benefits to a
3 | stalking horse bidder, there would have been no way for the
4 | Debtor to obtain a viable stalking horse bidder, and no buyer
5 | would have the incentive to serve as the stalking horse bidder.
6 | The Debtor submits that Purchaser's requested break-up fee of
7 | $60,000 (with no additional expense reimbursement), which
8 | amounts to approximately 3% of Purchaser's purchase price of
9 | $1.75 million, is fair, reasonable and consistent with market
10 | practice.

11 | Accordingly, the Debtor believes that its proposed break-up
12 | fee in favor of Purchaser will encourage bidding by satisfying
13 | the standards identified in Integrated Resources (i.e., serving
14 | "any of three possible useful functions: (1) to attract or
15 | 
16 | retain a potentially successful bid; (2) to establish a bid
17 | standard or minimum for other bidders to follow; or (3) to
18 | attract additional bidders." Id. at 662. Moreover, the Debtor
19 | believes that a minimum initial overbid of $100,000 (which
20 | covers more than the cost of the $60,000 break-up fee) and
21 | subsequent bidding increments of at least $75,000 will not cause
22 | any overbidder who otherwise wants to purchase the Acquired
23 | Assets from participating in an auction sale.

24 | The Debtor is confident that if any buyer exists who is
25 | willing to pay more money for the Acquired Assets than offered
26 | by Purchaser, they will submit an overbid and participate in the
27 | 
28 | 28

1  overbid process.   The Debtor is therefore confident that the
2  sale process established by the Debtor and agreed to by
3  Purchaser is properly designed to make sure that the highest
4  price possible is paid for the Acquired Assets under the
5  circumstances.

6  The Debtor therefore submits that the proposed bidding
7  procedures and stalking horse bid protections described above
8  and provided for in the APA are in the best interests of this
9  estate, are necessary and appropriate to maximize the value paid
10  for the Acquired Assets, and should be approved by the Court as
11  an exercise of the Debtor's sound business judgment.
12  Importantly, the Debtor is not seeking at the hearing on this
13  Motion to have the Court approve the asset sale itself.   That
14  request will be set forth in a separate sale motion to be filed
15  by the Debtor and set for hearing on full twenty-one days notice
16  to creditors and other parties in interest.
17

18  For these reasons, and given the significant benefits
19  provided by the APA and having a stalking horse bidder, the
20  Debtor urges the Court to approve the bid protections and break-
21  up fee provided to Purchaser as set forth in the APA at a
22  **hearing to be held on Tuesday, November 17, 2009 at 10:30 a.m.**
23  **or the first available hearing date thereafter**.
24  ///
25  ///
26
27
28

29

1

2                                    IV.

3              OTHER RELIEF REQUESTED BY THE DEBTOR

4          In addition to the relief described above, the Debtor is

5     requesting the Court to grant the following additional relief:

6          1.    The Debtor requests the Court to schedule the actual

7     sale hearing to be held on December 17, 2009, at 10:30 a.m.,

8     which the Debtor understands is an available date and time, so

9     that the Debtor can obtain an entered order by the Court that

10    day or the next day and close the sale during the week of

11    December 21, 2009.

12
           2.    The Debtor requests the Court to authorize the Debtor
13
      to conduct the auction at the law offices of the Debtors'
14
      bankruptcy counsel on Monday, December 14, 2009.   The Debtor
15
      would file the results of the auction sale with the Court by
16
17    Tuesday, December 15, 2009, so that the Court would have those

18    results in hand before the sale hearing to be held on December

19    17, 2009.

20         3.    The Debtor requests the Court to approve the form of

21    notice attached as Exhibit "2" to the annexed Declaration of

22    George D. Pillari, which the Debtor proposes to serve on all

23    creditors, all shareholders, parties who have requested special

24    notice, the Office of the United States Trustee and to all known

25    prospective overbidders.

26

27

28                                    30

1    4.    The Debtor requests the Court to approve the form of
2  APA used by Purchaser and attached as Exhibit "1" to the annexed
3  Declaration of George D. Pillari, and to require any prospective
4  overbidder to use the identical form of asset purchase agreement
5  as the APA, or deliver to the Debtor a red-lined version of a
6  proposed asset purchase agreement which identifies the changes
7  requested by the prospective overbidder, and deposit the
8  required $100,000 deposit noted above with the Debtor's counsel
9  in accordance with the terms of the APA and the proposed bid
10  procedures described above.

11                                V.

12                            CONCLUSION

13    Based upon all of the foregoing, the Debtor respectfully
14  requests that this Court:

15    1.    schedule a hearing to consider approval of this Motion
16  to be held on Tuesday, November 17, 2009 at 10:30 a.m. (or the
17  first available date and time thereafter);
18
19    2.    approve the auction sale format, bidding procedures
20  and stalking horse bid protections described above;

21    3.    approve the Debtor's proposed form of notice to be
22  provided to creditors and prospective overbidders in the form
23  attached as Exhibit "2" to the annexed Declaration of George D.
24  Pillari;

25    4.    approve the form of asset purchase agreement for
26  prospective overbidders to use by requiring prospective
27
28                               31

1  overbidders either to use the same form of APA agreed to by the
2  Debtor and Purchaser and attached as Exhibit "1" to the annexed
3  Declaration of George D. Pillari, or to submit a redlined
4  version of a proposed asset purchase agreement which indicates
5  the changes to the APA requested by the prospective overbidder;

6      5.   schedule a Court hearing to consider approval of the
7  sale of the Acquired Assets to Purchaser, or such other
8  prevailing bidder.  The Debtor requests the Court to schedule
9  the actual sale hearing to be held on December 17, 2009 at 10:30
10 a.m. so that the asset sale can be consummated during the week
11 of December 21, 2009;

12     6.   enter the form of Bidding Procedures Order attached as
13 Exhibit "3" to the annexed Declaration of George D. Pillari; and

14     7.   grant such other and further relief as the Court deems
15 just and proper.

16

17 Dated: November 11, 2009          LIFEMASTERS SUPPORTED SELFCARE,
                                     INC.
18
                                     /s/ Ron Bender
19                                   RON BENDER
                                     TODD M. ARNOLD
20                                   JOHN-PATRICK M. FRITZ
                                     LEVENE, NEALE, BENDER, RANKIN
21                                   & BRILL L.L.P.
                                     Attorneys for Chapter 11
22                                   Debtor and Debtor in Possession
23
24
25
26
27
28
                                     32

1

### DECLARATION OF GEORGE D. PILLARI

2

I, GEORGE D. PILLARI, HEREBY DECLARE AS FOLLOWS:

3

4

1. Either I have personal knowledge of the facts set forth below or a different professional at A&M has personal knowledge of such facts and has provided that information to me. If called to testify, I would and could competently testify thereto.

5

6

7

8

9

2. I am a Managing Director of Alvarez & Marsal Healthcare Industry Group, LLC ("A&M").

10

11

3. A&M is part of a turnaround management consulting firm which was founded in 1983 to provide specialized debtor management and advisory services to troubled companies. The firm has since grown to become a global provider of management and advisory services to companies in crisis or those in need of performance improvement in specific financial and operational areas. A&M's core services include Turnaround Management Consulting, Interim and Crisis Management, Creditor Advisory, and Performance Improvement in the healthcare industry. A&M has provided interim management services in a number of large and mid-size bankruptcy restructurings through the United States.

12

13

14

15

16

17

18

19

20

21

22

23

4. I have extensive experience in serving as a turnaround consultant, financial advisor and senior management, with a particular expertise in the health care area. I have substantial knowledge and experience serving in senior management positions and as a restructuring advisor.

24

25

26

27

28

33

5. I am currently serving as the President of LifeMasters Supported SelfCare, Inc., the Chapter 11 debtor and debtor in possession herein (the "Debtor"). The Debtor commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on September 14, 2009 (the "Petition Date"). The Debtor continues to operate its business, manage its financial affairs, and operate its bankruptcy estate as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6. The Debtor is a privately held company which was founded in 1994. The Debtor is headquartered in Irvine, California, and also has offices located in Cupertino, California, South San Francisco, California, Rancho Cordova, California, Albuquerque, New Mexico, Indianapolis, Indiana, and San Antonio, Texas.

7. The Debtor had total revenue in 2008 of approximately $80 million. With the exception of certain equipment lessors and sellers, the Debtor does not have any known secured creditors. The Debtor is not aware of any entity that asserts a lien against the Debtor's cash collateral. The Debtor currently has approximately 200 employees. Additional information about the Debtor can be obtained at the Debtor's website - www.lifemasters.com.

8. The Debtor is a national disease management company whose mission is to help its many thousands of participants

34

achieve and maintain optimal health by closing the gaps in medical care and encourage the adoption of healthy lifestyles. With more than a decade of experience, the Debtor is an expert at delivering disease management services to individuals with chronic diseases such as diabetes, cardiovascular disease, respiratory disease, musculoskeletal conditions and their co-morbidities.

9. The Debtor's health professionals coach and educate participants over the phone, teach them how to monitor their vital signs and symptoms, and ultimately take more responsibility for their health. The Debtor involves the participant's physicians by providing them with relevant medical information between office visits to prevent unnecessary complications. This often results in participants establishing a better relationship with their physicians and can help them avoid unnecessary hospitalizations and emergency room visits, reducing total costs to payors.

10. The Debtor has worked with, and continues to work with, some of the nation's leading health plans, employers, retirement systems and governmental organizations, which purchase the Debtor's services in an effort to reduce costs and enhance care. Historically, approximately 30% of the Debtor's gross revenue has been derived from its contracts with the Center for Medicare and Medicaid Services ("CMS"), which administers a number of Medicare and Medicaid programs. In or

35

about October, 2006, the Debtor requested early termination of one of its contracts with CMS due to a range of significant program problems and irregularities, rendering it impossible for the Debtor to satisfy the financial risk terms of the cooperative agreements.

11. In or about June, 2009, CMS cancelled a different contract with the Debtor for a demonstration program involving participants located in Florida. In conjunction with canceling the foregoing contracts, CMS has asserted claims to recover all amounts previously paid to the Debtor, which amounts to an aggregate of approximately $106 million.

12. The cancellation of contracts by CMS coupled with the cancellation of contracts by other customers caused a precipitous decrease of the Debtor's annual revenue by over 50%. The combination of this loss of revenue coupled with the claim asserted by CMS against the Debtor made it clear to the Debtor's Board of Directors that an expeditious financial restructuring was going to be necessary.

13. The Debtor's Board of Directors is comprised of five highly sophisticated and experienced people, four of whom have never been involved in the day-to-day operations of the Debtor's business. Even though it has been clear from the time of the CMS contract cancellation and assertion of the approximately $106 million claim against the Debtor that the Debtor's assets are worth substantially less than the Debtor's debt, and that

36

1    there would likely be no recovery for the Debtor's equity

2    holders, the members of the Debtor's Board of Directors take

3    their fiduciary duty to maximize the recovery to creditors

4    extremely seriously.  Both prior and subsequent to the Petition

5    Date, the Board has engaged in detailed and extensive meetings

6    on an average of once per week in an effort to maximize the

7    recovery for the Debtor's creditors.

8        14.  Given the complexity of the Debtor's business and the

9    dire circumstances facing the Debtor, the Board quickly

10   concluded that the Debtor was in serious and immediate need of a

11   highly skilled financial advisor to advise the Debtor.  The

12   Board interviewed a number of candidates and concluded that A&M

13   was the optimal choice.

14

15       15.  Beginning on June 10, 2009 and continuing through the

16   Petition Date, A&M served as the restructuring advisors to the

17   Debtor.  During this period, several professionals of A&M,

18   including myself, Brian Buchanan and Steven Kraus, devoted

19   substantial amounts of time and effort working with the Board

20   and the Debtor's senior management to, among other things,

21   assist in the development of projections, assist in cash

22   management activities, assist in the preparation of a

23   liquidation analysis, assist in the development and

24   implementation of a business plan, and assist in the dramatic

25   scale down of the Debtor's business operations and labor force,

26

27

28                              37

1    which was critically necessary to preserve the Debtor's cash
2    reserves given the termination of the CMS contracts and others.

3        16.   After consummating a substantial scale down of the
4    Debtor's business operations and labor force, the Board
5    concluded that the Debtor needed a chapter 11 bankruptcy filing
6    as the vehicle by which the Debtor's business could either be
7    sold or restructured through a confirmed plan of reorganization.
8    The Debtor therefore filed a voluntary petition under chapter 11
9    of the Bankruptcy Code on the Petition Date of September 14,
10   2009.

11       17.   The Board determined that the Debtor's pre-petition
12   management team was not qualified to take the Debtor through a
13   chapter 11 bankruptcy process.  None of them had experience in
14   managing a financially distressed company (in or out of
15   bankruptcy) and none of them had any experience or
16
17   qualifications to manage an asset sale process or to formulate a
18   chapter 11 plan of reorganization.

19       18.   The Board therefore requested A&M, which is one of the
20   nation's leading crisis management companies (as well as
21   financial advisors), to agree to manage the Debtor through the
22   entire bankruptcy process.  Specifically, the Board requested me
23   to serve as the Debtor's President and for Brian Buchanan, a
24   director of A&M, to serve as the Debtor's Chief Financial
25   Officer.   The Board also requested A&M to provide such
26   additional personnel as A&M determined were necessary to enable
27
28                                38

1    the Debtor to pursue the path that would maximize the recovery

2    for the Debtor's creditors, whether that path consisted of a

3    going concern asset sale, a restructuring under a confirmed plan

4    of reorganization, or a liquidation of the Debtor's business.

5         19.  Since the Petition Date, Mr. Buchanan, Steven Kraus of

6    A&M (who is serving as the Debtor's controller) and I have

7    effectively served as the entire senior management team of the

8    Debtor and have worked essentially full time for the Debtor.

9    During our tenure as senior management of the Debtor, A&M has

10   provided, among others, the following critically important

11   benefits to the Debtor:

12        i.   A&M initiated and managed the Debtor's data

13   center migration plan, which is a core component of the Debtor's

14   business as a disease management company.  The data center

15   migration, coordinated and implemented by A&M, resulted in

16   substantial monetary savings and economic efficiencies for the

17

18   Debtor.  Moreover, with the Debtor's disparate technologies

19   consolidated into co-location facilities, the Debtor can relieve

20   itself of more than $3.0 million of annual rent expense for

21   office space that previously housed the equipment.

22        ii.  A&M further economized the Debtor's business

23   operations by restructuring its work force from more than 400

24   employees to an expected number of 100 employees in the first

25   quarter of 2010, making the Debtor a more efficient and

26   competitive entity in the healthcare management industry.

27

28                                39

1    iii. A&M analyzed all of the Debtor's executory
2  contracts and unexpired leases, determined which ones needed to
3  be rejected at this early stage of the case, and coordinated the
4  rejection of certain executory contracts and unexpired leases
5  and negotiated settlements of their respective rejection damage
6  claims.

7    iv. A&M successfully persuaded the Debtor's key
8  employees to remain with the Debtor which was a difficult task
9  given the uncertainty created by the Debtor's bankruptcy filing.
10  Retaining those employees helped to preserve the Debtor's going-
11  concern value and enabled the Debtor to avoid the expense,
12  inefficiency, knowledge loss and business disruption of having
13  to hire and train new personnel.
14

15    v. A&M interfaced with the Board and the Debtor's
16  bankruptcy counsel and served as the point for receiving and
17  disseminating all important information to the Board, the
18  Debtor's counsel and prospective buyers and equity sponsors of a
19  plan of reorganization.

20    vi. Mr. Buchanan and I have been instrumental in the
21  daily operations of the Debtor's business and restructuring, at
22  all times seeking to implement a business plan to maintain the
23  Debtor's cash balances and facilitate a prompt sale of the
24  Debtor's business or the confirmation of a plan of
25  reorganization. In our capacities as the Debtor's two senior
26  officers, Mr. Buchanan and I have made crucial business
27

28                                    40

1  decisions for the Debtor regarding human resources, real estate
2  leases, executory contracts, cash flow preservation, and dealing
3  with vendors and creditors.

4          vii. Throughout this case, A&M has prepared detailed
5  and continuous cash flow projections, liquidation analyses,
6  asset sale analysis and going concern/plan restructuring
7  analyses, to enable the Board to determine the optimal exit
8  strategy for this case to maximize the recovery for the Debtor's
9  creditors.

10         20. At the direction of the Board, A&M developed an asset
11  sale and business reorganization strategy for the Debtor.
12  Ultimately, the Board on A&M's advice concluded that pursuing a
13  going concern asset sale strategy was the best way to maximize
14  the recovery for the Debtor's creditors.
15

16         21.   Rather than have the Debtor's estate incur the cost of
17  employing an investment banker, A&M agreed to handle this role
18  for the Debtor at no additional charge.   A&M facilitated the
19  entire asset sale process.   During this process, A&M met with
20  and facilitated the due diligence efforts of a number of
21  prospective buyers.   This included meetings or telephone
22  conferences with more than 30 prospective buyers, educating them
23  on the Debtor's business, facilitating extensive due diligence
24  by numerous prospective buyers, negotiating asset sale terms,
25  assisting in the documentation of asset sale agreements, and
26
27
28                              41

1  working with buyers in the preparation of the numerous and
2  detailed exhibits to the asset sale agreements.

3      22.  Less than two months after the Petition Date, A&M
4  successfully navigated the Debtor's going concern sale process
5  to the point of where the Debtor had fully negotiated and
6  written asset purchase agreements with two different buyers.
7  The best offer the Debtor received was from a buyer named Alere,
8  LLC ("Purchaser"), which is a company already engaged in the
9  same business as the Debtor.  Purchaser offered to purchase
10 substantially all of the Debtor's tangible and intangible assets
11 designated for acquisition by Purchaser (excluding the Debtor's
12 cash and outstanding accounts receivable), the Debtor's
13 executory contracts and unexpired leases that Purchaser elects
14 to acquire (the "Assumed Contracts"), and all of the Debtor's
15 intellectual property (except for any intellectual property that
16 Purchaser elects not to acquire) (collectively, the "Acquired
17 Assets") for a cash purchase price of $1.75 million.
18

19     23.  The Board authorized me to execute an Asset Purchase
20 Agreement with Purchaser ("APA"), which occurred on November 2,
21 2009.  A copy of the APA is attached hereto as Exhibit "1".  The
22 APA was negotiated between the Debtor and Purchaser in good
23 faith, arms-length negotiations, including exchanges of multiple
24 drafts of asset purchase agreements between the Debtor and
25 Purchaser (as well as concurrent exchanges of drafts of asset
26 purchase agreements with another interested buyer).  After
27
28

42

numerous rounds of concurrent negotiations with both potential buyers (as well as oral conversations with numerous other prospective buyers), the Debtor determined in the exercise of its sound business judgment that the $1.75 million cash proposal made by Purchaser in the APA is the best available offer for the Acquired Assets that the Debtor has received, and concluded that Purchaser's offer establishes a reasonable and viable floor for an auction sale of the Acquired Assets.

24.   The Debtor does not have any secured debt, and, as of October 31, 2009, the Debtor has approximately $7,384,000 of cash and approximately $4,443,000 of outstanding accounts receivable.   The sale is expected to net (after taking into account the fact that the Debtor is retaining all of its cash and accounts receivable) between $8-$10 million for the Debtor's estate.   Following the closing of the sale of the Acquired Assets, the Debtor will be in a position to propose a liquidating plan providing for the distribution of the proceeds from the sale of the Acquired Assets, coupled with the Debtor's cash and collections from outstanding accounts receivable, to the Debtor's administrative, priority and general unsecured creditors in accordance with their respective priorities under the Bankruptcy Code.

25.   In consultation with A&M, the Debtor has concluded that it is significantly better off having a binding agreement with a stalking horse bidder and then seeking overbids, if any,

43

1  in an auction format, than it would be were it to proceed to an
2  auction sale with no stalking horse bidder in place.  Also in
3  consultation with A&M, the Debtor has concluded that Purchaser
4  is the ideal stalking horse bidder.  The APA that Purchaser has
5  executed is straight forward, and Purchaser has agreed to a
6  break-up fee if it is not the winning bidder for the Debtor's
7  assets at the auction of only $60,000 (with no additional
8  expense reimbursement), which equates to approximately 3% of
9  Purchaser's $1.75 million purchase price.  I submit that this is
10  an extremely reasonable break-up fee and a relatively small
11  price for the Debtor to pay in exchange for having a guaranteed
12  buyer at the auction sale.  I also submit that a break-up fee of
13  $60,000 will not dissuade other interested parties from bidding
14  at the auction sale or otherwise serve to chill the bidding for
15  the Acquired Assets in any way.  In fact, as set forth in the
16  APA, given that the initial overbid is required to be at least
17  $100,000 higher than Purchaser's stalking horse bid and each
18  subsequent bid thereafter is required to be at least $75,000
19  higher than the preceding bid, Purchaser will not have any
20  bidding advantage at the auction sale resulting from its break-
21  up fee because each bid made at the auction sale will provide
22  the Debtor's estate with a better net result than the previously
23  submitted bid even after taking into account the payment of the
24  break-up fee to Purchaser if Purchaser is not the winning bidder
25  at the auction sale.
26
27
28
44

26.   A   description   of   the   assets   to   be   purchased   by Purchaser   free   and   clear   of   all   liens,   claims   and   interests (defined   as   the   "Acquired   Assets")   is   set   forth   in   full   in Section   1.1   of   the   APA.     As   set   forth   therein,   the   Acquired Assets consist of the Debtor's executory contracts and unexpired leases   that   Purchaser   elects   to   acquire   (the   "Assumed Contracts");   all   of   the   Debtor's   application   systems   and software necessary to support the Assumed Contracts; all of the Debtor's   intellectual   property   (except   for   any   intellectual property   that   Purchaser   elects   not   to   take);   the   Debtor's customer lists, sales pipeline lists and supplier lists and all of   the   Debtor's   records   (except   for   records   which   Purchaser determines   are   not   necessary   for   Purchaser   to   operate   the business).

27.   As   set   forth   in   Section   3.1   of   the   APA,   the   purchase price will consist of $1.75 million cash.   Purchaser has already delivered   the   $100,000   deposit   to   the   Debtor's   counsel   as required by Section 3.3 of the APA.   As set forth in Section 2.2 of the APA, the Debtor will pay all cure costs associated with executory   contracts   and   unexpired   leases   which   are   assumed   by the Debtor and assigned to Purchaser, except for any cure costs associated   with   unexpired   leases   of   non-residential   real property which will be the responsibility of Purchaser.

28.   Section 7.4 of the APA sets forth the agreement of the Debtor   and   Purchaser   relating   to   the   bankruptcy   aspects   of   the

1   sale, including the overbid procedures. The Debtor and

2   Purchaser have agreed that any initial overbid to Purchaser's

3   bid must: (i) be in all cash; (ii) be no less than $1,850,000

4   (the "Minimum Overbid"); (iii) be irrevocable until the closing

5   of the sale; (iv) be accompanied by a deposit of $100,000; (v)

6   demonstrate to the Debtor's reasonable satisfaction that the

7   bidder is financially able to consummate the transaction

8   contemplated by such bid; (vi) and contain terms and conditions

9   that, in the aggregate, are not materially more burdensome to

10   the Debtor than the terms and conditions contained in the APA.

11   29. Additionally, in order to be eligible to participate

12   in and to bid at the auction sale for the Acquired Assets, by

13   5:00 p.m. PST on Thursday, December 10, 2009, prospective

14   overbidders must: (A) deliver to me and to Ron Bender, Esq. of

15   Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB") the

16   following: (i) a redlined version of the APA indicating any

17   changes the prospective overbidder wishes to make to the APA;

18   (ii) a schedule of all of the Debtor's executory contracts and

19   unexpired leases that the prospective overbidder wants to have

20   assigned to it and evidence of the prospective overbidder's

21   financial ability to satisfy the "adequate assurance of future

22   performance" requirements of 11 U.S.C. § 365(b)(1)(C) with

23   respect to all such executory contracts and unexpired leases;

24   and (iii) evidence of the prospective overbidder's financial

25   ability to pay the Minimum Overbid; and (B) deliver the sum of

26

27

28                                    46

1  $100,000 in immediately available funds to LNBRB to serve as a
2  deposit.

3      30.  If the Debtor does not receive a qualified overbid
4  that is in compliance with the foregoing, the Debtor will
5  proceed immediately with seeking Court approval of its sale to
6  Purchaser in accordance with the APA.  If the Debtor does
7  receive at least one qualified overbid, then all parties who
8  submitted qualified overbids and Purchaser shall be entitled to
9  participate in an auction sale for the Acquired Assets, with
10 minimum subsequent bid increments of $75,000.  If the Court
11 fails to approve the Debtor's sale of the Acquired Assets to
12 Purchaser and instead approves a sale of all or a significant
13 portion of the Acquired Assets to a person or entity other than
14 Purchaser, the Debtor has agreed that it will be required to pay
15 to Purchaser (without any further order of the Court) a break-up
16 fee of $60,000, which break-up fee shall have a first priority
17 in and be paid out of the proceeds paid by the winning bidder,
18 and the Debtor will return the $100,000 deposit to Purchaser,
19 immediately upon consummation of a transaction with such winning
20 bidder.
21

22     31.  To my knowledge, no insider of the Debtor has any
23 interest in or connection with Purchaser, and no insider of the
24 Debtor will be receiving any special benefit as a result of the
25 Debtor's sale of the Acquired Assets to Purchaser.  The Debtor
26 has entered into the APA with Purchaser and is filing this
27

28                              47

1  Motion with the Court solely because the Board, after
2  consultation with A&M, has concluded that doing so is in the
3  best interest of the Debtor's creditors.

4      32. The Debtor, consistent with the advice and
5  recommendations of A&M, has concluded that the auction and
6  bidding procedures outlined above (and in more detail in the
7  APA) are designed to enable this estate to obtain the highest
8  price possible for the Acquired Assets and provide the greatest
9  possible recovery for the Debtor's creditors.

