RON BENDER (SBN 143364)
TODD M. ARNOLD (SBN 221868)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  rb@lnbrb.com, tma@lnbrb.com
Attorneys for Chapter 11 Debtor and Debtor in Possession

DAREN R. BRINKMAN (SBN 158698)
LAURA PORTILLO (SBN 186813)
KEVIN C. RONK (SBN 241598)
BRINKMAN PORTILLO RONK, PC
4333 Park Terrace Drive, Suite 205
Westlake Village, CA 91361
Telephone: (818) 597-2992
Facsimile: (818) 597-2998
Attorneys for the Official Committee of Unsecured Creditors

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>LIFEMASTERS SUPPORTED SELFCARE, INC.,<br><br>                    Debtor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 8:09-bk-19722-ES<br><br>Chapter 11<br><br>**FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**<br><br><u>Disclosure Statement Hearing</u>**:**<br>Date:  June 8, 2010<br>Time:  10:30 a.m.<br><br><u>Plan Confirmation Hearing</u>**:**<br>Date:  [To Be Scheduled]<br>Time:  [To Be Scheduled]<br><br>Place:  Courtroom "5A"<br>           411 West Fourth Street<br>           Santa Ana, CA 92701 |

1

## I.    INTRODUCTION

LifeMasters Supported SelfCare, Inc. (the "Debtor"), the debtor and debtor in possession in the above-referenced case, commenced its bankruptcy case by filing a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") on September 14, 2009 (the "Petition Date").  The Debtor is operating its bankruptcy estate and managing its financial affairs as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

Chapter 11 allows the Debtor, and, under some circumstances, creditors and other parties in interest, to propose a plan of reorganization.  A plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling the assets of its estate, or a combination of both.  The Debtor and the Official Committee of Unsecured Creditors (the "Committee") are the parties who are jointly proposing the First Amended Joint Chapter 11 Plan of Reorganization (the "Plan") sent to you in the same envelope as this document.  THE DOCUMENT YOU ARE READING IS THE FIRST AMENDED DISCLOSURE STATEMENT FOR THE PLAN.

The Plan is a liquidating plan.  In other words, the Debtor and the Committee (collectively referred to herein as the "Plan Proponents") seek to accomplish payments to creditors under the Plan by liquidating all of the Debtor's remaining assets, if any, and distributing the proceeds from the liquidation of those assets coupled with the proceeds from the prior sale of substantially all of the Debtor's assets and the Debtor's remaining cash on hand in accordance with the priorities set forth in the Bankruptcy Code.  The effective date of the Plan (the "Effective Date") will be the first business day which is at least fifteen days following the date of entry of the Court order confirming the Plan (the "Plan Confirmation Order") when and provided that all of the following conditions to the effectiveness of the Plan

have been satisfied or waived by the Plan Proponents: (a) there shall not be any stay in effect with respect to the Plan Confirmation Order; (b) the Plan Confirmation Order shall not be subject to any appeal or rehearing; and (c) the Plan and all documents, instruments and agreements to be executed in connection with the Plan shall have been executed and delivered by all parties to such documents, instruments and agreements.   The Debtor following the Effective Date shall be controlled by the Post-Confirmation Committee.  The Plan Proponents shall, in their sole and absolute discretion, have the right to waive any or all of the conditions set forth above to the effectiveness of the Plan.  If the Plan Proponents do so and accelerate the effectiveness of the Plan, the Plan Proponents shall file a notice with the Court identifying the Effective Date of the Plan.

**A.     Purpose of this Document**

This Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

**(1)     WHO CAN VOTE OR OBJECT**,

**(2)     WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed) AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION**,

**(3)     THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING ITS BANKRUPTCY,**

**(4)     WHAT THINGS THE BANKRUPTCY COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,**

**(5)      WHAT IS THE EFFECT OF CONFIRMATION, AND**

**(6)      WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights.  You are strongly encouraged to consult your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as this Disclosure Statement.  If there are any inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing sufficient information to enable parties affected by the Plan to make an informed judgment about the Plan.  Any party can now solicit votes for or against the Plan.

**B.      Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.   HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

**1.      Time and Place of the Confirmation Hearing**

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan (the "Plan Confirmation Hearing") will take place on <u>June 8</u>, 2010, at <u>10:00</u> a.m, before the Honorable Erithe Smith, United States Bankruptcy Judge for the Central District of California, in Courtroom "5A" located at 411 West Fourth Street, Santa Ana,

California.

### 2.     Deadline For Voting For or Against the Plan

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot to Todd M. Arnold, Esq., Levene, Neale, Bender, Rankin & Brill L.L.P. ("LNBRB"), 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067; Facsimile (310) 229-1244.

Your ballot must be received by 5:00 p.m. PST on _____, 2010 or it will not be counted.

### 3.     Deadline for Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court and served upon the following by 5:00 p.m. PST on _____, 2010:

Ron Bender, Esq./Todd M. Arnold, Esq.
Levene, Neale, Bender, Rankin & Brill L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Facsimile: (310) 229-1244

and

Daren R. Brinkman, Esq./Laura Portillo, Esq.
Brinkman Portillo Ronk, PC
4333 Park Terrace Drive, Suite 205
Westlake Village, CA 91361
Facsimile: (818) 597-2998

### 4.     Identity of Persons to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact counsel to the Debtor as follows:

Ron Bender, Esq./Todd M. Arnold, Esq.
Levene, Neale, Bender, Rankin & Brill L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244

or counsel to the Committee as follows:

Daren R. Brinkman, Esq./Laura Portillo, Esq.
Brinkman Portillo Ronk, PC
4333 Park Terrace Drive, Suite 205
Westlake Village, CA 91361
Telephone: (818) 597-2992
Facsimile: (818) 597-2998

**C.    Disclaimer**

The financial data relied upon in formulating the Plan is based on the Debtor's books and records which, unless otherwise indicated, are unaudited. The information contained in this Disclosure Statement is provided by the Debtor. The Debtor represents that everything stated in this Disclosure Statement is true to the Debtor's best knowledge. The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

**II. BACKGROUND**

**A.    Description and History of the Debtor's Business, Case Background and Necessity for Filing Chapter 11**

The Debtor is a privately held company which was founded in 1994. The Debtor was headquartered in Irvine, California, and also had offices located in Cupertino, California, South San Francisco, California, Rancho Cordova, California, Albuquerque, New Mexico, Indianapolis, Indiana, and San Antonio, Texas.

The Debtor had total revenue in 2008 of approximately $80 million. With the exception of certain equipment lessors and sellers, the Debtor does not have any known secured creditors.

The Debtor is not aware of any entity that asserts a lien against the Debtor's cash collateral. Prior to the recent closing of the sale of the Debtor's business (described in detail below), the Debtor had approximately 200 employees.  Additional information about the Debtor's business can be obtained from the Debtor's website - www.lifemasters.com.

The Debtor was a national disease management company whose mission was to help its many thousands of participants achieve and maintain optimal health by closing the gaps in medical care and encourage the adoption of healthy lifestyles.  With more than a decade of experience, the Debtor was an expert at delivering disease management services to individuals with chronic diseases such as diabetes, cardiovascular disease, respiratory disease, musculoskeletal conditions and their co-morbidities.

The Debtor's health professionals coached and educated participants over the phone, teaching them how to monitor their vital signs and symptoms, and ultimately take more responsibility for their health.  The Debtor involved the participant's physicians by providing them with relevant medical information between office visits to prevent unnecessary complications.  This often resulted in participants establishing a better relationship with their physicians and helping them avoid unnecessary hospitalizations and emergency room visits, reducing total costs to payors.

The Debtor worked with some of the nation's leading health plans, employers, retirement systems and governmental organizations, which purchased the Debtor's services in an effort to reduce costs and enhance care.  Historically, approximately 30% of the Debtor's gross revenue was derived from its contracts with the Center for Medicare and Medicaid Services ("CMS"), which administers a number of Medicare and Medicaid programs.

In or about October, 2006, the Debtor requested early termination of its contracts with CMS for a demonstration project in Oklahoma due to a range of significant program problems

7

and irregularities, rendering it impossible for the Debtor to satisfy the financial risk terms of the cooperative agreements. CMS accepted Debtor's request to terminate the Oklahoma Contract. In or about June, 2009, CMS cancelled a different contract with the Debtor for a demonstration program involving participants located in Florida. In conjunction with canceling the foregoing contracts, CMS sought to recover all amounts previously paid to the Debtor, which amounts to an aggregate of approximately $106 million.

The cancellation of the CMS contracts coupled with the cancellation of contracts by other customers caused a precipitous decrease in the Debtor's annual revenue by over 50% during 2009. The combination of this loss of revenue coupled with the claim asserted by CMS against the Debtor to recover all amounts previously paid to the Debtor made it clear to the Debtor's Board of Directors that an expeditious financial restructuring was going to be necessary.

Given the complexity of the Debtor's business and the dire circumstances facing the Debtor, the Board quickly concluded that the Debtor was in serious and immediate need of a highly skilled financial advisor to advise the Debtor. The Board interviewed a number of candidates and concluded that Alvarez & Marsal Healthcare Industry Group, LLC ("A&M") was the optimal choice.

Beginning on June 10, 2009 and continuing through the Petition Date, A&M served as the restructuring advisors to the Debtor. During this period, several professionals of A&M, including George Pillari, Brian Buchanan and Steven Kraus, devoted substantial amounts of time and effort working with the Board and the Debtor's senior management to, among other things, assist in the development of projections, assist in cash management activities, assist in the preparation of a liquidation analysis, assist in the development and implementation of a business plan, and assist in the dramatic scale down of the Debtor's business operations and

8

labor force, which was critically necessary to preserve the Debtor's cash reserves given the termination of the CMS and other contracts.

After consummating a substantial scale down of the Debtor's business operations and labor force, the Board concluded that the Debtor needed a chapter 11 bankruptcy filing as the vehicle by which the Debtor's business could either be sold or restructured through a confirmed plan of reorganization. The Debtor therefore filed a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date of September 14, 2009.

**B.      The Present Status of the Debtor's Chapter 11 Case.**

The Board determined that the Debtor's pre-petition management team was not qualified to take the Debtor through a chapter 11 bankruptcy process. None of them had experience in managing a financially distressed company (in or out of bankruptcy), and none of them had any experience or qualifications to manage an asset sale process or to formulate a chapter 11 plan of reorganization.