10      33. I strongly believe that proceeding with an auction
11  sale with a locked-in buyer (as compared with proceeding with a
12  blind auction with no actual sale agreement in hand) is in the
13  overwhelming best interests of this estate and will result in
14  the highest price possible being obtained for the Acquired
15  Assets. All of the prospective bidders the Debtor was in
16  discussions with, including Purchaser, were only willing to
17  serve as the stalking horse bidder if they received various
18  forms of benefits for doing so, including a break-up fee.
19  Without giving such benefits to a stalking horse bidder, there
20  would have been no way for the Debtor to obtain a viable
21  stalking horse bidder, and no buyer would have the incentive to
22  serve as the stalking horse bidder. I submit that Purchaser's
23  requested break-up fee of $60,000 (with no additional expense
24  reimbursement), which amounts to approximately 3% of Purchaser's
25  purchase price of $1.75 million, is fair, reasonable and
26
27

28                    48

1  consistent with market practice.    Moreover, I believe that a
2  minimum overbid of $100,000 (which covers more than the cost of
3  the $60,000 break-up fee) and subsequent bidding increments of
4  at least $75,000 will not cause any overbidder who otherwise
5  wants to purchase the Debtor's assets from participating in an
6  auction sale.

7  34.  I am confident that if any buyer exists who is willing
8  to pay more money for the Acquired Assets than offered by
9  Purchaser, they will submit an overbid and participate in the
10 overbid process.  I am therefore confident that the sale process
11 established by the Debtor and agreed to by Purchaser is properly
12 designed to make sure that the highest price possible is paid
13 for the Acquired Assets under the circumstances.
14

15 35.  I  therefore  submit  that  the  proposed  bidding
16 procedures and stalking horse bid protections described above
17 and provided for in the APA are in the best interests of this
18 estate, are necessary and appropriate to maximize the value paid
19 for the Acquired Assets, and should be approved by the Court as
20 an  exercise  of  the  Debtor's  sound  business  judgment.
21 Importantly, the Debtor is not seeking at the hearing on this
22 Motion to have the Court approve the asset sale itself.    That
23 request will be set forth in a separate sale motion to be filed
24 by the Debtor and set for hearing on full twenty-one days notice
25 to creditors.
26
27
28
49

36.  For these reasons, and given the significant benefits provided by the APA and having a stalking horse bidder, the Debtor urges the Court to approve the bid protections and break-up fee provided to Purchaser as set forth in the APA at a **hearing to be held on Tuesday, November 17, 2009 at 10:30 a.m. or the first available hearing date thereafter.**

37.  The Debtor's proposed form of notice to be provided to creditors, prospective overbidders and other parties in interest is attached hereto as Exhibit "2".  The Debtor's proposed form of Bidding Procedures Order is attached hereto as Exhibit "3".

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 11th day of November, 2009, at South San Francisco, California.

GEORGE D. PILLARI, Declarant

50

# EXHIBIT "1"

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement"), dated as of November 2, 2009 (the "Effective Date"), is by and between Alere LLC, a Delaware limited liability company ("Buyer"), and LifeMasters Supported SelfCare, Inc., a California corporation ("Seller").  Buyer and Seller are referred to collectively herein as the "Parties."

WHEREAS, on or about September 14, 2009 (the "Petition Date"), Seller filed a petition pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Central District of California (Santa Ana Division) (the "Bankruptcy Court"), which has been assigned case number 8:09-bk-19722-ES (the "Bankruptcy Proceeding");

WHEREAS, Seller is in the business of providing disease management and wellness services (collectively, the "Business") from its leased places of business in California, New Mexico, Texas and Indiana; and

WHEREAS, Buyer desires to purchase certain assets and assume certain liabilities of the Business, and Seller agrees to sell and/or assign the same to Buyer on the terms and conditions herein set forth:

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements herein contained, Seller and Buyer do hereby agree as follows:

## ARTICLE I: SALE OF ASSETS

1.1 **Purchase and Sale of Assets.**  Subject to the applicable conditions hereinafter set forth, Seller agrees to sell, transfer, convey, assign and deliver to Buyer, free and clear of all liens, claims, interests, mortgages, pledges, security interests, charges and encumbrances (collectively, "Liens"), all of the following assets (collectively referred to as the "Acquired Assets"):

    (a)    All Assumed Contracts (as defined in Section 2.2).

    (b)    All application systems and software, including all computer software, programs and source disks, and related program documentation, tapes, manuals, forms, computer hardware and networking and communication assets, necessary to support the Assumed Contracts and as described on **Annex 1.1(b)**, provided, however, that the items marked with an asterisks on Annex 1.1(b) are subject to leases or licenses as set forth on Annex 2.2.  An updated Annex 1.1(b) indicating with an asterisks which items included therein are subject to leases or licenses will be provided within two (2) business days of the Effective Date.

    (c)    All Seller Intellectual Property (as defined in Section 1.2), except that Buyer may designate prior to Closing any Seller Intellectual Property it does not wish to acquire.  Seller Intellectual Property includes, but is not limited to, the intangible property and rights including intellectual property, policies and procedures, research, Patient Activation Measures, disease management programs, and data and relationship with the University of Oregon, including assumption and assignment of all licenses and other agreements necessary to convey all such Seller Intellectual Property (it being understood that such licenses and other agreements shall be included in the Assumed Contracts).

(d) Seller's entire right, title and interest in all customer lists, sales pipeline lists and supplier lists currently maintained by Seller in files or on computer memory (collectively, the "Lists") and all records, including all sales information, kept by Seller in connection with the Business, except to the extent that Seller requires such records for the purpose of administering the Bankruptcy Proceeding (the "Records"; provided, that "Records" shall not include those records which Buyer determines on or before Closing are not necessary for Buyer to operate the Business and of which Buyer does not take actual possession, or which Buyer returns to Seller following Closing).

1.2 **Certain Definitions.** All capitalized terms not defined in this Agreement shall have the meaning ascribed to them in the Bankruptcy Code. In addition, for the purposes of this Agreement, the following terms have the following meanings:

(a) "Intellectual Property" shall mean any or all of the following: (i) all United States, international and foreign patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof; (ii) all inventions (whether or not patentable or reduced to practice), invention disclosures, improvements, trade secrets, proprietary information, know how, technology, technical data, customer lists, processes and formulae, plans, drawings and blue prints, whether tangible or intangible and whether stored, compiled, or memorialized physically, electronically, photographically, or otherwise, and all rights to and documentation relating to any of the foregoing; (iii) all copyrights, copyrights registrations and applications therefor, and all other rights corresponding thereto, in both published works and unpublished works, including all such rights in software, user and training manuals, marketing and promotional materials, internal reports, business plans and any other expressions, mask works, firmware and videos, whether registered or unregistered; (iv) all computer software, including all source code, object code, firmware, development tools, files, records and data, and all media on which any of the foregoing is recorded; (v) all trade names, logos, common law trademarks and service marks, Internet domain names, trade dress, and the goodwill associated therewith, and all trademark and service mark registrations and applications therefor; (vi) all databases and data collections and all rights therein; and (vii) all moral and economic rights of authors and inventors, however denominated.

(b) "Seller Intellectual Property" shall mean any Intellectual Property that is owned by, or exclusively licensed to, Seller.

## ARTICLE II: ASSUMPTION OF LIABILITIES

2.1 **No Assumption of Liabilities**. Except as specifically set forth herein, Buyer is assuming no liabilities of Seller.

2.2 **Executory Contracts and Leases.** Subject to the applicable conditions hereinafter set forth, Buyer shall designate those executory contracts and unexpired leases which it wishes to be assigned to it at Closing, if any, which shall be set forth on **Annex 2.2** (the "Designated Contracts"). Seller shall file the Assumption and Cure Motion (as defined in Section 7.4(c)) with the Bankruptcy Court, pursuant to 11 U.S.C. § 365, seeking authority

to assume and assign to Buyer the Designated Contracts and Buyer shall assume any on-going liabilities and obligations in connection with all Designated Contracts approved for assumption and assignment by the Bankruptcy Court (any such approved Designated Contracts, the "Assumed Contracts"). Seller shall be responsible for payment of any cure costs required by 11 U.S.C. § 365 for any Assumed Contracts, which cure costs are specified for each Designated Contract on **Annex 2.2** (the "Cure Costs"), except that Buyer shall be responsible for payment of any cure costs required by 11 U.S.C. § 365 for any Assumed Contracts that are unexpired leases of non-residential real property (the "Lease Costs"). For the avoidance of doubt, and notwithstanding anything herein to the contrary, Buyer shall only assume and be deemed to assume those contracts and leases that are set forth on **Annex 2.2** and, with respect to such contracts and leases, shall only assume such liabilities and obligations which accrue after the Closing Date, and at any time prior to Closing Buyer may remove any contracts or leases from the Assumed Contracts on **Annex 2.2**. Buyer shall provide Seller with such financial information as is reasonably required to enable Seller to satisfy the "adequate assurance of future performance" requirements of 11 U.S.C. § 365(b)(1)(C) with respect to all Designated Contracts and otherwise cooperate with Seller to assist Seller to obtain an order of the Bankruptcy Court approving of Seller's assumption and assignment to Buyer of the Designated Contracts.

2.3    **Imposition of Liabilities.** If any of Seller's liabilities are imputed to the Acquired Assets, such that Buyer is obligated to satisfy such liabilities, or if any of Seller's liabilities must be discharged prior to or as a condition of Closing, whether current liabilities or liabilities incurred as a result of the consummation of the transactions contemplated by this Agreement, Buyer may rescind its obligations under this Agreement with no further obligations to Seller, unless Seller is able to satisfy all such liabilities or discharge such liabilities prior to Closing, as the case may be, in which case Buyer shall not have any right to rescind its obligations under this Agreement.

2.4    **Seller's Medicare Provider Number.** The Parties agree that Buyer shall not under any circumstances assume the Medicare provider number or numbers of Seller, which number or numbers are set forth on **Annex 2.4,** at the Closing or any of the liabilities associated therewith.

2.5    **Employees.** At least 10 days prior to Closing, Buyer will provide Seller with a list of Seller's employees (client services and sales) that Buyer seeks to hire in connection with the transaction contemplated hereby.

### ARTICLE III:  PURCHASE AND CLOSING

3.1    **Purchase Price.** In consideration for Buyer's purchase of the Acquired Assets and Seller's other obligations under this Agreement, Buyer shall pay Seller at Closing the cash sum of one million seven hundred fifty thousand U.S. dollars (US$1,750,000.00) (the "Purchase Price").

3.2    **Closing.** The purchase and sale of the Acquired Assets and assignment of the Assumed Contracts shall be consummated at 10:00 a.m. prevailing Eastern Time on a date agreed to by the Parties, but in any event on or before the 10th day following the satisfaction of the Approval Condition (the "Closing Date"), at the offices of Buyer's attorneys, Foley Hoag LLP, 155 Seaport Boulevard, Boston, MA 02210, or such other mutually agreed to location (the "Closing").

3

3.3   **Deposit**.  Contemporaneous with the execution of this Agreement, Buyer shall pay to Seller a cash deposit in the amount of one hundred thousand dollars ($100,000.00) (the "Deposit").  The Deposit shall be held in escrow by Seller's attorneys pending the Closing and consummation of the transactions contemplated herein.

3.4   **Payment.**  At Closing, the Purchase Price shall be paid to Seller in good and sufficient funds by either certified bank check or wire transfer to an account designated in writing by Seller.  Buyer shall be entitled to a credit against the Purchase Price equal to the amount of the Deposit, and Seller shall be entitled to possession of the Deposit at Closing.

3.5   **Taxes.**  Seller shall pay and be responsible for the satisfaction of all property, excise, and other tax obligations, penalties and interest, imposed by any governmental entity in connection with the sale of the Acquired Assets and the transactions contemplated by this Agreement.

3.6   **Alternative Buyer**.  At any time prior to Closing, Buyer may designate a different entity to acquire any or all of the Acquired Assets; *provided, however*, that at all times Buyer shall be obligated for payment of the Purchase Price.

### ARTICLE IV:  RECORDS AND TECHNICAL ASSISTANCE

4.1   **Continued Access to Records.**  To the extent that records relating to the operations of Seller prior to the Closing Date are not transferred to Buyer at Closing, Seller shall preserve for a period of one (1) year after the Closing the records and documents pertaining to the Acquired Assets sold to Buyer pursuant to this Agreement and will grant Buyer such reasonable access to all such records and documents as may be needed by Buyer with respect to any matters pertaining to the Business arising prior to the Closing Date.  To the extent that Seller requires access to the Records for the purpose of administering its Bankruptcy Proceeding, Buyer shall grant Seller such reasonable access to all such records and documents as may be needed by Seller with respect to any matters pertaining thereto.  For a period of one (1) year after the Closing, Buyer will not destroy any Records without providing Seller with at least ten days prior written notice of Buyer's intent to destroy such Records and, if requested by Seller, Buyer will return such Records to Seller instead of destroying them.

### ARTICLE V: BUYER'S REPRESENTATIONS AND WARRANTIES

In addition to such other representations and warranties as are set forth elsewhere in this Agreement, Buyer represents and warrants to Seller as follows, each of which is true and correct on the date hereof and will be true and correct on the Closing Date:

5.1   **Existence and Authority.**  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware and has the power and authority to enter into this Agreement and to consummate the transactions contemplated herein.  Buyer currently has the funds available to it (and also will at the Closing) to enable Buyer to consummate the transactions contemplated by this Agreement.  Buyer's ability to consummate the transactions contemplated by this Agreement and to pay the Purchase Price to Seller at the Closing is therefore not subject to any financing contingency.

5.2     **Power to Acquire.** To Buyer's knowledge, and subject to satisfaction of the Conditions Precedent (as that term is defined in Section 8.1), the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein will not constitute a breach, violation or default, or create any Lien under its certificate of formation, operating agreement, or any judgment, decree, order, governmental permit, license, agreement, indenture or instrument to which it is a party. To Buyer's knowledge, other than the Bankruptcy Proceeding, there is no action, suit, proceeding or investigation pending that would prevent the transactions contemplated by this Agreement or that questions the validity or enforceability of the transactions contemplated by this Agreement or any action pursuant hereto.

## ARTICLE VI:  SELLER'S REPRESENTATIONS AND WARRANTEES

In addition to such other representations and warranties as are set forth elsewhere in this Agreement, Seller represents and warrants to Buyer as follows, each of which is true and correct on the date hereof and will be true and correct on the Closing Date. Except as specifically noted herein, such representations and warranties shall survive only until the Closing and Buyer's sole remedy for any breach of this Article VI shall be limited to its right to terminate this Agreement prior to Closing pursuant to section 9.3.

6.1     **Existence and Authority.** Seller is a corporation duly organized, validly existing and in good standing under the laws of California and, subject to satisfaction of the Conditions Precedent, has the corporate power and authority to enter into this Agreement and to consummate the transactions contemplated herein.

6.2     **Power to Convey.** Subject to satisfaction of the Conditions Precedent, the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein will not constitute a breach, violation or default, or create any Lien under its articles of incorporation, by-laws, or any judgment, decree, order, governmental permit, license, agreement, indenture or instrument to which it is a party.  To Seller's knowledge, other than the Bankruptcy Proceeding, there is no action, suit, proceeding or investigation pending that would prevent the transactions contemplated by this Agreement or that questions the validity or enforceability of the transactions contemplated by this Agreement or any action pursuant hereto.

6.3     **Authorization to Conduct Business.**

(a)     Seller has the capacity, the corporate authority, and the required regulatory agency approvals, including, without limitation, all necessary Governmental Permits (as defined below), to conduct its present business in the United States.

(b)     **Annex 6.3** sets forth a list and brief description of all licenses, franchises, permits, privileges, variances, immunities, approvals, clearances and other authorizations from governmental entities that are necessary to entitle Seller to own or lease, operate and use the Acquired Assets (collectively, the "Governmental Permits"). Seller owns, holds or possesses all Governmental Permits that are necessary to entitle Seller to own or lease, operate and use the Acquired Assets. To the knowledge of Seller, all of the Governmental Permits are valid and in full force and effect paid through the Closing Date of this Agreement.  Seller has not been informed in writing (or, to the knowledge of Seller, orally) by any governmental entity or any lawyer or consultant (knowledgeable in the relevant field), of any

5

deficiency, cancellation, default or any dispute with respect to any Governmental Permit. No proceeding is pending or, to the knowledge of Seller, threatened, to revoke, terminate or amend any Governmental Permit nor, to the knowledge of Seller, do any facts or circumstances exist which form a basis upon which any governmental entity reasonably could seek to revoke, terminate or adversely affect the rights of Seller under any Governmental Permit. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in a modification, impairment, revocation, suspension or limitation of any Governmental Permit or any breach, default or forfeiture of any rights thereunder. Except as set forth on **Annex 6.3**, no Governmental Permit requires the consent, approval or act of, or the making of any filing with, any governmental entity in order to remain in full force and effect after the execution and delivery of this Agreement. Complete and correct copies of all of the Governmental Permits and any supporting documents have heretofore been delivered to Buyer.

(c)     Seller warrants that it has not imported or sold any products or services without required Government Permits, including but not limited to any approvals required by the Centers for Medicare & Medicaid Services.  Any infractions predating the Closing Date which result in penalties, interest charges or legal expense to Buyer will be reimbursed by Seller regardless of when such penalties, interest, charges, or legal expenses are incurred.

(d)     Neither Seller nor any affiliate of Seller, nor the officers, directors, employees, agents or individuals with direct or indirect ownership interests (or any combination thereof) of 5% or more in Seller (as those terms are defined in 42 C.F.R. § 1001.1001) or any of its affiliates: (i) have engaged in any activities on behalf of Seller that are prohibited under, or are cause for civil or criminal penalties or mandatory or permissive exclusion from, any Federal Health Care Program under Sections 1128, 1128A, 1128B or 1877 of the SSA, Section 3729 of Title 31 of the United States Code or related state or local statutes, including knowingly and willfully offering, paying, soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind in return for, or to induce, the purchase, lease or order, or the arranging for or recommending of the purchase, lease or order, of any good, facility, item or service for which payment may be made in whole or in part under any such program; (ii) have had a civil monetary penalty assessed against them under Section 1128A of the SSA; (iii) have been excluded from participation under any Federal Health Care Program under Section 1128 of the SSA; or (iv) have been convicted (as defined in 42 C.F.R. § 1001.2) of any of the categories of offenses described in Sections 1128(a) or 1128(b)(1), (b)(2) or (b)(3) of the SSA. For purposes hereof, "Federal Health Care Program" means any plan or program that provides health care benefits, whether directly, through insurance or otherwise, that is funded directly, in whole or in part, by the government of the United States of America (other than the Federal Employees Health Benefits Program), including the Medicare, Medicaid and TRICARE programs (described in Title XVIII of the SSA, Title XIX of the SSA, and Title 10, Chapter 55 of the U.S.C., respectively), or any state health care program (as defined in Section 1128(h) of the SSA); and "SSA" means the United States Social Security Act, codified at Title 42, Chapter 7, of the United States Code.

6

(e)     Seller is not currently, nor has it been in the past: (i) to the knowledge of Seller, under investigation by the Department of Justice, the Office of the Inspector General of the U.S. Department of Health and Human Services, the Centers for Medicare and Medicaid Services, any state Attorney General, state Medicaid Agency or the FDA for promotional or other fraud and abuse or related issues; or (ii) suspended or debarred from contracting with the federal government. Seller has not engaged in any activity constituting fraud or abuse under any requirements of applicable law relating to healthcare insurance or reimbursement, and no payments of either cash or other consideration to any person by or on behalf of Seller have been made in violation of any applicable requirements of law.

6.4     **No Salary Liabilities.** Except as set forth on Schedules E and F, which Seller anticipates filing in the Bankruptcy Proceeding on or before October 30, 2009, there are no unpaid salary, bonus, vacation, severance package, incentive pay, or other remunerative obligations due to any employee (past or present) for service prior to the Petition Date, and Seller is current on all such obligations incurred after the Petition Date.

6.5     **No Brokers.** All negotiations relative to this Agreement and the transactions contemplated herein have been carried on by Seller directly with Buyer and without the intervention of any broker or third party retained by Seller; and Seller has not authorized any broker or third party to act on its behalf in connection with the transactions contemplated by this Agreement as to give rise to any valid claim against either of the parties for a finder's fee, brokerage commission or similar payment.

6.6     **Title.** Seller has good and marketable title to the Acquired Assets to the extent sold to Buyer hereunder, free and clear of all Liens or defects of title.

6.7     **Contracts.**

(a)     Seller has provided Buyer with complete copies of all Designated Contracts, including any and all amendments or revisions thereto.

(b)     All Designated Contracts are valid and in full force and effect except to the extent they have previously expired in accordance with their terms. Neither Seller, nor, to the knowledge of Seller, any other party to a Designated Contract has (other than with respect to any bankruptcy filing and/or insolvency provision) violated any material provision of, or committed or failed to perform any act which, with or without notice, lapse of time or both would constitute a material default under the provisions of any Designated Contract.

(c)     **Annex 6.7** lists: (i) all contracts to which Seller is a party that contain performance commitments or guarantees by Seller, including, without limitation, performance commitments or guarantees relating to return on investment, clinical, or administrative/operational performance (collectively, "Performance Guarantees"), (ii) to Seller's knowledge, the amount of any credits, refunds or penalties assessed or expected against Seller under such contracts with respect to such Performance Guarantees (collectively, "Performance Guarantee Penalties"), but which have not yet been paid or credited for prior periods or for the measurement period in effect as of the Effective Date (the "Current Measurement

7

Year"), and (iii) all Performance Guarantee Penalties assessed against Seller and paid or credited during the two immediately preceding years under such contracts.

(d)     The aggregate amount of Performance Guarantee Penalties and other liabilities for which have not yet been paid or credited (including with respect to Performance Guarantee Penalties expected for the Current Measurement Year) with respect to those Designated Contracts set forth on Annex 6.7(d) does not exceed $300,000 in the aggregate.

(e)     Except as set forth on **Annex 6.7**, no other party to a Designated Contract has provided notice of termination, threatened to terminate such Designated Contract, asked to renegotiate the terms, pricing, or Performance Guarantees of such Designated Contract, or asked for a waiver of any rights by Seller under such Designated Contract.

(f)     Under the terms of the Designated Contract between Seller and HCSC, there are no Performance Guarantee Penalties assessed or expected (including with respect to any Current Measurement Year), no performance measurement year has been established under the contract, and HCSC has not provided to Seller the data or other information required under the contract to establish a right to Performance Guarantees.

6.8     **Intellectual Property.**

(a)     Seller Intellectual Property; Proceedings. **Annex 6.8** sets forth as of the date hereof: (i) all Seller Registered Intellectual Property and specifies, where applicable, the jurisdictions in which each such item of Seller Registered Intellectual Property has been issued or registered, (ii) all Seller Intellectual Property other than Seller Registered Intellectual Property, including, without limitation, unregistered trademarks in which Seller asserts trademark rights, and (iii) all proceedings or actions before any court or tribunal (including the United States Patent and Trademark Office (the "PTO") or equivalent authority anywhere else in the world) related to ownership, validity or enforceability of any of Seller Registered Intellectual Property. For purposes hereof, the following terms have the following meanings: (A) "Registered Intellectual Property" shall mean all United States: (1) patents and patent applications (including provisional applications); (2) registered trademarks, applications to register trademarks, intent-to-use applications, or other registrations or applications related to trademarks; (3) registered copyrights and applications for copyright registration; and (4) any other Intellectual Property that is the subject of an application, certificate, filing, registration or other document issued, filed with, or recorded by any governmental entity; and (B) "Seller Registered Intellectual Property" shall mean all of the Registered Intellectual Property owned by, or filed in the name of, Seller.

(b)     No Order; Ownership and Use. No Seller Registered Intellectual Property and, to the knowledge of Seller, no Seller Intellectual Property is subject to any proceeding or outstanding order or stipulation which restricts in any manner the use, transfer, or licensing thereof by Seller, or which affects the validity, use or enforceability of such Seller Registered Intellectual Property or Seller Intellectual

8

Property, as applicable. Seller either (i) owns all right, title and interest in and to Seller Intellectual Property, free and clear of all Liens, or (ii) is exclusively licensed to use, or otherwise possesses legally valid exclusive rights to use, Seller Intellectual Property that it does not so own.

(c)     Registration. Each material item of Seller Registered Intellectual Property is valid and subsisting, all necessary registration, maintenance and renewal fees in connection with such Seller Registered Intellectual Property have been paid when due and all necessary documents, recordations and certificates in connection with such Seller Registered Intellectual Property have been filed with the relevant patent, copyright, trademark or other authorities in the United States for the purposes of prosecuting, maintaining or perfecting such Seller Registered Intellectual Property, except where such failure would not be material to Seller's rights in such Seller Registered Intellectual Property.

(d)     Third-Party Development. To the extent that any technology, software or Intellectual Property has been developed or created independently or jointly by a third party for Seller, Seller has a written agreement with such third party with respect thereto and Seller thereby either (i) has obtained ownership of, and is the exclusive owner of, or (ii) has obtained a license from such third party sufficient for the conduct of its business as currently conducted with respect to such Intellectual Property which has been disclosed to Seller by such third party as of the Effective Date.

(e)     Transfers. Seller has not transferred ownership of, or granted any exclusive license with respect to, any Seller Intellectual Property to any third party, or to the knowledge of Seller, permitted Seller's rights in proprietary, non-public Seller Intellectual Property to lapse or enter the public domain.

(f)     No Conflict. To the knowledge of Seller, all contracts set forth in **Annex 6.8** which (i) assign, exclusively license or otherwise exclusively transfer to Seller any Seller Intellectual Property, or (ii) grant to Seller non-exclusive licenses or rights under Intellectual Property of a third party, are in full force and effect. Seller is in material compliance with, and is not currently in material breach of, any term of any such contracts and, to the knowledge of Seller, all other parties to such contracts are in compliance with, and are not currently in material breach of, any term of such contracts.

(g)     No Infringement. The operation of the Business as such Business currently is conducted does not infringe or misappropriate the Intellectual Property of any third party or constitute unfair competition or unfair trade practices under the laws of any jurisdiction.

(h)     No Notice of Infringement. Seller has not received written notice from any third party that the operation of the Business as such Business currently is conducted, or any act, product or service of Seller, infringes or misappropriates the Intellectual Property of any third party or constitutes unfair competition or unfair trade practices under the laws of any jurisdiction.

9

(i) <u>No Third Party Infringement</u>. Seller has not delivered written notice to a third party which expressly alleges that such Person is infringing or misappropriating any Seller Intellectual Property. To the knowledge of Seller, no employee or consultant of Seller engaged in the development of products or services of, or in performing sales and marketing functions on behalf of, Seller is obligated under any contract with any third party which conflicts with such employee's or consultant's obligations to Seller with respect to any such activity performed on behalf of Seller.