The Board therefore requested A&M, which is one of the nation's leading crisis management companies (as well as financial advisors), to agree to manage the Debtor through the entire bankruptcy process. Specifically, the Board requested George Pillari, a managing director of A&M, to serve as the Debtor's President and for Brian Buchanan, a director of A&M, to serve as the Debtor's Chief Financial Officer. The Board also requested A&M to provide such additional personnel as A&M determined were necessary to enable the Debtor to pursue the path that would maximize the recovery for the Debtor's creditors, whether that path consisted of a going concern asset sale, a restructuring under a confirmed plan of reorganization, or a liquidation of the Debtor's business.

Since the Petition Date, Mr. Pillari, Mr. Buchanan and Steven Kraus of A&M, who is serving as the Debtor's controller, effectively served as the entire senior management team of

the Debtor.  During their tenure as senior management of the Debtor, A&M provided, among others, the following critically important benefits to the Debtor:

i.      A&M initiated and managed the Debtor's data center migration plan, which was a core component of the Debtor's business as a disease management company.  The data center migration, coordinated and implemented by A&M, resulted in substantial monetary savings and economic efficiencies for the Debtor.  Moreover, with the Debtor's disparate technologies consolidated into co-location facilities, the Debtor was able to relieve itself of more than $3.0 million of annual rent expense for office space that previously housed the equipment.

ii.      A&M further economized the Debtor's business operations by substantially reducing the size of the Debtor's work force from the more than 400 employees at the time of A&M's engagement, making the Debtor a more efficient and competitive entity in the healthcare management industry and helping the Debtor to preserve its cash resources.

iii.      A&M analyzed all of the Debtor's executory contracts and unexpired leases, determined which ones needed to be rejected at the early stage of this case, and coordinated the rejection of certain executory contracts and unexpired leases and negotiated settlements of certain of their respective rejection damage claims.

iv.      A&M successfully persuaded the Debtor's key employees to remain with the Debtor, which was a difficult task given the uncertainty created by the Debtor's bankruptcy filing.  Retaining those employees helped to preserve the Debtor's going-concern value and enabled the Debtor to avoid the expense, inefficiency, knowledge loss and business disruption of having to hire and train new personnel.

v.      A&M interfaced with the Board and LNBRB and served as the point for receiving and disseminating all important information to the Board, LNBRB and prospective buyers and equity sponsors of a plan of reorganization.

vi.    Mr. Pillari and Mr. Buchanan (who have served as the Debtor's President and Chief Financial Officer since the inception of the Debtor's bankruptcy case) were instrumental in the daily operations of the Debtor's business and restructuring, at all times seeking to implement a business plan to maintain the Debtor's cash balances and facilitate a prompt sale of the Debtor's business or the confirmation of a plan of reorganization.  In their capacities as the Debtor's two senior officers, Mr. Pillari and Mr. Buchanan have made crucial business decisions for the Debtor regarding human resources, real estate leases, executory contracts, cash flow preservation, and dealing with vendors and creditors.

vii.    Throughout this case, A&M has prepared detailed and continuous cash flow projections, liquidation analyses, asset sale analysis and going concern/plan restructuring analyses, to enable the Board to determine the optimal exit strategy for this case to maximize the recovery for the Debtor's creditors.

At the direction of the Board, A&M developed an asset sale and business reorganization strategy for the Debtor.  Ultimately, the Board (on A&M's advice) concluded that pursuing a going concern asset sale strategy was the best way to maximize the recovery for the Debtor's creditors.

Rather than have the Debtor's estate incur the cost of employing an investment banker, A&M agreed to handle this role for the Debtor at no additional charge.  A&M facilitated the entire asset sale process.  During this process, A&M met with and facilitated the due diligence efforts of a number of prospective buyers.  This included meetings or telephone conferences with more than 30 prospective buyers, educating them on the Debtor's business, facilitating extensive due diligence by numerous prospective buyers, negotiating asset sale terms, assisting in the documentation of asset sale agreements, and working with buyers in the preparation of the numerous and detailed exhibits to the asset sale agreements.

11

Less than two months after the Petition Date, A&M successfully navigated the Debtor's going concern sale process to the point of where the Debtor had fully negotiated and written asset purchase agreements with two different buyers.  The best stalking bid offer the Debtor received was from a buyer named Alere, LLC ("Alere"), which is a company already engaged in the same business as the Debtor and an affiliate of Inverness Medical Innovations, Inc., a publicly-traded medical diagnostic testing and health management company.  Alere offered to acquire, for a cash purchase price of $1.75 million, the Debtor's business (but excluding the Debtor's substantial cash and outstanding accounts receivable).

The Debtor executed an asset purchase agreement with Alere on November 2, 2009.  The agreement with Alere was negotiated in good faith, arms-length negotiations, including exchanges of multiple drafts of asset purchase agreements between the Debtor and Alere (as well as concurrent exchanges of drafts of asset purchase agreements with another interested buyer).  After numerous rounds of concurrent negotiations with both potential buyers (as well as oral conversations with numerous other prospective buyers), the Debtor determined in the exercise of its sound business judgment that the $1.75 million cash proposal made by Alere was the best available offer the Debtor had received, and established a reasonable and viable floor for an auction sale of those assets.

The Debtor does not have any known, valid secured debt, and, as of October 31, 2009, the Debtor had approximately $7,384,000 of cash and approximately $4,443,000 of outstanding accounts receivable.  After taking into account the fact that the Debtor was retaining all of its cash and accounts receivable, the addition of the sale proceeds was expected to result in remaining cash of $8-$10 million in the Debtor's estate.

In consultation with A&M, the Debtor concluded that it was significantly better off having a binding agreement with a stalking horse bidder and then seeking overbids, if any, in

an auction format, than it would be to proceed to an auction sale with no stalking horse bidder in place. Also in consultation with A&M, the Debtor concluded that Alere was the ideal stalking horse bidder given that Alere is a large, well-known company in the same industry as the Debtor and is an affiliate of a large public company. The sale agreement that Alere executed was straight-forward, and Alere agreed to a break-up fee if it was not the winning bidder for the Debtor's assets at the auction of $60,000 (without any additional expense reimbursement), which equates to approximately 3% of Alere's $1.75 million purchase price. The Debtor believed that this was an extremely reasonable break-up fee and a relatively small price for the Debtor to pay in exchange for having a guaranteed buyer at the auction sale. The Debtor also concluded that a break-up fee of $60,000 would not dissuade other interested parties from bidding at the auction sale or otherwise serve to chill the bidding for the Debtor's assets in any way.

In fact, as set forth in the sale agreement with Alere, given that the initial overbid was required to be at least $100,000 higher than Alere's stalking horse bid and each subsequent bid thereafter was required to be at least $75,000 higher than the preceding bid, Alere would not have any bidding advantage at the auction sale resulting from its break-up fee because each bid made at the auction sale would provide the Debtor's estate with a better net result than the previously submitted bid even after taking into account the payment of the break-up fee to Alere if Alere was not the winning bidder at the auction sale.

The primary assets sought to be sold by the Debtor at the auction sale consisted of the Debtor's executory contracts and unexpired leases; the Debtor's application systems and software; the Debtor's intellectual property; the Debtor's customer lists, sales pipeline lists and supplier lists; and the Debtor's records. One of the complexities in negotiating and documenting the Alere sale agreement had to do with addressing and dealing with the various

13

performance commitments or guarantees the Debtor had in certain of its executory contracts with customers.

The auction sale was scheduled to take place on December 14, 2009. In order to be eligible to participate in and to bid at the auction sale, by December 10, 2009, prospective overbidders were required to (i) deliver a proposed form of asset purchase agreement to the Debtor redlined against the version agreed to by Alere; (ii) provide evidence of the overbidder's financial ability to close the transaction; and (iii) deliver to the Debtor a $100,000 deposit to match the deposit provided by Alere.

At a hearing held on November 17, 2009, the Court approved Alere as the stalking horse bidder and approved the Debtor's proposed bidding procedures, including having the auction sale take place on December 14, 2009 at LNBRB's offices in Los Angeles.

The auction sale proceeded as scheduled on December 14, 2009. A total of three financially qualified buyers appeared at the auction sale, consisting of the Court approved stalking horse bidder Alere, The StayWell Company ("StayWell"), and VantagePoint Venture Partners 2006 (Q), L.P.

The initial bid of $1.75 million submitted by Alere was the Court approved stalking horse bid. Six overbids were submitted to the Alere stalking horse bid. The winning bid was submitted by StayWell in the amount of $2,225,000. The auction sale process implemented by the Debtor was very successful, resulting in increasing the purchase price paid for the Debtor's assets by $475,000 or approximately 27%.

At the sale hearing held on December 17, 2009, the Court approved the Debtor's sale of assets to StayWell in accordance with the terms of the asset purchase agreement entered into between the Debtor and StayWell and the related sale order. The Debtor's sale of assets to StayWell closed on or about December 31, 2009 as planned.

**C.    Significant Events During the Bankruptcy**

The following is a list of significant events which have occurred during this case:

**1.    Operational Issues.**

        i.    <u>Emergency Motion to Pay the Debtor's Pre-Petition Priority
Wages.</u>

At the commencement of this case, the Debtor filed an emergency motion for authority to pay the Debtor's pre-petition priority wages and related benefits in the ordinary course of business to avoid the disruption to the Debtor's business from failing to do so.  The Court granted the Debtor's emergency wage motion at a hearing held on September 18, 2009.

        ii.    <u>Emergency Motion to Provide Adequate Assurance of Payment
to the Debtor's Utilities.</u>

At the commencement of this case, the Debtor filed an emergency motion for an order authorizing the Debtor to provide adequate assurance of future payment to certain utility companies pursuant to Section 366(c) of the Bankruptcy Code.  The Court granted the Debtor's emergency utilities motion at a hearing held on September 18, 2009.

        iii.    <u>Emergency Motion to Continue to Use the Debtor's Cash
Management System.</u>

At the commencement of this case, the Debtor filed an emergency motion for authority to continue using the Debtor's cash management system.  The Court granted the Debtor's emergency cash management motion at a hearing held on September 18, 2009.

        iv.    <u>Unexpired Lease and Executory Contract Motions and
Agreements.</u>

Throughout this case, the Debtor has negotiated numerous resolutions with the Debtor's various landlords, all of which have been approved by the Court.  The Debtor has also filed

numerous motions to reject various unexpired leases and executory contracts, all of which have

been approved by the Court.