(j) <u>Proprietary Information Agreements</u>. Seller has taken commercially reasonable steps to protect Seller's rights in Seller's confidential information and trade secrets that it wishes to protect and any trade secrets or confidential information of third parties provided to Seller, and, without limiting the foregoing, Seller requires each employee or consultant of Seller to execute a proprietary information/confidentiality agreement and, except as set forth in **Annex 6.8**, all employees and consultants of Seller have executed such an agreement.

6.9 **Consents.** Except for the necessary Bankruptcy Court approvals as set forth herein, no consents, authorizations, approvals, filings or registrations with any government commission, board or other regulatory body or any other person is required for or in connection with the execution and delivery of this Agreement by Seller and the consummation of the transactions contemplated by this Agreement.

## **ARTICLE VII:  PRE-CLOSING COVENANTS**

7.1 **Efforts**. Each Party shall use commercially reasonable efforts to take all actions and to do all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement.

7.2 **Access to Customers, Property and Records**. At all times prior to Closing, Seller shall permit representatives of Buyer to contact Seller's customers and counterparties to the Designated Contracts and provide Buyer full access (at all reasonable times, and in a manner so as not to interfere with the operation of the Business) to Seller's records and information relating to the Business upon reasonable advance notice and during normal business hours, and Seller will make or cause to be made available to Buyer for copying, at Buyer's sole cost and expense, files and documents of Seller relating to the Business. Without limiting the foregoing, Seller will provide copies of all contracts, leases and agreements material to the Business (including licenses and vendor agreements) to allow Buyer to determine which of such contracts and agreements to designate as Designated Contracts.

7.3 **Preservation of Assets**. Prior to transfer of the Acquired Assets to Buyer, Seller will not (a) license, sell, lease or otherwise dispose of or enter into any contract for the license, sale, lease or other disposition of any Acquired Asset to any person or entity; or (b) amend, terminate, modify or reject any material contracts, licenses, registrations or applications. Prior to transfer of the Acquired Assets to Buyer, Seller will operate its Business within the usual, regular and ordinary course of business in all material respects.

10

7.4    **Bankruptcy Covenants.**

   (a)    <u>Competitive Bidding Procedures</u>.  This Agreement is subject to a competitive bid
          process pursuant to 11 U.S.C. § 363.  Buyer acknowledges that in connection with
          the sale of the Acquired Assets, Seller shall have sought, in a commercially
          reasonable manner as required by the Bankruptcy Code and as shall be directed
          by the Bankruptcy Court in the Sale Procedures Order (as defined in section
          7.4(d) hereof), higher and better offers for the Acquired Assets.  Buyer shall be
          entitled to submit further bids for the Acquired Assets in conformity with the Sale
          Procedures Order.

   (b)    <u>Sale Motion</u>.  Within seven (7) business days after the Effective Date, Seller shall
          file a motion with the Bankruptcy Court seeking approval of the transactions
          contemplated by this Agreement, subject to higher or better offers, and authority
          to transfer to Buyer the Acquired Assets free and clear of all Liens, pursuant to,
          *inter alia*, 11 U.S.C. §§ 105, 363 and 365 (the "<u>Sale Motion</u>").

   (c)    <u>Assumption and Cure Motion</u>.  Contemporaneous with the filing of the Sale
          Motion, Seller shall also file a motion with the Bankruptcy Court seeking entry of
          an order approving a process for counterparties to the Designated Contracts to
          contest the assumption and assignment of the Designated Contracts and/or the
          amount of cure payments owing on account of Seller's assumption of such
          contracts and assignment to Buyer ("<u>Assumption and Cure Motion</u>").

   (d)    <u>Sale Procedures Order</u>.  Contemporaneous with the filing of the Sale Motion,
          Seller shall also file a motion (the "<u>Sale Procedures Motion</u>") with the Bankruptcy
          Court seeking entry of an order approving sale and bidding procedures for the
          Acquired Assets (the "<u>Sale Procedures Order</u>").  The Sale Procedures Order shall
          be in a form and substance reasonably satisfactory to Buyer and shall contain, at a
          minimum, the following material terms:

          (i)     Any initial counteroffer or counterbid for the Acquired Assets must

                  (A)    be in all cash,

                  (B)    be no less than $1,850,000,

                  (C)    be irrevocable until the closing of the sale,

                  (D)    be accompanied by a deposit equal to at least 5% of the
                         Purchase Price,

                  (E)    demonstrate to Seller's reasonable satisfaction that the
                         bidder is financially able to consummate the transaction
                         contemplated by such bid, and

                  (F)    contain terms and conditions that, in the aggregate, are not
                         materially more burdensome to Seller than the terms and
                         conditions contained herein

          (collectively, a "<u>Qualified Counteroffer</u>");

11

(ii)     If Seller does not receive a Qualified Counteroffer within the time period set forth in the Sale Procedures Order, it may proceed immediately to approval of the transactions contemplated by this Agreement;

(iii)    If Seller receives at least one Qualified Counteroffer, Buyer and all parties submitting Qualified Counteroffers shall be entitled to participate in an auction for the Assigned Assets, with minimum subsequent bid increments of $75,000;

(iv)     In the event that the Bankruptcy Court fails to approve the sale of the Acquired Assets to Buyer and instead approves a sale of all or a significant portion of the Acquired Assets to a person or entity other than Buyer (an "Other Buyer"), Seller shall pay to Buyer, without further order of the Bankruptcy Court, a break-up fee equal to sixty thousand dollars ($60,000.00) (the "Break-up Fee"), which Break-up Fee shall have a first priority in and be paid out of the proceeds paid by an Other Buyer; and

(v)      The Deposit shall be returned to Buyer, and the Break-up Fee shall be paid to Buyer, immediately upon consummation of a transaction with an Other Buyer.

(e)     Bankruptcy Filings.  Seller shall promptly provide Buyer with drafts of all documents, motions, orders, filings or pleadings that Seller proposes to file with the Bankruptcy Court that relate to the consummation or approval of this Agreement, and will provide Buyer with reasonable opportunity to review and comment upon such filings as reasonably practical.  Seller shall also promptly provide Buyer with copies of all pleadings received by or served by or upon Seller in the Bankruptcy Proceeding relating to the transactions contemplated in this Agreement, which have not otherwise been served on Buyer.

7.5     **Cooperation**.  Buyer and Seller agree to cooperate with one another in good faith with respect to any discussions Buyer may have with any customers, vendors, current or former employees, or others having (or formerly having) business relationships with Seller with respect to the Acquired Assets.

## ARTICLE VIII: CONDITIONS TO CLOSING

8.1     **Conditions to obligations of Buyer.**  The obligation of Buyer to consummate the transactions to be performed by it in connection with the Closing is subject to the satisfaction of the following conditions (collectively, the "Conditions Precedent"):

(a)     The Bankruptcy Court will have entered an order in form and substance satisfactory to Buyer approving this Agreement and all of the terms and conditions hereof, authorizing Seller to consummate the transaction contemplated herein, authorizing Buyer to make offers to hire any employees of Seller, providing that any and all valid Liens shall attach to the Purchase Price at Closing, and containing findings that all applicable notice and hearing requirements for the transactions contemplated hereby under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and any local rules of the Bankruptcy Court have been satisfied, the transactions

12

contemplated hereby are in the best interests of Seller's estate and its creditors, and Buyer is a good faith purchaser pursuant to 11 U.S.C. § 363(m) (the "Sale Order").

(b)     The Bankruptcy Court will have entered an order in form and substance satisfactory to Buyer (either independently or as part of the Sale Order) approving Seller's assumption of the Assumed Contracts in accordance with section 365(b) of the Bankruptcy Code and assignment thereof to Buyer as of the Closing, which order shall provide that (other than Lease Costs to be paid by Buyer as set forth in Section 2.2 above) all defaults under the Assumed Contracts have been cured or will be cured by Seller prior to or as part of the Closing, that such Cure Costs include any and all performance guarantees accrued or attributable to the period prior to Closing (whether or not such guarantees are then presently due and owing), and further provides that payment of any and all Cure Costs are the obligation of Seller (the "Assumption Order").

(c)     The Sale Order either will have become final and non-appealable or the Sale Order will contain a waiver of the stay set forth in Rule 6004(g) of the Bankruptcy Rules, and the Assumption Order will have become final and non-appealable or the Assumption Order will contain a waiver of the stay set forth in Rule 6006(d) of the Bankruptcy Rules (collectively, the "Approval Condition").

(d)     The representations and warranties of Seller as set forth in Article VI hereof shall be true and correct in all material respects when made as of the Effective Date, and as of the Closing Date, except for representations made as of a specific date, which shall be true and correct as of such date.

(e)     There shall have been no change or effect with respect to the Business that (i) is or would be reasonably likely to be material and adverse to the financial position, results of operations, prospects or business of the Business taken as a whole, or (ii) would materially impair the ability of Seller or the Business to perform their respective obligations under this Agreement or otherwise materially impede the consummation of the transactions contemplated by this Agreement.

(f)     Each of the Designated Contracts shall be in full force and effect and each Designated Contract shall have been approved by the Bankruptcy Court as an Assumed Contract.

(g)     Buyer shall not have exercised its right to terminate this Agreement under section 2.3.

(h)     Seller shall have performed or complied in all material respects with its agreements and covenants required to be performed or complied with under this Agreement at or prior to the Closing.

(i)     Seller shall have executed and delivered such documents as are reasonably requested by Buyer to consummate the transactions contemplated herein.

8.2     **Conditions to obligations of Seller.**  The obligation of Seller to consummate the transactions to be performed by it in connection with the Closing is subject to the satisfaction of the following conditions:

13

     (a)     The Approval Condition shall have been satisfied.

     (b)     The representations and warranties of Buyer as set forth in Article V hereof shall be true and correct in all material respects when made as of the Effective Date, and as of the Closing Date, except for representations made as of a specific date, which shall be true and correct as of such date.

     (c)     Buyer shall have performed or complied in all material respects with its agreements and covenants required to be performed or complied with under this Agreement at or prior to the Closing, including payment of the Purchase Price as required hereunder.

8.3    **Waiver of Closing Conditions.** The respective conditions to Closing set forth in this Article VIII shall be subject to waiver by Buyer (as to the conditions stated in Section 8.1 of this Agreement) and by Seller (as to the conditions stated in Section 8.2 of this Agreement); *provided*, that the conditions set forth in Sections 8.1(a) - (c) and 8.2(a) of this Agreement may not be waived

## ARTICLE IX: TERM AND TERMINATION

9.1    **Automatic Termination.** If the Approval Condition is not otherwise satisfied within ninety (90) days after the Effective Date through no fault of Buyer or if the sale of all or a significant portion of the Acquired Assets closes with a party other than Buyer, then this Agreement automatically will terminate and the Parties will have no further obligations to the other under this Agreement other than the obligation of Seller to return the Deposit to Buyer and to pay Buyer the Break-Up Fee, if applicable. Notwithstanding the non-occurrence of the Approval Condition within ninety (90) days after the Effective Date, Buyer may unilaterally extend this Agreement by providing notice to Seller in writing of such extension prior to the expiration of such ninety (90) day period.

9.2    **Termination by Consent.** The Parties may terminate this Agreement with the consent of all Parties.

9.3    **Termination by Buyer**. In the event that (a) Seller fails to file the Sale Motion, the Assumption and Cure Motion and the Sale Procedures Motion by the dates set forth herein, or the Bankruptcy Court fails to approve the Sale Procedures Order within thirty (30) days after the filing of the Sale Procedures Motion, (b) the Conditions Precedent are not satisfied or waived, (c) any of Seller's representations and warranties set forth in Article VI are not true and correct on the date hereof or on the Closing Date, or (d) Seller is materially in default in the performance of its obligations under this Agreement, and such default is not cured on or before the Closing Date, Buyer, in its sole discretion, will be entitled to (i) proceed to Closing or (ii) terminate this Agreement by written notice to Seller. In the event that Buyer elects to terminate this Agreement pursuant to subsection (ii) of the preceding sentence, Seller shall immediately return the Deposit to Buyer.

9.4    **Buyer Default**. If Buyer fails to perform any of the covenants, agreements or obligations to be performed by Buyer pursuant to this Agreement, then Seller shall be entitled to terminate this Agreement upon written notice to Buyer. Seller's sole remedy at law or equity for Buyer's default under this Agreement or its failure to consummate the transactions contemplated hereunder shall be to retain the Deposit.

9.5    **Casualty.**  If a significant portion of the Acquired Assets are destroyed or damaged, Buyer may elect to terminate this Agreement by giving written notice to Seller.

## ARTICLE X: MISCELLANEOUS

10.1    **Reliance on Representations and Warranties.**  The Parties mutually agree that, notwithstanding any right of each Party to fully investigate the affairs of the other hereunder and notwithstanding any knowledge of facts determined or determinable by the investigating party pursuant to such investigation or right of investigation, each Party has the right to fully rely upon the representations and warranties of the other contained in this Agreement and on the accuracy of any certificate or other document given or delivered by one party to the other party pursuant to this Agreement. Further, knowledge by an agent of a Party of any fact so determined or determinable which is not otherwise disclosed in this Agreement or in any certificate or other document delivered by one Party to another Party pursuant to this Agreement shall not constitute a defense by any party for any claim for loss or damage by the other party for any misrepresentation, breach of warranty, covenant or breach of agreement made by it in this Agreement or in any such document or certificate.

10.2    **Assignment.**    Neither this Agreement, nor any right, interest, or obligation hereunder, may be assigned by any of the Parties hereto, without the prior written consent of the other Party, <u>except</u> that, in accordance with Section 3.6, Buyer may create a separate entity for the purpose of acquiring the Acquired Assets and Assumed Contracts.

10.3    **Entire Agreement**

(a)    This Agreement, including the Recitals and Annex hereto, supersedes all prior agreements and understandings between the Parties hereto, including, without limitation, that certain proposal letter from Buyer to Seller dated October 9, 2009, and constitutes the entire agreement of the Parties with respect to the matters contained herein.

(b)    The provisions of this Agreement shall be construed as an integrated agreement. Section headings and captions are included in this Agreement for convenience only and shall not be used in the interpretation or construction thereof. If any non-material provision of this Agreement or the application thereof to any person or circumstance is held by a court of competent jurisdiction to be invalid, illegal or unenforceable for any reason, the remainder of this Agreement, and the application of such provision to other persons or circumstances, shall not be affected thereby, and shall remain in full force and effect to the fullest extent permitted by applicable law.

(c)    Except as otherwise provided herein, this Agreement may be changed, amended or modified by, and only by, a written instrument executed by all Parties (and delivered physically or by facsimile transmission from any Party or its counsel to the other Parties or their respective counsel) and subject to approval of the Bankruptcy Court, if applicable.  No waiver of any provision of this Agreement will be valid unless in writing and signed by the Party against whom it is to be enforced.

10.4    **Notices.**  All notices, demands or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be effective if delivered to the addresses set forth below.  Notices may be communicated by hand delivery, facsimile, overnight delivery, email or United States mail, and shall be deemed given on the date such notice is sent, except for notice by overnight delivery or United States mail, which shall be deemed to be given on the day following the date such notice is sent. Such address for either Party may, from time-to-time, change following due notification of the other Party of such change.

| | |
|---|---|
| If to Seller: | Mr. George Pillari<br>Chief Executive Officer<br>LifeMasters Supported SelfCare, Inc.<br>15635 Alton Parkway, Suite 400<br>Irvine, CA 92618<br>Fax: (949) 789-0652<br>email: |
| with a copy to: | Ron Bender, Esq.<br>Levene, Neale, Bender, Rankin & Brill L.L.P.<br>10250 Constellation Blvd, Suite 1700<br>Los Angeles, CA 90067<br>Fax: (310) 229-1244<br>email: rb@lnbrb.com |
| If to Buyer: | Alere LLC<br>3200 Windy Hill Road, Suite B-100<br>Atlanta, GA 30339<br>Attention: General Counsel<br>Fax: (770) 916-1312<br>email: Craig.Apolinsky@alere.com |
| with a copy to: | Kenneth S. Leonetti, Esq.<br>Foley Hoag LLP<br>Seaport World Trade Center West<br>155 Seaport Boulevard<br>Boston, MA 02210<br>Fax: (617) 832-7000<br>email: kleonetti@foleyhoag.com |

10.5    **Payment of Fees and Expenses.**  Except as otherwise provided in this Agreement, each party hereto shall pay all fees and expenses of such Party's respective counsel, accountants, and all other expenses incurred by such Party incident to the negotiation, preparation and execution of this Agreement and consummation of the transactions contemplated hereby.

10.6    **Binding Effect.**  This Agreement shall be binding and conclusive upon and inure to the benefit of the respective Parties hereto and their successors and permitted assigns.

10.7    **Waiver.**  Failure of either Party to insist upon the strict performance of any of the covenants or conditions of this Agreement or to exercise any right or option conferred

16

herein in one or more instances shall not be construed as a waiver or relinquishment of any such covenant, or condition, right or option, but the same shall remain in full force and effect. The doing by either Party of any act or thing which it is not obligated to do hereunder shall not be deemed to impose an obligation upon it to do any such act or thing in the future or in any way change or alter any provision of this Agreement.

10.8 **Severability**. In the event any covenant, condition, term, or provision contained herein shall be held to be invalid, illegal, or unenforceable in any respect, in whole or in part, by a judgment, order or decree of any court or other tribunal of competent jurisdiction, the validity of the remaining covenants, conditions, terms and provisions contained herein, and the validity of the remaining part of any term or provision held to be partially invalid, illegal or unenforceable, shall in no way be affected, prejudiced, or disturbed thereby.

10.9 **Third Party Beneficiaries**. Nothing contained in this Agreement, express or implied, is intended to confer upon any persons not parties to this Agreement any rights or remedies of any nature whatsoever under or by reason of this Agreement, nor is this Agreement intended to create any rights in any third party beneficiaries, and no such rights shall exist.

10.10 **General Interpretative Principles.** Unless the context otherwise requires, this Agreement shall not be construed in favor of or against any party hereto and, except as otherwise herein specifically provided, all of the words and phrases contained herein shall be given their usual and ordinary meanings.

10.11 **Counterparts.** This Agreement may be executed in several counterparts that together shall constitute but one and the same Agreement, binding on both parties notwithstanding that both parties have not signed the same counterpart. A signature on behalf of either Buyer or Seller on a copy of this agreement transmitted electronically or by facsimile shall be deemed to be an original signature.

10.12 **Governing Law**. This Agreement shall be construed in accordance with the laws of the State of Delaware, without regard to conflict of laws principles.

10.13 **Jurisdiction.** The Bankruptcy Court will have exclusive jurisdiction over all matters, including any legal action, suit, or proceeding arising out of or relating to this Agreement, any related agreements, or the contemplated transaction and the interpretation, implementation, and enforcement of this Agreement, and the Parties irrevocably submit and consent to such jurisdiction and venue.

*[Remainder of Page Intentionally Blank; Signature Page Follows]*

17

IN WITNESS WHEREOF, the parties have duly executed this Asset Purchase Agreement as of the day and year first written above.

LIFEMASTERS SUPPORTED SELFCARE, INC.

_____

Name: George Pillari
Title:   President


ALERE LLC

_____

Name:  Ron Geraty
Title:   Chief Executive Officer

18

IN WITNESS WHEREOF, the parties have duly executed this Asset Purchase Agreement as of the day and year first written above.

LIFEMASTERS SUPPORTED SELFCARE, INC.

Name: George Pillari
Title:    President

ALERE LLC

Name:  Ron Geraty
Title:   Chief Executive Officer

LifeMasters Software Inventory
Commercial Software
11/11/2009

| Description | Comment |
|---|---|
| Accountable Software AnyView IDS (heavily customized) - billing | |
| Blackberry - personal device software | |
| BMC Magic - help desk software | |
| Cybertrust - security certificates for external facing web sites | |
| Diskeeper - utility software | |
| DocAve Backup for Sharepoint - backup software | |
| First Data Bank - drug information software | * |
| Gold Standard - Clinical Phamacology software | * |
| Great Plains - financial accounting software | |
| Healthwise - health content | * |
| iGrafix - business process documentation software | |
| Kronos - time and attendance software | |
| LMU (Training Partners) - in house  training management software | |
| McAfee - anti virus software | |
| Mdaemon - email system software | |
| Microsoft Windows, Office, SQL Server, OCS, Reporting Services, Analysis Services, Visual Studio Team System 2008 Development Edition, and other products | * |
| NICE - call recording software | |
| Pervasive - extract, tranform, and load software | |
| PGP - encryption software | |
| ReadyTalk - web conferencing sofware | |
| Redgate - database administration tool | |
| Rightfax - fax software | |
| RSA Envision - security software | |
| SAS - statistical analysis software | |
| Scrutinizer - network monitoring sofftware | |
| Shavlik - patch management software | |
| Solarwinds - network monitoring software | |
| SQL Sentry - job scheduler software | |
| SQL Toolbelt -  operational database and backup software | |
| Sterling Windows Choice Server - CMS billing software (will decommission) | |
| Symantec Backup Exec & NetBackup - backup software | * |
| Telapprise - telecom bill management software | * |
| TM1 - budget and financial analysis | |
| Training Partners - online training/university software | |
| Tumbleweed - secure file transfer software | |
| Ultimate UltiPro - payroll/human resources software | |
| Ultra Edit Maintenance  - data processing maintenance software | |
| Verisign - security certificates for data exchange with trading partners | |
| VMware - virtualization software | |

Note: source disks, documentation, tapes, manuals, and forms available for some of the  listed software

ANNEX 1.1(b) (PT1)
LifeMasters Software Inventory
11/11/2009

| Description |
| --- |
| ClaimsApp (aka Triage engine) (identification and stratification) |
| WebApps |
|   Enrollment participant record (EPR) |
|   Computerized participant record (CPR), including Active Intervention Model (AIM) |
| MyLifeMasters (participant portal) |
| Decision Support Application (DSA, or client portal) |
| Client reporting - daily, weekly, monthly, and quarterly standard reports |
| Fulfillment |
| Claims data warehouse |
| Operational data warehouse |
| PatientReportingLine (IVR) |
| ScriptBuilder |
| COREdb |
| Clinical Indicator reporting framework |
| Claims refresh |
| Predictive Dialing System interface |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |

Note: source disks, documentation, tapes, manuals, and forms available for some of the  listed software

ANNEX 1.1(b) (PT2)

Avaya Equipment & Software

| System | License Type | Description | License Qty | Qty in use | S/W rev. | Site | License Type | Comment |
|---|---|---|---|---|---|---|---|---|
| PBX | s8700 | Master PBX equipment | n/a | | R015x.01.1.4315.1 | SAC | n/a | |
| LSP | s8300 | Remote site local survivable processor | n/a | | R015x.01.1.4315.1 | SAT | n/a | |
| LSP | s8300 | Remote site local survivable processor | n/a | | R015x.01.1.4315.1 | SSF | n/a | |
| LSP | s8300 | Remote site local survivable processor | n/a | | R015x.01.1.4315.1 | IRV | n/a | |
| LSP | s8300 | Remote site local survivable processor | n/a | | R015x.01.1.4315.1 | IND | n/a | |
| LSP | s8300 | Remote site local survivable processor | n/a | | R015x.01.1.4315.1 | ALB | n/a | |
| LSP | s8300 | Remote site local survivable processor | n/a | | R015x.01.1.4315.1 | CUP | n/a | |
| PBX | IP Softphone | Application used for virtual staff, not agents (to be replaced by One-x) | 50 | ~20 | 6.0 or below | All | concurrent | * |
| PBX | IP Agent | Agent software for virtual workforce | 107 | ~20 | 7.0 or below | All | concurrent | * |
| PBX | One-x | Replacement for IP Softphone which is no longer being deployed by Avaya | 350 | new | 1.x | All | concurrent | * |
| PBX | EC-500 | Feature button to automatically ring cell phone and desk phone simultaneously | 440 | 5 | n/a | All | concurrent | * |
| PBX | Stations | License to use agent and staff phones | 2,076 | 772 | n/a | | per seat | * |
| PBX | ACD agents | License for agents to use automated call distribution feature | 780 | ~80 | n/a | | concurrent | * |
| PBX | Trunks | License of individual channels for any internal and external circuits, including voice mail, PDS, and external trunks | 12,000 | 798 | | | per seat | * |
| PDS | Agent | Agent software licenses for predictive dialer | 152 | ~70 | 4.01.1 | | concurrent | * |
| PDS | Trunks | License for individual channels for agents or circuits related to PDS | 304 | 280 | 4.01.1 | | per seat | * |
| PDS | Supervisor | Agent software licenses for predictive dialer for system administrators | 10 | ~8 | 4.01.1 | | concurrent | * |
| Modular Messaging | Mailboxes | Voice mail server seat licenses | 1,600 | ~400 | Version 3.0 | | per seat | * |
| Modular Messaging | Text to Speech | Voice mail text to speech seat licenses | 2 | 2 | | | per seat | * |
| AES | TSAPI | License for agents that will be recorded | 1,000 | ~500 | r4.2.1.20.5.0 | SAC | per seat | * |

Note: Once data center migration completes in 2009, the end state config. will be reduced and not all of this equipment will be operational.