### 2.    Administrative Matters.

The Debtor was required to address the various administrative matters attendant to the

commencement of this bankruptcy case, which required an extensive amount of work by

LNBRB and the Debtor's employees.  These matters included the preparation of the Debtor's

Schedules of Assets and Liabilities and Statements of Financial Affairs, and the preparation of

the materials required by the Office of the United States Trustee (the "OUST"), including,

without limitation, the 7-Day Package for the Debtor.  The Debtor has made every effort to

comply with its duties under 11 U.S.C. Sections 521, 1106 and 1107 and all applicable OUST

guidelines, including the filing of the Debtor's monthly operating reports with the OUST.  The

Debtor also attended its initial interview with the OUST, and the meeting of creditors required

under 11 U.S.C. § 341(a), as well as the Court ordered case status conferences.  The Debtor has

also obtained and provided notice of the claims bar date in this case.  The Debtor also prepared

and filed its various insider compensation forms.

### 3.    Formation of the Committee.

On December 14, 2009, the OUST appointed the Committee to represent the interests of

the unsecured creditors in this case.  The Committee is comprised of three unsecured creditors

consisting of Tension Envelope, Inc., DOME Printing and Heeter Direct.

### 4.    Employment of Professionals.

The Debtor has employed LNBRB as bankruptcy counsel and A&M as crises managers.

The Debtor has also employed Patton Boggs LLP as special healthcare counsel and Lucy W.

Reckseit as the Debtor's general counsel. The Committee employed Brinkman Portillo Ronk

16

("BPR"), PC as bankruptcy counsel.  The Debtor intends to employ Deloitte, LLP ("Deloitte") as its accountants to prepare and file tax returns.

### 5.     The Sale Process.

A detailed summary of the Debtor's sale process is provided above.  As indicated above, the Debtor consummated a sale of its business on or about December 31, 2009.

### 6.     Status of Estate Funds.

Assuming a Plan Effective Date of August 2, 2010, the Debtor projects having a remaining balance of cash ("Estate Funds") available for distribution to general unsecured creditors of approximately $10 million.  This sum will be reduced by any interim fees and expenses which are paid to professionals employed in this case, but that would also reduce the amount of any such fees and expenses to paid following confirmation of the Plan.

### 7.     Legal Proceedings Against CMS

As explained above, the Debtor believes that CMS wrongfully terminated and/or breached its contracts with the Debtor.  CMS has asserted two claims against the Debtor's estate in the total approximate amount of $108 million.  There are a total of approximately $6.5 million of other general unsecured claims.  As a result, if the claims of CMS are not otherwise reduced or eliminated, CMS holds approximately 94% of the total general unsecured debt in this case and would therefore receive almost all of the Estate Funds.  As discussed below, the Debtor also believes that, due to the Debtor's transfer of funds into, and CMS's withdraw of funds from, escrow accounts, despite CMS's wrongful termination and/or breach of contracts with the Debtor, CMS may be obligated to return such funds to the Debtor's estate, as the transfer of such funds constitute fraudulent and/or preferential transfers.  The Debtor and the

Committee have filed or are in the process of filing a complaint against Defendants[1] seeking, among other things, to eliminate or subordinate the CMS claims and to recover funds previously paid into or out of escrow accounts for the benefit of the Defendants. The following is a summary of the lawsuit. The entirety of the claims and recoveries sought in the complaint can be ascertained from reviewing the complaint which is or soon will be on file with the Court. The following is a summary for informational purposes only and is not to be deemed a statement of all bases for claims against the Defendants, all claims against the Defendants, or all recovery sought against the Defendants.

The full basis for the claims asserted by CMS is unknown to the Debtor and cannot be ascertained without an accounting of the data and methodology underlying the calculation of the claims. The Debtor believes that it is entitled to an accounting of the data and methodology underlying the calculation of the claims asserted by CMS. The Debtor believes that CMS breached its agreement with the Debtor under the Oklahoma contract as CMS interfered with the Debtor's ability to perform by failing and refusing to provide the Debtor with the data necessary to analyze and evaluate the initial design of the Oklahoma program or the claims and financial experience under the Oklahoma Program. The Debtor also believes that CMS failed to modify and enhance the Oklahoma program where necessary. The Debtor believes that CMS breached the Oklahoma contract when CMS, <u>inter alia</u>, (a) failed to work collaboratively with the Debtor; (b) failed to provide the Debtor with access to the data and books and records from which the results of the Oklahoma program were being determined; (c) failed to provide the Debtor with data that was provided to identically-situated Medicare Health Support

---

[1] The "Defendants" are the United States Department of Health and Human Services, through its Secretary, and its component agency through which it exercises its authority to administer the Medicare and Medicaid programs, CMS, through its Acting Administrator.

("MHS") pilot program companies; (d) failed to modify the Oklahoma contract to require budget neutrality instead of a 5% cost savings as it did for similarly-situated MHS pilot programs, (e) failed to work in good faith with the Debtor during the "Good Faith Period" under the Oklahoma contract; (f) failed to permit the Debtor to invoke the dispute resolution process under the Oklahoma contract; and (g) failed to work in good faith and with fair dealing with the Debtor during the course of the Oklahoma contract.

The Debtor believes that CMS breached its agreement with the Debtor under the Florida contract as CMS interfered with the Debtor's ability to perform by failing and refusing to provide the Debtor with the reports and information necessary to analyze the data and modify and enhance the Florida program where necessary.  The Debtor believes that CMS breached the Florida Contract when CMS, inter alia, (a) failed to provide the Debtor with a final financial reconciliation; (b) failed to provide access to the data and books and records from which the results of the Florida program were being determined; (c) projected very significant three-year cost savings and a significant payment to the Debtor (over and above fees) throughout the early years of the Florida program, then abruptly projected no-net cost savings; and (d) failed to work in good faith and with fair dealing with the Debtor during the course of the Florida contract.

The Debtor also believes that CMS was a creditor of the Debtor during the period commencing ninety (90) days prior to the Petition Date and concluding on the Petition Date (i.e., June 16, 2009 through and including September 14, 2009 (the "Preference Period")). During the Preference Period, the Defendants received the following payments from the Debtor's Oklahoma escrow account (the "Oklahoma Escrow Preference Payments"):

      a.      On or about July 14, 2009 - $207,822.55; and

      b.      On or about August 4, 2009 - $8.71.

During the Preference Period, the Debtor caused the following amounts to be deposited into the Florida escrow account (the "Florida Escrow Preference Deposits"):

    a.    On or about July 1, 2009 - $68,282.96; and

    b.    On or about July 17, 2009 - $80,057.05.

During the Preference Period, the Defendants received the following payment from the Florida escrow account (the "Florida Escrow Preference Payment" and, together with the Oklahoma Escrow Preference Payments and the Florida Escrow Preference Deposits, the "Preferential Transfers"):

    a.    On or about July 30, 2009 - $5,138,117.12.

The Debtor believes that the Preferential Transfers were of a property interest of the Debtor; that the Preferential Transfers were made to or for the benefit of the Defendants at a time in which the Defendants were creditors of the Debtor; that the Preferential Transfers were for or on account of an antecedent debt owed by Debtor to the Defendants before the Preferential Transfers were made; that Preferential Transfers in an amount of not less than $5,494,288.39 were made while the Debtor was insolvent; and the Preferential Transfers enabled the Defendants to receive more than they would otherwise receive if (a) the Debtor's bankruptcy case were a case under chapter 7 of the Bankruptcy Code; (b) the Preferential Transfers had not been made; and (c) the Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.  The Debtor therefore believes that it is entitled to avoid the Preferential Transfers pursuant to 11 U.S.C. § 547(b) and to recover the value of the Preferential Transfers from the Defendants pursuant to 11 U.S.C. § 550(a).

In addition to the Preferential Transfers, during the four (4) year period commencing four (4) years prior to the Petition Date and concluding on the Petition Date (i.e., September 14, 2005 through and including September 14, 2009 (the "Fraudulent Transfer Period"), the Debtor

made a number of other transfers to or for the benefit of the Defendants. During the Fraudulent

Transfer Period, the Debtor caused the following amounts to be deposited into the Oklahoma

escrow account or added to the Oklahoma escrow account as interest or income (the

"Oklahoma Escrow Fraudulent Transfer Deposits"):

     a.     On or about January 17, 2006 - $953,728.86;

     b.     On or about February 28, 2006 - $350,464.54;

     c.     On or about March 3, 2006 - $142,747.89;

     d.     On or about March 21, 2006 - $81,703.43;

     e.     On or about April 3, 2006 - $145,980.05;

     f.     On or about May 4, 2006 - $141,204.07;

     g.     On or about June 5, 2006 - $139,181.15;

     h.     On or about July 3, 2006 - $139,951.93;

     i.     On or about August 4, 2006 - $171,110.13;

     j.     On or about September 6, 2006 - $180,593.41;

     k.     On or about October 3, 2006 - $179,273.98;

     l.     Interest and income for 2006 - $51,812.68;

     m.     Interest and income for 2007 - $94,245.73;

     n.     Interest and income for 2008 - $63,518.93; and

     o.     Interest for and income 2009 - $13,148.99.

During the Fraudulent Transfer Period, the Defendants received the following payments

from the Oklahoma escrow account (the "Oklahoma Escrow Fraudulent Transfer Payments"):

     a.     On or about November 14, 2008 - $223,313;

     b.     On or about December 10, 2008 - $223,313;

     c.     On or about January 8, 2009 - $223,313;

d.  On or about February 6, 2009 - $223,313;

e.  On or about March 9, 2009 - $223,313;

f.  On or about April 9, 2009 - $223,313;

g.  On or about May 11, 2009 - $691,205.82; and

h.  On or about June 10, 2009 - $691,205.82.

During the Fraudulent Transfer Period, the Defendants received the following payment from Debtor's Wells Fargo account (the "Oklahoma Direct Fraudulent Transfer Payment"):

a.  On or about September 29, 2008 - $223,313.