ANNEX 1.1(b) (PT2)

ANNEX 1.1(b) (PT3)

LifeMasters Network Inventory

| Install Site City | Serial # | Item Name | Item Type | Comment |
|---|---|---|---|---|
| ALBUQUERQUE | FDO1128Y1HY | WS-C3750-48PS-S | Chassis | * |
| ALBUQUERQUE | FDO1128Y22E | WS-C3750-48PS-S | Chassis | * |
| ALBUQUERQUE | FDO1128Y2K7 | WS-C3750-48PS-S | Chassis | * |
| ALBUQUERQUE | FDO1128Z5ZP | WS-C3750-48PS-S | Chassis | * |
| ALBUQUERQUE | FDO1128Z70S | WS-C3750-48PS-S | Chassis | * |
| ALBUQUERQUE | FDO1129Y42X | WS-C3750-48PS-S | Chassis | * |
| ALBUQUERQUE | FHK1245F0SL | CISCO2811 | Chassis | |
| ALBUQUERQUE | n/a | WS-C6K-9SLOT-FAN2 | Module - Fan | |
| ALBUQUERQUE | SAL081235L8 | WS-X6148-45AF | Module - Card | |
| ALBUQUERQUE | SAL085281YN | WS-X6148-45AF | Module - Card | |
| ALBUQUERQUE | SAD04090AA8 | WS-X6248-RJ-45 | Module - Card | |
| ALBUQUERQUE | SAL08207RKB | WS-X6148-45AF | Module - Card | |
| ALBUQUERQUE | SAL1130VVZ2 | WS-SUP32-GE-3B | Module - Card | * |
| ALBUQUERQUE | SAL1027UEUG | WS-SUP32-GE-3B | Module - Card | |
| ALBUQUERQUE | AZS10250T9R | WS-CAC-6000W | Module - PSU | |
| ALBUQUERQUE | AZS10090UJ9 | WS-CAC-6000W | Module - PSU | |
| ALBUQUERQUE | SCA041301DC | WS-C6509 | Chassis | |
| ALBUQUERQUE | FTX1211A081 | CISCO2811 | Chassis | |
| ALBUQUERQUE | SAD03261598 | WS-X6248-RJ-45 | Module - Card | |
| ALBUQUERQUE | SAL081232WP | WS-X6148-45AF | Module - Card | |
| ALBUQUERQUE | SAL094760N6 | WS-X6148-45AF | Module - Card | |
| ALBUQUERQUE | SAL05157LJW | WS-X6408A-GBIC | Module - Card | |
| ALBUQUERQUE | SAD04010JN0 | WS-X6K-SUP1A-2GE | Module - Card | |
| ALBUQUERQUE | SAD04290NC3 | WS-X6K-SUP1A-2GE | Module - Card | |
| ALBUQUERQUE | ACP03451418 | WS-CAC-1300W | Module - PSU | |
| ALBUQUERQUE | ACP03471705 | WS-CAC-1300W | Module - PSU | |
| ALBUQUERQUE | ART0826E0KP | WS-CAC-2500W | Module - PSU | |
| ALBUQUERQUE | n/a | WS-C6K-6SLOT-FAN | Module - Fan | |
| ALBUQUERQUE | TBA04010433 | WS-C6506-1300AC= | Chassis | |
| ALBUQUERQUE | TBA04100514 | WS-C6506-1300AC= | Chassis | |
| ALBUQUERQUE | n/a | WS-C6K-6SLOT-FAN | Module - Fan | |
| ALBUQUERQUE | n/a | WS-C6K-6SLOT-FAN | Module - Fan | |
| ALBUQUERQUE | SAD041407VW | WS-X6248-RJ-45 | Module - Card | |
| ALBUQUERQUE | SAD040806A6 | WS-X6248-RJ-45 | Module - Card | |
| ALBUQUERQUE | SAD04090ABW | WS-X6248-RJ-45 | Module - Card | |
| ALBUQUERQUE | SAD04120592 | WS-X6248-TEL | Module - Card | |
| ALBUQUERQUE | SAD03440152 | WS-X6K-SUP1A-2GE | Module - Card | |
| ALBUQUERQUE | FTX1035B2TR | AIR-AP1242AG-A-K9 | Chassis | |
| ALBUQUERQUE | FTX1035B2TS | AIR-AP1242AG-A-K9 | Chassis | |
| ALBUQUERQUE | FTX1035B2T4 | AIR-AP1242AG-A-K9 | Chassis | |
| ALBUQUERQUE | FTX1035B2UQ | AIR-AP1242AG-A-K9 | Chassis | |
| ALBUQUERQUE | FTX1035B2UP | AIR-AP1242AG-A-K9 | Chassis | |
| ALBUQUERQUE | FTX1035B2UL | AIR-AP1242AG-A-K9 | Chassis | |
| ALBUQUERQUE | FTX1035B2UR | AIR-AP1242AG-A-K9 | Chassis | |
| ALBUQUERQUE | FTX1035B2T2 | AIR-AP1242AG-A-K9 | Chassis | |
| ALBUQUERQUE | | ADTRAN MX2800 | Chassis | |
| | | | | .... |
| CUPERTINO | CAT0948R3ST | WS-C3560-48PS-S | Chassis | |
| CUPERTINO | FTX0949D0W7 | Cisco2811 | Chassis | |
| CUPERTINO | FHK1245F0SM | CISCO1841-T1 | Chassis | |
| CUPERTINO | CAT1129RHB2 | WS-C3750-48PS-S | Chassis | * |
| CUPERTINO | FTX0949E46J | AIR-AP1232AG-A-K9 | Chassis | |
| CUPERTINO | FTX0949E46L | AIR-AP1232AG-A-K9 | Chassis | |
| | | | | .... |
| INDIANAPOLIS | FTX1211A09L | Cisco2811 | Chassis | |
| INDIANAPOLIS | FHK1245F0SP | Cisco2811 | Chasis | |
| INDIANAPOLIS | SAL09433YB7 | WS-C6506-E | Chassis | |
| INDIANAPOLIS | DCH09431254 | WS-C6506-E-FAN | Module - Card | |
| INDIANAPOLIS | SAL09507NF1 | WS-X6148-21AF | Module - Card | |

| Install Site City | Serial # | Item Name | Item Type | Comment |
|---|---|---|---|---|
| INDIANAPOLIS | SAL0949736W | WS-X6148-21AF | Module - Card | |
| INDIANAPOLIS | SAL1012GQ22 | WS-X6148-21AF | Module - Card | |
| INDIANAPOLIS | SAL1005CB3X | WS-X6148-21AF | Module - Card | |
| INDIANAPOLIS | SAL100198BT | WS-C6506E-S32-GE | Module - Card | |
| INDIANAPOLIS | AZS09510A6G | WS-CAC-6000W | Module - PSU | |
| INDIANAPOLIS | AZS09510A6F | WS-CAC-6000W | Module - PSU | |
| INDIANAPOLIS | SAL09433M37 | WS-C6506-E | Chassis | |
| INDIANAPOLIS | DCH09440741 | WS-C6506-E-FAN | Module - Card | |
| INDIANAPOLIS | SAL09528W8R | WS-X6148-21AF | Module - Card | |
| INDIANAPOLIS | SAL095189CJ | WS-X6148-21AF | Module - Card | |
| INDIANAPOLIS | SAL1011G3CD | WS-X6148-21AF | Module - Card | |
| INDIANAPOLIS | SAL1019ME0F | WS-X6148-21AF | Module - Card | |
| INDIANAPOLIS | SAL10019FZE | WS-SUP32-GE-3B | Module - Card | |
| INDIANAPOLIS | AZS09510A5W | WS-CAC-6000W | Module - PSU | |
| INDIANAPOLIS | AZS09510A5U | WS-CAC-6000W | Module - PSU | |
| INDIANAPOLIS | SAL1021NRNN | WS-X6148-GE-45AF | Module - Card | |
| INDIANAPOLIS | SAD04140CPJ | WS-X6248-RJ-45 | Module - Card | |
| INDIANAPOLIS | SAL10019P0N | WS-SUP32-GE-3B | Module - Card | |
| INDIANAPOLIS | SAL1002A7CE | WS-SUP32-GE-3B | Module - Card | |
| INDIANAPOLIS | AZS09510A6J | WS-CAC-6000W | Module - PSU | |
| INDIANAPOLIS | AZS09510A62 | WS-CAC-6000W | Module - PSU | |
| INDIANAPOLIS | SAL09433YBA | WS-C6506-E | Chassis | |
| INDIANAPOLIS | DTH09440KZ4 | ASA-180W-PWR-AC | Module - PSU | |
| INDIANAPOLIS | JMX1004K063 | ASA5510-AIP10-K9 | Chassis | |
| INDIANAPOLIS | JAB1002031A | ASA-SSM-10 | Module - WIC | |
| INDIANAPOLIS | FTX1004C44E | CISCO2811-SEC/K9 | Chassis | |
| INDIANAPOLIS | FOC09521UN9 | WAN Interface Card | Module - WIC | |
| INDIANAPOLIS | FTX1004B0RT | AIR-AP1242AG-A-K9 | Chassis | |
| INDIANAPOLIS | FTX1004B0RS | AIR-AP1242AG-A-K9 | Chassis | |
| INDIANAPOLIS | FTX1004B0S3 | AIR-AP1242AG-A-K9 | Chassis | |
| INDIANAPOLIS | FTX1004B0S1 | AIR-AP1242AG-A-K9 | Chassis | |
| INDIANAPOLIS | FTX1004B0S0 | AIR-AP1242AG-A-K9 | Chassis | |
| INDIANAPOLIS | FTX1004B0RZ | AIR-AP1242AG-A-K9 | Chassis | |
| INDIANAPOLIS | FTX1004B0S4 | AIR-AP1242AG-A-K9 | Chassis | |
| INDIANAPOLIS | FTX1004B0RV | AIR-AP1242AG-A-K9 | Chassis | |
| INDIANAPOLIS | FTX1004B0RW | AIR-AP1242AG-A-K9 | Chassis | |
| INDIANAPOLIS | FTX1004B0S2 | AIR-AP1242AG-A-K9 | Chassis | |
| INDIANAPOLIS | FTX1004B0RN | AIR-AP1242AG-A-K9 | Chassis | |
| INDIANAPOLIS | FTX1004B0RR | AIR-AP1242AG-A-K9 | Chassis | |
| INDIANAPOLIS | FTX1004B0RQ | AIR-AP1242AG-A-K9 | Chassis | |
| INDIANAPOLIS | FTX1004B0RY | AIR-AP1242AG-A-K9 | Chassis | |
| INDIANAPOLIS | FTX1004B0RX | AIR-AP1242AG-A-K9 | Chassis | |
| INDIANAPOLIS | FTX1004B0RP | AIR-AP1242AG-A-K9 | Chassis | |
| INDIANAPOLIS | FTX1004B0RU | AIR-AP1242AG-A-K9 | Chassis | |
| INDIANAPOLIS | FDO1128Z60F | WS-C3750-48PS-S | CHASSIS | * |
| INDIANAPOLIS | FDO1124Z5CW | WS-C3750-48PS-S | CHASSIS | * |
| INDIANAPOLIS | FDO1128Z741 | WS-C3750-48PS-S | CHASSIS | * |
| INDIANAPOLIS | FDO1128Z70A | WS-C3750-48PS-S | CHASSIS | * |
| | | | | |
| | | | | |
| IRVINE | 18207781 | Cisco 3640 | CHASSIS | |
| IRVINE | FOC1024Y2Z6 | WS-C3750G-48PS-S | CHASSIS | |
| IRVINE | FDO1128Z6V2 | WS-C3750-48PS-S | CHASSIS | * |
| IRVINE | JMX0515K759 | CISCO 2610 | CHASSIS | |
| IRVINE | 44403510135 | PIX-515-UR-BUN | CHASSIS | |
| IRVINE | 15140611 | Cisco 3640 | CHASSIS | |
| IRVINE | FTX1035B2TT | AIR-AP1242AG-A-K9 | CHASSIS | |
| IRVINE | FTX1035B2US | AIR-AP1242AG-A-K9 | CHASSIS | |
| | | | | |
| RANCHO CORDOVA | FDO1129Y42V | WS-C3750-48PS-S | Chassis | * |
| RANCHO CORDOVA | FDO1125Y168 | WS-C3750-48PS-S | Chassis | * |
| RANCHO CORDOVA | FDO1124Z5AJ | WS-C3750-48PS-S | Chassis | * |

| Install Site City | Serial # | Item Name | Item Type | Comment |
|---|---|---|---|---|
| RANCHO CORDOVA | FDO1128Y1LQ | WS-C3750-48PS-S | Chassis | * |
| RANCHO CORDOVA | JMX1245L15E | ASA5510 | Chassis | |
| RANCHO CORDOVA | JMX1245L15F | ASA5510 | Chassis | |
| RANCHO CORDOVA | CAT0943Z30P | WS-C3560-48PS-S | Chassis | |
| RANCHO CORDOVA | FHK1245F0SK | Cisco2811 | Chassis | |
| RANCHO CORDOVA | N/R | WS-C6K-9SLOT-FAN2 | Module - FAN | |
| RANCHO CORDOVA | SAL1027U619 | WS-X6148A-GE-TX | Module - Card | |
| RANCHO CORDOVA | SAD040106PX | WS-X6248-RJ-45 | Module - Card | |
| RANCHO CORDOVA | SAD04120647 | WS-X6248-RJ-45 | Module - Card | |
| RANCHO CORDOVA | SAD04080234 | WS-X6248-RJ-45 | Module - Card | |
| RANCHO CORDOVA | SAL1131WGUU | WS-SUP32-GE-3B | Module - Card | |
| RANCHO CORDOVA | SAL1126SQ43 | WS-SUP32-GE-3B | Module - Card | |
| RANCHO CORDOVA | SAL081232RY | WS-X6148-45AF | Module - Card | |
| RANCHO CORDOVA | SAL0810VM0N | WS-X6148-45AF | Module - Card | |
| RANCHO CORDOVA | SAL0810VM9T | WS-X6148-45AF | Module - Card | |
| RANCHO CORDOVA | DCH1125Y02E | WS-CAC-6000W | Module - PSU | |
| RANCHO CORDOVA | DCH1125Y02F | WS-CAC-6000W | Module - PSU | |
| RANCHO CORDOVA | SCA041401B0 | WS-C6509 | Chasis | |
| RANCHO CORDOVA | 251206308 | CISCO2501 | Chasis | |
| RANCHO CORDOVA | 44405132411 | PIX-515-UR-BUN | Chasis | |
| RANCHO CORDOVA | JAB094402AN | ASA-SSM-AIP-10-K9 | Module - WIC | |
| RANCHO CORDOVA | JMX0948K0DM | ASA5510-AIP10-K9 | Chasis | |
| RANCHO CORDOVA | FTX1046A1N1 | CISCO2821 | Chasis | |
| RANCHO CORDOVA | FTX1035B2UM | AIR-AP1242AG-A-K9 | Chasis | |
| RANCHO CORDOVA | FTX1035B2UK | AIR-AP1242AG-A-K9 | Chasis | |
| RANCHO CORDOVA | FTX1035B2T6 | AIR-AP1242AG-A-K9 | Chasis | |
| RANCHO CORDOVA | FTX1035B2T8 | AIR-AP1242AG-A-K9 | Chasis | |
| RANCHO CORDOVA | FTX1035B2T3 | AIR-AP1242AG-A-K9 | Chasis | |
| RANCHO CORDOVA | FTX1035B2UT | AIR-AP1242AG-A-K9 | Chasis | |
| RANCHO CORDOVA | FTX1035B2TU | AIR-AP1242AG-A-K9 | Chasis | |
| RANCHO CORDOVA | FTX1035B2T7 | AIR-AP1242AG-A-K9 | Chasis | |
| RANCHO CORDOVA | FTX1035B2UN | AIR-AP1242AG-A-K9 | Chasis | |
| RANCHO CORDOVA | TBA04140039 | WS-C6006 | Chasis | |
| RANCHO CORDOVA | SAD04430BJR | WS-X6K-SUP1A-2GE | Module - Card | |
| RANCHO CORDOVA | SAL08311M1M | WS-X6148-45AF | Module - Card | |
| RANCHO CORDOVA | SAL08528244 | WS-X6148-45AF | Module - Card | |
| RANCHO CORDOVA | SAL09454Q7C | WS-X6148A-45AF | Module - Card | |
| RANCHO CORDOVA | SAD040106FF | WS-X6248-RJ-45 | Module - Card | |
| RANCHO CORDOVA | SON04100547 | WS-CAC-1300W | Module - PSU | |
| RANCHO CORDOVA | | WS-CAC-1300W | Module - PSU | |
| RANCHO CORDOVA | FOC1026Z4X4 | WS-C3750G-48PS-S | Chassis | |
| RANCHO CORDOVA | FAB0419U0A2 | WS-C2924-XL | Chassis | |
| RANCHO CORDOVA | FOC1025Y0YC | WS-C3750G-48PS-S | Chassis | |
| RANCHO CORDOVA | FTX1031B446 | AIR-AP1242AG-A-K9 | Chassis | |
| RANCHO CORDOVA | FTX1031B445 | AIR-AP1242AG-A-K9 | Chassis | |
| RANCHO CORDOVA | FTX1031B444 | AIR-AP1242AG-A-K9 | Chassis | |
| RANCHO CORDOVA | FTX1031B442 | AIR-AP1242AG-A-K9 | Chassis | |
| RANCHO CORDOVA | FTX1031B443 | AIR-AP1242AG-A-K9 | Chassis | |
| RANCHO CORDOVA | JMX0738L13T | CISCO3640A | Chassis | |
| RANCHO CORDOVA | FTX1004C2NH | CISCO3825 | Chassis | |
| | | | | |
| | | | | |
| SAN ANTONIO | CAT1129RJ5E | WS-C3750-48PS-S | Chassis | * |
| SAN ANTONIO | CAT1129RJ5K | WS-C3750-48PS-S | Chassis | * |
| SAN ANTONIO | CAT1129RJ5R | WS-C3750-48PS-S | Chassis | * |
| SAN ANTONIO | CAT1129RJ5X | WS-C3750-48PS-S | Chassis | * |
| SAN ANTONIO | CAT1129RJ5Y | WS-C3750-48PS-S | Chassis | * |
| SAN ANTONIO | CAT1129RJ54 | WS-C3750-48PS-S | Chassis | * |
| SAN ANTONIO | CAT1129RJ5C | WS-C3750-48PS-S | Chassis | * |
| SAN ANTONIO | CAT1129RJ5L | WS-C3750-48PS-S | Chassis | * |
| SAN ANTONIO | CAT1129RJ6Q | WS-C3750-48PS-S | Chassis | * |
| SAN ANTONIO | FOC12432KH6 | VWIC2-2MFT-T1/E1 | Module - WIC | |

| Install Site City | Serial # | Item Name | Item Type | Comment |
|---|---|---|---|---|
| SAN ANTONIO | FOC12432LLL | VWIC2-2MFT-T1/E1 | Module - WIC | |
| SAN ANTONIO | FHK1245F0SJ | CISCO2811 | Chassis | |
| SAN ANTONIO | SAL083530S9 | WS-X6148-45AF | Module - Card | |
| SAN ANTONIO | SAL08290UZH | WS-X6148-45AF | Module - Card | |
| SAN ANTONIO | SAL085070BZ | WS-X6148-GE-TX | Module - Card | |
| SAN ANTONIO | SAL085281T0 | WS-X6148-GE-TX | Module - Card | |
| SAN ANTONIO | SAD112200GP | WS-SUP32-GE-3B | Module - Card | * |
| SAN ANTONIO | SAD112200BB | WS-SUP32-GE-3B | Module - Card | * |
| SAN ANTONIO | SAL09018T1X | WS-X6408A-GBIC | Module - Card | |
| SAN ANTONIO | DCH1125Y02K | WS-CAC-6000W | Module - PSU | * |
| SAN ANTONIO | DCH1125Y02T | WS-CAC-6000W | Module - PSU | * |
| SAN ANTONIO | SAL08455T0Y | WS-C6509 | Chassis | |
| SAN ANTONIO | JAB0843058J | CSS11501 | Chassis | |
| SAN ANTONIO | 30671189 | WIC/VIC 0 | Module - WIC | |
| SAN ANTONIO | FOC085249A3 | CISCO1760 | Chassis | |
| SAN ANTONIO | 88809021800 | PIX-515E-UR-BUN | Chassis | |
| SAN ANTONIO | FTX1145A4L3 | CISCO2811 | Chassis | |
| SAN ANTONIO | N/R | WS-C6K-9SLOT-FAN2 | Module - FAN | |
| SAN ANTONIO | SAD05090BJE | sup-1a | Module - Card | |
| SAN ANTONIO | SAL08353A1J | X6148 | Module - Card | |
| SAN ANTONIO | SAL09004KQV | X6148 | Module - Card | |
| SAN ANTONIO | SAL09232R5N | X6148 | Module - Card | |
| SAN ANTONIO | SAL09486ANX | X6148a | Module - Card | |
| SAN ANTONIO | | WS-CAC1300W | Module - Card | |
| SAN ANTONIO | | WS-CAC1300W | Module - PSU | |
| SAN ANTONIO | SAL08363EPC | WS-C6509 | Chassis | |
| SAN ANTONIO | SAL08342Y1Q | X6148 | Module - Card | |
| SAN ANTONIO | SAL08321QCY | X6148 | Module - Card | |
| SAN ANTONIO | SAL08342Y3V | X6148 | Module - Card | |
| SAN ANTONIO | SAL09094KR1 | X6148 | Module - Card | |
| SAN ANTONIO | SAD04510UD9 | sup-1a | Module - Card | |
| SAN ANTONIO | | WS-CAC1300W | Module - PSU | |
| SAN ANTONIO | | WS-CAC1300W | Module - PSU | |
| SAN ANTONIO | | WS-CAC1300W | Module - PSU | |
| SAN ANTONIO | SAL08455T0U | WS-C6509 | Chassis | |
| SAN ANTONIO | | WS-CAC1300W | Module - PSU | |
| SAN ANTONIO | JMX1004K05V | CSS11501 | Chassis | |
| SAN ANTONIO | 18200028 | WIC-1DSU-T1= | Module - WIC | |
| SAN ANTONIO | 19649285 | WIC-1DSU-T1= | Module - WIC | |
| SAN ANTONIO | 23768451 | WIC-1DSU-T1= | Module - WIC | |
| SAN ANTONIO | 23768517 | WIC-1DSU-T1= | Module - WIC | |
| SAN ANTONIO | JAD05230C1X | NM-2FE2W= | Module - WIC | |
| SAN ANTONIO | JAE0840XA4H | NM-2W= | Module - WIC | |
| SAN ANTONIO | 18691573 | CISCO3640 | Chassis | |
| SAN ANTONIO | FTX0903J0HF | AIR-AP1210 | Chassis | |
| SAN ANTONIO | FTX0903J0HG | AIR-AP1210 | Chassis | |
| SAN ANTONIO | FTX0903J0HM | AIR-AP1210 | Chassis | |
| SAN ANTONIO | FTX0903J0HN | AIR-AP1210 | Chassis | |
| SAN ANTONIO | FTX0903J0HL | AIR-AP1210 | Chassis | |
| SAN ANTONIO | FTX0903J0HJ | AIR-AP1210 | Chassis | |
| SAN ANTONIO | FTX0903J0HE | AIR-AP1210 | Chassis | |
| SAN ANTONIO | FTX0903J0HD | AIR-AP1210 | Chassis | |
| | | | | |
| | | | | |
| SOUTH SAN FRANCISCO | JMX0944K0AC | ASA5510-AIP10-K9 | Chassis | |
| SOUTH SAN FRANCISCO | JAB094203AJ | ASA-SSM-AIP-10-K9 | Chassis | |
| SOUTH SAN FRANCISCO | JMX0941K06M | CSS11501 | Chassis | |
| SOUTH SAN FRANCISCO | FDO1128Y2R3 | WS-C3750-48PS-S | Chassis | * |
| SOUTH SAN FRANCISCO | FDO1128Y2ML | WS-C3750-48PS-S | Chassis | * |
| SOUTH SAN FRANCISCO | FDO1128Y1FF | WS-C3750-48PS-S | Chassis | * |
| SOUTH SAN FRANCISCO | FDO1128Z74N | WS-C3750-48PS-S | Chassis | * |
| SOUTH SAN FRANCISCO | FDO1128Y2C3 | WS-C3750-48PS-S | Chassis | * |

LifeMasters Network Inventory

| Install Site City | Serial # | Item Name | Item Type | Comment |
|---|---|---|---|---|
| SOUTH SAN FRANCISCO | FDO1129ZA8H | WS-C3750-48PS-S | Chassis | * |
| SOUTH SAN FRANCISCO | FOC0941Z394 | WS-C2950-24 | Chassis | |
| SOUTH SAN FRANCISCO | FHK1245F0SN | 2811 | Chassis | |
| SOUTH SAN FRANCISCO | FTX1211A06T | 2811 | Chassis | |
| SOUTH SAN FRANCISCO | 44480361202 | PIX-515-R-BUN | Chassis | |
| SOUTH SAN FRANCISCO | n/a | PIX-515R-SW | Chassis | |
| SOUTH SAN FRANCISCO | FTX1145A4L1 | 2811 | Chassis | |
| SOUTH SAN FRANCISCO | FTX0851R0UP | AIR-AP1210 | Chassis | |
| SOUTH SAN FRANCISCO | FTX1035B2TV | AIR-AP1242AG-A-K9 | Chassis | |
| SOUTH SAN FRANCISCO | FTX0851R0UN | AIR-AP1210 | Chassis | |
| SOUTH SAN FRANCISCO | FTX0922R02S | AIR-AP1230A-A-K9 | Chassis | |
| SOUTH SAN FRANCISCO | FTX0922E09U | AIR-AP1230A-A-K9 | Chassis | |
| SOUTH SAN FRANCISCO | FTX0917E25B | AIR-AP1230A-A-K9 | Chassis | |
| SOUTH SAN FRANCISCO | FTX0917E4W8 | AIR-AP1230A-A-K9 | Chassis | |
| SOUTH SAN FRANCISCO | FTX0922E09Z | AIR-AP1230A-A-K9 | Chassis | |
| SOUTH SAN FRANCISCO | FTX0851R0UR | AIR-AP1210 | Chassis | |
| SOUTH SAN FRANCISCO | n/a | CWLMS-2.5-R-K9 | Software | |
| SOUTH SAN FRANCISCO | FOC1024Y2YS | WS-C3750G-48PS-S | Chassis | |
| SOUTH SAN FRANCISCO | n/a | CWLMS-2.5-R-K9 | Software | |
| SOUTH SAN FRANCISCO | QMNCRX5160049 | CWWLSE-1130-19-K9 | Software | |
| SOUTH SAN FRANCISCO | TBA04120051 | WS-C6506-1300AC= | Chasis | |
| SOUTH SAN FRANCISCO | SAL1027U5VE | WS-X6148A-GE-TX | Module - Card | |
| SOUTH SAN FRANCISCO | SAL1027UAVP | WS-SUP32-GE-3B | Module - Card | |
| SOUTH SAN FRANCISCO | SAD0827020V | WS-X6148-GE-TX | Module - Card | |
| SOUTH SAN FRANCISCO | SAL1027U64P | WS-SUP32-GE-3B | Module - Card | |
| SOUTH SAN FRANCISCO | SAL1019MLY6 | WS-X6148-GE-45AF | Module - Card | |
| SOUTH SAN FRANCISCO | SAD040806GH | WS-X6248-RJ-45 | Module - Card | |
| SOUTH SAN FRANCISCO | N/A | WS-CAC-6000W | Module - PSU | |
| SOUTH SAN FRANCISCO | N/A | WS-CAC-6000W | Module - PSU | |
| SOUTH SAN FRANCISCO | N/A | WS-C6K-6SLOT-FAN2 | Module - FAN | |
| SOUTH SAN FRANCISCO | TBA04140027 | WS-C6006 | Chasis | |
| SOUTH SAN FRANCISCO | SON04100503 | WS-CAC-1300W | Module - PSU | |
| SOUTH SAN FRANCISCO | SAD060904FR | WS-X6K-SUP1A-2GE | Module - Card | |
| SOUTH SAN FRANCISCO | SAD041406BZ | WS-X6248-RJ-45 | Module - Card | |
| SOUTH SAN FRANCISCO | SAD041407UA | WS-X6248-RJ-45 | Module - Card | |
| SOUTH SAN FRANCISCO | SAD041407RL | WS-X6248-RJ-45 | Module - Card | |
| SOUTH SAN FRANCISCO | SON04100503 | WS-CAC-1300W | Module - PSU | |
| SOUTH SAN FRANCISCO | N/A | WS-C6K-6SLOT-FAN2 | Module - FAN | |
| | | | | |
| | | | | |
| Sunnyvale | FOC1040ZAEC | WS-C2960G-24TC-L | Chassis | |
| Sunnyvale | FOC1040ZAGU | WS-C2960G-24TC-L | Chassis | |
| Sunnyvale | FOC1040ZAET | WS-C2960G-24TC-L | Chassis | |
| Sunnyvale | JAB083403AC | CSS11501S-K9= | Chassis | |
| Sunnyvale | FOC1030ZBEX | WS-C3560G-48TS-E | Chassis | |
| Sunnyvale | FOC1030ZBC0 | WS-C3560G-48TS-E | Chassis | |
| Sunnyvale | FTX1004W0G0 | CISCO1841-T1 | Chassis | |
| Sunnyvale | 44480450817 | PIX-515-UR-BUN | Chassis | |
| Sunnyvale | FTX1145A4K6 | CISCO2811 | Chassis | |
| Sunnyvale | FHK1245F0SG | CISCO2811 | Chassis | |
| Sunnyvale | JMX1036K0ZQ | CSS11501 | Chassis | |
| Sunnyvale | FTX1004C2NH | CISCO3825 | Chassis | |