During the Fraudulent Transfer Period, the Debtor caused the following amounts to be deposited into the Florida escrow account or added to the Florida escrow account as interest or income (the "Florida Escrow Fraudulent Transfer Deposits"):

a.  On or about October 4, 2005 - $390,663.57;

b.  On or about November 3, 2005 - $304,700.08;

c.  On or about December 6, 2005 - $491,129.29;

d.  Interest and income for 2005 - $33,828.84;

e.  On or about January 3, 2006 - $565,827.84;

f.  On or about February 28, 2006 - $551,303.73;

g.  On or about March 3, 2006 - $638,689.00;

h.  On or about April 3, 2006 - $623,596.17;

i.  On or about May 4, 2006 - $499,898.99;

j.  On or about June 5, 2006 - $166,172.79;

k.  On or about July 3, 2006 - $394,540.98;

l.  On or about August 4, 2006 - $97,820.43;

m.  On or about September 6, 2006 - $261,885.93;

n.    On or about October 3, 2006 - $261,885.93;

o.    On or about November 3, 2006 - $285,730.29;

p.    On or about December 4, 2006 - $232,815.22;

q.    Interest for 2006 - $205,959.01;

r.    On or about January 4, 2007 - $194,766.52;

s.    On or about February 2, 2007 - $188,010.57;

t.    On or about March 2, 2007 - $103,877.75;

u.    On or about April 2, 2007 - $100,812.17;

v.    On or about May 2, 2007 - $98,189.39;

w.    On or about June 4, 2007 - $96,122.96;

x.    On or about July 3, 2007 - $94,567.47;

y.    On or about August 2, 2007 - $93,319.37;

z.    On or about September 4, 2007 - $87,789.13;

aa.    On or about October 1, 2007 - $85,506.97;

bb.    On or about November 2, 2007 - $83,463.25;

cc.    On or about December 4, 2007 - $80,077.25;

dd.    Interest for 2007 - $288,537.59;

ee.    On or about January 3, 2008 - $1,620,053.17;

ff.    On or about January 3, 2008 - $57,008.52;

gg.    On or about February 2, 2008 - $91,237.36;

hh.    On or about March 5, 2008 - $169,766.20;

ii.    On or about April 2, 2008 - $132,679.03;

jj.    On or about May 2, 2008 - $116,423.91;

kk.    On or about June 3, 2008 - $113,020.00;

23

ll.    On or about July 2, 2008 - $371,270.86;

mm.    On or about August 1, 2008 - $172,548.87;

nn.    On or about August 29, 2008 - $411,736.22;

oo.    On or about October 2, 2008 - $233,177.10;

pp.    On or about November 3, 2008 - $229,743.26;

qq.    On or about December 1, 2008 - $229,799.94;

rr.    Interest and income for 2008 - $288,421.12;

ss.    On or about January 6, 2009 - $217,826.49;

tt.    On or about January 30, 2009 - $196,515.00;

uu.    On or about March 2, 2009 - $188,115.21;

vv.    On or about April 2, 2009 - $186,603.35;

ww.    On or about May 1, 2009 - $196,526.39;

xx.    On or about June 1, 2009 - $135,782.49; and

yy.    Interest and income for 2009 - $23,803.06.

During the Fraudulent Transfer Period, the Defendants received the following payment from the Florida escrow account (the "Florida Escrow Fraudulent Transfer Payment" and, together with the Preferential Transfers, the Oklahoma Escrow Fraudulent Transfer Deposits, the Oklahoma Escrow Fraudulent Transfer Payments, the Oklahoma Direct Fraudulent Transfer Payments, and the Florida Escrow Fraudulent Transfer Deposits, the "Fraudulent Transfer Payments"):

a.    On or about March 12, 2008 - $8,662,246.

The Debtor believes that it received less than reasonably equivalent value in exchange for each and every one of the Fraudulent Transfer Payments in an amount of not less than $17,102,137.03 and/or the obligations that lead to the incurrence of the obligation underlying

each and every one of the Fraudulent Transfers (the "Fraudulent Transfer Obligations" and, together with the Fraudulent Transfer Payments, the "Fraudulent Transfers").

The Debtor believes that it is entitled to avoid the Fraudulent Transfers pursuant to 11 U.S.C. §§ 544 and 548(a)(1)(B) and California Civil Code §§ 3439 et seq. The Debtor believes that it is entitled to recover the Fraudulent Transfers or the value of the Fraudulent Transfers from the Defendants pursuant to 11 U.S.C. § 550(a).

Based on the conduct described above, including the lack of accounting of the basis for CMS's claims and CMS's unlawful termination and/or breach of its contracts with the Debtor, the Debtor disputes CMS's claims, including (1) the amount of CMS's Proof of Claim 87 ("Claim 87") allegedly arising under the Oklahoma Contract, if any, and (2) the amount of Proof of Claim 88 ("Claim 88" and, together with Claim 87, the "Claims") allegedly arising under the Florida contract, if any. The administration of the Debtor's bankruptcy case will be unduly delayed unless and until there is a determination of the rights of the parties and the amounts of the CMS Claims, which represent, by far, the largest potential liabilities of the Debtor's estate.

Based on the Defendants' conduct described herein and in the complaint, including, but not limited to, the Defendants' breach of the Oklahoma and Florida contracts, the Defendants' failure to act in good faith under the contracts, and the Defendants' inequitable conduct leading to the termination of the contracts, the Debtor believes that the Defendants' Claims are unenforceable against the Debtor, in whole or in part, and should be disallowed, in whole or in part, pursuant to 11 U.S.C. § 502(b).

The Debtor's vendors, suppliers, landlords, personal property lessors, service providers, utilities and other parties provided goods and services required for the operation of the Debtor's business and extended credit to the Debtor without knowing that the Defendants could assert a

claim or claims to recover from the Debtor substantially all amounts ever paid by the Defendants to the Debtor and in reliance on the Defendants not asserting such claims, which represent approximately 94% of the unsecured creditor pool and which, if allowed and/or not subordinated, would substantially reduce the distribution to holders of allowed general unsecured claims.

The Debtor's equity holders invested funds into the Debtor required for the operation of the Debtor's business without knowing that the Defendants would assert a claim or claims to recover from the Debtor substantially all amounts ever paid by the Defendants to the Debtor and in reliance on the Defendants not asserting such claims, which, if allowed and/or not subordinated to equity interests, would eliminate any distribution to the holders of equity interests.

Since the Debtor had successfully delivered disease management programs to more than one million program participants nationwide, with documented costs savings for the Debtor's clients as well as improved quality of life and enhanced quality of care for the individuals served, the Debtor was at a loss as to why the Defendants contended that both the Oklahoma program and Florida program were not achieving these same or similar results. However, the Defendants denied, and have contained to deny, the Debtor full access to the control group data from which the Debtor could independently verify the whether the alleged Claims performance guaranty claims are valid. The Defendants' refusal to provide the control group data calls into question the veracity of the Defendants' allegations and unverified conclusions, and suggests that the control group data, if delivered to the Debtor for analysis, would show different results. It is patently unfair and entirely inequitable for the Defendants to assert claims that are years old but not provide a legitimate basis for establishing the claims. The combination of the loss of revenue from the termination of the CMS contracts coupled with the Defendants' alleged

claims against the Debtor, demands for immediate payment of the claims, and refusal to agree to reasonable repayment terms for the alleged claims against the Debtor, was a direct cause of, and forced the Debtor to sell its assets and cease ongoing business operations, which may have provided a means for paying a larger amount to creditors over time than is currently expected. The Debtor believes that the Defendants' conduct was inequitable.  The Debtor believes that the Defendants' conduct resulted in injury to the Debtor's creditors by substantially reducing funds available to pay allowed claims and potentially inflating the pool of allowed claims.  The Debtor believes that the Defendants' conduct conferred an unfair advantage to the Defendants by substantially reducing funds available to pay allowed claims and potentially inflating the pool of allowed claims.  The Debtor believes that equitable subordination of the Defendants' Claims to (a) all allowed claims against the Debtor, and (b) all equity interests in the Debtor would not be inconsistent with the provisions of the Bankruptcy Code.  Accordingly, the Debtor believes that the Defendants' Claims should be subordinated to (a) all allowed claims against the Debtor, and (b) all equity interests in the Debtor pursuant to 11 U.S.C. § 510(c).

### III.  SUMMARY OF THE PLAN OF REORGANIZATION

**A.**    **What Creditors and Interest Holders Will Receive Under The Plan**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority.  The Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each class will receive.

**B.**    **Unclassified Claims**

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Plan Proponents have <u>not</u> placed the following claims in a class.

**1.    Administrative Expenses**

Administrative expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Bankruptcy Code Section 507(a)(2).  The Bankruptcy Code requires that all administrative claims be paid on the Effective Date, unless a particular claimant agrees to a different treatment.

The following chart lists <u>all</u> of the Debtor's §507(a)(2) administrative claims and their treatment under the Plan.[2]

<u>**NON-PROFESSIONAL**</u>

| <u>Name</u> | <u>Alleged Amount</u> | <u>Treatment</u> |
|---|---|---|
| Callahan-Pentz Properties | $9,510.74 – alleged post-petition rent due and owing | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such fees and expenses. |
| Nice Systems | $44,984.38 – alleged post-petition amounts due and owing for goods and services | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such fees and expenses. |
| **TOTAL ALLEGED** | **$54,495.54 est.** | |

<u>**PROFESSIONAL**</u>

| <u>Name</u> | <u>Estimated Amount</u> | <u>Treatment</u> |
|---|---|---|
| Clerk's Office Fees | $0 | Paid in full on the Effective Date out of the Estate Funds. |
| Office of the U.S. Trustee Fees | $0 | Paid in full on the Effective Date out of the Estate Funds. |

---

[2] The chart below is for informational purposes and are not an admission as to the validity of any particular claim.