Servers and Storage

| Server Host/DNS Name | Description | Manufacturer | Model | Serial Number | Comment |
|---|---|---|---|---|---|
| Cetus | PDS Development Server | Dell | PowerEdge 2850 | F7S0081 | |
| Colusa1 | ISA Server | Dell | PowerEdge 1850 | D3KL61 | |
| Colusa2 | ISA Server | Dell | PowerEdge 1850 | HMKCJ91 | |
| Keyboard/Display | Keyboard/display | | | | |
| Phobos | SSF-IDS Server | Dell | PowerEdge 1850 | 10J0T81 | |
| SACO-DC1 | Domain Controller | Dell | PowerEdge 1850 | | |
| SACO-DC2 | Domain Controller | Dell | PowerEdge 1850 | | |
| alaska | Domain Controller | | Virtual | | |
| apodis | QA | | Virtual | | |
| challenger | LMU Test Server | | Virtual | | |
| colorado | Domain Controller | | Virtual | | |
| Exabyte | Test/Lab systems | Exabyte | LTO | | |
| QA-Almaak | Test/Lab systems | Dell | PowerEdge 850 | D8LMP91 | |
| qa-anaconda | Test/Lab systems | | Virtual | | |
| qa-asp | Test/Lab systems | | Virtual | | |
| qa-bobcat | Test/Lab systems | | Virtual | | |
| qa-caiman | Test/Lab systems | | Virtual | | |
| qa-centaurus | Test/Lab systems | | Virtual | | |
| qa-chara1 | Test/Lab systems | | Virtual | | |
| qa-chara2 | Test/Lab systems | | Virtual | | |
| qa-charon | Test/Lab systems | | Virtual | | |
| qa-cheetah1 | Test/Lab systems | | Virtual | | |
| qa-cheetah2 | Test/Lab systems | | Virtual | | |
| qa-claimsdb | Test/Lab systems | | Virtual | | |
| qa-client | Test/Lab systems | | Virtual | | |
| qa-custemail | Test/Lab systems | | | | |
| QA-ESXH1 | Test/Lab systems | Dell | PowerEdge 2850 | | |
| QA-ESXIH1 | Test/Lab systems | Dell | PowerEdge 2850 | | |
| QA-ESXIH2 | Test/Lab systems | Dell | PowerEdge 2850 | | |
| QA-ESXIH2 | Test/Lab systems | Dell | PowerEdge 2850 | | |
| QA-ESXIH3 | Test/Lab systems | Dell | PowerEdge 2850 | | |
| QA-ESXIH3 | Test/Lab systems | Dell | PowerEdge 2850 | | |
| QA-ESXIH4 | Test/Lab systems | Dell | PowerEdge 2850 | | |
| QA-ESXIH4 | Test/Lab systems | Dell | PowerEdge 2850 | | |
| QA-ESXIH5 | Test/Lab systems | Dell | PowerEdge 6850 | | |
| qa-leopard | Test/Lab systems | Dell | PowerEdge 1850 | | |
| qa-lobos | Test/Lab systems | | | | |
| qa-lobosmsdtc | Test/Lab systems | | | | |
| QA-LOBOS-Node1 | Test/Lab systems | Dell | PowerEdge 2850 | 7224K71 | |
| QA-LOBOS-Node2 | Test/Lab systems | Dell | PowerEdge 2850 | C224K71 | |
| QA-Lobos-PV1 | Test/Lab systems | Dell | PowerVault | | |
| QA-Lobos-PV2 | Test/Lab systems | Dell | PowerVault | | |
| qa-lobosvs1 | Test/Lab systems | | | | |
| qa-mamba | Test/Lab systems | | | | |
| qa-mira | Test/Lab systems | | Virtual | | |
| qa-naboo | Test/Lab systems | | Virtual | | |
| qa-ns2 | Test/Lab systems | | Virtual | | |
| qa-orca | Test/Lab systems | | Virtual | | |
| QA-Panther1 | Test/Lab systems | Dell | PowerEdge 850 | CHVTN91 | |
| QA-Panther2 | Test/Lab systems | Dell | PowerEdge 850 | HGVTN91 | |
| qa-pisces-rs | Test/Lab systems | | | | |
| qa-python2 | Test/Lab systems | | Virtual | | |
| qa-python3 | Test/Lab systems | | Virtual | | |
| qa-sarin | Test/Lab systems | | Virtual | | |
| qa-scorpius | Test/Lab systems | | Virtual | | |
| QA-Titan | Test/Lab systems | Dell | PowerEdge 850 | 15WJP91 | |
| qa-tools | Test/Lab systems | | Virtual | | |
| qa-utah1 | Test/Lab systems | | Virtual | | |
| ssfdev003 | QA | | Virtual | | |
| ssf-qaweb01 | QA | | Virtual | | |
| ssf-qweb01t | QA | | Virtual | | |
| SSF-SQLDB01T | QA | Dell | PowerEdge 2850 | HHX4K71 | |
| SSF-SQLDBDV01T | QA | Dell | PowerEdge 2850 | CHX4K71 | |
| ssf-webdvt | QA | | Virtual | | |
| utah5 | QA | | Virtual | | |

Servers and Storage

| Server Host/DNS Name | Description | Manufacturer | Model | Serial Number | Comment |
|---|---|---|---|---|---|
| ESXiwsh1 | Test/Lab ESX | Dell | PowerEdge 2850 | | |
| Acamar | Reporting Services | Dell | PowerEdge 2850 | 2R2DY71 | |
| ALMAAK1 | Terminal Server | | Virtual | | |
| ALMAAK2 | Terminal Server | | Virtualize | | |
| ALMAAK3 | Terminal Server | | Virtual | | |
| Altair | Team Foundation | Dell | PowerEdge 2850 | 5STWT91 | |
| Apollo2 | SQL | Dell | PowerEdge 6650 | GHZ7Z11 | |
| Aquarius | Claims DataWarehouse | Dell | PowerEdge 6650 | 2MJ0961 | |
| Arcturus | HCE Database Server | Dell | PowerEdge 2850 | 375FV91 | |
| ARRAKIS2 | Reporting Server | | Virtual | | |
| ASCELLA1 | Proclarity | | Virtual | | |
| AURIGA | QA Terminal Server | | Virtual | | |
| CALLISTO | SQL | | Blade | | |
| Camelopardalis | Idera Server | Dell | PowerEdge 2850 | DQHXB71 | |
| Camelopardalis | Idera Server | Dell | PowerEdge 2850 | DQHXB71 | |
| Camelopardalis | Idera Server | Dell | PowerEdge 2850 | DQHXB71 | |
| Canopus | Claims DataWarehouse Dev | Dell | PowerEdge 2850 | H65FV91 | |
| Cassiopeia | Finance Billing Server | Dell | PowerEdge 2850 | F80F2B1 | |
| CDL210 DAE1 | Virtual Tape Drives | EMC | EMC CDL-210 | | * |
| CDL210 DAE2 | Virtual Tape Drives | EMC | EMC CDL-210 | | * |
| CDL210 DAE3 | Virtual Tape Drives | EMC | EMC CDL-210 | | * |
| CDL210 DAE4 | Virtual Tape Drives | EMC | EMC CDL-210 | | * |
| CDL210 DAE5 | Virtual Tape Drives | EMC | EMC CDL-210 | | * |
| CDL210 Director | Virtual Tape Drives | EMC | EMC CDL-210 | | * |
| CDL210 Server | Virtual Tape Drives | EMC | EMC CDL-210 | | * |
| Centaurus | DataWarehouse Analysis | Dell | PowerEdge 6650 | 7Z18421 | |
| CERES | Sandbox | | Virtual | | |
| CHARA1 | WebApps Server | | Virtual | | |
| CIRCINI | PCRecruiter | | Virtual | | |
| CX3-10C1 DAE1 | EMC Storage | EMC | EMC CX3-10C | | |
| CX3-10C1 DAE2 | EMC Storage | EMC | EMC CX3-10C | | |
| CX3-10C1 Power Supply | EMC Storage | EMC | EMC CX3-10C | APM00070904536 | |
| CX3-10C1 SPA/SPB | EMC Storage | EMC | EMC CX3-10C | CF2RJ070300116 | |
| CX3-10C1 SPA/SPB | EMC Storage | EMC | EMC CX3-10C | CF2RJ070300116 | |
| CX4-240 DAE | EMC Storage | EMC | EMC CX4-240 | | |
| CX4-240 Power Supply | EMC Storage | EMC | EMC CX4-240 | APM00092201170 | |
| CX4-240-SPA/SPB | EMC Storage | EMC | EMC CX4-240 | CF2ZS091200041 | |
| CX4-240-SPA/SPB | EMC Storage | EMC | EMC CX4-240 | CF2ZS091200041 | |
| CX-700 DAE1 | EMC Storage | EMC | EMC CX-700 | | |
| CX-700 DAE10 | EMC Storage | EMC | EMC CX-700 | | |
| CX-700 DAE11 | EMC Storage | EMC | EMC CX-700 | | |
| CX-700 DAE12 | EMC Storage | EMC | EMC CX-700 | | |
| CX-700 DAE13 | EMC Storage | EMC | EMC CX-700 | | |
| CX-700 DAE2 | EMC Storage | EMC | EMC CX-700 | | |
| CX-700 DAE3 | EMC Storage | EMC | EMC CX-700 | | |
| CX-700 DAE4 | EMC Storage | EMC | EMC CX-700 | | |
| CX-700 DAE5 | EMC Storage | EMC | EMC CX-700 | | |
| CX-700 DAE6 | EMC Storage | EMC | EMC CX-700 | | |
| CX-700 DAE7 | EMC Storage | EMC | EMC CX-700 | | |
| CX-700 DAE8 | EMC Storage | EMC | EMC CX-700 | | |
| CX-700 DAE9 | EMC Storage | EMC | EMC CX-700 | | |
| CX-700 Power Supply | EMC Storage | EMC | EMC CX-700 | APM00041301543 | |
| CX-700 SP A | EMC Storage | EMC | EMC CX-700 | LKE00041700505 | |
| CX-700 SP B | EMC Storage | EMC | EMC CX-700 | LKE00053300901 | |
| CYGNUS | SSF Print Server | | Virtual | | |
| Deimos | Imothep Database Server | Dell | PowerEdge 6850 | 604R881 | |
| Deneb | Claims Test Database Server | Dell | PowerEdge 2850 | FTV5D91 | |
| Deneb | Claims Test Database Server | Dell | PowerEdge 2850 | FTV5D91 | |
| Eris | Data Loading and Refresh | Dell | PowerEdge 2850 | B2LFY61 | |
| Eris PowerVault | Data Loading and Refresh | Dell | PowerVault | 8ZR1V71 | |
| EUROPA | CDW | | Blade | | |
| Fabric Switch1 | EMC Fiber switch | | | | |
| Fabric Switch2 | EMC Fiber switch | | | | |
| Hercules | Staging Database | Dell | PowerEdge 2850 | 43YBK71 | |
| Heros | Reconciliation Database | Dell | PowerEdge 6650 | 945DJ21 | |

Servers and Storage

| Server Host/DNS Name | Description | Manufacturer | Model | Serial Number | Comment |
|---|---|---|---|---|---|
| Heros2 | DB Restoration | Dell | PowerEdge 6650 | HHZ7Z11 | |
| HYDRA | Training - SQL | | Virtual | | |
| JUNO | Training - New Feature WebApp | | Virtual | | |
| Keyboard/Display | Keyboard/display | | | | |
| Korton | Development | Dell | PowerEdge 2650 | FVF0R51 | |
| LEDA | ETL/Pervasive | | Virtual | | |
| Leo | VSS/Apps Storage | Dell | PowerEdge 2850 | HD6JZ81 | |
| LIBRA | TM1 | | Virtualize | | |
| LMBUILD | QA | | Virtual | | |
| Imss-emcsans | VIP on CX4 for management | | | | |
| LMSS-SEM | Network Intelligence | RSA | NIE1050-EX | | • |
| MENDOCINO | Training - TS Server | | Virtual | | |
| MERGA | Magic | | Virtual | | |
| MINKAR | Tandberg Management | | Virtual | | |
| MIRACH | Cisco Works | | Decommission | | |
| MIRANDA | VOIP Manager | | Virtual | | |
| Musca | Exchange OWA | | Virtual | | |
| NABOO | Archive Test server | | Virtual | | |
| NEREID | Training - New Feature SQL | | Virtual | | |
| NS1 | Mail Daemon | Dell | PowerEdge 1850 | GJDCZ81 | |
| NS-500G | NAS Control Station | EMC | EMC NS-500G | | |
| PALLAS | Archive | | Virtual | | |
| PISCES | SQL Reporting Services | | Virtual | | |
| PLUTO | Terminal Server | | Virtual | | |
| PORTIA | Office Communicator | | Virtual | | |
| PORTIA | Office Communicator | | Virtual | | |
| Procyon | SAS Server | Dell | PowerEdge 2850 | C0SGV81 | |
| RHEA | TBD | | Blade | | |
| Rigel | Outcomes SQL | Dell | PowerEdge 2850 | 6XWFP91 | |
| Rigel | Outcomes SQL | Dell | PowerEdge 2850 | 6XWFP91 | |
| Rigel | Outcomes SQL | Dell | PowerEdge 2850 | 6XWFP91 | |
| Roosevelt | IRV HRIS Database | | Virtual | | |
| Salm | Pervasive Production | Dell | PowerEdge 1850 | 604R1B1 | |
| Sarin | Pervasive Development | Dell | PowerEdge 1850 | 404R1B1 | |
| Scorpius | DataWarehouse | Dell | PowerEdge 6650 | 6FQZ421 | |
| Sirius | Secure FTP | Dell | PowerEdge 1850 | 9VSY571 | |
| SOL | Terminal Server | | Virtual | | |
| SSF-Claraltr01 | San Monitoring | Dell | Optiplex 240 | | |
| SSF-DEVBUILD | QA | | Virtual | | |
| SSF-Fs001 | Secure FTP | Dell | PowerEdge 2850 | G5ZF971 | |
| SSF-H21 | IBM Blade 8853 | IBM | IBM H Series Chassis | YK168081R11J | • |
| SSF-H21 | IBM Blade 8853 | IBM | IBM H Series Chassis | YK168081R11J | • |
| SSF-H21 | IBM Blade 8853 | IBM | IBM H Series Chassis | YK168081R11J | • |
| SSF-H21 | IBM Blade 8853 | IBM | IBM H Series Chassis | YK168081R11J | • |
| SSF-H21 | IBM Blade 8853 | IBM | IBM H Series Chassis | YK168081R11J | • |
| SSF-H21 | IBM Blade 8853 | IBM | IBM H Series Chassis | YK168081R11J | • |
| SSF-H21 | IBM Blade 7995 | IBM | IBM H Series Chassis | YK168081R11J | • |
| SSF-H21 | IBM Blade 7995 | IBM | IBM H Series Chassis | YK168081R11J | • |
| SSF-H21 | IBM Blade 7995 | IBM | IBM H Series Chassis | YK168081R11J | • |
| SSF-H21 | IBM Blade 7995 | IBM | IBM H Series Chassis | YK168081R11J | • |
| SSF-SL500 | Tape Library | SUN StorageTek | SL500 | 559000101977 | |
| THEBE | TBD | | Blade | | |
| Titan | SQL | Dell | PowerEdge 2850 | G0SGV81 | |
| Titan | SQL | Dell | PowerEdge 2850 | G0SGV81 | |
| Titan | SQL | Dell | PowerEdge 2850 | G0SGV81 | |
| Uranus | Netbackup | Dell | PowerEdge 2850 | BSW3T81 | |
| VEGA | Blackberry Server | | Virtual | | |
| VENTURA | Training - New Feature TS | | Virtual | | |
| VESTA | Training - WebApps | | Virtual | | |
| Wayback | Archive | Plasmon | Plasmon AA80 | | |
| Zorton | SSAS Development Server | Dell | PowerEdge 2850 | 64QWGB1 | |
| MODOC | NICE exports, lit, Qualtrack | Dell | PowerEdge 2450 | | |
| Mono | Exchange | Dell | PowerEdge 2850 | 5ZNC961 | |
| Mono-PV1 | Exchange storage | Dell | PowerVault | 6D3CJ91 | |
| SanBernardino | Application Server | Dell | PowerEdge 1750 | F6K1F61 | |

| Server Host/DNS Name | Description | Manufacturer | Model | Serial Number | Comment |
|---|---|---|---|---|---|
| SanLuisObispo | MOM Server | Dell | PowerEdge 2850 | D7Q3S81 | |
| Santaclara | NICE Voice Logger | | | | |
| Santacruz | NICE CMAPI Logger | | | | |
| Cuba | NICE Database | Dell | PowerEdge 2850 | FMP66B1 | |
| Denmark | NICE Audio Analytics Server | Dell | PowerEdge 2850 | 4RP66B1 | |
| Fiji | NICE Storage Center | Dell | PowerEdge 2850 | 28ML6B1 | |
| Ireland | NICE Screen Logger | Dell | PowerEdge 2850 | 8NP66B1 | |
| Israel | NICE Interactions Server | Dell | PowerEdge 2850 | 6RP66B1 | |
| PERU | NICE Survey | Dell | 420SC | | |
| Turkey | NICE Application Server | Dell | PowerEdge 2950 | 26ZS1C1 | |
| Argentina | WebApps Server | Dell | PowerEdge 1850 | HCK9L61 | |
| Brazil | WebApps Server | Dell | PowerEdge 1850 | DCK9L61 | |
| Chile | WebApps Server | Dell | PowerEdge 1850 | C3K9L61 | |
| CX3-10C2 Power Supply | EMC Storage | EMC | EMC CX3-10C | CK200070900286 | * |
| CX3-10C2 SPA/SPB | EMC Storage | EMC | EMC CX3-10C | CF2RJ065100518 | * |
| CX3-10C2 SPA/SPB | EMC Storage | EMC | EMC CX3-10C | CF2RJ065100518 | * |
| CX3-10C2 Storage1 | EMC Storage | EMC | EMC CX3-10C | | * |
| CX3-10C2 Storage2 | EMC Storage | EMC | EMC CX3-10C | | * |
| Fabric Switch3 | EMC Fiber switch | | | | * |
| Fabric Switch4 | EMC Fiber switch | | | | |
| Italy-Node1 | Production Coredb | Dell | PowerEdge 6850 | 9XNFJ91 | |
| Italy-Node2 | Production Coredb | Dell | PowerEdge 6850 | 7XNFJ91 | |
| Kenya1 | ESX Host - Terminal Servers | Dell | PowerEdge 6850 | 5LPFDB1 | |
| Kenya2 | ESX Host - Terminal Servers | Dell | PowerEdge 6850 | 6LPFDB1 | |
| VS-KENYA1A | WebApps TS | | Virtual | | |
| VS-KENYA1B | WebApps TS | | Virtual | | |
| VS-KENYA1C | WebApps TS | | Virtual | | |
| VS-KENYA1D | WebApps TS | | Virtual | | |
| VS-KENYA1E | WebApps TS | | Virtual | | |
| VS-KENYA1F | WebApps TS | | Virtual | | |
| VS-KENYA1G | WebApps TS | | Virtual | | |
| VS-KENYA2A | WebApps TS | | Virtual | | |
| VS-KENYA2B | WebApps TS | | Virtual | | |
| VS-KENYA2C | WebApps TS | | Virtual | | |
| VS-KENYA2D | WebApps TS | | Virtual | | |
| VS-KENYA2E | WebApps TS | | Virtual | | |
| VS-KENYA2F | WebApps TS | | Virtual | | |
| VS-KENYA2G | WebApps TS | | Virtual | | |
| Garfield | Great Plains | Dell | PowerEdge 2850 | 93YBK71 | |
| 2161DS2 | KVM | Dell | 2161DS2 KVM | | |
| 2161DS2 | KVM | Dell | 2161DS2 KVM | | |
| qa-utah3 | Test/Lab systems | | | | |

| Server Host/DNS Name | Description | Manufacturer | Model | Comment |
|---|---|---|---|---|
| Adder1 | SYV Web Apps Server | Dell | PowerEdge 1850 | |
| Adder2 | SYV Web Apps Server | Dell | PowerEdge 1850 | |
| Adder3 | SYV Web Apps Server | Dell | PowerEdge 1850 | |
| Anaconda | DC/CSS/DNS/Time Server | Dell | PowerEdge 1650 | |
| Asp-Node1 | MOM/SMS Cluster | Dell | PowerEdge 2850 | |
| Asp-Node2 | MOM/SMS Cluster | Dell | PowerEdge 2850 | |
| Bear | SYV MOM Management Server | Dell | PowerEdge 2850 | |
| Boomslang | iGrafx Server | Dell | PowerEdge 1850 | |
| Caiman | Kronos Server | Dell | PowerEdge 1850 | |
| Caracal1 | ISA 2006 Cluster | Dell | PowerEdge 1850 | |
| Caracal2 | ISA 2006 Cluster | Dell | PowerEdge 1850 | |
| Cheetah1 | Sharepoint Web | Dell | PowerEdge 1850 | |
| Cheetah2 | Sharepoint Web | Dell | PowerEdge 1850 | |
| CX300 DAE | DAE 2 tray | EMC | EMC CX-300 | |
| CX300 Power Supply | Storage Processor Standby Power Supply | EMC | EMC CX-300 | |
| CX300 SPA/SPB | Storage Processor CX300 | EMC | EMC CX-300 | |
| CX3-10C DAE | DAE 2 tray | EMC | EMC CX3-10C | * |
| CX3-10C Power Supply | Storage Processor Standby Power Supply | EMC | EMC CX3-10C | * |
| CX3-10C SPA | Storage Processor CX3-10C | EMC | EMC CX3-10C | * |
| CX3-10C SPB | Storage Processor CX3-10C | EMC | EMC CX3-10C | * |
| Fabric Switch | Fabric Switch | EMC | | |
| Fabric Switch | Fabric Switch | EMC | | |
| Hammerhead | Backup Server/DC/DNS/WINS/VIC | Dell | PowerEdge 2850 | |
| Hyena | SMS 2003 | Dell | PowerEdge 2850 | |
| JACKAL1 | ESX HOST SERVER | Dell | PowerEdge 6850 | * |
| Jackal2 | ESX HOST SERVER | Dell | PowerEdge 6850 | * |
| Leopard | Netbackup Server | Dell | PowerEdge 2850 | |
| Lobos-Node1 | SQL Server - Coredb | Dell | PowerEdge 6850 | * |
| Lobos-Node2 | SQL Server - Coredb | Dell | PowerEdge 6850 | * |
| Mamba1 | IVR | Dell | PowerEdge 2850 | |
| Mamba2 | IVR | Dell | PowerEdge 2850 | |
| NS2 | NS2 | Dell | PowerEdge 1850 | |
| Ocelot | Enterprise Access Control Server | Dell | PowerEdge 850 | |
| Panther1 | ISA | Dell | PowerEdge 1850 | |
| Panther2 | ISA | Dell | PowerEdge 1850 | |
| Pictor | Webtrends PE 2850 | Dell | PowerEdge 2850 | |
| Piranha | Logging Server - syslog, MOM Database Server | Dell | PowerEdge 2650 | |
| Python1 | WEB STAGING | Dell | PowerEdge 1850 | |
| Python2 | LMOL Web Server | Dell | PowerEdge 1850 | |
| Python3 | LMOL Web Server | Dell | PowerEdge 1850 | |
| Scorpion | Virtual Center Server | Dell | PowerEdge 1850 | |
| Stonefish | Windows Sessions Directory | Dell | PowerEdge 1750 | |
| SYV Digital Switch #1 | Dell PE2161 Digital Server switch | Dell | PowerEdge 2161 DS-2 | |
| SYV Digital Switch #2 | Dell PE2161 Digital Server switch | Dell | PowerEdge 2161 DS-2 | |
| SYV-SL500 | Storage Tek Tape Library | Sun | SL500 | |
| Tarantula | Network monitoring Server | Dell | PowerEdge 1850 | |