28

| | | |
|---|---|---|
| Levene, Neale, Bender, Rankin & Brill L.L.P., bankruptcy counsel to the Debtor | $350,000 est. in excess of pre-petition retainer and post-petition payments made.<br><br>This estimate of fees and expenses assumes that the estate has to go to trial on the complaint against the Defendants. The actual fees and expenses will me lower if there is a settlement with the Defendants. | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such fees and expenses. |
| Brinkman Portillo Ronk, PC, counsel to the Committee | | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such fees and expenses. |
| Alvarez & Marsal Healthcare Industry Group, LLC, crisis managers to the Debtor | $300,000 est. in excess of pre-petition and post-petition payments made. | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such fees and expenses. |
| Patton Boggs LLP, special healthcare counsel to the Debtor | $495,000 est. in excess of pre-petition and post-petition payments made.<br><br>This estimate of fees and expenses assumes that the estate has to go to trial on the complaint against the Defendants. The actual fees and expenses will me substantially lower if there is a settlement with the Defendants. | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such fees and expenses. |
| Lucy W. Reckseit, general counsel to the Debtor | $0 – previously paid in full pursuant to final fee application and order thereon. | N/A |
| Tatum, LLC | $57,380.05 for post-petition services rendered. | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such administrative claim. |

| Deloitte, LLP, proposed accountants to the Debtor | $35,000 | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such administrative claim. |
|---|---|---|
| **TOTAL** | **$_____ est.** | |

Bankruptcy Court Approval of Fees Required:

The Bankruptcy Court must approve all professional fees and expenses and administrative claims listed in this chart before they may be paid, as well as approving any previously allowed fees and expenses sought by professionals pursuant to applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Guidelines of the OUST. For all fees except Clerk's Office fees and the fees owing to the OUST, the professional in question must file and serve a properly noticed fee application, and the Bankruptcy Court must rule on the application. Only the amount of fees and expenses allowed by the Bankruptcy Court will be required to be paid under the Plan.

The administrative claim amounts set forth above simply represent the Plan Proponents' best estimate as to the amount of allowed administrative claims estimated to be incurred by professionals prior to the Effective Date of the Plan and that will be paid on the Effective Date or as soon as they are allowed and to the extent allowed by the Bankruptcy Court. The actual administrative claims may be higher or lower. By voting to accept the Plan, creditors are not acknowledging the validity of, or consenting to the amount of, any of these administrative claims, and creditors are not waiving any of their rights to object to the allowance of any of these administrative claims. By voting to accept the Plan, creditors also understand that the final amount of allowed fees and expenses of the professionals employed in this case may be higher or lower than the figures set forth above, which again are just estimates.

## 2.    Priority Tax Claims

Priority tax claims include certain unsecured income, employment and other taxes described by Section 507(a)(8) of the Bankruptcy Code.  The Bankruptcy Code requires that each holder of such a Section 507(a)(8) priority tax claim receive the present value of such claim in regular installment payments in cash (i) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such claim; (ii) over a period ending not later than five (5) years after the Petition Date; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for under the Plan.

The following charts list all of the Debtor's Section 507(a)(8) priority tax claims and their treatment under the Plan:[3]

| Claimant | Alleged Amount | Treatment |
|---|---|---|
| Bexar County | Scheduled - $45,423.67 (Filed Claim No. 45 asserting a secured claim in the amount of $45,423.67) | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such priority tax claim. |
| Franchise Tax Board | Claim No. 84 - $1,669.97 | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such priority tax claim. |
| New Mexico Taxation & Revenue Department | Claim No. 91 - $217,482.31 | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such priority tax claim. |
| Department of Taxation | Claim No. 51 - $12,601.99 | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such |

[3] The chart below is for informational purposes and are not an admission as to the validity of any particular claim.

31

| Claimant | Alleged Amount | Treatment |
|---|---|---|
| | | priority tax claim. |
| Oklahoma Tax Commission | Claim No. 30 - $25,312.60 | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such priority tax claim. |
| Sacramento County Tax Collector | Scheduled - $30,577.46 Claim No. 27 - $30,647.49 | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such priority tax claim. |
| State Board of Equalization | Claim No. 58 - $998.00 | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such priority tax claim. |
| Texas Comptroller of Public Accounts | Claim No. 83 - $6,810.83 | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such priority tax claim. |
| Treasurer Bernalillo County | Claim No. 33 - $8,328.88 | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such priority tax claim. |
| **TOTAL ALLEGED** | **$349,275.74** | |

### C.    Classified Claims and Interests

#### 1.    Classes of Secured Claims

Secured claims are claims secured by liens on property of the estate.   The following charts list <u>all</u> of the Debtor's alleged secured claims and their treatment under the Plan:[4]

---

[4] The chart below is for informational purposes and are not an admission as to the validity of any particular claim.

| CLASS | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 1-A | Alleged Secured Claim of: Iron Mountain Information Management, Inc.<br><br>Collateral: 329 boxes of documents held in storage<br><br>Value of Collateral: Unknown.<br><br>Priority of Security Interest: Unknown, the Debtor disputes any alleged security interest of creditor.<br><br>Alleged Amount of Claim: $329.00 secured $3,608.61 general unsecured | N | Y<br><br>Impaired; allowed claim in this class is entitled to vote on the Plan. | Any allowed secured claim paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such secured claim; any allowed general unsecured claim to be paid in accordance with other allowed Class 3 general unsecured claims. |
| 1-B | Alleged Secured Claim of: Consona Corporation<br><br>Collateral: Deposit for lease of real property<br><br>Value of Collateral: $12,200.85<br><br>Priority of Security Interest: First<br><br>Alleged Amount of Claim: $12,200.85 secured | N | Y<br><br>Impaired; allowed claim in this class is entitled to vote on the Plan. | Any allowed secured claim paid in full by setoff against deposit; any allowed general unsecured claim to be paid in accordance with other allowed Class 3 general unsecured claims. |

| CLASS | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|-------|------------|----------------|----------------|-----------|
| | $137,206.05 general unsecured | | | |
| 1-C | Alleged Secured Claim of: Canon Financial Services, Inc. Collateral: Office Equipment Value of Collateral: Unknown. Priority of Security Interest: Unknown, the Debtor disputes any alleged security interest of creditor, as (1) the underlying agreement between the parties created a leasing relationship, (2) the underlying lease may have been assumed and assigned to StayWell, and/or (3) the underlying lease may have been rejected and the equipment returned to the creditor. Alleged Amount of Claim: $23,064.68 secured $49,649.21 general unsecured | N | Y Impaired; allowed claim in this class is entitled to vote on the Plan. | Any allowed secured claim paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such secured claim; any allowed general unsecured claim to be paid in accordance with other allowed Class 3 general unsecured claims. |
| 1-D | Alleged Secured Claim of: Bexar County | N | Y Impaired; allowed claim | Any allowed secured claim paid in full by setoff against deposit; any allowed general unsecured |

| CLASS | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| | Collateral: Unknown<br><br>Value of Collateral: Unknown<br><br>Priority of Security Interest: Unknown<br><br>Alleged Amount of Claim: $45,423.67 secured | | in this class is entitled to vote on the Plan. | claim to be paid in accordance with other allowed Class 3 general unsecured claims. |
| 1-E | Alleged Secured Claim of: De Lage Landen Financial Services, Inc.<br><br>Collateral: Office Equipment<br><br>Value of Collateral: Unknown.<br><br>Priority of Security Interest: Unknown, the Debtor disputes any alleged security interest of creditor, as (1) the underlying agreement between the parties created a leasing relationship, (2) the underlying lease may have been assumed and assigned to StayWell, and/or (3) the underlying lease may have been rejected and the equipment returned | N | Y<br><br>Impaired; allowed claim in this class is entitled to vote on the Plan. | Any allowed secured claim paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such secured claim; any allowed general unsecured claim to be paid in accordance with other allowed Class 3 general unsecured claims. |

| CLASS | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| | to the creditor. <br><br> Alleged Amount of Claim: <br> $103,543.18 secured | | | |

### 2.        Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Bankruptcy Code Sections 507(a) (1), (4), (5), (6) and (7) are required to be placed in classes.  These types of claims are entitled to priority treatment as follows:  The Bankruptcy Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim.  However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claim.  The following chart lists the class containing the Debtor's (non-tax) priority claims and their treatment under the Plan:

| CLASS | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 2 | Priority claims pursuant to 11 U.S.C. Sections 507(a)(1), (4), (5), (6), and (7) (the "Non-Tax Priority Claims"). <br><br> Estimated Amount of Non-Tax Priority Claims: <br> Based on (1) amendments to the Debtor's Schedule E of priority claims filed with the Court and to be filed with the Court, and (2) an analysis of proofs of | N | Y <br><br> Impaired; allowed claims in this class are entitled to vote on the Plan. | Paid in full out of the Estate Funds on the later of the Effective Date and the date the Bankruptcy Court enters an order allowing such priority claims. |

| | | | |
|---|---|---|---|
| claim filed with the Court, the Debtor estimates that the maximum potential amount of Non-Tax Priority Claims is approximately $21,900 | | | |

### 3.    Class of General Unsecured Claims

General unsecured claims are unsecured claims not entitled to priority under Bankruptcy Code Section 507(a).  The following chart identifies the Plan's treatment of the class containing <u>all</u> of the Debtor's non-priority general unsecured claims (see Exhibit "1" hereto for detailed information about each claim; Exhibit "1" is for informational purposes and is not an admission as to the validity of any particular claim.):

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 3 | All general unsecured claims<br><br>The Debtor included a total of $128,670.92 of non-priority unsecured claims in its bankruptcy schedules.  An additional approximately $118,865.04 of non-priority unsecured claims have been asserted against the Debtor in filed proofs of claim, and claims marked as "unknown" have also been asserted against the | Y<br><br>Impaired; allowed claims in this class are entitled to vote on the Plan. | All Estate Funds remaining after (i) all allowed administrative claims, all allowed priority tax claims, and all allowed priority (non-tax) claims have been paid in full, and (ii) the Reserve (defined below) has been established and funded will be distributed to holders of Class 3 allowed claims on a <u>pro rata</u> basis based upon the allowed amount of their Class 3 claims.<br><br>The Debtor estimates that holders of Class 3 allowed claims will receive a distribution of 8.7% if the $108 million in claims asserted by CMS are allowed in full and will receive a distribution of 100% if the claims asserted by CMS are allowed in the amount of approximately $3.5 million or less. |

Debtor in filed proofs of claim.

Excluding any claim in favor of CMS, the Debtor estimates that there will likely be a total of approximately $6.5 million of allowed non-priority unsecured claims. However, these figures are just estimates. The actual final amount of allowed non-priority unsecured claims may be higher or lower than these figures, and Class 3 claim holders voting on the Plan should not rely on these figures in making their voting decision. Also, to the extent any or all of the approximately $108 million in claims asserted by CMS is ultimately allowed by the Court, that would have a significant impact on the ultimate recovery for other Class 3 claim holders.