ANNEX 1.1(b) (PT4)

| Tiger-Host | Virtual Server Host | Dell | PowerEdge 1850 |
| Tigershark | Netbackup Operations Manager | Dell | PowerEdge 2850 |
| Viper | DocAve Sharepoint Backup Server | Dell | PowerEdge 1850 |

ANNEX 2.2

| Name | Pre-Petition Cure Amount | Address1 | Address2 | City | State | Zip | Description |
|---|---|---|---|---|---|---|---|
| Action Group | - | | | | | | |
| AHS New Mexico Holdings, Inc. | - | Attn: Karen Bond | 3519 - 20th Avenue, S.E. | Rio Rancho | NM | 87124-0000 | Preparation of affirmative action plan for the Debtor, 2008-2009 |
| Arise Health Plan | - | | 7850 Jefferson NE, Suite 200 | Albuquerque | NM | 87109-0000 | Non-Residential Real Property sub-leased by the Debtor from AHS New Mexico Holdings, Inc.; 7850 Jefferson NE, Suite 100, Albuquerque, NM 87109 Lease commenced on 11/12/2007 and terminates on 2/29/2012 |
| AT&T Corp. | 11,557.85 | Attn: Master Agreement Support | 2710 Executive Drive | Green Bay | WI | 54304-0000 | Disease Management Services for Arise Prime Lessor (landlord) Suburban Land Corporation c/o Ashcraft Construction 625 Pennsylvania N Albuquerque, NM 87110 |
| AT&T Corporation | | Attn: Marti Elliott, Design Eng | One AT&T Way | Bedminster | NJ | 07921-0752 | Telecom services provided to the Debtor |
| AT&T Global Business Services | | Attn: Terrell Hill, Premiere Client | 2600 Camino Ramon | San Ramon | CA | 94583-0000 | Telecom services provided to the Debtor |
| Avaya Inc. | 18,815.16 | P.O. Box 5332 | One River Oaks Parkway | Milpitas | CA | 95035-0000 | Telecom services provided to the Debtor |
| Avaya Inc. | | Attn: Sheri Keller | 90 Blue Ravine Road | Folsom | NY | 10087-5332 | Telephone equipment leased by the Debtor |
| Avaya Financial Services c/o Quagga | | Attn: Lana Schler | 14400 Hertz Quail Spring Parkway | Folsom | CA | 95630-0000 | Telephone equipment leased by the Debtor |
| Avaya, Inc. | - | Attn: Denise Jackson, President | 5414 Oberlin Drive, Suite 300 | San Diego | OK | 73434-0000 | Telephone equipment leased by the Debtor |
| Balboa Travel, Inc. | 85.00 | Angelo Dascoli, Health Fund Dir | 101 Avenue of the Americas, 3rd fl | New York | CA | 92121-0000 | Travel services provided to the Debtor |
| Building Service 32BJ Health Fund | | | | | NY | 10013-1991 | Disease Management Services provided by the Debtor for Building Service 32BJ Health Fund / Building Service 32BJ North Fund |
| Catalihan-Pentz Properties | - | 5674 Stoneridge Dr. Suite 212 | | Pleasanton | CA | 94588-0000 | Non-Residential Real Property leased by the Debtor:/ 10989 Trade Center Drive, Suite 100/Rancho Cordova, Ca 95670/Sacramento, County/Lease commenced on 1/15/2000 and terminates on 12/31/2010 |
| Cannon Business Solutions | 1,272.83 | 300 Commerce Square | | Burlington | NJ | 08016-0000 | Copiers leased by the Debtor |
| Cannon Financial Services | | 14904 Collections Center Dr. | | Chicago | IL | 60693-0000 | Copier IR5050 leased by the Debtor-001-/0332539-003-$511.125/year |
| Cannon Financial Services | - | 14904 Collections Center Dr. | | Chicago | IL | 60693-0000 | Cannon IR3045 leased by the Debtor/001-/0332539-002-$85.544/year |
| Cannon Financial Services | - | 14904 Collections Center Dr. | | Chicago | IL | 60693-0000 | Cannon Copier IR3045 leased by the Debtor/001-332539-002/$2,772/year |
| Cannon Financial Services | | 14904 Collections Center Dr. | | Chicago | IL | 60693-0000 | Cannon Copier IR5055 leased by the Debtor/001-0332539-001/$7,882/year |
| Canon Financial Services, Inc. | | P.O Box 4004 | | Carol Stream | IL | 60197-4004 | Copiers leased by the Debtor |
| Carrier Commercial Service | 2,829.59 | 9012 Washington NE | | Albuquerque | NM | 87113-0000 | Albuquerque - HVAC Maintenance provided to the Debtor |
| CB Richard Ellis, Inc. | - | Attn: Jonathan Moeller | 950 Tower Lane, Suite 670 | San Mateo | CA | 94404-0000 | Leasing agent for the Debtor |
| Certified Communications, Inc. | | 85 NE Loop 410 | | San Antonio | TX | 78216-5829 | San Antonio - Permanent Placement Recruiter for the Debtor |
| Channing Bete Co., Inc. | 11,512.48 | PO Box 84-5897 | | Boston | MA | 02284-5897 | Imprinted Booklets for the Debtor |
| Channing Bete Company | | Attn: Michelle O'Neill, Marketing | One Community Place | South Deerfield | MA | 01373-0200 | Imprinted Booklets for the Debtor |
| Chevron Corporation | - | Attention: Manager, U.S. Benefits | Post Office Box 6067 | San Ramon | CA | 94583-6067 | Disease Management Services provided by the Debtor for /Chevron |
| Cisco Systems Capital CRP | - | P.O Box 41601 | | Philadelphia | PA | 19101-0000 | Cisco Router/Software leased by the Debtor/2487467-5/533.365/year |
| Cisco Systems Capital CRP | - | P.O. Box 41601 | | Philadelphia | PA | 19101-0000 | Router/Software leased by the Debtor/2487467-5/311.968/year |
| Cisco Systems Capital CRP | - | P.O. Box 41601 | | Philadelphia | PA | 19101-0000 | Router/Software leased by the Debtor/2487467-5/$16.035/year |

EXHIBIT 2.2

| Creditor | Amount | Attn / PO Box | Street Address | City | State | Description |
|---|---|---|---|---|---|---|
| Cisco Systems Capital CRP | | P.O. Box 41601 | | Philadelphia | PA | 19101-0000 Cisco Router/Software leased by the Debtor/2487/4675/$29,868/year |
| CIT Technology Financial Services | 63,566.62 | P.O. Box 550599 | | Jacksonville | FL | 32255-0000 Cannon IR2270 Copier leased by the Debtor/910-0094666-000/$45,324/year |
| CIT Technology Financial Services | | P.O. Box 550599 | | Jacksonville | FL | 32255-0000 Cannon ImageRUNNER 6 leased by the Debtor/910-0036906-000/$7,266/year |
| CIT Technology Financial Services | | P.O. Box 550599 | | Jacksonville | FL | 32255-0000 Cannon Image Runner 3570 leased by the Debtor/910-0036906-000/$3,367/year |
| CIT Technology Financial Services | | P.O. Box 550599 | | Jacksonville | FL | 32255-0000 Cannon Copier IR3570 leased by the Debtor/2001197575 updated # 910-0031124-000/$3,367/year |
| CIT Technology Financial Services | | P.O. Box 550599 | | Jacksonville | FL | 32255-0000 Cannon Copier IR3570 leased by the Debtor/910-0039015-000/$7,492/year updated # 910-0025926-000/$2,310/year |
| CIT Technology Financial Svcs | | P.O. Box 550599 | | Jacksonville | FL | 32255-0000 EMC Clarion Server leased by the Debtor/911-0075733-000/$3,281/year |
| | | P.O. Box 550599 | | Jacksonville | FL | 32255-0000 Cannon Copier IR6570 leased by the Debtor/910-0042566-000/$7,445/year |
| | | P.O. Box 550599 | | Jacksonville | FL | 32255-0000 Cannon IR2270 leased by the Debtor/2001/82781 |
| CIT Technology Financial Services | | P.O. Box 550599 | | Jacksonville | FL | 32255-0000 Cannon IR6570 leased by the Debtor/2002/10193 updated # 910-0035751-000/$14,380/year |
| Cbox Consulting, LLC | | 23896 Network Place | | Chicago | IL | 60673-0000 Servers leased by the Debtor/450-48/25167-000 |
| Compassionate Care Consulting | | Attn: Sharon Lucas, President | 627 Shenandoah St | Thousand Oaks | CA | 91360-0000 ACP Trainer for the Debtor |
| Consona Corporation | | Attn: Kathy Kinder | 450 E. 9th Street, Suite 300 | Indianapolis | IN | 46240-0000 Non-Residential Real Property sub-leased by the Debtor from Consona Corporation /20823 |
| | 1,350.00 | Attn: Jessica Cox, President | 23 Beacon Hill Lane | Englewood | CO | 80111-0000 Accreditation Consultant for the Debtor |
| De Lage Landen PRE-1 LLC | 2,930.08 | c/o Jones Lang LaSalle | 201 Mission Street, Suite 1300 | San Francisco | CA | 94105-0000 Non-Residential Real Property leased by Debtor/5000 Shoreline Court, Suite 300/South San Francisco, CA 94080/San Mateo County/¼Lease commenced on 4/1/2005 and terminates on 10/21/2011 |
| | | | | | | Stevens Creek Blvd, Suite 300/Cupertino, CA 95014/Santa Clara County/¼Lease commenced on 2/1/2009 and terminates on 3/31/2011 /¼Prime Lease (Landlord)/Stevens Creek Office Center Associates/20833 Stevens Creek Blvd., Suite 102/Cupertino, CA 95014 |
| De Lage Landen | | 1055 Westlakes Dr. | | Syracuse | NY | 13212-0000 Neopost 5i92 leased by the Debtor/234941/$12,077/year |
| De Lage Landen | | 1055 Westlakes Dr. | | Syracuse | NY | 13212-0000 Neopost U65 leased by the Debtor/234941/$3,426/year |
| Dell Financial Services | 4,155.06 | 99355 Collections Center Drive | | Chicago | IL | 60693-0000 South San Francisco Equipment leased by the Debtor/001-6386554-000/$49,961/year |
| Disease Management Purchasing | 13,012.50 | Attn: Al Lewis, President | 57 River Street, Suite 102 | Wellesley Hills | MA | 02481-0000 Consulting Services and Membership |
| Dynamic Methods, Inc. | 503.75 | Attn: Morgan Harris, Partner | 2212 Dupont Drive, Suite R. | Irvine | CA | 92612-0000 Consulting Services provided to the Debtor |
| Dynamic Methods, Inc. | | 9070 Irvine Center Dr. Suite #260 | | Irvine | CA | 92618-0000 Consulting Services provided to the Debtor |
| Eaton Electrical, Inc | | Attn: David Spedelsbach, Regional | 3949 Corrales Road, Suite 200 | Corrales | NM | 87048-0000 Albuquerque - Battery and maintenance services provided to the Debtor |
| Eleven Fortune Park Limited Prtnshp | 1,225.00 | c/o IBUS Management & Development | 1899 Pennsylvania Ave, NW, Ste 530 | Washington | DC | 20006-0000 Non-Residential Real Property leased by the Debtor/10401 N. Meridian Circle, Suite 350/Indianapolis, IN 46268/Marion County/¼Lease commenced on 4/1/05 and terminates on 11/20/2011 |

| Creditor | Amount | Attn / Address | Address | City | State | Description |
|---|---|---|---|---|---|---|
| Eliza Corporation | | Attn: Lucas Merrow, CEO | 100 Cummings Center | Beverly | MA | 01915-0000 Speech recognition technology services and applications provided by the Debtor |
| eLoyalty Attn: Legal Department | | Two Conway Park | 150 Field Drive, Suite 250 | Lake Forest | IL | 60045-0000 Consulting services provided to the Debtor |
| EMC2 Corporation | | Attn: Contract Administration | 1008 Western Avenue, Suite 500 | Seattle | WA | 98104-0000 Software License and ESAAS Agreement provided to the Debtor |
| eProject, Inc. | | Attn: Contract Administration | 1008 Western Avenue, Suite 500 | Seattle | WA | 98104-0000 Software License and ESAAS Agreement provided to the Debtor |
| Fair Isaac Corp., Attn: Contracts | | Reference LIR 1275273 | 3661 Valley Centre Drive | San Diego | CA | 92130-0000 Master License and Service Agreement |
| Fair Isaac Corporation | 2,176.58 | P.O. BOX 201129 | | Dallas | TX | 75320-1129 Master License and Service Agreement |
| First Data Bank, Inc | | Attn: Contracts | 500 East 96th Street, Suite 500 | Indianapolis | IN | 46240-3767 License agreement - drug data |
| First Data Bank, Inc | | PO Box 281832 | | Atlanta | GA | 30384-1832 License agreement - drug data |
| Frontline Technologies | | 3195 Park Road, Suite C | | Benicia | CA | 94510-0000 South San Francisco - Part of HVAC install Services |
| Fuller Engineering Company, Inc. | 5,434.64 | 4135 West 99th Street | | Carmel | IN | 46032-0000 Clean agent fire suppression system provided to the Debtor |
| Gather, Inc. (aka Gather.com) | | 85 Devonshire Street, 3rd Floor | | Boston | MA | 02109-0000 Internet discussion group |
| Geometrix | | 240 Bay Street | Victoria, British Columbia V9A 3K5 | | | Training Partner for LMU |
| Gold Standard Multimedia, Inc. | | 302 Knights Run Avenue, Suite 800 | | Tampa | FL | 33602-0000 Clinical Pharmacology license agreement |
| Gold Standard Multimedia, Inc. | | Post Office Box 1453 | | Tampa | FL | 33601-0000 Clinical Pharmacology license agreement |
| 1542 Communications | | Timothy L. Husni, President | | Pittsburgh | PA | 15203-0000 Marketing consulting services provided to the Debtor |
| Hallmark Global Technologies, Inc. | | 262 Chapman Road | | Newark | DE | 19702-0000 Temporary staffing services provided to the Debtor |
| Harris Interactive, Inc. | | 60 Corporate Woods | | Rochester | NY | 14623-1457 Participant research services provided to the Debtor |
| Harvard Health Publications | | 10 Shattuck Street, Second Floor | | Boston | MA | 02115-0000 Content License Agreement provided to the Debtor |
| Health Care Service Corporation | | Britt Olander, Kevin Meek | 300 East Randolph | Chicago | IL | 60601-0000 Disease Management Services provided by the Debtor for: /Blue Medicare PPO - New Mexico/Blue Medicare PPO - Texas/HCSC - Illinois/HCSC - New Mexico/HCSC - Oklahoma/HCSC - Texas/HCSC - Texas - FEP Non-HMO/HCSC - Illinois FEP/HCSC - Oklahoma - Commercial/HCSC - New Mexico - FEP |
| Health Insurance Risk Sharing Plan | | Arnie Goldman, CEO | 33 East Main Street, Suite 230 | Madison | WI | 53703-0000 Disease Management Services provided by the Debtor for: /HIRSP |
| Health Network One, Inc. | | Attn: Martin Bilowich, President | 801 East Hallandale Beach Bld, #200 | Fort Lauderdale | FL | 33309-0000 License agreement for /HIRSP |
| Healthways World Headquarters | | Tony Vaughn, David Franzen | 701 Cool Springs Boulevard | Franklin | TN | 37067-0000 Disease Management Services provided by the Debtor for: /Ford |
| Healthwise, Inc. | 12,250.00 | 2601 No. Bogus Basin Rd. | Post Office Box 1989 | Boise | ID | 83701-0000 License agreement |
| Hotel and Restaurant Employees Intl. | | Garey Schmidt, Marty Lindeman | 711 North Commons Drive | Aurora | IL | 60504-4197 Disease Management Services provided by the Debtor for: /HEREIU Welfare Fund |
| IBM | 687.13 | P.O. Box 676673 | | Dallas | TX | 75267-0000 Bladecenter HS21 leased by the Debtor/D00F7919&$30.661/year |
| IBM | | P.O. Box 676673 | | Dallas | TX | 75267-0000 Bladecenter HS21 leased by the Debtor/D00F8427&$8.425/year |
| IBM | | Attn: Fabio MendesDe Souza | 4111 Northside Parkway | Atlanta | GA | 30327-0000 Leased equipment leased by the Debtor |
| IBM | | P.O. Box 534151 | | Atlanta | GA | 30353-4151 Equipment leased by the Debtor |
| IBM/Cognos (formerly Applix, Inc.) | | New Orchard Road | | Armonk | NY | 10504-0000 Perpetual license agreement |
| IBM/Cognos Corporation | | P.O. Box D3923 | | Boston | MA | 02241-3923 Perpetual license agreement |
| Insignia Health, LLC | | Attn: Craig Swanson | 465 Vixen Road | Wayzata | MN | 55391-0000 Non-Exclusive Copyright License re: Patient Activation Measure IP owned by the State of Oregon and licensed by Insignia Health, LLC |
| InterCall, Inc. | 2,048.40 | Attn: General Counsel | 8420 W. Bryn Mawr Ave., Ste 400 | Wayne | DE | 19807-0000 Meeting/conferencing Agreement and Project Attachments |
| Intuitive Technical Solutions | | Attn: Daniel A. Cooper, CEO | 21660 E. Copley Dr, Ste. 308 | Diamond Bar | CA | 91765-0000 IT Consulting services provided to the Debtor |

| Creditor | Amount | Address | City | State | Description |
|---|---|---|---|---|---|
| Intuive Technical Solutions | | 143 Union Blvd | Denver | CO | 80228-0000 IT consulting services provided to the Debtor |
| Iron Mountain | 1,027.45 | 1000 Campus Drive | Collegeville | PA | 19426-0000 Offsite backup storage and shredding services provided to the Debtor |
| Iron Mountain (Indy) | 179.85 | Post Office Box 27128 | New York | NY | 10087-7128 Offsite backup storage and shredding services provided to the Debtor |
| Iron Mountain (IRV) Acct #CF514 | 282.64 | P.O. Box 601002 | Los Angeles | CA | 90060-1002 Offsite backup storage and shredding services provided to the Debtor |
| Iron Mountain (IRV) Acct #CF514 | | P.O. Box 601002 | Los Angeles | CA | 90060-1002 Offsite backup storage and shredding services provided to the Debtor |
| Iron Mountain (SAT) Acct # 57165 | 535.70 | Post Office Box 915004 | Dallas | TX | 75391-5004 Offsite backup storage and shredding services provided to the Debtor |
| Iron Mountain Off-Site Data | 3,172.04 | Post Office Box 915026 | Dallas | TX | 75391-5026 Offsite backup storage and shredding services provided to the Debtor |
| J&J Air Conditioning | 350.00 | 1086 North 11th Street | San Jose | CA | 95112-2927 HVAC install provided to the Debtor in South San Francisco |
| Kronos Incorporated | | Attn: Alyce Moore, VP / 297 Billerica Road | Chelmsford | MA | 01824-0000 Workforce timekeeper for the Debtor |
| Language Line Services, Inc. | | Attn: Louis Provenzona, Jr. / 1 Lower Ragsdale Drive, Building 2 | Monterey | CA | 93940-0000 Interpreting services provided to the Debtor |
| Language Line Services, Inc. | 1,555.17 | P.O. Box 202564 | Dallas | TX | 75320-2564 Interpreting services provided to the Debtor |
| Masergy Communications, Inc. | | Attn: Contract Administration / 2740 N. Dallas Pkwy., Ste. 260 | Plano | TX | 75093-0000 IT Network Services provided to the Debtor |
| Masergy Communications, Inc. | 11,504.20 | P.O. Box 671454 | Dallas | TX | 75267-1454 IT Network Services provided to the Debtor |
| National Institutes of Health | | Attn: Royalties Administrator / 6011 Executive Blvd., Ste 325 | Rockville | MD | 20852-0000 License Agreement provided to the Debtor |
| National Institutes of Health | | P.O Box 979071 | Saint Louis | MO | 63197-9000 License Agreement provided to the Debtor |
| Navicent, Inc. | 18,750.00 | Attention: Jack Domet, President / 3501 N. Southport Ave, Ste. 2210 | Chicago | IL | 60657-0000 Locate and screen enrollment outsource vendor for the Debtor |
| Neopost Leasing | 2,383.03 | P.O. Box 45822 | San Francisco | CA | 94145-0822 Mail Machine U6S leased by the Debtor/406 1050b/$3,294/year |
| Neopost Postage Lease | 448.05 | C/O De Lage Landen Financial / Post Office Box 45600 / 1055 Westlakes Drive | Berwyn | PA | 19312-2410 Postage equipment leased by the Debtor |
| Neopost, Inc. | | Attn: Legal Department / Post Office Box 45800 | San Francisco | CA | 94145-0000 Postage equipment leased by the Debtor |
| NICE Systems, Inc. | | Attn: Legal Department / 301 Route 17 North, 10th Floor | Rutherford | NJ | 07070-0000 Maintenance service agreement |
| NICE Systems, Inc. | 39,107.30 | Post Office Box 9421 | Uniondale | NY | 11555-9421 Maintenance service agreement |
| NICE Systems, Inc. | | Lynne Hamilton, John Jacopin / 277 E. Town Street | Columbus | OH | 43215-4642 Disease Management Services provided by the Debtor for :Ohio PERS |
| Ohio Public Employees Retirement Sy | | | Columbus | OH | 43229-0000 Mail related consulting services provided to the Debtor |
| Pervasive Software, Inc. | | Attn: Randy Jonkers, CFO / 12365 Riata Trace Pkwy, Bldg. B | Austin | TX | 78727-0000 IT related consulting services provided to the Debtor |
| PGP Corporation | | 3460 W. Bayshore | Palo Alto | CA | 94303-0000 Encryption software provided to the Debtor |
| Pitney Bowes Credit Corp | | 1313 N. Atlantic Street, FL3 | Spokane | WA | 99201-0000 Postage Base & Scale leased by the Debtor/217274100 4/$3,156/year |
| Pitney Bowes Credit Corporation | | P.O. Box 856460 | Louisville | KY | 40285-6460 Postage machines leased by the Debtor |
| Pitney Bowes Credit Corporation | | 27 Waterview Wy | Shelton | CT | 08484-4301 Postage machines leased by the Debtor |
| Pitney Bowes Financial services | | 5101 Interchange Way | Louisville | KY | 40229-0000 Mail Machine leased by the Debtor |
| Pitney Bowes Financial services | | 5101 Interchange Way | Louisville | KY | 40229-0000 Mail Machine leased by the Debtor 679 2886/$5,798/year |
| PR Newswire | | The Harborside Financial Center / 806 Plaza Three, 6th Floor | Jersey City | NJ | 07311-0000 Media intelligence products provided to the Debtor |
| PR Newswire | | G.P.O. Box 5897 | New York | NY | 10087-5897 Media intelligence products provided to the Debtor |
| PreferredOne Administrative Svcs | | Attention: Elaine Anderson / 6105 Golden Hills Drive | Minneapolis | MN | 55416-0000 Disease Management Services provided by the Debtor for the Debtor for :Preferred One - Fully Insured/Preferred One - ASO Accounts |
| ProClarity | | 500 South 10th Street | Boise | ID | 83707-0000 Analytics server product provided to the Debtor |
| Q&A Research | | Attn: Warren Pino, President / 64 Digital Drive | Novato | CA | 94949-0000 Survey fulfillment and data scanning processes provided to the Debtor |
| Q&A Research | 30,238.00 | 7220 West 98th Terrace | Overland Park | KS | 66212-0000 Survey fulfillment and data scanning processes provided to the Debtor |

| Name | Amount | Attn / Address | Street | City | State | Description |
|---|---|---|---|---|---|---|
| Quagga Corporation | | | 90 Blue Ravine Road | Folsom | CA | 95630.0000 (Avaya partner) Master Equipment Purchase Agreement |
| Quest Software, Inc. | 7,498.38 | Attn: Mark Luhdorff, CFO | 5822 Roseville Road | Sacramento | CA | 95842.0000 Data Center Collocation provided to the Debtor |
| Qwest Software, Inc | 31,452.20 | Attn: Susan Moore | 409 N. Rowley | Mitchell | SD | 57301-0000 Colo, internet, long distance services provided to the Debtor |
| Qwest Enterprise America, Inc. | | Attn: Mike Oliver | 175 Joerschke Dr., Ste. P | Grass Valley | CA | 95945-0000 Colo, internet, long distance services provided to the Debtor |
| R Systems, Inc. | 12,320.00 | Attn: Mandeep Sodhi, VP of Sales | 5000 Windplay Drive, Suite 5 | El Dorado Hills | CA | 95762-0000 Temporary staffing services provided to the Debtor |
| ReadyTalk aka Evocate, Inc. | 2,879.13 | Attn: Scott King, VP Sales | 1598 Wynkoop Street | Denver | CO | 80202-0000 Teleconference Services provided to the Debtor |
| Ref & Sons, Inc. | | | 4621 Orange Grove Ave. | Sacramento | CA | 95841-0000 Rancho Cordova - HVAC/Electrical work provided to the Debtor |
| Ref & Sons, Inc. | | | 4621 Orange Grove Ave. | Sacramento | CA | 95841-0000 Rancho Cordova - HVAC/Electrical work provided to the Debtor |
| Revelwood | | Attn: Robert Gordy, Managing Prin | 14 Walsh Drive | Parsippany | NJ | 07054-0000 Customer profitability model analysis provided to the Debtor |
| School Employees Retirement System | | of Ohio - Attn: General Counsel | 300 East Broad Street, Suite 100 | Columbus | OH | 43215-0000 Disease Management Services provided by the Debtor for /Ohio SERS |
| Silverlink Communications | 11,405.69 | Attn: Vice President, Enterprise | 67 South Bedford Street - # 300E | Burlington | MA | 01803-0000 Voice application services provided to the Debtor |
| SoundBite Communications | | Attn: Christopher Hemme, | 2 Burlington Woods Drive | Burlington | MA | 01803-0000 Call campaign services provided to the Debtor |
| SQL Sentry | | Attn: 18415 Northcross Drive | | Huntersville | NC | 28078-0000 Event manager services provided to the Debtor |
| STAT PADS, LLC | | Attn: Dana Miller | 13901 W. Wainwright, Suite A | Boise | ID | 83713-0000 Service Agreement for AED Devices provided to the Debtor |
| State Teachers Retirement System | 239,733.00 | of Ohio, Attn: S. Kroesel, S Durfee | 275 East Broad Street | Columbus | OH | 43215-3771 Disease Management Services provided by the Debtor for /State Teachers Retirement System of Ohio |
| StayWell - Atlantic House | 1,719.84 | Attn: Patrick A. Clifford | One Atlantic Street, Sixth Floor | Stamford | CT | 06901-0000 Content License Agreement |
| StayWell Health Management | | fbo H&R Block, Attn: Pres & CEO | 3000 Ames Crossing Road | Saint Paul | MN | 55121-1400 Subcontractor to StayWell for/DM Services provided by the Debtor for; /H&R Block |
| Storage USA (Extra Space Storage) | 136.00 | 2410 Mercantile Drive | | Rancho Cordova | CA | 95742-0000 Off site storage provided to the Debtor |
| Taft, Stettinius & Hollister, LLP | | Attention: John P. Curp, Esq. | 21 East State Street, 12th Floor | Columbus | OH | 43215-4221 for Notice Purposes/ Counsel to Debtor |
| Tatum, LLC | | Attn: Arthur J. Cohen, | 2040 Main Street, Suite 700 | Irvine | CA | 92614-0000 Interim staffing services provided to the Debtor |
| Telecom Design Group | | Attn: David A. Marks, | 1333 Broadway, Suite 601 | San Francisco | CA | 94103-0000 Temporary staffing services provided to the Debtor |
| Teleapse | 8,470.42 | Attn: Legal Department | 4 North Second Street, Suite 595 | San Jose | CA | 95113-0000 Telecom expense management services provided to the Debtor |
| TexoMD Corp. | | Attn: W.T. Andros, President | 400 Village Square Crossing, # 3K | Palm Beach Gardens | FL | 33410-5196 Billing address verification provided to the Debtor |
| The Irvine Company | | 8001 Irvine Center Drive, Suite 840 | | Irvine | CA | 92618-0000 Non-Residential Real Property leased by the Debtor/ ·15635 Alton Parkway, Suite 400/Irvine, CA 92618/Orange County/Lease commended on 6/1/2004 and terminates on 12/31/2013 |
| Thompson Advisory Group (aka TAG) | | Attn: J. Dieter Thompson | 3930 Glade Road, Suite 108-113 | Colleyville | TX | 76034-0000 Network and contracts assessment services provided to the Debtor |
| Travis Commerical Real Estate Svcs. | | Attn: Randall S. Parker, | 840 Newport Center Drive, Suite 770 | Newport Beach | CA | 92660-0000 San Antonio - Facilities management services provided to the Debtor |
| Travis Commercial Real Estate Svcs. | | 9601 McAllister Fwy | | San Antonio | TX | 78216-0000 San Antonio - Facilities management services provided to the Debtor |
| Ultimate Software aka Ultipro | | 2000 Ultimate Way | | Fort Lauderdale | FL | 33326-0000 Perpetual license agreement - Workforce Management |