The goal of the Plan Proponents is to provide for holders of Class 3 allowed claims to be paid 100% of the amount of their class 2 allowed claims. If sufficient Estate Funds are available, holders of Class 3 allowed claims will also receive post-petition interest, at a rate not to exceed the federal post-judgment interest rate established by 28 U.S.C. § 1961(a).

The distribution to holders of Class 3 allowed claims shall be made within thirty days following the later of (i) the entry of a Bankruptcy Court order resolving the final remaining disputed claim, and (ii) the entry of a Bankruptcy Court order allowing the fees and expenses of the professionals who were employed in this case. The Debtor estimates that the distribution to holders of Class 3 allowed claims will be made by around August 31, 2010, unless the lawsuit against CMS has not been resolved by that time.

The Plan provides that the Post-Confirmation Committee, may, in its discretion, make an interim or partial distribution to holders of allowed Class 3 claims, with an appropriate reserve on account of disputed claims, if doing so appears to be in the best interests of creditors. This could occur, for example, if the lawsuit against CMS has not been resolved by the Plan Effective Date.

The estimated percentage distribution set forth above is just an estimate. The Debtor will not know the actual percentage distribution until the claims objection process has been completed and final applications for approval of the fees and expenses of the professionals employed in this case have been ruled upon. By voting to accept the Plan, Class 3 claim holders are acknowledging that their actual percentage recovery may

| | | | be higher or lower than as estimated above. |

### 4. Class of Interest Holders

Interest holders are the parties who hold an ownership interest (i.e., equity interest) in the Debtor. Since the Debtor is a corporation, the interest holders are the owners of the stock of the Debtor. The following chart identifies the Plan's treatment of the Debtor's interest holders:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 4 | Equity interests in the Debtor. | Y<br><br>Impaired; holders of Class 4 interests are entitled to vote on the Plan. | If there are any Estate Funds remaining after all allowed administrative claims have been paid in full, all allowed priority tax claims have been paid in full, all allowed priority (non-tax) claims have been paid in full, all allowed Class 3 claims have been paid in full, including post-petition interest up to the federal post-judgment interest rate, all post-confirmation expenses of the estate have been paid in full, and the Reserve has been established and funded, then the remaining balance of the Estate Funds will be distributed to holders of Class 4 interests on a pro rata basis based upon the amount and priority of their Class 4 interests.<br><br>Based upon the amount of the CMS claim and the amount of Estate Funds, the only way that there will be sufficient money available to make a distribution to the holders of Class 4 interests is if the claim asserted by CMS is allowed in an amount of less than approximately $3.5 million and/or if the Defendants are ultimately forced to pay money back to the Debtor's estate. This will not be |

| | | | known until the lawsuit against the Defendants has been concluded. |

### D.    Means of Effectuating the Plan and Implementation of the Plan

#### 1.    Funding for the Plan

The Plan will be funded entirely by the Estate Funds and any recovery of funds obtained from the pursuit of any claims by the estate through litigation and avoidance causes of action, including the lawsuit against Defendants.

#### 2.    The Post-Confirmation Committee of Creditors

The confirmation of the Plan by the Court, creates a post-confirmation committee of unsecured creditors ("Post-Confirmation Committee"), consisting of the members of the pre-confirmation committee.

#### 3.    Disbursing Agent

**Appointment of Disbursing Agent.**  David Gottlieb shall be appointed as the Disbursing Agent for the purpose of making all distributions provided for under the Plan ("Distributions") David Gottlieb is a Certified Public Accountant and a chapter 7 Panel Trustee in the Central District of California. Mr. Gottlieb is a partner at Crowe Horwath, LLP, where he specializes in insolvency matters.  Mr. Gottlieb has no financial interest in the pre-confirmation Debtor nor any claim against the Debtor.

All accounts maintained by the Disbursing Agent shall state specifically that they are trust accounts and shall not be commingled.

**Preliminary Schedule of Proposed Distributions.**  The Post-Confirmation Committee and the Disbursing Agent shall prepare a preliminary schedule of proposed Distributions to creditors ("Distribution Schedule"), and provide the Distribution Schedule, at least five (5) days prior to the making of any such Distributions, to the Disbursing Agent and to any party-in-interest who files and serves upon the Committee, after Confirmation, a request for the Distribution Schedule. In the event that the party-in-interest should file and serve an objection to the making of any proposed Distribution set

forth on the Distribution Schedule, the Disbursing Agent shall not make such Distribution until such

objection is resolved, or an order of the Court approving such responsibility of the Disbursing Agent to

determine the accuracy of Distributions to be made pursuant to this Plan, and the Debtor shall have any

responsibility therefore. In the event that the Disbursing Agent so desires, the Disbursing Agent or the

Committee shall be entitled to seek, on an ex parte basis, an order of the Court approving the making of

the Distributions pursuant to the Distribution Schedule.  All checks for Distributions and

correspondence therewith shall reference that the checks must be cashed within 180 days of their date.

All claimants shall be obligated to notify the Disbursing Agent in writing of changes in address and to

cash checks on a timely basis.  The Disbursing Agent shall be entitled, after such 180 day period, to

presume the non-cashing of such distribution checks means that such claimant is no longer entitled

thereto and use such funds for other purposes as provided in this plan.

**Financial Reporting.**  The Disbursing Agent shall file the post-confirmation status reports

every 180 days following the Effective Date. The Disbursing Agent shall provide reports regarding the

funds controlled by the Disbursing Agent and regarding Distributions under this Plan, as may be

reasonably requested by the Post-Confirmation Committee or by any party-in-interest who files and

serves upon the Disbursing Agent, after Confirmation, a request for such reports.

**Employment of Agents.**  The Post-Confirmation Committee may employ and act through

agents and confer upon them such power and authority as may be necessary or advisable to fulfill the

Committee's obligations hereunder, and may compensate such agents from and charge such expenses

to, to the extent such expenses are reasonable, the hourly compensation received by Disbursing Agent,

and the Disbursing Agent may pay such agents from the Plan Fund. The Plan Fund shall be the

exclusive source of funds to pay costs, expenses and fees of the agents or representatives of the

Committee.

**Employment and Compensation of Disbursing Agent.** The Disbursing Agent shall serve with

bond and shall receive reimbursement of expenses incurred and compensation for distribution services

rendered pursuant to the Plan. Expenses shall be reimbursed as incurred, and each time a disbursement

is made, the Disbursing Agent shall be paid compensation in the amount of a reasonable hourly fee. The Disbursing Agent may obtain compensation and reimbursement for its expenses by preparing a billing statement setting forth its entitlement to such compensation and reimbursement of expenses, and by serving such billing statement upon the Post-Confirmation Committee and any other party who requests it. If any party-in-interest fails to object to any such billing statement within seven (7) days after service of such billing statement, the Disbursing Agent shall thereafter immediately be entitled to the compensation requested thereby and the Disbursing Agent shall be entitled to forthwith withdraw from the Administrative Reserve funds sufficient to pay such compensation. If a timely objection to the Disbursing Agent's billing statement is filed by any Post-Confirmation Committee member, the Disbursing Agent shall schedule the matter for hearing before the Court and the Court will determine the merits of the objection. The Plan Fund shall be the exclusive source of payment of the Disbursing Agent's fees, costs, and expenses.

**Compliance with Tax Requirements.**  To the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed upon him by any governmental unit, and all Distributions pursuant to this Plan shall be subject to such tax withholding and reporting requirements.

**Resignation.**  The Disbursing Agent may resign at any time at will upon thirty (30) days' written notice to the Court and to the Post-Confirmation Committee . The resigning Disbursing Agent shall be entitled to retain any compensation paid to it prior to its resignation and shall also be entitled to fees owed to it at the time of its resignation. Upon any resignation of the Disbursing Agent, the Post-Confirmation Committee shall appoint a replacement Disbursing Agent.

**Interim Distributions.**  The Disbursing Agent shall make interim Distributions as the Post-Confirmation Committee deems appropriate, reserving sufficient funds to pay administrative and post-Confirmation expenses for which the estate shall be responsible.

**Employment of Professionals by the Post-Confirmation Committee.**  After the Effective Date, the Post-Confirmation Committee may employ, without further notice, hearing or order of the

Court, Brinkman Portillo Ronk, or any other law firm as his attorneys to investigate and pursue causes of action on behalf of the Post-Confirmation Committee referenced in the Plan. In that capacity, BPR will be able to efficiently continue in this capacity for the disbursing agent Post-Confirmation Committee. In addition, the Post-Confirmation Committee may employ such attorneys, accountants and other professionals as he may desire to render services on such terms as it he deems reasonable. Any professional employed by the Post-Confirmation Committee after the Effective Date shall be entitled to obtain payment of its fees and costs as a post-effective Date operating expense without the need for any further order of the Court with respect thereto; such payments shall be made exclusively from the Plan Fund.

### Post-confirmation Professional Fees

Any professional seeking compensation of post-Effective Date fees and costs shall submit to the Disbursing Agent and serve upon the Post-Confirmation Committee a billing statement which shall include documentation of fees and costs. If such parties fail to object to any such billing statement within seven (7) days after the service of such billing statement, the fees and costs requested thereby shall be deemed allowed, and the professional shall thereafter immediately be entitled to the compensation requested thereby shall be deemed allowed, and the professional shall thereafter immediately be entitled to the compensation requested thereby and the Disbursing Agent shall forthwith pay such compensation to the professional from the Administrative Reserve. If a timely objection to the professional's billing statement is timely served by any such party and no consensual resolution can be reached, the professional may schedule the matter for hearing before the Court and the Court will determine the merits of the objection. The Disbursing Agent shall pay to the professionals such amount of fees and expenses that are not in dispute, reserving the disputed amounts for resolution by the Court or the parties.

If the Disbursing Agent should fail to pay the post-Effective Date fees and costs of any professional within fifteen (15) days after the date upon which such professional is entitled to obtain payment of such fees and costs hereunder, the professional shall be entitled to seek an order of the Court

requiring the Disbursing Agent to forthwith pay such fees and costs to the professional by filing a motion to compel the payment of the professional's claim.

### 4. Compromise Procedures

The settlement discretion conferred in this Plan authorize the Post-Confirmation Committee to consummate settlements within the following ranges and procedural guidelines:

**(1) Avoidance Actions Less than $20,000 and Claim Objections Less than $75,000**

The Post-Confirmation Committee will be free to consummate settlements in this class in its business judgment without further notice or court orders.