ANNEX 2.2

ANNEX 2.2

| Name | Amount | Address | City | State | Zip | Description |
|---|---|---|---|---|---|---|
| Ultimate Software aka Ultipro | 452.50 | 1485 North Park Dr | Fort Lauderdale | FL | 33326-0000 | Perpetual license agreement - Workforce Management |
| URAC | | 1220 "L" Street, NW, Ste. 400 | Washington | DC | 20005-0000 | Accreditation for LifeMasters |
| Verizon Wireless | | One Verizon Way | Basking Ridge | NJ | 07920-1097 | Telecom services provided to the Debtor |
| Verizon Wireless | | Post Office Box 660108 | Dallas | TX | 75266-0108 | Telecom services provided to the Debtor |
| Verizon Wireless | | Post Office Box 15062 | Albany | NY | 12212-5062 | Telecom services provided to the Debtor |
| Verizon Wireless | 16,090.49 | Post Office Box 9622 | Mission Hills | CA | 91346-9622 | Telecom services provided to the Debtor |
| Verizon Wireless | | Attn: Kim Jackson, SVP, 1100 Park Place, 4th Floor | San Mateo | CA | 94403-0000 | Telecom services provided to the Debtor |
| WageWorks, Inc. | | | | | | FSA Benefits Vendor services provided to the Debtor |
| Wagner Power Systems | | Attn: Albert Hutcherson 4000 Osuna Road, NE | Albuquerque | NM | 87109-0000 | 3 year preventive maintenance agreement |
| West (A Thomson Reuters Business) | 1,036.93 | P.O. Box 6292 | Carol Stream | IL | 60197-6292 | Legal research database services provided to the Debtor |
| Westlaw Subscription Agreement | | 610 Opperman Drive | Saint Paul | MN | 55123-0000 | Legal research database services provided to the Debtor |
| Total | 597,940.68 | | | | | |

**ANNEX 2.4**

LifeMasters Supported SelfCare, Inc. is not a Medicare provider.  Thus it does not have a
Medicare provider number.  However, in order to pay LifeMasters Supported SelfCare,
Inc. through the CMS payment system, LifeMasters Supported SelfCare, Inc. was
assigned cost plan number H5413.

**ANNEX 2.4**

**EXHIBIT 2.4**

LifeMasters APA – Annex 6.3 Licenses and Permits

- Albuquerque – Business License

- California – Certificate of Status

- City of Irvine Business License

- Cupertino Business License

- Florid – Annual Report

- Indiana – Certificate of Good Standing

- LifeMasters – Domestic/Foreign Qualifications

  o California – Domestic as of 06/23/1994

  o Florida – Foreign as of 09/02/2005

  o Indiana – Foreign as of 01/24/2006

  o New Jersey – Foreign 11/03/2000

  o New Mexico – Foreign 08/30/2004

  o Texas – Foreign 02/02/2005

  o Wisconsin – Foreign 10/14/2008

- New Jersey – Business Registration Certificate

- New Mexico – Certificate of Good Standing

- Nevada – Business License

- Rancho Cordova – Business License

- South San Francisco – Business License

- Telephone Medical Advice Services Certificate

- Texas – Certificate of Fact (aka Good Standing)

- Wisconsin – Certificate of Authority

EXHIBIT 6.3

ANNEX 6.7

| Contract | (i) Contracts with performance guarantees | (ii) Seller's Estimate of Performance Guarantee Penalties as of 10/31/09 | (iii) Performance Guarantees assessed in Prior Two Years |
|---|---|---|---|
| Health Care Service Corporation | x | $ - | $ - |
| Building Service 32BJ Health Fund | x | $ 250,000 | $ - |
| Health Insurance Risk Sharing Plan | x | $ 15,000 | $ - |
| H&R Block | x | $ - | $ - |
| Arise Health Plan | | | $ - |
| Chevron | x | $ 190,000 | $ 345,000 |
| Ford | x | $ | $ - |
| Hotel and Restaurant Employees Int. | x | A | |
| Ohio Public Employees Retirement Sy | x | $ | $ 1,670,000 |
| Ohio School Employees Retirement System | x | $ | $ - |
| Preferred One | x | $ 80,000 | $ - |
| Ohio State Teachers Retirement System | x | $ 480,000 | $ 560,000 |

A - contract amendment in process to eliminate performance liability for prior and current year

EXHIBIT 6.7

**ANNEX 6.7 (d)**

 **Contract**

| |
|---|
| Health Care Service Corporation |
| Building Service 32BJ Health Fund |
| Health Insurance Risk Sharing Plan |
| H&R Block |
| Arise Health Plan |

**U.S. Patents**

| TITLE | APP.# File Date | PATENT# File Date | INVENTOR(S) | OWNER | STATUS SUB/STATUS NEXT TAX |
|---|---|---|---|---|---|
| Systems and methods for evaluating patient-specific information and providing patient management recommendations for healthcare providers | 11/655,721 1/19/2007 | 10/042,766 1/8/2002 United States | Delusignan, Roger Davis, Jeffery | LifeMasters Supported SelfCare, Inc | Filed |
| System and method for evaluating patient-specific information and providing patient management recommendations | 2467059 11/15/2002 | PCT/US02/ 36540 11/15/2002 Patent Cooperation Treaty | Delusignan, Roger Davis, Jeffery | LifeMasters Supported SelfCare, Inc | Filed Client Pays MF/Ann 11/15/2008 |
| Method to identify and prioritize modifiable risk factors resulting in interventions that focus on individuals | 11/576943 10/13/2005 | PCT/US2005/036783 10/13/2005 Patent Cooperation Treaty | Newell, Robert Derek | LifeMasters Supported SelfCare, Inc (By Assignment) | Filed |
| Supporter Selfcare Model | 60/911,048 4/10/2007 | | Mathews, Meredith W. Osmick, Mary J. | LifeMasters Supported SelfCare, Inc | Filed |
| Method and Apparatus for a Personal Health Network | 978,892 11/26/2007 | 5,827,180 10/27/1998 | Goodman, David F. | LifeMasters Supported SelfCare, Inc | Filed |

**EXHIBIT 6.8**



# LifeMasters

## LIFEMASTERS SUPPORTED SELFCARE, INC.

### U.S. and Foreign Trademark and Copyright Status Report

Updated on: September 16, 2008

## U.S. TRADEMARKS

| Mark Serial/Reg. Number | Country | Class(es) Goods and Services | Status/Comments |
|---|---|---|---|
| MEDISAVE<br>Serial No.: 75/718,357<br>Reg. No.: 2,535,298 | United States | CLASS 9: computer software that assists businesses in forecasting disease-specific health care costs and event rates for a given population, and in performing cost-benefit analyses of programs for preventing or managing diseases within that population | Cancelled (Voluntarily) |
| LifeMasters<br>Serial No.: 76/274,996 | United States | CLASS 9: electronic data processing, storage, transmission, and receiving devices for a personal health network, namely, data processors, computer pagers, computer keyboards, modems, fax machines, and telephones;<br>CLASS 38: electronic data communication services for a personal health network, namely, electronic processing and transmission of messages and data; leasing and renting personal electronic data-processing, storage, transmission and receiving devices, namely, pagers;<br>CLASS 39: electronic data communication services for a personal health network, namely, electronic collection and storage of messages and data;<br>CLASS 41: educational services, namely, conducting classes, seminars, conferences and workshops and providing one-to-one instruction in the field of health care for educating patients, physicians and caregivers about healthcare, nutrition, disease processes, self-guided healthcare treatment and self-guided disease treatment; | ABANDONED<br>Filed: 06/20/2001 |

1

| Mark Serial/Reg. Number | Country | Class(es) Goods and Services | Status/Comments |
|---|---|---|---|
| LifeMasters<br><br>Serial No.: 76/976,614<br>Reg. No.: 2,854,848 | United States | interactive television programming services featuring healthcare management information for educating patients, physicians and caregivers about healthcare, nutrition, disease processes, self-guided healthcare treatment and self-guided disease management; and CLASS 42: health information services, namely, generating and maintaining files and personal medical history records for patients and healthcare providers; leasing and renting personal electronic data processing, storage, transmission, and receiving devices, namely, computers and computer software for a personal health care network; health monitoring services by which health care professionals can monitor and track through remote and non-remote means the current health status of patients; providing healthcare consultation and information services for patients, physicians and caregivers in the fields of healthcare, nutrition, disease processes, self-guided health care treatment and self-guided disease management; healthcare consultation services, namely, incentive-based reward programs operated by a healthcare support network to encourage member patients to follow their prescribed treatment programs and reward them for doing so; rehabilitative and preventative treatment programs operated by a health care support network that feature incentive awards to encourage and reward member patients to follow prescribed treatment programs, development and supervision of rehabilitation and preventative cardiovascular programs for administration of health care by individual patients<br><br>CLASS 16: series of publications in the nature of newsletters, instructional teaching manuals in a series to be updated regularly, workbooks, and pamphlets, in the field of healthcare management | REGISTERED<br>Filed: 06/20/2001<br>Registered: 06/15/2004<br>Affidavit of Use due: 06/15/2010<br>Renewal due: 06/15/2014<br>Divisional of 76/274,996 |

2

| Mark Serial/Reg. Number | Country | Class(es) Goods and Services | Status/Comments |
|---|---|---|---|
| **AIM FOR HEALTH**<br>Serial No.: 78/289,443<br>Reg. No.: 3,245,312 | United States | **CLASS 44:** health information services, namely, generating and maintaining files and personal medical history records for patients and healthcare providers, health monitoring services by which health care professionals can monitor and track through remote and non-remote means the current health status of patients; providing consultation and information services for patients, physicians and caregivers in the fields of healthcare, nutrition, disease processes, development and supervision of preventative health programs for administration of health care by individual patients | REGISTERED<br>Filed: 08/19/2003<br>Registered: 05/22/2007<br>**Affidavit of Use due: 05/22/2013**<br>Renewal Due: 05/22/2017 |
| **LIFEMASTERS**<br>Serial No.: 75/017,792<br>Reg. No.: 1,998,449 | United States | **CLASS 35:** management services for health care provision and medical care provision | REGISTERED<br>Filed: 11/13/1995<br>Registered: 09/03/1996<br>**Renewal Due: 09/03/2016** |
| **LIFEMASTERS SUPPORTED SELFCARE**<br>Serial No.: 75/417,673<br>Reg. No.: 2,929,051 | United States | **CLASS 42:** health information and monitoring services by which health care professionals can monitor and track through remote and non-remote means the current health status of patients; leasing personal electronic data processing, storage, transmission and receiving devices, computers, pagers and computer software for a personal health care network | REGISTERED<br>Filed: 01/14/1998<br>Registered: 03/01/2005<br>**Affidavit of Use due: 03/01/2011**<br>Renewal due: 03/01/2015 |
| **LIFEMASTERS SUPPORTED SELFCARE**<br>Serial No.: 75/417,679<br>Reg. No.: 2,742,175 | United States | **CLASS 38:** electronic transmission of messages and data for a personal health network | REGISTERED<br>Filed: 01/14/1998<br>Registered: 07/29/2003<br>**Affidavit of Use due: 07/29/2009**<br>Renewal due: 07/29/2013 |
| <br>Serial No.: 75/444,365<br>Reg. No.: 2,513,639 | United States | **CLASS 38:** electronic transmission of messages and data for a personal health network | Cancelled (Voluntarily) |
|  | United States | **CLASS 42:** providing health care information; maintaining personal medical history records and files, and monitoring patients' current health status for access | Cancelled (Voluntarily) |

| Mark Serial/Reg. Number | Country | Class(es) Goods and Services | Status/Comments |
|---|---|---|---|
| **HEARTMASTERS** Serial No.: 75/444,366 Reg. No.: 2,463,111 | United States | by health care professionals by remote and non-remote means; leasing personal electronic data processing, storage, transmission and receiving devices, computers, pagers and computer software for a personal health care network | REGISTERED Filed: 06/25/1999 Registered: 08/23/2005 Affidavit of Use due: 08/23/2011 Renewal Due: 08/23/2015 |
| **LIFEMASTERS CAREGUIDE** Serial No.: 75/713,923 Reg. No.: 2,742,378 | United States | **CLASS 42:** development and supervision of rehabilitation and preventative cardiovascular programs for self administration of health care by individual patients | Cancelled (Voluntarily) |
| **LIFEMASTERS ONLINE** Serial No.: 75/736,891 Reg. No.: 2,987,652 | United States | **CLASS 16:** series of publications in the nature of newsletters, instructional teaching manuals in a series to be updated regularly, workbooks, and pamphlets, in the field of healthcare management; **CLASS 41:** educational services, namely, providing instruction in the field of health care for educating patients, physicians and caregivers about healthcare, nutrition, disease processes, self-guided healthcare treatment and self-guided disease treatment; and **CLASS 42:** providing healthcare information via a global computer network, featuring healthcare management information for educating patients, physicians and caregivers about healthcare, nutrition, disease processes, self-guided healthcare treatment and self-guided disease management | Cancelled (Voluntarily) |
| **LIFEMASTERS ONLINE** Serial No.: 75/751,379 Reg. No.: 2,507,733 | United States | **CLASS 42:** providing healthcare information via a global computer network, featuring healthcare management information for educating patients, physicians and caregivers about healthcare, nutrition, disease processes, self-guided healthcare treatment and self-guided disease management | Cancelled (Voluntarily) |
| ◯ LifeMasters Serial No.: 76/274,999 Reg. No.: 3,046,516 | United States | **CLASS 42:** health monitoring services by which health care professionals can monitor and track through remote and non-remote means the current health status of patients; healthcare consultation services, namely, incentive-based reward programs operated by a healthcare support network to encourage member patients to follow | REGISTERED Filed: 06/20/2001 Registered: 01/17/2006 Affidavit of Use due: 01/17/2012 Renewal due: 01/17/2016 |

| Mark, Serial/Reg. Number | Country | Class(es) Goods and Services | Status/Comments |
|---|---|---|---|
| | | their prescribed treatment programs and reward them for doing so | |
| LifeMasters<br><br>Serial No.: 76/977,218<br>Registration No.: 2,929,517 | United States | **CLASS 16:** series of publications in the nature of newsletters, instructional teaching manuals in a series to be updated regularly, workbooks, and pamphlets, in the field of healthcare management;<br>**CLASS 35:** business management and consulting services in the fields of health care provision and medical care provision;<br>**CLASS 38:** electronic data communication services for a personal health network, namely, electronic processing and transmission of messages and data;<br>**CLASS 39:** electronic data communication services for a personal health network, namely, electronic collection and storage of messages and data;<br>**CLASS 41:** educational services, namely, conducting classes, seminars, conferences and workshops and providing one-to-one instructions in the field of health care for educating patients, physicians and caregivers about healthcare, nutrition, disease processes, self-guided healthcare treatment and self-guided disease treatment; and<br>**CLASS 42:** health information services, namely, generating and maintaining files and personal medical history records for patients and healthcare providers; providing healthcare consultation and information services for patients, physicians and caregivers in the fields of healthcare, nutrition, disease processes, self-guided health care treatment and self-guided disease management; development and supervision of rehabilitation and preventative cardiovascular programs for administration of health care by individual patients | REGISTERED<br>Filed: 06/20/2001<br>Registered: 03/01/2005<br>Affidavit of Use due: 03/01/2011<br>Renewal due: 03/01/2015<br>Divisional of 76/274,999 |
| **AIM**<br>Serial No.: 78/285,253<br>Reg. No.: 3,259,095 | | **CLASS 41:** Educational services, namely, conducting classes in the field of health care for physicians and caregivers about healthcare treatment, disease processes, and | REGISTERED<br>Filed: 08/08/2003<br>Registered: 07/03/2007<br>Affidavit of Use due: 07/03/2013 |

| Mark Serial/Reg. Number | Country | Class(es) Goods and Services | Status/Comments |
|---|---|---|---|
| **PARTNERS FOR LIFE** Serial No.: 78/538,232 | United States | **CLASS 44:** health information services, namely, generating and maintaining files and personal medical history records for patients and healthcare providers; health monitoring services by which health care professionals can monitor and track through remote and non-remote means the current health status of patients; providing consultation and information services for patients, physicians and caregivers in the fields of healthcare, nutrition, disease processes, development and supervision of preventative health programs for administration of health care by individual patients | Renewal Due: 07/03/2017 |
| | | **CLASS 16:** series of publications, namely, newsletters, instructional teaching manuals in a series to be updated regularly, workbooks, and pamphlets in the field of healthcare management; **CLASS 38:** electronic data communication services for a personal health network, namely, electronic transmission of messages and data; **CLASS 39:** electronic data communication services for a personal health network, namely, electronic storage of messages and data; **CLASS 41:** Educational services, namely, conducting classes, seminars, conferences and workshops and providing one-to-one instructions in the field of health care for educating patients, physicians and caregivers about healthcare, nutrition, disease processes, self-guided healthcare treatment and self-guided disease treatment; and **CLASS 44:** health information services, namely, generating and maintaining files and personal medical history records for patients and healthcare providers; providing healthcare information services for patients, physicians and caregivers in the fields of healthcare, nutrition, disease processes, self-guided health care treatment and self-guided disease management; health monitoring services by which health care professionals can monitor and track through remote and non-remote means the current health status of patients; development | PENDING Filed: 12/09/2003 Will publish 09/30/2008 No current deadlines |

6

| Mark Serial/Reg. Number | Country | Class(es) Goods and Services | Status/Comments |
|---|---|---|---|
| | | and supervision of rehabilitation and preventative cardiovascular programs for administration of health care by individual patients | |
| PSR Serial No. 78/338,235 | United States | CLASS 42: health information services, namely, generating and maintaining files and personal medical history records for patients and healthcare providers | ABANDONED Filed: 12/09/2003 |
| MAP Serial No. 78/338,237 | United States | CLASS 16: workbooks and pamphlets in the field of healthcare management | ABANDONED Filed: 12/09/2003 |
| SUPPORTING HEALTHY OUTCOMES Serial No. 78/348,188 Reg. No. 2,951,565 | United States | CLASS 16: series of publications in the nature of newsletters, instructional teaching manuals in a series to be updated regularly, workbooks, and pamphlets, in the field of health care management; CLASS 38: electronic data communication services for a personal health network, namely, electronic processing and transmission of messages and data; CLASS 39: electronic data communication services for a personal health network, namely, electronic collection and storage of messages and data; CLASS 41: educational services, namely, conducting classes, seminars, conferences and workshops and providing one-to-one instructions in the field of health care for educating patients, physicians and caregivers about healthcare, nutrition, disease processes, self-guided healthcare treatment and self-guided disease treatment; and CLASS 44: health information services, namely, generating and maintaining files and personal medical history records for patients and healthcare providers; health monitoring services by which health care professionals can monitor and track through remote and non-remote means the current health status of patients; providing healthcare information services for patients, physicians and caregivers in the fields of health care, nutrition, disease processes, self-guided health care treatment and self-guided disease management; development and supervision of rehabilitation and preventative cardiovascular programs for administration | REGISTERED Filed: 01/16/2004 Registered: 05/17/2005 Affidavit of Use due: 05/17/2011 Renewal due: 05/17/2015 |

7

| Mark Serial/Reg. Number | Country | Class(es) - Goods and Services | Status/Comments |
|---|---|---|---|
| **LIFEMASTERS** Serial No.: 78/348,210 Registration No.: 2,970,208 | United States | of health care by individual patients **CLASS 16:** series of publications in the nature of newsletters, instructional teaching manuals in a series to be updated regularly, workbooks and pamphlets, in the field of healthcare management; **CLASS 38:** electronic data communication services for a personal health network, namely, electronic processing and transmission of messages and data; **CLASS 39:** electronic data communication services for a personal health network, namely, electronic collection and storage of messages and data; **CLASS 41:** educational services, namely, conducting classes, seminars, conferences and workshops and providing one-on-one instructions in the field of health care for educating patients, physicians and caregivers about healthcare, nutrition, disease processes, self-guided healthcare treatment and self-guided disease treatment; and **CLASS 44:** health information services, namely, generating and maintaining files and personal medical history records for patients and healthcare providers; health monitoring services by which health care professionals can monitor and track through remote and non-remote means the current health status of patients; providing healthcare information services for patients, physicians and caregivers in the fields of healthcare, nutrition, disease processes, self-guided health care treatment and self-guided disease management; development and supervision of rehabilitation and preventative cardiovascular programs for administration of health care by individual patients | **REGISTERED** Filed: 01/06/2004 Registered: 07/19/2005 **Affidavit of Use due: 07/19/2011** Renewal due: 07/19/2015 |

8

## FOREIGN TRADEMARKS

| | | | |
|---|---|---|---|
| **PARTNERS FOR LIFE**<br>Serial No.: 1219781 | Canada | Electronic data communication services for a personal health network, namely, electronic processing and transmission of messages and data; electronic data communication services for a personal health network, namely, electronic collection and storage of messages and data; educational services, namely, conducting classes, seminars, conferences and workshops and providing one-to-one instructions in the field of health care for educating patients, physicians and caregivers about healthcare, nutrition, disease processes, self-guided healthcare treatment and self-guided disease treatment, health information services, namely, generating and maintaining files and personal medical history records for patients and healthcare providers; health monitoring services by which health care professionals can monitor and track through remote and non-remote means the current health status of patients; providing healthcare information services for patients, physicians and caregivers in the fields of health care, nutrition, disease processes, self-guided health care treatment and self-guided disease management, development and supervision of rehabilitation and preventative cardiovascular programs for administration of health care by individual patients<br><br>Series of publications in the nature of newsletters, instructional teaching manuals in a series to be updated regularly, workbooks, and pamphlets, in the field of healthcare management | **PENDING**<br>App. Date 06/09/2004<br><br>Need to submit a certified copy of corresponding U.S. Registration upon issuance. U.S. application was published: 09/10/2008 |
| **SUPPORTING HEALTHY OUTCOMES**<br>Serial No. 1220465<br>Reg. No.: TMA703406 | Canada | Electronic data communication services for a personal health network, namely, electronic transmission of messages, data, and documents relating to medical histories, health histories, medical records, health information, medical information, health status of patients, healthcare information and records, nutrition, disease processes, healthcare treatment, disease treatment, and/or<br><br>Series of publications in the nature of newsletters, instructional teaching manuals in a series to be updated regularly, workbooks, and pamphlets, in the field of health care management | **REGISTERED**<br>Filed: 06/15/2004<br>Registered: 12/18/2007<br>**Renewal Due: 12/18/2022** |

| **LIFEMASTERS**<br>Serial No. 1220460<br>Reg. No. TMA691320 | Canada | disease management, via telephone, facsimile, the Internet and a computer network; electronic processing of messages and data related to medical histories, health histories, medical records, health information, medical information, health status of patients, healthcare information and records, nutrition, disease processes, healthcare treatment, disease treatment, and/or disease management, via facsimile transmission, telegram transmission, the Internet and a computer network; electronic storage of medical histories, health histories, medical records, health information, medical information, health status of patients, information and records related to the healthcare, nutrition, disease processes, health care treatment, disease treatment, and/or disease management, electronic voice message services, namely, the recordal, storage and subsequent delivery of voice messages by telephone; electronic mail services; educational services, namely, conducting classes, seminars, conferences and workshops and providing one-on-one instructions in the field of health care for educating patients, physicians and caregivers about healthcare, nutrition, disease processes, self-guided healthcare treatment and self-guided disease treatment; health information services, namely, generating and maintaining files and personal medical history records for patients and healthcare providers; health monitoring services by which health care professionals can monitor and track through remote and non-remote means the current health status of patients; providing healthcare information services for patients, physicians and caregivers in the fields of healthcare, nutrition, disease processes, self-guided health care treatment and self-guided disease management; development and supervision of rehabilitation and preventative cardiovascular programs for administration of health care by individual patients<br><br>Series of publications in the nature of newsletters, instructional teaching manuals in a series to be updated regularly, workbooks and pamphlets in the field of healthcare management.<br><br>Electronic data communication services for a personal health network, namely, electronic processing and transmission of messages and data; electronic data communication services for a | REGISTERED<br>Filed: 06/17/2004<br>Registered: 07/04/2007<br>Renewal Due: 07/04/2022 |

| | | |
|---|---|---|
| **PARTNERS FOR LIFE**<br>Serial No.: 003878345<br>Reg. No.: 003878345 | European<br>Community[1] | personal health network, namely, electronic collection and storage of messages and data; educational services, namely, conducting classes, seminars, conferences and workshops and providing one-on-one instructions in the field of health care for educating patients, physicians and caregivers about healthcare, nutrition, disease processes, self-guided healthcare treatment and self-guided disease treatment; health information services, namely, generating and maintaining files and personal medical history records for patients and healthcare providers; health monitoring services by which health care professionals can monitor and track through remote and non-remote means the current health status of patients; providing healthcare information services for patients, physicians and caregivers in the fields of healthcare, nutrition, disease processes, self-guided health care treatment and self-guided disease management; development and supervision of rehabilitation and preventative cardiovascular programs for administration of health care by individual patients<br><br>**CLASS: 16:** Series of publications in the nature of newsletters, instructional teaching manuals in a series to be updated regularly, workbooks, and pamphlets, in the field of healthcare management;<br>**CLASS: 41:** Educational services, namely conducting classes, seminars, conferences and workshops and providing one to one instructions in the field of health care for educating patients, physicians and caregivers about healthcare, nutrition, disease processes, self guided healthcare treatment and self-guided disease treatment; and<br>**CLASS: 42:** Health information services, namely, generating and maintaining files and personal medical history records for patients and healthcare providers; health monitoring services by which health care professionals can monitor and track through | REGISTERED<br>Filed: 06/09/2004<br>Registered: 01/20/2006<br>Renewal Due: 06/09/2014 |