**(2) Avoidance Actions Between $20,000 and $50,000 and Claim Objections between $75,000 and $200,000**

As to Avoidance Actions, provided that a proposed settlement agreement represents a minimum recovery of ate least 50% of the total amount sought, the Post-Confirmation Committee will be free to consummate settlements in its business without further notice or court orders. As to Claim Objections, provided that a proposed settlement represents a minimum reduction of a least 50% of the amount objected to, the Post-Confirmation Committee will be free to consummate settlements in its business judgment without further notice or court orders. All other proposed settlements in this class will be notice to the 20 largest unsecured creditors and to creditors who have requested special notice under Bankruptcy Rule 2002 (collectively the "Notice Parties") as outlined below.

**(3) Avoidance Greater than $50,000 and Claim Objections Greater Than $200,000**

All proposed settlements in this class will be sent to the Notice Parties.

The notice shall include the following information

(i)    A general description of the Avoidance Action or Claim Objection including the name of the party and the face amount of the avoidance action or claim;

(ii)    The terms of the compromise of the Avoidance Action or Claim Objection; and

(iii)    The reason for the compromise of the Avoidance Action or Claim Objection and business justification therefore.

Unless a Notice Party files with the Court and serves upon the Post-Confirmation Committee an objection to the proposed compromise within 15 days of service of the noticed settlement, the Post-Confirmation Committee shall be free to consummate the compromise without necessity of further notice or order of the Court.

If an objection is timely filed by a Notice Party, a hearing on the proposed compromise must be scheduled by the Notice Party and noticed to the Post-Confirmation Committee , the Office of the United States Trustee and each objecting Notice Party.

### 5.   Objections to Claims

The claims bar date in this case was January 22, 2010.  Attached as Exhibit "1" to this Disclosure Statement is a claims chart, which identifies all of the Debtor's scheduled claims and all proofs of claim which have been filed against the Debtor.   The Post-Confirmation Committee  will file objections to all claims which are inconsistent with the Debtor's books and records unless the Post-Confirmation Committee  deems the inconsistency to be insignificant. As provided by Section 502(c) of the Bankruptcy Code, the Bankruptcy Court may, upon required notice and motion, estimate any contingent or unliquidated disputed claim for purposes of confirmation of the Plan.  The Post-Confirmation Committee , as the case may be, will have the authority to file any objections to claims following the confirmation of the Plan, and the Bankruptcy Court shall retain jurisdiction over the Debtor, the Reorganized Debtor, the Post-Confirmation Committee  and this case to resolve such objections to claims following the confirmation of the Plan.  Nothing contained in the Plan shall constitute a waiver or release by the Debtor, the Reorganized Debtor or the Post-Confirmation Committee  of any rights of setoff or recoupment, or of any defense, the Debtor, or the Post-Confirmation Committee  may have with respect to any claim.

**6. Investigation and Prosecution of Claims and Avoidance Actions**

The Post-Confirmation Committee will analyze all payments made within ninety-days prior to the Petition Date for non-insiders, as well as all payments made within one-year prior to the Petition Date for insiders, to determine whether any payments made are avoidable as preferences. If appropriate to do so, the Post-Confirmation Committee will prosecute such avoidance causes of action for the benefit of holders of Class 3 allowed claims. Attached as Exhibit "2" to this Disclosure Statement is a chart which identifies all payments made within ninety-days prior to the Petition Date to non-insiders and one-year prior to the Petition Date to insiders and which could therefore possibly be subject to avoidance as preferential transfers. The Post-Confirmation Committee also reserves the right to investigate and pursue any fraudulent transfer or other avoidance causes of action arising under Chapter 5 of the Bankruptcy Code as it deems appropriate.

**7.    Payment of Professional Fees and Expenses Incurred after the Effective Date**

On the Effective Date, a reserve (the "Reserve" or "Plan Fund") will be established out of the Estate Funds to pay the fees and expenses of counsel to the Reorganized Debtor and to the Post-Confirmation Committee which are estimated to be incurred after the Effective Date, including to address post-Effective Date administrative matters, to close out the Debtor's Chapter 11 case through the entry of a final decree, to pay any post-confirmation fees owing to the OUST, to file final tax returns, and to effectuate a corporate dissolution of the Debtor. The Disbursing Agent shall have the authority to pay all such fees and expenses out of the Reserve without any further order of the Bankruptcy Court. The amount of the Reserve will depend primarily upon the status of the lawsuit against Defendants at the time of Plan confirmation. Prior to the Plan confirmation hearing, the Debtor and the Post-Confirmation Committee will

file a notice with the Court identifying the amount of the Reserve.

### 8.    Exculpations and Releases

To the maximum extent permitted by law, neither the Debtor, the Reorganized Debtor, the Post-Confirmation Committee , nor any of their employees, officers, directors, shareholders, agents, members, representatives, or professionals employed or retained by any of them, whether or not by Bankruptcy Court order, shall have or incur liability to any person or entity for an act taken or omission made in good faith in connection with or related to the formulation and implementation of the Plan, or a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of the Plan, or the consummation and implementation of the Plan and the transactions contemplated therein.

### 9.    Injunctions

The Plan Confirmation Order shall enjoin the prosecution, whether directly, derivatively or otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest released, discharged or terminated pursuant to the Plan.  Except as provided in the Plan or the Plan Confirmation Order, as of the Effective Date, all entities that have held, currently hold or may hold a claim or other debt or liability that is discharged or an interest or other right of an equity security holder that is extinguished pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, the Post-Confirmation Committee , or their property, members, officers, or directors, agents or representatives, including professionals employed on behalf of the Debtor's estate, on account of any such discharged claims, debts or liabilities or extinguished interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner

any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor; and (v) commencing or continuing any action in any manner, in any place, that does not comply with or is inconsistent with the provisions of the Plan.  By accepting distributions pursuant to the Plan, each holder of an allowed claim receiving distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in this Section.

### 10.    Miscellaneous.

 Under the Plan, the Debtor will turn over the cash in the bank accounts to the Disbursing Agent on behalf of the Post-Confirmation Committee , and Debtor has no duties to make scheduled payments. .Any creditor shall have the right to request information from the Committee or its counsel regarding the status of the liquidation or the status of the disbursements to the creditors. After the receipt of such a request from a creditor in writing, the Committee's or its counsel shall have thirty days to prepare and send a written response to the inquiring creditor. If the creditor does not receive a timely response to his/her inquiry, then such creditor shall have the right to file a motion with the Bankruptcy Court to compel a response from the Committee.

### E.    Risk Factors

The Plan Proponents do not believe that there is any risk of non-performance of the Plan since the Plan consists of the distribution of the Estate Funds (which already exist) in accordance with the terms of the Plan.  The performance of the Plan is therefore not subject to any other variables.  The primary unknown at this point is what the outcome of the lawsuit against the Defendants will be which, given the magnitude of the claims asserted by CMS, may have a substantial impact upon the ultimate distribution to be made to holders of Class 3 allowed claims and to holders of Class 4 equity interests if holders of Class 3 allowed claims are ultimately paid in full.

**F.      Other Provisions of the Plan**

**1.      Executory Contracts and Unexpired Leases**

**a)      Assumptions**

The Debtor will not be assuming any executory contracts or unexpired leases under the Plan.

**b)      Rejections**

All of the Debtor's executory contracts and unexpired leases which have not been previously rejected will be deemed rejected on the Effective Date.  THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF AN UNEXPIRED LEASE OR EXECUTORY CONTRACT WHICH IS REJECTED ON THE EFFECTIVE DATE WILL BE THIRTY (30) DAYS AFTER THE DATE OF ENTRY OF THE PLAN CONFIRMATION ORDER.  Any claim based on the rejection of an unexpired lease or executory contract will be barred if the proof of claim is not timely filed, unless the Bankruptcy Court orders otherwise.  To the extent any claims are filed based on the rejection of executory contracts or unexpired leases, such claims shall constitute and be treated as administrative claims to the extent such claims are allowed, if at all, for any post-petition amounts due, and otherwise as class 3 claims.

**2.      Changes in Rates Subject to Regulatory Commission Approval.**

The Debtor is not subject to governmental regulatory commission approval of its rates.

**3.      Retention of Jurisdiction.**

After confirmation of the Plan and occurrence of the Effective Date, in addition to jurisdiction which exists in any other court, the Bankruptcy Court will retain such jurisdiction as is legally permissible including for the following purposes:

a.      to resolve any and all disputes regarding the operation and interpretation

49

of the Plan and the Plan Confirmation Order;

        b.    to determine the allowability, classification, or priority of claims and interests upon objection by the Debtor, the Post-Confirmation Committee  or by other parties in interest with standing to bring such objection or proceeding, including to adjudicate the lawsuit against Defendants to final order;

        c.    to determine the extent, validity and priority of any lien asserted against property of the Debtor or property of the Debtor's estate;

        d.    to construe and take any action to enforce the Plan, the Plan Confirmation Order, and any other Bankruptcy Court order, issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan, the Plan Confirmation Order, and all matters referred to in the Plan and the Plan Confirmation Order, and to determine all matters that may be pending before the Bankruptcy Court;

        e.    to determine any and all applications for allowance of compensation and reimbursement of expenses of professionals for the period on or before the Effective Date;

        f.    to determine any request for payment of administrative expenses;

        g.    to determine motions for the rejection, assumption, or assignment of executory contracts or unexpired leases filed before the Effective Date and the allowance of any claims resulting therefrom;

        h.    to determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted during the pendency of this case whether before, on, or after the Effective Date;

        i.    to determine such other matters and for such other purposes as may be provided in the Plan Confirmation Order;

        j.    to modify the Plan under Section 1127 of the Bankruptcy Code in order

to remedy any apparent defect or omission in the Plan or to reconcile any inconsistency in the Plan so as to carry out its intent and purpose;

k.      except as otherwise provided in the Plan or the Plan Confirmation Order, to issue injunctions, or to take such other actions or make such other orders, as may be necessary or appropriate to restrain interference with the Plan or the Plan Confirmation Order, or the execution or implementation by any person or entity of the Plan or the Plan Confirmation Order;

l.      to issue such orders in aid of consummation of the Plan or the Plan Confirmation Order, including approval of distributions under the Plan, notwithstanding any applicable nonbankruptcy law, with respect to any person or entity, to the fullest extent authorized by the Bankruptcy Code or Bankruptcy Rules; and

m.      to enter a final decree closing this Chapter 11 case.