---

[1] European Community Trademark Countries: Austria, Benelux (Belgium, The Netherlands & Luxembourg,) Denmark, Finland, France, Germany, Greece, Ireland, Italy, Portugal, Spain, Sweden, United Kingdom, Cyprus, The Czech Republic, Estonia, Hungary, Latvia, Lithuania, Malta, Poland, Slovakia, and Slovenia

11

| SUPPORTING HEALTHY OUTCOMES Serial No. 003898863 | European Community[1] | ABANDONED App. Date 06/17/2004 |
|---|---|---|
| | | remote and non-remote means the current health status of patients; providing healthcare information services for patients, physicians and caregivers in the fields of healthcare, nutrition, disease processes, self-guided health care treatment and self-guided disease management; development and supervision of rehabilitation and preventative cardiovascular programs for administration of health care by individual patients |

**CLASS: 16**
Series of publications in the nature of newsletters, instructional (teaching manuals in a series to be updated regularly, workbooks, and pamphlets, in the field of health care management

**CLASS: 38**
Electronic data communication services for a personal health network, namely, electronic processing and transmission of messages and data

**CLASS: 39**
Electronic data communication services for a personal health network, namely, electronic collection and storage of messages and data

**CLASS: 41**
Educational services, namely, conducting classes, seminars, conferences and workshops and providing one-to-one instructions in the field of health care for educating patients, physicians and caregivers about healthcare, nutrition, disease processes, self-guided healthcare treatment and self-guided disease treatment

**CLASS: 42**
Health information services, namely, generating and maintaining files and personal medical history records for patients and healthcare providers; health monitoring services by which health care professionals can monitor and track through remote and non-remote means the current health status of patients; providing healthcare information services for patients, physicians and caregivers in the fields of health care, nutrition, disease processes, self-guided health care treatment and self-guided disease management; development and supervision of rehabilitation and preventative cardiovascular programs for administration of health care by individual patients

12

| | | | REGISTERED Filed: 06/17/2004 Registered: 10/20/2005 Renewal Due: 06/17/2014 |
|---|---|---|---|
| **LIFEMASTERS** Serial No. 003898871 Reg. No. 003898871 | European Community[1] | | CLASS: 16: series of publications in the nature of newsletters, instructional teaching manuals in a series to be updated regularly, workbooks and pamphlets, in the field of healthcare management; CLASS: 38: electronic data communication services for a personal health network, namely, electronic processing and transmission of messages and data; CLASS: 39: electronic data communication services for a personal health network, namely, electronic collection and storage of messages and data; CLASS: 41: educational services, namely, conducting classes, seminars, conferences and workshops and providing one-on-one instructions in the field of health care for educating patients, physicians and caregivers about healthcare, nutrition, disease processes, self-guided healthcare treatment and self-guided disease treatment; and CLASS: 42: health information services, namely, generating and maintaining files and personal medical history records for patients and healthcare providers; health monitoring services by which health care professionals can monitor and track through remote and non-remote means the current health status of patients; providing healthcare information services for patients, physicians and caregivers in the field of healthcare, nutrition, disease processes, self-guided health care treatment and self-guided disease management; development and supervision of rehabilitation and preventative cardiovascular programs for administration of healthcare by individual patients |

13

## U.S. COPYRIGHTS

| Title | Type of Item | Claimant | Year | Reg. No. and Date |
|---|---|---|---|---|
| MediSave CHD | Computer program | Medical Scientists, Inc. | 1994 | TX-4-463-604 01/24/1997 |
| Prostate cancer risk assessment program | Computer program | Medical Scientists, Inc. | 1992 | TXu-544-864 11/16/1992 |
| Prostate cancer: risk factors and screening methods | n/a | Medical Scientists, Inc | 1992 | TXu-544-888 11/16/1992 |
| Colorectal risk assessment | Printout | Medical Scientists, Inc | 1993 | TXu-577-492 07/02/1993 |
| SSI presentation | 1 v. | Medical Scientists, Inc | 1993 | TXu-590-910 06/29/1993 |
| Breast cancer early detection program | 1 v. | Medical Scientists, Inc | 1993 | TXu-606-410 11/29/1993 |
| Medical Scientists, Inc. scope of work document for medical information services, November 15, 1993 | 15. p | Medical Scientists, Inc | 1993 | TXu-612-794 11/29/1993 |
| HealthChek diabetes | 54 p. | Medical Scientists, Inc | 2000 | TXu-911-935 12/12/2000 |
| MediSave 4.0 | Computer Program | Medical Scientists, Inc | 2002 | TXu-026-046 03/28/02 |

14

# EXHIBIT "2"

RON BENDER (SBN 143364)
TODD M. ARNOLD (SBN 221868)
JOHN-PATRICK M. FRITZ (SBN 245240)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbrb.com, tma@lnbrb.com, jpf@lnbrb.com

Attorneys for Chapter 11 Debtor
and Debtor in Possession

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

(SANTA ANA DIVISION)

| | |
|---|---|
| In re: | ) Case No. 8:09-bk-19722-ES |
| | ) |
| LIFEMASTERS SUPPORTED SELFCARE, INC., a California corporation, | ) Chapter 11 |
| | ) |
| | ) **NOTICE OF AUCTION SALE OF THE DEBTOR'S ASSETS AND OPPORTUNITY TO OVERBID** |
| Debtor. | ) |
| | ) |
| | ) Auctions Sale: |
| | ) Date: December 14, 2009 |
| | ) Time: 10:30 a.m. |
| | ) Place: Law Offices of LNBRB |
| | ) 10250 Constellation |
| | ) Blvd., Suite 1700 |
| | ) Los Angeles, CA 90067 |
| | ) |

1

PLEASE TAKE NOTICE that pursuant to an order of the Bankruptcy Court, an auction sale (the "Auction Sale") for substantially all of the tangible and intangible assets (excluding cash and accounts receivable), leasehold interests and contract rights owned by LifeMasters Supported SelfCare, Inc., the Chapter 11 debtor and debtor in possession herein (the "Debtor"), will be held on December 14, 2009, commencing at 10:30 a.m. at the law offices of Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB") located at 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067.

The assets to be sold at the Auction Sale free and clear of all liens, claims and interests (defined as the "Acquired Assets") consist of the Debtor's executory contracts and unexpired leases that the winning bidder at the Auction Sale elects to acquire (the "Assumed Contracts"); all of the Debtor's application systems and software necessary to support the Assumed Contracts; all of the Debtor's intellectual property (except for any intellectual property that the winning bidder elects not to take); the Debtor's customer lists, sales pipeline lists and supplier lists and all of the Debtor's records (except for records which the winning bidder determines are not necessary for it to operate the business).

PLEASE TAKE FURTHER NOTICE that pursuant to an order of the Bankruptcy Court, Alere, LLC ("Alere" or "Purchaser"), has been

2

approved as the stalking horse bidder with a cash purchase price of $1.75 million for the Acquired Assets.

In order to be eligible to participate in and to bid at the Auction Sale, by 5:00 p.m. PST on Thursday, December 10, 2009 (the "Bid Deadline"), prospective overbidders must: (A) deliver to George D. Pillari of Alvarez & Marsal Healthcare Industry Group, LLC ("A&M") and to Ron Bender, Esq. of LNBRB the following: (i) a redlined version of the asset purchase agreement entered into between the Debtor and Alere (the "APA") indicating any changes the prospective overbidder wishes to make to the APA; (ii) a schedule of all of the Debtor's executory contracts and unexpired leases that the prospective overbidder wants to have assigned to it and evidence of the prospective overbidder's financial ability to satisfy the "adequate assurance of future performance" requirements of 11 U.S.C. § 365(b)(1)(C) with respect to all such executory contracts and unexpired leases; (iii) a bid that meets the standards of a Qualified Overbid (as defined below) and (iv) evidence of the prospective overbidder's financial ability to pay the minimum overbid required below to consummate its purchase of the Acquired Assets; and (B) deliver the sum of $100,000 in immediately available funds to LNBRB to serve as a deposit. Any prospective overbidder who satisfies all of the requirements set forth in this paragraph will be deemed by A&M to constitute a "Qualified Overbidder."

3

The initial bid at the Auction Sale will be the offer made by Purchaser in the APA. If there are no Qualified Overbidders or if no Qualified Overbidder submits a Qualifying Overbid by the Bid Deadline, Purchaser's bid as contained in the APA will be deemed to be the winning bid and the Auction Sale will be cancelled. In order to constitute a "Qualified Overbid," the initial overbid from a Qualified Overbidder must: (i) be in all cash; (ii) be no less than \$1,850,000; (iii) be irrevocable until the closing of the sale; (iv) be accompanied by a deposit of \$100,000; (v) demonstrate to the Debtor's reasonable satisfaction that the bidder is financially able to consummate the transaction contemplated by such bid; and (vi) contain terms and conditions that, in the aggregate, are not materially more burdensome to the Debtor than the terms and conditions contained in the APA. If at least one Qualified Overbid is submitted, then Purchaser and all Qualified Overbidders will be entitled to participate in the Auction Sale, with minimum subsequent bid increments (beyond the initial overbid) of \$75,000.

If the Court fails to approve the Debtor's sale of the Acquired Assets to Purchaser and instead approves a sale of all or a significant portion of the Acquired Assets to a person or entity other than Purchaser, the Debtor will be required to pay to Purchaser a break-up fee of \$60,000, immediately upon consummation of a transaction with such other person or entity.

4

Following the conclusion of the Auction Sale, LNBRB will promptly return the $100,000 deposits to all qualified bidders except for the winning bidder. The $100,000 deposit of the winning bidder will constitute a non-refundable deposit.

The Auction Sale will continue until the Debtor announces that no further and higher bids have been received. The results of the Auction Sale will be final, and no party will be entitled to make another bid for the Acquired Assets following the conclusion of the Auction Sale. The Debtor will file the results of the Auction Sale with the Court by Tuesday, December 15, 2009.

The hearing for the Court to approve the Debtor's sale of the Acquired Assets to the winning bidder at the Auction Sale will be held at the Court on December 17, 2009, at 10:30 a.m.

The form of APA used by Purchaser can be obtained by making a written request to Steven Kraus of A&M whose email address is as follows: skraus@alvarezandmarsal.com. Any prospective overbidder is required to use the identical form of asset purchase agreement as the APA, or deliver to Mr. Pillari of A&M (whose email address is gpillari@alvarezandmarsal.com) and to Ron Bender, Esq. of LNBRB (whose contact information is set forth in upper, left-hand corner of the first page of this Notice) a red-lined version of a proposed asset purchase

///

///

1  agreement   which   identifies   the   changes   proposed   by   the

2  prospective overbidder.

3  Dated: November __, 2009          LIFEMASTERS SUPPORTED SELFCARE,
                                     INC.

4
                                     */s/ Ron Bender*
5                                    RON BENDER
                                     TODD M. ARNOLD
6                                    JOHN-PATRICK M. FRITZ
                                     LEVENE, NEALE, BENDER, RANKIN
7                                    & BRILL L.L.P.
                                     Attorneys for Chapter 11
8                                    Debtor and Debtor in Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                     6

# EXHIBIT "3"

1    RON BENDER (SBN 143364)
     TODD M. ARNOLD (SBN 221868)
2    JOHN-PATRICK M. FRITZ (SBN 245240)
     LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
3    10250 Constellation Boulevard, Suite 1700
     Los Angeles, California 90067
4    Telephone:  (310) 229-1234
     Facsimile:  (310) 229-1244
5    Email:  rb@lnbrb.com, tma@lnbrb.com, jpf@lnbrb.com

6    Attorneys for Chapter 11 Debtor
     and Debtor in Possession
7

8             UNITED STATES BANKRUPTCY COURT
             CENTRAL DISTRICT OF CALIFORNIA
9                (SANTA ANA DIVISION)

10

11    In re:                        ) Case No. 8:09-bk-19722-ES
                              )
12    LIFEMASTERS       SUPPORTED   ) Chapter 11
     SELFCARE, INC., a California   )
13    corporation,                 )
                              ) **ORDER: (1) APPROVING AUCTION**
14                               ) **SALE FORMAT, BIDDING PROCEDURES**
                  Debtor.        ) **AND STALKING HORSE BID**
15                               ) **PROTECTIONS; (2) APPROVING FORM**
                              ) **OF NOTICE TO BE PROVIDED TO**
16                               ) **INTERESTED PARTIES; (3)**
                              ) **APPROVING FORM OF ASSET**
17                               ) **PURCHASE AGREEMENT FOR**
                              ) **PROSPECTIVE OVERBIDDERS TO USE;**
18                               ) **AND (4) SCHEDULING A COURT**
                              ) **HEARING TO CONSIDER APPROVAL OF**
19                               ) **THE SALE TO THE HIGHEST BIDDER**
                              )
20                               )
                              )
21                               ) Court Scheduled Hearing:
                              ) Date:  [To Be Scheduled]
22                               ) Time:  [To Be Scheduled]
23                               ) Place: Courtroom "5A"
                              )         411 West Fourth Street
24                               )         Santa Ana, CA 92701-4593
                              )
25                               )
                              )
26                               )
                              )
27                               )

28

1    At the above-referenced date, time, and location, the Court
2  held a hearing to consider the motion (the "Bid Procedures
3  Motion") filed by LifeMasters Supported SelfCare, Inc., the
4  Chapter 11 debtor and debtor in possession herein (the
5  "Debtor"), for entry of an order approving various bidding and
6  sale procedures with regard to a pending sale of certain of the
7  Debtor's assets.  Appearances were made at the hearing on the
8  Bid Procedures Motion as set forth on the record of the Court.
9
10   The Court, having considered the Bid Procedures Motion and
11 all pleadings filed by the Debtor in support of the Bid
12 Procedures Motion, any pleadings filed in response to the Bid
13 Procedures Motion, and the statements, arguments and
14 representations of the parties made at the hearing on the Bid
15 Procedures Motion, and good cause appearing,

16   IT IS HEREBY ORDERED AS FOLLOWS:

17   1.   The Debtor's requested auction sale format, bidding
18 procedures and stalking horse bid protections are approved.

19   2.   An auction sale (the "Auction Sale") for the Acquired
20 Assets (as defined in the asset purchase agreement [the "APA"]
21 agreed to by the Debtor and Alere, LLC ["Purchaser"]) shall be
22 held at the law offices of Levene, Neale, Bender, Rankin & Brill
23 L.L.P. ("LNBRB") on Monday, December 14, 2009 commencing at
24 10:30 a.m.

25   3.   In order to be eligible to participate in and to bid
26 at the Auction Sale, by 5:00 p.m. PST on Thursday, December 10,

2

1   2009 (the "Bid Deadline"), prospective overbidders must: (A)

2   deliver to George D. Pillari of Alvarez & Marsal Healthcare

3   Industry Group, LLC ("A&M") and to Ron Bender, Esq. of LNBRB the

4   following: (i) a redlined version of the APA indicating any

5   changes the prospective overbidder wishes to make to the APA;

6   (ii) a schedule of all of the Debtor's executory contracts and

7   unexpired leases that the prospective overbidder wants to have

8   assigned to it and evidence of the prospective overbidder's

9   financial ability to satisfy the "adequate assurance of future

10  performance" requirements of 11 U.S.C. § 365(b)(1)(C) with

11  respect to all such executory contracts and unexpired leases;

12  (iii) a bid that meets the standards of a Qualified Overbid (as

13  defined in paragraph 4 below) and (iv) evidence of the

14  prospective overbidder's financial ability to pay the minimum

15  overbid required in paragraph 4 below to consummate its purchase

16

17  of the Acquired Assets; and (B) deliver the sum of $100,000 in

18  immediately available funds to LNBRB to serve as a deposit. Any

19  prospective overbidder who satisfies all of the requirements set

20  forth in this paragraph 3 will be deemed by A&M to constitute a

21  "Qualified Overbidder."

22      4.   The initial bid at the Auction Sale will be the offer

23  made by Purchaser in the APA. If there are no Qualified

24  Overbidders or if no Qualified Overbidder submits a Qualifying

25  Overbid by the Bid Deadline, Purchaser's bid as contained in the

26  APA will be deemed to be the winning bid and the Auction Sale

27  will be cancelled. In order to constitute a "Qualified

28

                            3

Overbid," the initial overbid from a Qualified Overbidder must: (i) be in all cash; (ii) be no less than $1,850,000; (iii) be irrevocable until the closing of the sale; (iv) be accompanied by a deposit of $100,000; (v) demonstrate to the Debtor's reasonable satisfaction that the bidder is financially able to consummate the transaction contemplated by such bid; (vi) and contain terms and conditions that, in the aggregate, are not materially more burdensome to the Debtor than the terms and conditions contained in the APA. If at least one Qualified Overbid is submitted, then Purchaser and all Qualified Overbidders will be entitled to participate in the Auction Sale, with minimum subsequent bid increments (beyond the initial overbid) of $75,000.

5.    The break-up fee set forth in the APA is fair and reasonable in the circumstances, and is hereby approved. If the Court fails to approve the Debtor's sale of the Acquired Assets to Purchaser and instead approves a sale of all or a significant portion of the Acquired Assets to a person or entity other than Purchaser, the Debtor will be required to pay to Purchaser (without any further order of the Court) a break-up fee of $60,000, which break-up fee shall have a first priority in and be paid out of the proceeds paid by the winning bidder, and without any further order of the Court the Debtor will return the $100,000 deposit to Purchaser, all immediately upon the consummation of a transaction with such winning bidder.

4

6.    Following the conclusion of the Auction Sale, LNBRB will promptly return the $100,000 deposits to all qualified bidders except for the winning bidder.  The $100,000 deposit of the winning bidder will constitute a non-refundable deposit.

7.    The Auction Sale will continue until the Debtor announces that no further and higher bids have been received. The results of the Auction Sale will be final, and no party will be entitled to make another bid for the Acquired Assets following the conclusion of the Auction Sale.  The Debtor will file the results of the Auction Sale with the Court by Tuesday, December 15, 2009.

8.    The hearing for the Court to approve the Debtor's sale of the Acquired Assets to the winning bidder at the Auction Sale will be held at the Court on December 17, 2009, at 10:30 a.m.

9.    The form of notice attached hereto as Exhibit "A" of the opportunity to overbid at the Auction Sale is approved.  The Debtor shall serve a copy of the notice on all creditors, all shareholders, all parties who have requested special notice, the Office of the United States Trustee, the Purchaser and all known prospective overbidders.

10.   The form of APA used by Purchaser and attached as Exhibit "1" to the Declaration of George D. Pillari annexed to the Bid Procedures Motion is approved, and any prospective overbidder is required to use the identical form of asset purchase agreement as the APA, or deliver to A&M and to LNBRB a

1  red-lined version of a proposed asset purchase agreement which

2  identifies the changes proposed by the prospective overbidder.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| In re:<br>LIFEMASTERS SUPPORTED SELFCARE, INC. | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER 8:09-bk-19722-ES |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067.

A true and correct copy of the foregoing document described as **DEBTOR'S MOTION FOR AN ORDER: (1) APPROVING AUCTION SALE FORMAT, BIDDING PROCEDURES AND STALKING HORSE BID PROTECTIONS; (2) APPROVING FORM OF NOTICE TO BE PROVIDED TO INTERESTED PARTIES; (3) APPROVING FORM OF ASSET PURCHASE AGREEMENT FOR PROSPECTIVE OVERBIDDERS TO USE; AND (4) SCHEDULING A COURT HEARING TO CONSIDER APPROVAL OF THE SALE TO THE HIGHEST BIDDER; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF GEORGE D. PILLARI IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On November 11, 2009, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Todd M Arnold    tma@lnbrb.com
- Catherine E Bauer    Catherine.Bauer@usdoj.gov
- Ron Bender    rb@lnbrb.com
- Eugene Chang    echang@steinlubin.com
- Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
- Gerald P Kennedy    gpk@procopio.com
- Julie E Oelsner    joelsner@weintraub.com
- James R Selth    jim@wsrlaw.net
- Matthew J Troy    matthew.troy@usdoj.gov
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On November 11, 2009, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

Service by Overnight Mail
The Hon. Erithe A. Smith
United States Bankruptcy Court
411 West Fourth Street
Santa Ana, CA 92701

ALL THE ATTACHED SERVICE LISTS WERE SERVED BY U.S. MAIL

☒ Service information continued on attached page

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                    **F 9013-3.1**

| In re:                                      | CHAPTER 11 |
|---------------------------------------------|------------|
| LIFEMASTERS SUPPORTED SELFCARE, INC.        |            |
|                                 Debtor(s).  | CASE NUMBER 8:09-bk-19722-ES |

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2009 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| November 11, 2009 | Lourdes Cruz | | /s/ Lourdes Cruz |
|-------------------|--------------|--|------------------|
| Date              | Type Name    | | Signature        |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                              **F 9013-3.1**

LifeMasters Supported SelfCare, Inc.    SERVICE BY U.S. MAIL
RSN
File No. 4427


LifeMasters Supported SelfCare, Inc.    Catherine E. Bauer                RSN-Counsel for 11 Fortune Park, L.P.
15635 Alton Parkway, Suite 400          Nancy S Goldenberg                Christine D. Lynch
Irvine, CA 92618                        U.S. Trustee - Santa Ana          Goulston & Storrs, P.C.
                                        411 West Fourth Street, Suite 9041    400 Atlantic Avenue
                                        Santa Ana, CA 92701-8000          Boston, MA 02110


RSN                                     RSN-Counsel for Callahan-Pentz Prop.    Counsel for Alere, LLC
IBM Corporation                         Eugene K. Chang                   Kenneth S. Leonetti
Attn: Vicky Namken                      Stein & Lubin LLP                 FOLEY HOAG LLP
13800 Diplomat Dr.                      Transamerica Pyramid              Seaport World Trade Center West
Dallas, TX 75234                        600 Montgomery Street, 14th Floor    155 Seaport Boulevard, Boston
                                        San Francisco, CA 94111           Massachusetts 02210

LifeMasters Supported SelfCare, Inc.
20 Largest
File No. 4427

LifeMasters Supported SelfCare, Inc.
15635 Alton Parkway, Suite 400
Irvine, CA 92618

Catherine E. Bauer
Nancy S Goldenberg
U.S. Trustee - Santa Ana
411 West Fourth Street, Suite 9041
Santa Ana, CA 92701-8000

Aetna Health Management, LLC
980 Jolly Road, Mailstop U2lL
Blue Bell, PA 19422

American Diagnostic Corp.    ADC
55 Commerce Drive
Hauppauge, NY 11788

AmeriChoice Health Services
333 N. Alabama St, Suite 350
Indianapolis, IN 46204

Centers for Medicare & Medicaid  CMS
7500 Security Boulevard
Baltimore, MD 21244-1850

CHANNING L. BETE CO., INC.
PO BOX 84-5897
BOSTON, MA 02284-5897

Chinese Community Health Plan
445 Grant Ave, Suite 700
San Francisco, CA 94108

CIT Technology Financing Services, Inc.
23896 Network Place
Chicago, IL 60673-1238

DOME Printing
340 Commerce Circle
Sacramento, CA 95815

Duquesne Litho Inc.
350 Presto-Sygan Road
Bridgeville, PA 15017

Faria Printing & Graphics
1812 Tribute Road
Sacramento, CA 95815

Cenveo San Francisco
P.O. Box 31001-1187
Pasadena, CA 91110-1187

Heeter Direct
441 Technology Drive
Canonsburg, PA 15317

INGENIX
P O Box 271256
Salt Lake City, UT 84127-1256

New Mexico Taxation & Revenue Dept
P O Box 25127
Santa Fe, NM 87504-5127

Kieckhafer,Schiffer & Company LLP
6201 Oak Canyon Drive
Irvine, CA 92618

Nice Systems, Inc
PO Box 9421
Uniondale, NY 11555-9421

R Systems
5000 Windplay Drive, Suite 5
El Dorado Hills, CA 95762

State Teachers Retirement System of Ohio
275 E. Broad Street
Columbus, OH 43215

THE NETWORK GUYS
39355 California St.
FREEMONT, CA 94538

The Wackenhut Corporation
4200 Wackenhut Drive, Suite 100
Palm Beach Gardens, FL 33410