**G.      Tax Consequences of Plan.**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.   The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues the Plan may present to the Debtor.   The Debtor CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all of the tax implications of any action.

The Debtor does not anticipate that confirmation of the Plan will have a significant or material effect on its tax liability.   The Debtor makes no representations regarding the potential tax consequences to creditors or interest holders.

## IV.  CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic plan confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims.  The Plan Proponents CANNOT and DO NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm a plan. Some of the requirements include that the plan must be proposed in good faith, relate to the acceptance of the plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the plan is feasible.  These requirements are <u>not</u> the only requirements for confirmation.

### A.    Who May Vote or Object

#### 1.    Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan, but, as explained below, not everyone is entitled to vote to accept or reject the Plan.

#### 2.    Who May Vote to Accept/Reject the Plan

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim or interest which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

##### a)    What Is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to have the right to vote.  Generally, any proof of claim or interest will be allowed, unless a

party in interest files an objection to the claim or interest.  When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE ON ACCOUNT OF PRE-PETITION CLAIMS WAS JANUARY 22, 2010.  A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed.  A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.  An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

### b)        What Is an Impaired Claim/Interest

As noted above, an allowed claim or interest has the right to vote only if it is in a class that is <u>impaired</u> under the Plan.  A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.  For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.  The Plan Proponents believe that members of Classes 1-A, 1-B, 1-C, 1-D, 1-E, 2, 3 and 4 are entitled to vote to accept or reject the Plan.  Parties who dispute the Plan Proponents' characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Plan Proponents have incorrectly characterized the class.

### 3.        Who Is <u>Not</u> Entitled to Vote

The following four types of claims are <u>not</u> entitled to vote:  (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to

Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan.  Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4.    Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject the Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### 5.    Votes Necessary to Confirm the Plan

If impaired classes exist, the Bankruptcy Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed in Section IV.A.8 below.

### 6.    Votes Necessary for a Class to Accept the Plan

A class of claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted on the plan, voted in favor of the plan.  A class of interests is considered to have accepted a plan when at least two-thirds (2/3) in amount of the interest-holders of such class which actually

voted on the plan, voted to accept the plan.

### 7.    Treatment of Non-Accepting Classes

As noted above, even if <u>all</u> impaired classes do not accept the Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code.  The process by which non-accepting classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting classes of claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

### 8.    Request for Confirmation Despite Nonacceptance by Impaired Class(es)

The Plan Proponents will ask the Bankruptcy Court to confirm the Plan by cramdown on any class who does not vote to accept the Plan.

### B.    Liquidation Analysis

Another confirmation requirement is the best interest of creditors test (the "Best Interest Test"), which requires a liquidation analysis.  Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value that is not less than the amount that such holder would receive or retain if the debtor was liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the debtor's assets are usually sold by a Chapter 7 trustee.  Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien.  Administrative claims are paid next.  Next, unsecured creditors are paid from any

remaining sales proceeds, according to their rights to priority.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims.  Finally, interest holders receive the balance, if any, that remains after all creditors are paid in full.

For the Bankruptcy Court to be able to confirm the Plan, the Bankruptcy Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation of the Debtor.

Since this is a liquidation plan where all of the Estate Funds are being distributed to creditors and then to equity holders if all creditors are paid in full in accordance with the priorities established by the Bankruptcy Code, the economic result of the Plan is the same as it would have been if there was a Chapter 7 liquidation of the Debtor except that all of the costs (including the fees of the Chapter 7 trustee and the professionals employed by the Chapter 7 trustee) of a Chapter 7 are avoided through the confirmation of the Plan.  As a result, there can be no question that all creditors and equity holders will receive *not less* under the Plan than they would receive in a Chapter 7 liquidation of the Debtor, thereby satisfying the Best Interest Test.

## C.    Feasibility

Another requirement for Plan confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis.  The first aspect considers whether the Committee and its Disbursing Agent will have enough cash on hand on the Effective Date to pay all the claims and expenses which are entitled to be paid on the

Effective Date.  Since all payments to be made under the Plan will be funded out of the Estate Funds (which already exist), there is no issue as to the cash funding feasibility of the Plan.

The second aspect considers whether the Committee and its Disbursing Agent will have enough cash over the life of the Plan to make the required Plan payments.  Since the Plan is a liquidating plan of reorganization, this aspect of the feasibility analysis is irrelevant and not applicable to this case.

<h1 style="text-align:center">V.    EFFECT OF CONFIRMATION OF PLAN</h1>

**A.    No Discharge**

Since this is a liquidating plan of reorganization, the Debtor will not be receiving a discharge following confirmation of the Plan pursuant to 11 U.S.C. § 1141.

**B.    Revesting of Property in the Post-Confirmation Committee**

Upon the confirmation of the Plan all the property of the Debtor revests, on the Effective date in the Post-Confirmation Committee. Without limiting the generality of the foregoing, the confirmation of the Plan vests in the Post-Confirmation Committee , as of the Effective Date, the right to pursue all claims of the estate, including, but not limited to, avoidance actions pursuant to Chapter 5 of the Bankruptcy Code.

**C.    Post-Confirmation Status Report**

Within 120 days following the entry of the Plan Confirmation Order, unless a final decree closing the Debtor's Chapter 11 case is first entered, the Disbursing Agent shall file a status report with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on the OUST, the Post-Confirmation Committee  and its counsel, and those parties who have requested special notice.  Further status reports shall be filed every 120 days and served on the same entities until a final decree is entered closing the Debtor's Chapter 11 case, unless otherwise ordered by the

Bankruptcy Court.

### D.    Post-Confirmation Conversion/Dismissal

A creditor or any other party in interest may bring a motion to convert or dismiss this case under Section 1112(b) of the Bankruptcy Code after the Plan is confirmed if there is a default in performing the Plan.  If the Bankruptcy Court orders this case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate, and the automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Bankruptcy Court during this case.  The Plan Confirmation Order may also be revoked under very limited circumstances.  The Bankruptcy Court may revoke the Plan Confirmation Order if it was procured by fraud and if a party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the Plan Confirmation Order.

### E.    Payment of United States Trustee Fees

The Debtor and the Disbursing Agent, as the case may be, shall be responsible for the timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6) until a final decree is entered closing the Debtor's Chapter 11 case.  After the Effective Date, the Disbursing Agent shall file with the Bankruptcy Court and serve on the OUST quarterly financial reports regarding all income and disbursements, including all Plan payments, for each quarter (or portion thereof) that this case remains open.

### F.    Final Decree

Once the Debtor's estate has been substantially consummated as referred to in 11 U.S.C. § 1101(2), the Debtor, the Disbursing Agent, the Post-Confirmation , or any other party as the Bankruptcy Court shall designate in the Plan Confirmation Order, shall file a motion

with the Bankruptcy Court to obtain a final decree to close this case.

Dated:  May 3, 2010                           LEVENE, NEALE, BENDER, RANKIN
                                                      & BRILL L.L.P.

                                              By: _/s/ Ron Bender_____
                                                      Ron Bender
                                                      Todd M. Arnold
                                                      Attorneys for Chapter 11 Debtor
                                                      and Debtor in Possession and Co- Plan
                                                      Proponent

Dated:  May 3, 2010                           BRINKMAN PORTILLO RONK, PC

                                              By: _/s/ Daren R. Brinkman_____
                                                      Daren R. Brinkman
                                                      Laura Portillo
                                                      Attorneys for Official Committee of
                                                      Unsecured Creditors and
                                                      Co-Plan Proponent

59

| In re: | | |
|---|---|---|
| LIFEMASTERS SUPPORTED SELFCARE, INC. | | CHAPTER  11 |
| | Debtor(s). | CASE NUMBER: Bk-N: 8:09-bk-19722 ES |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

> 4333 Park Terrace Dr., Suite 205, Westlake Village, CA 91361

The foregoing document described as **FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **May 3, 2010,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒   Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On **May 3, 2010,** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

By U.S. Mail

The Hon. Erithe A. Smith
United States Bankruptcy Court
411 West Fourth Street
Santa Ana, California 92701

By U.S. Mail

George D. Pillari/Brian Buchanan
Alvarez & Marshall Healthcare Industry Group, LLC
100 Pine Street, Suite 900
San Francisco, California 94111

☒   Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

☐   Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 3, 2010 | Orson Baumann | /s/ Orson Baumann |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                          **F 9013-3.1**

| In re: | | CHAPTER  11 |
|---|---|---|
| LIFEMASTERS SUPPORTED SELFCARE, INC. | Debtor(s). | CASE NUMBER: Bk-N:  8:09-bk-19722 ES |

## ADDITIONAL SERVICE LIST

### Served by E-mail via the Court's Notice of Electronic Filing ("NEF"):

1. Todd M Arnold     tma@lnbrb.com
2. Catherine E Bauer     Catherine.Bauer@usdoj.gov
3. Ron Bender     rb@lnbrb.com
4. Neil Jon Bloomfiedd     njbloomfield@njblaw.com
5. Daren Brinkman     office@brinkmanlaw.com
6. Eugene Chang     echang@steinlubin.com
7. Nancy S Goldenberg     nancy.goldenberg@usdoj.gov
8. Peter J Gurfein     pgurfein@akingump.com
9. Jay W Hurst     jay.hurst@oag.state.tx.us, sherri.simpson@oag.state.tx.us
10. Gerald P Kennedy     gpk@procopio.com
11. Leib M Lerner     leib.lerner@alston.com
12. Julie E Oelsner     joelsner@weintraub.com
13. Laura J Portillo     office@brinkmanlaw.com
14. Kevin C Ronk     Kevin@brinkmanlaw.com
15. James R Selth     jim@wsrlaw.net
16. Derrick Talerico     dtalerico@loeb.com, kpresson@loeb.com;ljurich@loeb.com
17. Matthew J Troy     matthew.troy@usdoj.gov
18. United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov
19. Wendy M Warren     wwarren@bassberry.com
20. Marc J Winthrop     mwinthrop@winthropcouchot.com, pj@winthropcouchot.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                 **F 9013-3.1**